```
 1                 UNITED STATES OF AMERICA
                 UNITED STATES DISTRICT COURT
 2                MIDDLE DISTRICT OF FLORIDA

 3                         -  -  -
 4             HONORABLE JAMES S. MOODY, JR.
            UNITED STATES DISTRICT JUDGE PRESIDING
 5                         -  -  -

 6   UNITED STATES OF AMERICA,   )
                                 )
 7          PLAINTIFF,           )
                                 )
 8   VS.                         ) NO. 8:15-cr-183-T-30AEP
                                 )
 9   D. ANDA NORBERGS,           )
                                 )
10          DEFENDANT.           )
     _____)
11

12
                          TRIAL - DAY 7
13                        **EXCERPT**

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS
                    NOVEMBER 16, 2016
15                    TAMPA, FLORIDA

16

17
            MELISSA A. PIERSON, CA CSR 12499,
18               IL CSR 084.003138, RPR
            FEDERAL OFFICIAL COURT REPORTER
19          801 N. FLORIDA AVENUE, 2ND FLOOR
                  TAMPA, FLORIDA 33602
20              PH:  (813)301-5336
                USDCtranscripts@gmail.com
21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL:

 2    ON BEHALF OF PLAINTIFF:
              A. LEE BENTLEY, III
 3            UNITED STATES ATTORNEY
              BY:  MR. ADAM SALTZMAN, ESQ.
 4            BY:  MR. JAY TREZEVANT, ESQ.
              ASSISTANT UNITED STATES ATTORNEYS
 5            400 N. TAMPA STREET
              ST. 3200
 6            TAMPA, FL 33602
              (813) 274-6000
 7            ADAM.SALTZMAN@USDOJ.GOV

 8

 9    ON BEHALF OF DEFENDANT:
              FEDERAL PUBLIC DEFENDERS
10            BY:  MS. JENNY L. DEVINE, ESQ.
              400 N. TAMPA STREET
11            ST. 2700
              TAMPA, FL 33602
12            (813) 228-2715
              JENNY_DEVINE@FD.ORG

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I-N-D-E-X

2     **WITNESS:**

3     D. Anda Norbergs

4              Direct Examination by Mr. Sartis:          4

5

6

7

8

9

10                          **E X H I B I T S**

11    Government's Exhibit No. 41A-1                       77

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | TAMPA, FLORIDA; NOVEMBER 16, 2016 |
| 2 | - - - |
| 3 | (COURT IN SESSION AT 2:01 P.M.) |
| 4 | * * * * |
| 5 | THE COURT:  Call your next witness, please. |
| 6 | MR. SARTIS:  Your Honor, the defense would call |
| 7 | Dr. D. Anda Norbergs. |
| 8 | MADAM CLERK:  Please raise your right hand. |
| 9 | THE WITNESS:  I do. |
| 10 | (Witness sworn.) |
| 11 | MADAM CLERK:  Please state your name and spell your |
| 12 | first and last name for the record. |
| 13 | THE WITNESS:  Diana Anda Norbergs, D-I-A-N-A, |
| 14 | A-N-D-A, Norbergs, N-O-R-B-E-R-G-S. |
| 15 | MADAM CLERK:  Thank you.  You may have a seat. |
| 16 | THE COURT:  Proceed. |
| 17 | MR. SARTIS:  Before we get there, can you switch me |
| 18 | over to this portion so I can make sure this is working? |
| 19 | Perfect.  Thank you. |
| 20 | **DIANA ANDA NORBERGS** |
| 21 | Called as a witness herein, having been first duly sworn, |
| 22 | was examined and testified as follows: |
| 23 | **DIRECT EXAMINATION** |
| 24 | BY MR. SARTIS: |
| 25 | Q.  Good afternoon, Dr. Norbergs. |

1    **A.**   Hello.

2    **Q.**   Tell the Jury, please, what it is that you do?

3    **A.**   I'm a medical oncologist and hematologist.

4    **Q.**   And are you still in the practice, as you sit here, over

5    the course of the last week or two?

6    **A.**   No.

7    **Q.**   Are you still in practice at all?

8    **A.**   No.  I retired.

9    **Q.**   When did you retire?

10    **A.**   2014.

11    **Q.**   Okay.  Tell the Jury, please, your education.  Start,

12    please, with high school, presuming you went to high school.

13    **A.**   Yes.  Um, after high school, at age 17, I was admitted

14    to the University of Missouri Med School, and finished med

15    school, and then I did my internship and residency at New

16    York Medical College in New York City, and then after that I

17    did my hematology/oncology fellowship at Cornell University

18    in New York.

19    **Q.**   At the time, prior to your retirement, were you board

20    certified in any area of medicine?

21    **A.**   I was board certified in internal medicine and medical

22    oncology.

23    **Q.**   Do you have a license in Florida?

24    **A.**   Yes.

25    **Q.**   To practice medicine, I should say.  When did you get

1  that license?

2  **A.**  Probably about 1988, '89.

3  **Q.**  And tell the Jury, please, your work experience, kind of

4  explain to them where you worked as a doctor?

5  **A.**  Well, fellowship training is working, basically.  I was

6  an internist in a specialty, so I worked in New York during

7  that time.  After my fellowship I worked as an Assistant

8  Professor of Medicine at New York Medical College where I

9  taught medical students.  I lectured.  I did research and

10  also saw patients.

11       After I left being in New York to move to my family

12  -- closer to my family in Florida, that was about 1989, I

13  then was -- I was hired, while I was in New York, by *MOOES

14  clinic, which is a multi-subspecialty/specialty clinic, and

15  when that clinic dissolved or was dissolving, a group of us

16  doctors, medical oncologists, other medical oncologists and

17  radiation oncologists decided to form a small cancer center.

18  After the sale of that cancer center I was then a private --

19  in private practice, which was about 2007, which was East

20  Lake Oncology.

21  **Q.**  Let's talk about East Lake Oncology, and let me focus

22  you on the years 2009 through 2012.  Okay.  Were you licensed

23  to practice medicine in Florida?

24  **A.**  Yes.

25  **Q.**  Did you have the ability to bill Medicare?

1   **A.**   Yes.

2   **Q.**   Did you have the ability to bill Medicaid?

3   **A.**   No.

4   **Q.**   Why is that?

5   **A.**   At that time I chose not to bill Medicaid.

6   **Q.**   Let me ask you, describe for the Jury your East Lake

7   Oncology practice.  Start with, I guess, the hierarchy of the

8   personnel you had?

9   **A.**   Start with personnel.  Um, my office was a small office.

10   Um, I always felt it was important to have hands-on with my

11   patients, and I wanted them to feel comfortable and at home.

12   Um, so I usually had one full time employee at the front desk

13   whom most of my patients always recognized, and then one

14   part-time employee who varied.  Um, I had one full-time

15   billing person, and one part-time billing person.  The

16   full-time usually was what -- who patients would get to know.

17          Then I had, um -- in the beginning I had -- in '09

18   I had my chemo nurses, which were two RN's.  One was Melissa.

19   Melissa was my -- a chemo nurse full-time, and then Peggy was

20   part-time, and Melissa was studying to go to nurse

21   practitioner school, so then she left.

22          I had a lab technologist, and then an office nurse

23   or a technician that would draw the blood and would take care

24   of patients.

25   **Q.**   Okay.  Did you have an office manager?

1    **A.**    Initially I did not have an office manager.

2    **Q.**    And at some point that changed?

3    **A.**    Yes.

4    **Q.**    And Ms. Krouse is that person that took that position?

5    **A.**    Yes, in 2011.

6    **Q.**    Tell the Jury about the doctors that were part of East

7    Lake Oncology from '09 to 2012?

8    **A.**    I was partially disabled and, um, I could not work all

9    day.  So I had hired Dr. Raj, who was one -- also, she had

10   children and a child, and she also wanted to work part-time,

11   so kind of like co-sharing until '11, '12, I'm not -- yes.

12   **Q.**    How did somebody -- a patient find their way to your

13   office?

14   **A.**    Usually they were referred by a primary care physician

15   or a subspecialty.  I would also have some of my patients

16   would have their friends or church people in their church go

17   see me as a second opinion, or um, most generally it was by a

18   physician referral.

19   **Q.**    And when somebody was referred to your office at East

20   Lake Oncology, did that person already have a cancer

21   diagnosis, for example?

22   **A.**    Yes.

23   **Q.**    Okay.  And walk the Jury through the patient experience

24   as they come to your office for the first time?

25   **A.**    For the first time what would happen is usually the

1     referring doctor would call -- his staff would call my staff

2     to ask for an appointment and to obtain medical records.  My

3     patients would get an appointment, temporary appointment and

4     then the medical records that were obtained were reviewed by

5     me.  If it was an urgent diagnosis like somebody had a

6     platelet -- whatever, if it was urgent, I would place the

7     patient in immediately.  If it was somebody who needed

8     testing, or laboratory testing, or some more records, then I

9     would wait for those records.

10            Once that was completed they would come into my

11    office.  I would then see them in the exam room.  They would,

12    um -- I would spend approximately an hour-and-a-half,

13    sometimes longer if they didn't understand their diagnosis.

14    I felt that a patient should always understand their

15    diagnosis because the more they understand their disease

16    process, the more they will be able to have less anxiety and

17    less fear of their diagnosis.

18    **Q.**    Let me stop you for a second.  Your practice of meeting

19    with the patient for that hour-and-a-half or however long --

20    amount of time that was, was that something that was standard

21    from your perspective in your industry?

22    **A.**    No.

23    **Q.**    Did you meet people more or less?

24    **A.**    I met with patients more.

25    **Q.**    Okay.  Continue.  After your initial meeting what then

1   occurred?

2   **A.**   It depended on what the patient was there for.  Some of

3   my blood patients then would have testing or follow-up.  Some

4   of my cancer patients the same thing, they may need tests,

5   and we made sure that we would -- we would -- our staff made

6   sure that we would always schedule the tests for them because

7   I felt patients are scared enough in the doctor's office.

8   They won't remember to schedule anything.

9   **Q.**   Now, was chemotherapy a part of what you do as an

10  oncologist, correct?

11  **A.**   Correct.

12  **Q.**   Now, does every patient receive chemotherapy?

13  **A.**   No.

14  **Q.**   Okay.  How is that decision made?

15  **A.**   That decision is made by guidelines, by my training, by

16  peer review journals, by multiple stuff -- multiple evidence.

17  **Q.**   When it came to prescribing medication, walk the Jury,

18  please, through the process of prescription for chemotherapy?

19  **A.**   When I prescribed medication, I would see the patient.

20  I would determine, like, if it was a follow-up patient that

21  received chemotherapy before and needed it again, I would

22  make sure they didn't have significant side effects, that

23  their blood counts weren't too low or they couldn't receive

24  it.  So those patients I would see and then I would write on

25  our -- we have a charge slip that I would write the order of

1    and the milligrams of the drugs.

2            That -- afterwards usually if it's a follow-up

3    patient, I would take the patient to the chemotherapy room

4    with the charge bill and give it to the nurse at that time.

5    If adjustments needed to be done, I would do them, calculate

6    them and then give them a charge slip.  Then the chemotherapy

7    nurse would infuse the chemotherapy.

8    **Q.**   Were -- was the mixes of the chemotherapy agent -- was

9    the mixing of the chemotherapy agent something that you,

10   hands-on, did?

11   **A.**   No.

12   **Q.**   Who was responsible for that?

13   **A.**   It was the chemotherapy nurses.

14   **Q.**   And did you supervise them in the mixing of these

15   products?

16   **A.**   Supervise them in that I was in the office.  I had

17   trained nurses who were experienced.  So if they had

18   questions, they would come to me.

19   **Q.**   Okay.  I'll ask you the question again about infusions.

20   Did you actually perform the infusion with chemotherapy for

21   the patient?

22   **A.**   I do not personally infuse the chemotherapy.

23   **Q.**   Is that the responsibility of the chemotherapy nurses?

24   **A.**   Yes.

25   **Q.**   Let's discuss the process of ordering drugs into East

1   Lake Oncology.  I'll ask you to tell the Jury from the time

2   you select a prescription how was the process?

3   **A.**   Once I select the medication and the -- usually then it

4   would go back to the chemotherapy nurses.  They would make an

5   appointment for the patient, so therefore, we would know when

6   they would be coming for an infusion.  This was usually with

7   new patients.  So the nurses -- as I always said, the nurses

8   are in charge of their own schedule.  I'm not going to do

9   their scheduling.

10          Then the nurses would tell us what they would need

11  for that week, whether they needed -- you know, who was

12  coming in, when they would need the stuff.  They would

13  usually give it to Kelly -- Kelly -- as time went later on

14  and Kelly would order the drugs.

15  **Q.**   And what would be the basis for Kelly -- how would she

16  know what to order?

17  **A.**   The nurses would give her -- this would be probably

18  around 2011 to 2012 after she had been trained to order

19  drugs, she would know to order the drugs because the nurses

20  gave her the order.

21  **Q.**   Okay.  And how did the nurses know what drugs to give to

22  Kelly?

23  **A.**   They would look on the patient's schedule, and on the

24  patient's schedule we also had it computerized where we write

25  out the doses next to the patient on the patient schedule.

1   **Q.**   Um, was there a process in place at East Lake Oncology

2   for the receipt of drugs into the practice?  Let me ask when

3   a box showed up with drugs inside of it, chemotherapy agents,

4   was there a process of how to take care of that box?

5   **A.**   Yes.  Chemotherapy was always taken by the front.  You

6   sign it and take it to the back to the chemotherapy office.

7   It's in the back of the office, and, um, chemotherapy nurses

8   would know how to handle it.  They usually did most of the

9   chemotherapy handling, um.  It's a small office so other

10  people would handle it, but mostly it was chemotherapy.  And

11  if it was something cold, it was notified -- the front desk

12  would always send it back and tell them, "this is cold."

13  **Q.**   And do you know how the drugs got from the box into

14  their appropriate slots into the office?

15  **A.**   The chemotherapy nurses took it out of the box and put

16  it --

17  **Q.**   Is that something that you did?

18  **A.**   No, sir.

19  **Q.**   From that point forward the boxes are in inventory, if I

20  may say it that way.  What was the process, then, of somebody

21  being able to take the appropriate drug and infuse it to the

22  appropriate patient?

23  **A.**   The super bill -- once I had the super bill in the

24  patient and the chemotherapy area, the chemo nurses would

25  then have the patients sit in a chair.  They would go to the

1   cabinet or the refrigerator, we're not talking about a large

2   room.  We're talking shelves and a refrigerator, and they

3   would remove whatever drug they needed.  There's a hood and

4   then they would take that and mix the drugs.

5   **Q.**   While chemotherapy is being administered, was there a

6   physician in the office?

7   **A.**   Yes.

8   **Q.**   Was that physician always you?

9   **A.**   No.

10   **Q.**   And who else may have been present?

11   **A.**   Dr. Raj.

12   **Q.**   Now, during that time period of 2009 through 2012, did

13   you ever experience any unexpected adverse reactions with --

14          MR. TREZEVANT:  Objection.

15          THE COURT:  Sustained.

16   BY MR. SARTIS:

17   **Q.**   Did you ever identify any issues with --

18          MR. TREZEVANT:  Objection.

19          THE COURT:  Do you wish to pursue this line of

20   questioning?

21          MR. SARTIS:  I do, your Honor.

22          THE COURT:  Approach the bench.

23   (Sidebar conference held outside

24   the presence of the Jury.)

25          THE COURT:  The Government says the Defense was

1    adamant that the Government should not go into any area that

2    would indicate that the patients had an adverse reaction or

3    it was detrimental to their health.

4              MR. TRAGOS:  Can I say something?

5              THE COURT:  This is not your witness.

6              MR. TRAGOS:  I understand.

7              THE COURT:  No, this is not your witness.

8              MR. SARTIS:  The Government, in their part of the

9    case, made the reference -- they eluded to the fact that

10   there was no guarantee that these drugs were good.  They just

11   asked on cross-examination if she knew that the Avastin could

12   have been water

13             THE COURT:  I'm not stopping you.  What I'm saying

14   if you go down this road, the Government, on cross, is going

15   to get right back in the adverse reactions, detrimental

16   health, all the stuff you were trying to keep out.

17             MR. SARTIS:  The issue the Government has already

18   indicated there is no evidence it was good or bad.  I think

19   that's why we asked for a jury instruction to that effect.

20             THE COURT:  Maybe they do or maybe they don't.  You

21   stopped them and you had a reason for stopping them.  Now you

22   no longer have a way to stop them.

23             MR. SARTIS:  All right.  I'll let it go.  I'll

24   withdraw the question.

25             (Back before the Jury.)

1           MR. SARTIS:  You shall -- I'll withdraw the

2    question.

3           THE COURT:  All right.

4    BY MR. SARTIS:

5    **Q.**   Let's talk for a second about your process of ordering

6    drugs.  What companies did you use during the time period of

7    2009 through 2012?

8    **A.**   There were multiple companies.  I used Cardinal, QSP,

9    McKesson, Metro, I think Priority, which was Cardinal.  Um, I

10   may have used one or two more.

11   **Q.**   And frankly, what was the purpose of having so many

12   companies?

13   **A.**   Generally speaking, it was the Medicare and insurance

14   reimbursement, and to make sure that the drugs would not be

15   more expensive than I would receive in reimbursement.

16   **Q.**   Was it common in your industry to price-shop drugs?

17   **A.**   Yes.

18   **Q.**   Let's talk momentarily about QSP.  How did you find out

19   about QSP?

20   **A.**   I think, and I can't recall exactly, but I think Kelly

21   was the one who found them or the nurses found them.  I'm not

22   sure.  But, at that time, we were starting to get numerous

23   wholesalers.

24   **Q.**   And do you recall ever using Cancer Drugs Online?

25   **A.**   No.

1    **Q.**   What about Global?

2    **A.**   Yes.

3    **Q.**   Okay.  I'll ask the same question.  How did you find out

4    about them?

5    **A.**   It was a chemotherapy nurse.

6    **Q.**   Okay.  When you prescribed chemotherapy drugs to

7    patients, do you -- did you use the brand name or did you use

8    the chemical name?

9    **A.**   I used the brand name.

10   **Q.**   Why did you use the brand name?

11   **A.**   It's simple.  I usually cannot pronounce all the heavy

12   chemical names, and it's easier to say Rituxan than

13   Rituximab.

14   **Q.**   Dr. Norbergs, from 2009 until 2012, did you have any

15   concerns that the drugs that you were receiving were not

16   FDA-approved?

17   **A.**   No.

18   **Q.**   During that time period did the fact that a drug company

19   may be in Canada cause you concern?

20   **A.**   No.

21   **Q.**   Had you seen foreign-made drugs in the course of your

22   practice?

23   **A.**   Yes.

24   **Q.**   In fact, did you see foreign-made drugs after this time

25   period of '09 through '12?

**A.**   Approximately 70 percent of the drugs are manufactured

outside of the United States.

**Q.**   From 2009 to 2012, was there anything that led you to

believe that the drugs you were receiving from companies, and

I'll use QSP as the example, were drugs that should not be

imported or weren't supposed to be in the United States?

**A.**   No.

**Q.**   At some point, ma'am, did you, in fact, discover that

there was an issue with foreign drugs?

**A.**   Yes.

**Q.**   Let's take a moment and talk about the medications that

are at issue in this case.  Procrit, and I believe the

testimony has been that the non-FDA-approved version of that

is Eprex, do you recall that?

**A.**   Yes.

**Q.**   Did you prescribe Procrit?

**A.**   Yes.

**Q.**   And did you buy Procrit from a specific vendor?

**A.**   Yes.

**Q.**   And who was that vendor?

**A.**   It was Curescript to begin with and then it was Metro.

**Q.**   Why did you use that company to begin with?

**A.**   It was with a buying group, and the buying group had

rebates and more of a group purchasing power.

**Q.**   Did you ever prescribe Eprex?

1    **A.**    No.

2    **Q.**    Let's talk for a second about Neulasta.  Did you

3    prescribe Neulasta?

4    **A.**    Yes.

5    **Q.**    And the non-FDA-approved version of that, as we learned,

6    is Neulastim, with an "i-m" at the end.  Did you ever

7    prescribe Neulastim?

8    **A.**    No.

9    **Q.**    Did you ever request your office to order Neulastim?

10   **A.**    No.

11   **Q.**    Were you ever made aware that Neulastim had been

12   received into your office?

13   **A.**    No.

14   **Q.**    Rituxan.  Did you use Rituxan and prescribe that?

15   **A.**    Yes.

16   **Q.**    Did you ever -- did you ever prescribe the

17   non-FDA-approved version, which we know now is MabThera?

18   **A.**    No.

19   **Q.**    Did you ever direct your office to order MabThera?

20   **A.**    No.

21   **Q.**    Did you ever -- were you aware that MabThera had been

22   shipped to your office in lieu of Rituxan?

23   **A.**    No.

24   **Q.**    Treanda, did you prescribe Treanda?

25   **A.**    Yes.

1  **Q.**   And the non-FDA-approved is Ribomustin, correct?

2  **A.**   Correct.

3  **Q.**   Did you ever prescribe Ribomustin?

4  **A.**   No.

5  **Q.**   Did you ever direct your office to order Ribomustin?

6  **A.**   No.

7  **Q.**   Were you ever made aware that Ribomustin had been

8  delivered to your office?

9  **A.**   No.

10  **Q.**   Zometa.  Did you prescribe Zometa?

11  **A.**   Yes.

12  **Q.**   And we heard in this trial that there is Zometa United

13  States FDA-approved and Zometa non-FDA-approved.  Did you

14  ever prescribe the non-FDA-approved Zometa?

15  **A.**   No.

16  **Q.**   Did you ever direct your office to order the

17  non-FDA-approved Zometa?

18  **A.**   No.

19  **Q.**   Did anyone bring to your attention that a

20  non-FDA-approved Zometa may have entered your office?

21  **A.**   No.

22  **Q.**   Ma'am, let me ask you, at the time '09 to 2012, if

23  someone would have brought this to your attention, what would

24  you have done?

25  **A.**   I would have stopped using the drugs.

**Q.**   In 2009, was there any guidance that you had, any -- we have seen these news articles and letters from the FDA.  Did you receive any notice from the FDA in 2009 that there was an issue with Neulasta?

**A.**   No.

**Q.**   Or Rituxan?

**A.**   No.

**Q.**   Or Procrit?

**A.**   No.

**Q.**   Or Treanda?

**A.**   No.

**Q.**   Or Zometa?

**A.**   No.

**Q.**   I'll ask the same question for 2010, did anybody -- did you receive any correspondence from the FDA during 2010?

**A.**   No.

**Q.**   2011, did you receive any correspondence indicating, don't use, you know, Neulasta from QSP"?

**A.**   No, I did not receive any.

**Q.**   We'll go through this in a little bit, but you received a subpoena.  Do you recall that?

**A.**   Yes.

**Q.**   And Agent Larson testified he dropped that subpoena off to your office and handed it to you?

**A.**   Yes.

1    **Q.**   Do you recall that?

2    **A.**   Yes.  I recall an agent dropping it off, yes.

3    **Q.**   Do you recall a conversation with him where he indicates

4    to you that you're doing something horribly wrong and illegal

5    and should stop it immediately?

6    **A.**   I was under attorney instruction not to interact and he

7    would not interact with me and just accept the paper and walk

8    away.

9    **Q.**   Is that what happened, ma'am?

10   **A.**   And that is what I did.

11   **Q.**   In 2012, and I'll show you these, we'll go through them

12   in a moment, but there were documents that were sent to you

13   by the FDA.  There was a document, do you recall that?

14   **A.**   Yes.

15   **Q.**   Do you remember seeing that document?

16   **A.**   Yes.

17   **Q.**   When about did you receive that document, if you know?

18   **A.**   Excuse me?

19   **Q.**   About what time did you receive that document, time

20   frame?

21   **A.**   I'm not sure when I received it.  I'm pretty sure when

22   I -- well, I'm positive I know when I saw it.

23   **Q.**   When did you see it?

24   **A.**   I was seeing a patient, it was approximately the end of

25   June, and he brought in that letter.  He said a friend of his

```
 1   who wanted to go see me had Googled this letter -- Googled my
 2   name and found this letter, and I -- in front of him I read
 3   that letter and I was flabbergasted.  I was really upset but
 4   carried on.  I went out the door and went to Kelly and I
 5   said, "Kelly, do you know anything about this?"  And she
 6   said --
 7             MR. TREZEVANT:  Objection, nonresponsive, hearsay,
 8   move to strike.
 9             THE COURT:  Sustained on what Kelly said.
10   Otherwise, overruled.
11   BY MR. SARTIS:
12   Q.   Just tell us what you said to Kelly?
13   A.   I said to Kelly, "Do you know about this letter?  Do you
14   know when we received this letter?"  And I said, "We have
15   stopped using QSP, have we not?"  And, um, "We don't have any
16   further drugs, anything that is suspicious?
17   Q.   From an industry perspective, those years of 2009 to
18   2012, before the -- all the notices and the news articles
19   came out, was there a concern that you were aware of that
20   there were potentially counterfeit drugs coming into the
21   United States?
22   A.   In March of 2012, my husband was reading the Wall Street
23   Journal -- I don't have time to read papers -- and he told
24   me --
25             MR. TREZEVANT:  Objection, hearsay.
```

1   BY MR. SARTIS:

2   **Q.**   Just tell us -- just tell us what you learned?

3   **A.**   I learned at that time that Avastin had come in

4   counterfeit, and at that time I didn't use Avastin.  I never

5   used -- well, I wouldn't say never, but I do not use Avastin.

6   The drug has serious side effects.  I will not use it.

7   **Q.**   That being said, did the fact that the correspondence

8   that was at issue was as to Avastin, did that color your -- I

9   guess, what you were looking for?

10  **A.**   Well, it was, like, if you don't use a drug, why are you

11  going to pay attention to a lot of data about it?  It was,

12  like, I know that the Avastin was counterfeit.  I didn't use

13  Avastin.  So I didn't have to check my office for any type of

14  counterfeit Avastin.

15  **Q.**   Okay.  Dr. Norbergs, let me show you some documents that

16  have been admitted into evidence.  Let me show you first what

17  has been marked as Exhibit 1A.  Can you see that on your

18  screen?

19  **A.**   Yes.

20  **Q.**   Make it a little bigger.

21  **A.**   Thank you.

22  **Q.**   Is there any question in your mind that you are the

23  principle of East Lake Oncology?

24  **A.**   No question.

25  **Q.**   All right.  And that you are the -- see where is says,

1    "designated qualifying practitioner?"

2    **A.**   Yes.  I'm --

3    **Q.**   That's you.  Okay.  Let me show you what has been

4    entered into evidence as Government's Exhibit 6E.  Do you

5    recall seeing faxes, and I guess, advertisements like this,

6    coming into your office?

7    **A.**   Yes.  In 2009, um, Kelly and my nurses were showing me a

8    lot of these faxes.

9    **Q.**   And, I guess, let me just highlight some of this stuff.

10   It says in that first paragraph, "QSP has realigned itself to

11   become the top source of affordable quality specialty

12   medications in the world.  Through our international

13   wholesale partners we now have access to new product lines as

14   well as increased inventory."  Did that raise any red flags

15   for you at the time?

16   **A.**   At the time, no.

17   **Q.**   Let me show you what has been marked Exhibit 6F, and at

18   some point did you fill out an application in order to have a

19   business account with them?

20   **A.**   Yes.

21   **Q.**   And whose writing is on this document?

22   **A.**   Most of it appears to be Kelly's.

23   **Q.**   And, in fact, it asks for some references for you --

24   excuse me.  It asks for some references, and apparently you

25   provided a reference of Oncology Supply, correct?

**A.**    Correct.

**Q.**    Did that cause you any concern that they are asking you

for references of other drug companies?

**A.**    No.

**Q.**    Let me take you to Government's Exhibit 6G.  Do you

recall seeing these order forms?

**A.**    Yes.

**Q.**    And when you were looking at these forms, did the fact

that it says, for example, "Zometa UK," and the second line

says, "Zometa Canada," did that cause you concern?

**A.**    No.

**Q.**    Why did it not concern you?

**A.**    Most drugs are made outside of America, and I felt that

Canada and UK were a lot better drugs.

**Q.**    Did you think that QSP was providing you drugs that had

not been FDA-approved?

**A.**    No.

**Q.**    Let me show you what has been marked in evidence as

Exhibit 6B.  This file, do you recall this?

**A.**    Yes.

**Q.**    Let's talk for a second about some of these stickies.

Do you know when these stickies were affixed to this

envelope?

**A.**    No.

**Q.**    Um, let's talk about the one in the top left there on

1    the Taxotere sticker.

2    **A.**    Okay.

3    **Q.**    Can you talk us through what this purports to be?

4    **A.**    This says, "2g of Gemzar," which is equivalent to

5    2000 milligrams, and it says, "100 milligrams Eloxatin."

6    Then it had "Camptosar," which was crossed out, and

7    underneath I had "unknown."  I'm not sure when I wrote that,

8    if that was written at the same time.  Stickies, I would --

9    stickies didn't matter in our office.

10   **Q.**    Let's switch our attention to one event.

11   **A.**    Yes.

12   **Q.**    Do you recall having this conversation with Kelly?

13   **A.**    No.

14   **Q.**    Did you direct her to ask these questions?

15   **A.**    I'm not sure.  I do not recall this.

16   **Q.**    And that being said, do you even know the time period

17   that this thing may have been created?

18   **A.**    No.

19   **Q.**    And I'll ask the same question then for that final

20   sticky on the left, which says, "Will be able to order

21   5-19-09.  Takes about five to six days."  Do you have any

22   idea what that is about?

23   **A.**    It would be about an order that takes five to six days,

24   and that there was a holiday, but outside of that I would not

25   know.

1    **Q.**   Did you ever at some point, I mean, we're seeing this

2    document now as it's been provided as this exhibit, did

3    somebody ever give you this folder the way it looks here in

4    your office and tell you to look at it?

5    **A.**   No.

6    **Q.**   Let me show you what has been marked Government's

7    Exhibit 12A.  It's another credit application for QSP,

8    correct?

9    **A.**   Yes.

10   **Q.**   And again, trade references.  You provide McKesson.

11   Who's McKesson?

12   **A.**   McKesson is another wholesaler.

13   **Q.**   And you provided Henry Schein?

14   **A.**   Yes.

15   **Q.**   What or who is Henry Schein?

16   **A.**   Henry Schein is a medical supply office.

17   **Q.**   And again, Oncology Supply?

18   **A.**   Correct.

19   **Q.**   Any concern they are asking for these references?

20   **A.**   No.

21   **Q.**   Anything about this document that specifically caused

22   you concern?

23   **A.**   No.

24   **Q.**   I guess we'll go down to the bottom.  Is this your

25   signature?

**A.**   Yes.

**Q.**   Now, is this your actual signature, you signed it?

**A.**   Yes.

**Q.**   Okay.  Are there documents where your signature appears but it wasn't your hand that made the signature?

**A.**   Yes.

**Q.**   Let me show you Government's Exhibit 13A.  Do you have any recollection seeing this document?

**A.**   It looks like I saw it in court.  I've seen it -- it looks like a "Kelly scrap" that she writes.  I don't see my handwriting.

**Q.**   The fax line on the top says, "March 15, '11."  Do you see that on top?

**A.**   Yes.

**Q.**   Do you have any recollection of actually seeing this document contemporaneously?

**A.**   No.

**Q.**   Quantum Solutions, did you use Quantum Solutions in your practice?

**A.**   I did not know we used Quantum Solutions.

**Q.**   And there's a document that has got "Quantum Solutions, SLR," do you see that?

**A.**   Yes.

**Q.**   And then it says, "Cancer Drugs Online?"

**A.**   Yes.

1   **Q.**   There is some handwriting down the right side of this

2   document.  Do you see that?

3   **A.**   Yes.

4   **Q.**   Whose handwriting is that?

5   **A.**   Mine.

6   **Q.**   Explain to the Jury what it is that's happening with

7   this document?

8   **A.**   I was comparing QSP, and it's pretty blurred so I can't

9   see it very well, but I was comparing prices with QSP at that

10  time.

11  **Q.**   Now, the date stamp on this says February 17, 2008.  Is

12  that possible?

13  **A.**   I do not think so.

14  **Q.**   Meaning you think that that date stamp is not accurate?

15  **A.**   Correct.

16  **Q.**   Let me show you what has been marked into evidence as

17  Government's Exhibit 14D, as in Delta.  Again, another file

18  folder with stickies on it.

19  **A.**   Yes.

20  **Q.**   Do you recall reviewing this document in your office

21  back between 2009 and 2012?

22  **A.**   I recognize the sticky on the upper right-hand, which

23  says, "need to go back to Metro for Procrit.  Curescript is

24  on backorder."

25  **Q.**   Whose handwriting is that?

1  **A.**   Mine.

2  **Q.**   Tell the Jury about what causes this to be created?

3  **A.**   Um, we have a contract for Procrit, and at that time it

4  was with Curescript.  So Curescript had a back order on

5  Procrit, and because of it being not available, um, I said to

6  go back to Metro where we had previously had a contract with.

7  **Q.**   Was it -- are you telling me that there were drug

8  companies or distributors that sometimes run out of product?

9  **A.**   Yes.

10  **Q.**   Did that happen?

11  **A.**   A lot.

12  **Q.**   Do you recall this top left sticky at all?  Do you have

13  any knowledge of it?

14  **A.**   No.

15  **Q.**   And how about the one on the bottom?

16  **A.**   No.

17  **Q.**   Let's go to Government's Exhibit 15C.  Do you see this?

18  **A.**   Yes.

19  **Q.**   Another one of the advertisements that would come into

20  your office?

21  **A.**   Yes.

22  **Q.**   Back in 2011, because it says it's dated November of

23  '11, did the fact that this said, "Rx Oncology Consultants is

24  a priced saving licensed supplier of oncology medication.

25  Please review product," did that cause you concern back in

1   those days?

2   **A.**   No.

3   **Q.**   Did you ever use Rx Oncology Consultants?

4   **A.**   No.

5   **Q.**   Let's go to Government's Exhibit 28.  Do you have a

6   recollection of this sticky?

7   **A.**   No.

8   **Q.**   Let's talk about it for a second.  It's an inventory

9   account, right?

10   **A.**   Yes.

11   **Q.**   Walk the Jury through the purpose of an inventory

12   account?

13   **A.**   Medications are extremely expensive in a

14   hematology/oncology practice, and we would order once or

15   twice a week, depending on our patient load, and so we would

16   not keep medications too long.  Um, I always -- the nurses

17   would go in the back -- they would count the drugs to order

18   them.  To do an inventory was a good way of checking whether

19   the nurses used the medications, did we need more

20   medications, what was left, etc.

21   **Q.**   Now, let me go to the next page, page 20, again, to

22   Exhibit 28.  Is this something that you would have received

23   as a regular course in the practice?

24   **A.**   Yes.

25   **Q.**   And what is this?

**A.**   It is a list of medications and how many vials we have

of it.

**Q.**   At any time did you recall seeing any notes like this

one which included names that were not the names that you are

familiar were FDA-approved?

**A.**   No.

**Q.**   Let me show you the next page of Government's

Exhibit 28.  What's that part?

**A.**   A list of medications.

**Q.**   Same question, anything on this document that caused you

concern?

**A.**   No.

**Q.**   Next page.  This is Exhibit 20A.  What's that

specifically?

**A.**   A list of medications.

**Q.**   And are these what we call cold storage?

**A.**   Yes.

**Q.**   Rituxan FDA-approved?

**A.**   Yes.

**Q.**   Procrit FDA-approved?

**A.**   Yes.

**Q.**   In fact, is there anything on this list that's not

FDA-approved?

**A.**   No.

**Q.**   Let's continue to Government's Exhibit 21F, as in fox.

1    Do you recall this, apparently a note, indicating that

2    somebody had to borrow Herceptin 440 from FCS for Dorothy

3    Hertel?

4    **A.**   I don't recall this note specifically, but I do recall

5    we would borrow from FCS and FCS would borrow from us.

6    **Q.**   Is that normal in your industry?

7    **A.**   We had a good relationship.  I don't know if it was

8    normal or not, but it wasn't unusual for them nor us.

9    **Q.**   Ma'am, at any point when you returned medications to

10   them, did you receive a phone call from their pharmacy

11   department?

12   **A.**   No.

13   **Q.**   Did anybody call you, the doctor, saying, "Dr. Norbergs,

14   what did you send us?"

15   **A.**   No.

16   **Q.**   Any reason to believe that any of the products you

17   provided to them were not consistent with what they had

18   loaned you?

19   **A.**   No.

20   **Q.**   Now, let's talk for a moment about your practice as

21   compared to the practices you have been in, in the past.

22   Hospital setting --

23   **A.**   Yes.

24   **Q.**   -- did you do your own drug ordering?

25   **A.**   In a hospital?

1    **Q.**    Yes.

2    **A.**    No.

3    **Q.**    Did you do your own, I guess, inventory accounting?

4    **A.**    No.

5    **Q.**    Did you do your own billing?

6    **A.**    No.

7    **Q.**    How about the practice -- when you left the hospital

8    practice and went into that group of doctors, did you engage

9    or do the billing in that office?

10   **A.**    No.

11   **Q.**    Did you do the drug ordering?

12   **A.**    No.

13   **Q.**    Were you involved in any of the negotiations with the

14   drug companies for price at that -- in that setting?

15   **A.**    No.

16   **Q.**    Is East Lake Oncology the first time that you have

17   actually been responsible for all of these different areas?

18   **A.**    Yes.

19   **Q.**    How big is FCS?

20   **A.**    Um --

21   **Q.**    How many doctors?

22   **A.**    Lots.  I mean, FCS is probably the largest oncology

23   group in Florida.  It's throughout the whole State of

24   Florida.

25   **Q.**    How many nurses do you think they have?

1          MR. TREZEVANT:  Objection, as to relevance.

2          THE COURT:  Sustained.

3    BY MR. SARTIS:

4    **Q.**   Do you have the resources that are available to them in

5    regards to their manpower?

6    **A.**   No.

7    **Q.**   At some point -- I'm going to show you now what's on the

8    screen is Government's Exhibit 2A.  Do you recall the

9    subpoena for documents?

10   **A.**   Yes.

11   **Q.**   This is a subpoena that Agent Larson brought to you?

12   **A.**   Yes.

13   **Q.**   Is this the only subpoena you have ever received?

14   **A.**   No.

15   **Q.**   I mean, in a medical practice, in your experience, I

16   mean, are subpoenas something that you get all the time?

17   **A.**   We get subpoenas for medical records all the time.

18   **Q.**   Okay.  Did this particular subpoena that you received

19   back in October of 2011 cause you concern?

20   **A.**   Well, most subpoenas are mailed -- are given to us

21   through the mail or through my attorney.  I usually -- I was

22   not personally served or needed to be personally served.

23   **Q.**   But this one you actually were personally served?

24   **A.**   Yes.

25   **Q.**   Did that -- were you concerned about that, that

1    particular process?

2    **A.**    Yes.

3    **Q.**    And what did you do based on that change?

4    **A.**    Followed the instructions.

5    **Q.**    And let's go to page 2 of that document.  You are

6    talking about these instructions here?

7    **A.**    Yes.

8    **Q.**    Did you provide anything that was asked of you, did you

9    provide it?

10   **A.**    Yes.

11   **Q.**    Did the fact that you were being asked to provide your

12   records for the purchases of Gemzar, Zometa, Kytril, Eloxatin

13   and Taxotere from May 1st, 2006 until July 1st, 2011, cause

14   you concern?

15   **A.**    It -- I didn't understand why, um, but, um, I felt it

16   was probably a problem with that company.

17   **Q.**    Frankly, I mean, even here it says in paragraph five,

18   "Records of contracts with representatives of Global Rx

19   Stores and/or Martin Dean and Linda Allan, including

20   correspondence, emails..." and it continues.  Did that cause

21   you concern at that time?

22   **A.**    No.  No.

23   **Q.**    Did this document cause you to question your ability to

24   purchase from QSP?

25   **A.**    No.

1   **Q.**   In fact, is QSP mentioned anywhere in this document?

2   **A.**   No.

3   **Q.**   Let's talk for a moment about Government's Exhibit 11B.

4   This is that invoice that we saw earlier.  Do you see that?

5   **A.**   Yes.

6   **Q.**   Let me just highlight this.  Dr. Norbergs, were you

7   aware that drugs were being sent to your practice labeled as

8   gifts for the United Kingdom?

9   **A.**   No, I was not aware of it.

10  **Q.**   Did anybody in your practice bring this to your

11  attention?

12  **A.**   No.

13  **Q.**   If someone would have told you this, what would you have

14  done?

15  **A.**   I would have asked, "what gift, and by whom, and where

16  is it," and a lot more questions.

17              THE COURT:  How much longer do you have on direct?

18              MR. SARTIS:  A considerable amount, Judge.

19              THE COURT:  Let's take our 15-minute break.

20              CSO OFFICER:  All rise.

21              (Afternoon recess taken at 2:54 p.m.)

22              THE COURT:  Do the jury instructions look okay?

23              MR. TRAGOS:  I'm sorry, I didn't look at them yet.

24  I'm sorry.  I will look at them now, though.

25              MR. SARTIS:  It's a definite maybe.

1   (Jury enters courtroom at 3:16 p.m.)

2          THE COURT:  Proceed.

3          MR. SARTIS:  Thank you, your Honor.

4   BY MR. SARTIS:

5   **Q.**   Dr. Norbergs, let me show you what has been marked as

6   Government's Exhibit 11C.  I don't know if you see that on

7   your screen?

8   **A.**   Yes.

9   **Q.**   Do you recall seeing any documents that looked like this

10  back in '09 through 2011?

11  **A.**   No.

12  **Q.**   Were you the point of contact for QSP from '09 to 2012?

13  **A.**   No.

14  **Q.**   Who was the point of contact?

15  **A.**   Kelly.

16  **Q.**   Did you actually ever converse with people at QSP?

17  **A.**   No.

18  **Q.**   Let's move on to Government's Exhibit 11D, and we have

19  seen something like this previously.  Do you have any idea

20  when you would have received this document here?  The stamp

21  on the top is --

22  **A.**   May 2009.

23  **Q.**   Doctor, do you have any recollection actually receiving

24  this document?

25  **A.**   No.

1    **Q.**   Is any of the handwriting on this document yours?

2    **A.**   I can't tell.

3    **Q.**   Did you receive a lot of correspondence in your office

4    on a regular basis?

5    **A.**   Yes.

6    **Q.**   And did you receive a lot of price sheets from various

7    companies?

8    **A.**   Yes.

9    **Q.**   And did you receive advertisements often?

10   **A.**   Yes.

11   **Q.**   Did you personally review all of those documents?

12   **A.**   No.

13   **Q.**   Let's talk about Government's Exhibit 11E now, this one

14   here you see on the top left-hand corner has a Canadian flag

15   and it says, "Quality Specialty Products."  Do you see that?

16   **A.**   Yes.

17   **Q.**   And the sticky notes apparently attached to it,

18   "Attention.  Dr. Norbergs has questions with somebody

19   involving Pete at QSP."  Do you recall that?

20   **A.**   Yes.

21   **Q.**   Whose handwriting is that?

22   **A.**   Kelly's.

23   **Q.**   Do you recall this document?

24   **A.**   No.

25   **Q.**   Do you recall the document with the Canadian flag, do

1    you recall this?

2    **A.**   No.

3    **Q.**   Would this have caused you concern somewhere between

4    2009 and 2012?

5    **A.**   Yes.

6    **Q.**   QSP products, correct?

7    **A.**   Correct.

8    **Q.**   And do you know whose writing that is?

9    **A.**   No.

10   **Q.**   Well, it's got your name on the top.  Do you see that?

11   **A.**   Yes.

12   **Q.**   That is not your writing?

13   **A.**   No.

14   **Q.**   Now, let's talk about these that are mentioned here

15   Gemzar 1g and Eloxatin 100 milligrams.  Chemotherapy agents?

16   **A.**   Yes.

17   **Q.**   FDA-approved products?

18   **A.**   Yes.

19   **Q.**   Is this something you would have ordered in the course

20   of your practice?

21   **A.**   Yes.

22   **Q.**   What about the sticky note there, ever seen that?

23   **A.**   That looks like Kelly's sticky.

24   **Q.**   "Company put transaction through Visa?"

25   **A.**   I don't know what that would be regarding to.

1  **Q.**  Let me continue on to Government's Exhibit 15B.  Do you

2  see that on your screen?

3  **A.**  Yes.

4  **Q.**  All right.  Tell us what this is?

5  **A.**  A list of oncology drugs on the left, and then, Global,

6  which is also called Oberlin, in the middle, and QSP on the

7  outside.

8  **Q.**  Do you know whose writing is the Global and QSP?

9  **A.**  Global is typed.  QSP is --it looks like Kelly's

10  handwriting.

11  **Q.**  Now, let me focus you here towards the center of this

12  page.  Do you see where it says, "Rituxan known as MabThera?"

13  **A.**  Yes.

14  **Q.**  Did you see this document back in -- somewhere between

15  2009 and 2012?

16  **A.**  I may have.  I'm not sure.

17  **Q.**  Does the fact that it says, "Rituxan known as MabThera,"

18  would that have caused you concern back between 2009 and

19  2012?

20  **A.**  No.

21  **Q.**  Does it cause you concern today?

22  **A.**  Yes.

23  **Q.**  Let me show you Government's Exhibit 21B.  That's the --

24  I think that's a progress note, correct?

25  **A.**  Well, it's actually a scrap -- I would use my progress

1    notes that I wrote on as papers to write things on.

2    **Q.**    And this is one of those examples?

3    **A.**    Yes.

4    **Q.**    And let me show you the bates stamp on the bottom.

5    That's an E-L-O-P-A, correct?

6    **A.**    Correct.

7    **Q.**    Is this one of the documents that you provided to the

8    Government?

9    **A.**    Yes.

10    **Q.**    And whose writing is that?

11    **A.**    My writing.

12    **Q.**    And walk the Jury through, please, what this all means.

13    **A.**    What it is is that I would put QSP -- that if we could

14    get it overnight -- these were drugs that we needed to order

15    because of patients that were coming in, I'd put

16    "Erbitux, Receptin and Velcade."  These were drugs we would

17    require for patients the next day or a few days and where to

18    get them from.

19    **Q.**    Okay.  And the line below talks about Zometa and Global?

20    **A.**    Yes.

21    **Q.**    What is that about?

22    **A.**    Same thing, Global, Zometa, where to get the drugs from.

23    **Q.**    Are the drugs that you have written on this document

24    FDA-approved drugs?

25    **A.**    Yes.

1    **Q.**   And is there -- did you distinguish in any note that

2    anyone should order other than a FDA-approved drug?

3    **A.**   No.

4    **Q.**   Let me show you Government's Exhibit 21G.  Whose

5    initials, Doctor, are these?

6    **A.**   Mine.

7    **Q.**   Okay.  What is this note supposed to demonstrate?

8    **A.**   That we needed these products and to order them through

9    QSP.

10   **Q.**   And again, are these documents on this page all

11   FDA-approved names of drugs -- let me state that again.  The

12   drugs that are listed on this document, which is Government's

13   Exhibit 21G, are these all the names of FDA-approved drugs?

14   **A.**   Yes.

15   **Q.**   Let me show you Government's Exhibit 101A.  Do you know

16   what that is?

17   **A.**   Yes.

18   **Q.**   Tell the Jury, again, what this particular page is?

19   **A.**   This is the second half of a computer-generated check

20   from QuickBooks.

21   **Q.**   Okay.  And there is writing on it.  Do you see it says

22   "file?"

23   **A.**   Yes.

24   **Q.**   Is that your writing?

25   **A.**   No.

1    **Q.**   Whose handwriting is that?

2    **A.**   My husband's.

3    **Q.**   What is your husband's name?

4    **A.**   Timothy Shannon.

5    **Q.**   Is he here today?

6    **A.**   Yes.

7    **Q.**   Can you point him out to the Jury, please.

8    **A.**   Over there (indicating).

9    **Q.**   Pick out an article of clothing he is wearing.

10    **A.**   A Navy blazer.

11    **Q.**   Okay.  Is this his writing?

12    **A.**   Yes.

13    **Q.**   Why does his writing appear on the payment for the check

14    stub for East Lake Oncology?

15    **A.**   He would print the checks for me.  He would input into

16    QuickBooks the invoices, and I would sign the checks, and he

17    would attach it, either to the package or the papers.

18    Sometimes I had just packages of papers and I would just give

19    it to him to organize it on his desk.  That was before Kelly

20    was the manager.  As Kelly -- well, this one was 2011.  So

21    this one was probably just handed to -- he'd take -- he

22    stapled it and then it was given to Kelly.

23    **Q.**   Is your husband a medical billing specialist?

24    **A.**   No.

25    **Q.**   Is he a medical professional?

1    **A.**   No.

2    **Q.**   What does he do?

3    **A.**   He's an airline pilot.

4    **Q.**   Let me show you page 2, 101A, as in alpha.

5           THE COURT:  Let me stop you.  Let's take a

6    five-minute break.

7           CSO OFFICER:  All rise.

8    (Jury exits courtroom at 3:27 p.m.)

9           CSO OFFICER:  Please be seated.

10   (Juror has been ill throughout trial.)

11   (Jury enters courtroom at 3:32 p.m.)

12          THE COURT:  How are you feeling?

13          THE JURY:  I'm getting there.  I'm so sorry.

14          THE COURT:  That's all right.  Let me know if you

15   need another break.

16          THE JUROR:  Thank you.

17          THE COURT:  Proceed.

18          MR. SARTIS:  Yes, sir.

19   BY MR. SARTIS:

20   **Q.**   Dr. Norbergs, let's go to page 2 of Government's

21   Exhibit 101A, and we've seen this document here.  Again, if

22   you look at the bottom of the document, provided by you,

23   correct?

24   **A.**   Excuse me?

25   **Q.**   We've seen this document before?

1    **A.**   Yes.

2    **Q.**   And this is a document, because of the bates stamp that

3    we know was provided by you, to the Government?

4    **A.**   Yes.

5    **Q.**   Okay.  Apparently this page is a page that was stapled

6    to the packet of the top page being the check stub, correct?

7    **A.**   Correct.

8    **Q.**   And Doctor, did you receive these and write your

9    payments based on this document?

10   **A.**   Yes.

11   **Q.**   And did you do that personally or did somebody else do

12   that, put this information -- provide this information to

13   you?

14   **A.**   It was in a packet -- it was in papers, sometimes in the

15   packet, sometimes not.  My husband was the one who entered

16   the data into my checkbook or QuickBooks and I --

17          THE COURT:  Speak into the microphone, please.

18          THE WITNESS:  Oh, I'm sorry.

19   BY MR. SARTIS:

20   **Q.**   Is there any handwriting on here that you can identify?

21   **A.**   No.

22   **Q.**   Okay.  Your handwriting does not appear on it?

23   **A.**   I don't think so.

24   **Q.**   Doctor, let's just go into this a little bit.  Here in

25   the middle of the page it indicates "Ribomustin known as

1    Treanda in the US," do you see that?

2    **A.**    Yes.

3    **Q.**    "-Germany-100 milligrams," and there are two lines, one

4    for 100 milligrams, one for 25.  Do you see that?

5    **A.**    Yes.

6    **Q.**    Back in -- what is the date of this document?  September

7    of 2011, did you see that on this document?

8    **A.**    Yes.

9    **Q.**    Did it cause you concern then?

10   **A.**    Unfortunately I did not see these documents until later.

11   **Q.**    When is later?

12   **A.**    Probably July or August or -- yeah.

13   **Q.**    July or August of what year?

14   **A.**    2012.

15   **Q.**    Okay.  Why wouldn't this have been something that you

16   would have been paying attention to back in 2009 or 2011,

17   during this time period?

18   **A.**    There was no reason to pay attention to it.  I mean, I

19   would have -- I did not know that there were non-FDA-approved

20   drugs in the market.

21   **Q.**    As you sit here today does that opinion change?

22   **A.**    Of course.

23   **Q.**    Let's go to Government Exhibit 101A-1.  Again, another

24   file that says, "file," on the document.  Again, whose

25   handwriting is that?

1    **A.**   My husband's.

2    **Q.**   Let's go to Government's Exhibit 102.  Do you see that?

3    **A.**   Yes.

4    **Q.**   Again, another document, an invoice from QSP, correct?

5    **A.**   Yes.

6    **Q.**   And just looking at the top of the document, back at the

7    time from '09 to 2012, did it not strike you that there

8    wasn't some sort of license number on the top of this

9    invoice?

10   **A.**   Nobody looked for license numbers.

11   **Q.**   Nobody in your office looked for that?

12   **A.**   No.

13   **Q.**   Is there a reason?

14   **A.**   It wasn't an issue.

15   **Q.**   And again, a document you provided to the Government,

16   correct?

17   **A.**   Yes.

18   **Q.**   By the way, what does that "QF" mean on the bottom right

19   here?

20   **A.**   "Q" is QuickBooks, and "F" is the flow sheet.  I had --

21   my husband started a drug flow sheet so that I could see when

22   the payments were going to be due.  And then, Kelly did my

23   flow sheet for me after she -- after a time.

24   **Q.**   Now, this particular document is dated December of 2011.

25   Do you see that?

1   **A.**   Yes.

2   **Q.**   Would this have been something you saw at that time?

3   **A.**   No.

4   **Q.**   And we'll go ahead and go through this one for a moment.

5   Do you see the Ribomustin known as Treanda?

6   **A.**   Yes.

7   **Q.**   At the time did that cause you concern?

8   **A.**   When I saw it?  Yes.

9   **Q.**   And when do you think you would have seen this?

10   **A.**   It had to be, like, July, when I was organizing --

11   **Q.**   Of what year?

12   **A.**   2012.

13   **Q.**   All right.  And I'll ask the same question about the

14   MabThera known as Rituxan.

15   **A.**   Same.

16   **Q.**   Same.  That would have caused you concern, if you had

17   seen it?

18   **A.**   Yes.

19   **Q.**   And Neulastim known as Neulasta?

20   **A.**   Yes, I would have been concerned.

21   **Q.**   Let's go to Government Exhibit 102 alpha.  This one

22   doesn't say "file" on it?

23   **A.**   Correct.

24   **Q.**   But it is a document that's stamped E-L-O-P-A, correct?

25   **A.**   Correct.

1    **Q.**   And again, I don't want to belabor this, but these are

2    documents you provided to the Government?

3    **A.**   Yes.

4    **Q.**   You didn't destroy them?

5    **A.**   No.

6    **Q.**   You didn't try to hide them somewhere?

7    **A.**   No.

8    **Q.**   The second page of that document, again, "QF" on the

9    bottom, right?

10    **A.**   Yes.

11    **Q.**   This one dated December 2, 2011, right?

12    **A.**   Yes.

13    **Q.**   "MabThera known as Rituxan, refrigerated, European

14    Union."  Had you seen this back in December of 2011, would

15    this have caused you concern?

16    **A.**   Yes.

17    **Q.**   Tell the Jury, I guess, why did you not stop everything,

18    go to the FDA website, look up whatever the FDA guy said you

19    could look up, why didn't you do all that back in 2011?

20    **A.**   It was not an issue.  There was no reason for me to go

21    into an FDA website.  Um, things in the medical community if,

22    events occurred, it traveled very fast between colleagues,

23    and I would get emails then, or notifications, or I would

24    read about it.  I read a lot of medical journals and web

25    pages.  Sorry.

1    **Q.**   Government's Exhibit 110, again, E-L-O-P-A, your

2    documents, right?

3    **A.**   Yes.

4    **Q.**   Where do you think that these documents were coming

5    from, from QSP?

6    **A.**   I don't understand the question.

7    **Q.**   I guess what I'm asking is back contemporaneously, back,

8    you know, in December '11, 2009, 2010, that time period,

9    these QSP orders, where did you think that these drugs were

10   coming from?

11   **A.**   From the Midwest distributor.

12   **Q.**   And where do you think they were?

13   **A.**   Where they were located?  At the time I thought they

14   were in Tennessee.  Um, I always thought they were United

15   States distributors.

16   **Q.**   Now, I'll show you the top right-hand corner here of

17   this document.  It's got a correspondence address in

18   Winnipeg, Canada, and I guess it's Manitoba.  Did that not

19   strike you, the company had a Canadian address?

20   **A.**   No.

21   **Q.**   Again, this is Government's Exhibit 111 for the date of

22   January 4, 2012.  Do you see that?

23   **A.**   Yes.

24   **Q.**   I'm going to ask the same question.  Sorry to be

25   repetitive.  Neulastim known as Neulasta, in the US, did

1  you -- had you seen that back in December of 20 -- I'm sorry,

2  January of 2012?

3  **A.**   No.

4  **Q.**   And would you have used this document to cut the check

5  at that time?

6  **A.**   I wouldn't have used that document.  I would have used

7  the price.

8  **Q.**   You would have used --

9  **A.**   The price.  The price was in QuickBooks.

10  **Q.**   How do you know -- I'm sorry, it was where?

11  **A.**   In QuickBooks.

12  **Q.**   Where were all these documents stored?

13  **A.**   On a little table in dividers, and once they were

14  completed, they were in a binder on the table.  Otherwise,

15  they were divided, um -- we weren't efficient to begin with,

16  but later on when Kelly was a manager, she efficientized

17  (sic).  They were in multiple levels of a dividing shelf.

18  **Q.**   So at some point Kelly organized these?

19  **A.**   Yes.

20  **Q.**   And at any point did you just kind of grab those binders

21  and flip through them to see what they were or what was going

22  on with them?

23  **A.**   No.

24  **Q.**   I guess, was there any cause for alarm back in these

25  days?

1    **A.**    No.

2    **Q.**    Here's Government's Exhibit 112, a similar document.

3    The date on this one January 25, 2012.  Do you see that?

4    **A.**    Yes.

5    **Q.**    Something, again, that concerns you today?

6    **A.**    Today it still is not very concerning because the

7    distributors and wholesalers can have correspondence

8    addresses elsewhere.

9    **Q.**    Right.  But what about the product description?

10   **A.**    That would concern me.

11   **Q.**    Doctor, I don't know if I asked this, did you ever

12   actually write Neulastim?

13   **A.**    No.

14   **Q.**    Government's Exhibit 113, this one is from February 1st,

15   of 2012, and there is some writing on this one, and again,

16   you see the Neulastim, correct?

17   **A.**    Yes.

18   **Q.**    You see the MabThera, there is two of them, two line

19   items?

20   **A.**    Yes.

21   **Q.**    And then you see the sub-order?

22   **A.**    Yes.

23   **Q.**    Let's talk about that sub-order.  Whose handwriting is

24   that?

25   **A.**    I'm not sure.  Possibly mine.

1    **Q.**   Okay.  So Eloxatine, Abraxane and Dacogen apparently

2    were not received?

3    **A.**   Correct.

4    **Q.**   And there is a sub-order there from UK Wholesaler.  Any

5    concerns now, at this time, February of 2012?

6    **A.**   Yes.

7    **Q.**   And what, I guess, caused you to write this note on this

8    document?

9    **A.**   In -- later on in -- I would be compiling them for,

10   like, when I would have time, I would take and compile them

11   and -- for the accountant.  So I would know exactly.  And I

12   would have looked that I hadn't paid it, or Kelly had given a

13   notice to me that I hadn't paid it.  Um, it would have been

14   something I reacted to possibly in March/April of 2014 --

15   2012 or longer, later.  I'm not sure.

16   **Q.**   Government's Exhibit 115.  The date on this one

17   February 22, 2012.  There is, kind of, I don't know what you

18   call it, a bracket placed around the top, again, from

19   UK Wholesaler.  Do you see that?

20   **A.**   Yes.

21   **Q.**   Do you know who put that mark there?

22   **A.**   No.

23   **Q.**   Did you recall seeing this back in 2012?

24   **A.**   Well, later on in '12, but not at the time.

25   **Q.**   All right.  When -- well, I'll get that.  116, another

1    document provided by you, correct?

2    **A.**    Correct.

3    **Q.**    February 26th, I believe, 2012?

4    **A.**    Correct.

5    **Q.**    Sorry about that.  Again, a document provided by you.

6    Can you identify the handwriting on this document?

7    **A.**    No.

8    **Q.**    Concerning, at the time, that there is MabThera on this

9    and Neulastim on this order form?

10   **A.**    I did not see it at that time.

11   **Q.**    At some point you did identify it?

12   **A.**    Yes.

13   **Q.**    Was it concerning then?

14   **A.**    Yes.

15   **Q.**    Let me show you Government's Exhibit 152-1.  This is one

16   of the packing slips that's been testified to.  Do you see

17   that?

18   **A.**    Correct.

19   **Q.**    Did you see the packing slips?

20   **A.**    No.

21   **Q.**    And obviously it says, "MabThera known as Rituxan."  Do

22   you see that?

23   **A.**    Yes.

24   **Q.**    At the time, September 21, 2011, would this -- if this

25   had been brought to your attention, would this have caused

1    you concern?

2    **A.**    Absolutely.

3    **Q.**    Did anybody ever come up to you and say, "Dr. Norbergs,

4    this stuff doesn't -- this packing slip says MabThera.  The

5    box says Rituxan?"

6    **A.**    Nobody -- nobody came up to me to tell me that.

7    **Q.**    Let me show you 152-10, again, another shipment package.

8    This one has, "Eprex" on it, "known as Procrit in the US."

9    Is this something that you saw?

10   **A.**    No.

11   **Q.**    Did you guys put these documents somewhere just as a

12   reference?

13   **A.**    They were -- the documents, after they were paid for,

14   would go in binders, and they were basically for tax purposes

15   and we needed to keep the information.

16   **Q.**    Were these documents that you would go through

17   periodically?

18   **A.**    No.

19   **Q.**    Frankly, did you rely on your staff?

20   **A.**    Absolutely.  They were good staff members.  Wonderful

21   staff I had.  Caring, good staff.  Um, my manager was -- she

22   was trained.  She could finish my sentences.  She --

23   **Q.**    Let's go to Government's Exhibit 160.  An email to Kelly

24   from Jerry at G.P. Larys Limited.  Do you see that?

25   **A.**    Yes.

1    **Q.**    Um, did you have any contact with people at G.P. Larys

2    or this Jerry individual?

3    **A.**    I don't even know who he is.

4    **Q.**    Okay.  Is this something that would have been somebody

5    else's day-to-day contact person?

6    **A.**    Yes.

7    **Q.**    Who would that have been in your office?

8    **A.**    Kelly.

9    **Q.**    Was this email ever brought to your attention?

10   **A.**    No.

11   **Q.**    Let's look at Government's Exhibit 171.  And we've

12   obviously had a chance to look at this now a couple of times.

13   Does it surprise you -- when you saw this exhibit, did it

14   surprise you?

15   **A.**    No.

16   **Q.**    Why not?

17   **A.**    I know that I ordered drugs from QSP.

18   **Q.**    What was the -- I guess, walk the Jury through the

19   thought process back in 2000 -- what is this 2010/2011,

20   during this time frame, what was going on back then?

21   **A.**    Um, 2009 and '10, it was -- I mean, we were getting

22   flooded in all kinds of, um, product, new distributors.  Some

23   of them had good prices.  A majority of them had poor prices.

24   If you put them together, then you would have cheaper

25   shipping or more shipping.  So -- charges.  So I would get

| | |
|---|---|
| 1 | hot sheets from Cardinal.  I would get hot sheets from QSP. |
| 2 | I would get -- and it would be weekly changes in the drug |
| 3 | prices.  Then ASP was constantly changing.  So -- and we were |
| 4 | constantly behind the eight-ball in the sense that, um, the |
| 5 | drug prices kept on going up and up, and our reimbursement |
| 6 | stayed at the same level until it caught up in two quarters. |
| 7 | So it was very important to keep track of drug prices, which |
| 8 | I never did in my past. |
| 9 | **Q.**   Now, there is three pages to this document.  Any issues |
| 10 | with the fact that, apparently, Mr. -- I'm sorry, |
| 11 | Agent Larson indicates here that on February 28, 2012, that's |
| 12 | the last MabThera/known as Rituxan order that came out of |
| 13 | your office.  Do you see that? |
| 14 | **A.**   Yes. |
| 15 | **Q.**   What happened?  Why change back or -- change back to QSP |
| 16 | at that time? |
| 17 | **A.**   Their orders, their shipping were becoming less reliable |
| 18 | in the sense that they couldn't pinpoint the date they could |
| 19 | deliver, and then they were out of the drug.  So I went |
| 20 | back to -- I started -- I think I had an agreement then with |
| 21 | McKesson and negotiated further drug prices on McKesson. |
| 22 | We had to change distributors left and right.  As a |
| 23 | matter small practice I really couldn't have a lot of options |
| 24 | like the large practices because of volume discounting. |
| 25 | **Q.**   I would like to show you what is |

1    Government's Exhibit 181 that was offered as a demonstrative,

2    if the Court would allow me to do so?

3              THE COURT:  All right.

4              MR. SARTIS:  If I may publish that your Honor?

5              THE COURT:  Yes.

6    BY MR. SARTIS:

7    **Q.**   Dr. Norbergs, do you recall Agent Larson testified to

8    this -- this spreadsheet?

9    **A.**   Yes.

10   **Q.**   And kind of walk the Jury through, and again,

11   contemporaneously, back in this '09, 2010, 2011, 2012 time

12   period.  Now, there is, apparently, the price, for example,

13   on the top, of Velcade is $1,396.60, right?

14   **A.**   Correct.

15             MR. TREZEVANT:  Objection to leading.

16             THE COURT:  Sustained.

17   BY MR. SARTIS:

18   **Q.**   Okay.  I'm sorry.  Do you see the price for Velcade?

19   **A.**   Correct.

20   **Q.**   And then there's an ASP price.  Do you see that?

21   **A.**   Yes.

22   **Q.**   What is that price?

23   **A.**   I'm not sure whether that was ASP plus six percent

24   reimbursement rate or ASP.

25   **Q.**   Regardless, what's the number?

1    **A.**    1,368.

2    **Q.**    How did that, I guess, compare with the price?

3    **A.**    I'm not sure.  I would have to look it up.

4    **Q.**    The price, two lines over, where it says "price?"

5    **A.**    Right.  It compared 1,396.60.

6    **Q.**    Right.

7    **A.**    That it would be $27 more than the average sales price.

8    **Q.**    Let me ask this way:  So what?  Why does that matter?

9    **A.**    Well, if I had to constantly get reimbursement for a

10   less amount of money than what -- if I had to pay for these

11   drugs at a higher amount than it was reimbursed, I would

12   basically be paying the patient to come and see me.  Again,

13   this is one sheet that Agent Larson produced.

14   **Q.**    Is that kind of the norm in your practice based on

15   pricing?

16   **A.**    No.  Our prices -- I don't know where all of this prices

17   came, but if this is ASP without the six percent that may

18   make a little bit better understanding, but -- and I don't

19   know where exactly he said he -- I was trying to follow, but

20   he got it from the manufacturer.  The prices that the

21   distributors would give us were always different prices.  I

22   mean, we could negotiate sometimes for lower prices.  FCS,

23   because they are huge, they would have the best prices.

24   **Q.**    My guess is, is this why you branched out and looked at

25   some of these advertisements that you received from other

1  companies?

2  **A.**   Yes.

3  **Q.**   Let me show you Government's Exhibit 330A.  That's a

4  super bill, correct?

5  **A.**   Yes.

6  **Q.**   All right.  Walk us through exactly what a super bill

7  is.  First of all, is it an invoice of some sort?  Is it a

8  bill?

9  **A.**   It's a slip of paper with all of our potential --

10  probably majority of our charges that we would use.  As with

11  the Medicare, Mr. Quindoza, there is the CPT codes,

12  there's -- there's coding on it, and then, underneath there's

13  a little box on it.  If you can -- and, like, this is -- on

14  the lower right, that's my handwriting, and those are pretty

15  much the orders that I would write on there.  A blank charge

16  slip would come to me with the patient's chart, and once I'm

17  done with the patient or with the patient and completed with

18  the patient, I would put, "Okay.  For my next appointment in

19  three weeks, I would ask for a blood count, a BMP."  These

20  are lab works.  Because this patient -- I don't know which

21  one it is -- has -- is on a blood thinner, I would ask for

22  the blood to be every week.  Then, there is orders to add

23  magnesium.  There was something that the patient told me and

24  I would say, "Okay.  Maybe having too much diarrhea I would

25  get magnesium," and, um, then, I would have orders, like,

1   first CT Pet Scan and the drug orders and the hydration.

2   That was my communication with my staff.

3   **Q.**   Is this common how you communicate with your staff?

4   **A.**   This is a small office.  We would always talk, but this

5   way it wouldn't be misinterpreted.

6   **Q.**   On this particular document it indicates Rituxan

7   600 milligrams.  Do you see that?

8   **A.**   Yes.

9   **Q.**   Did you ever write for MabThera?

10  **A.**   No.

11  **Q.**   Did you ever direct your staff that, "I'm going to write

12  Rituxan, but what I really mean is MabThera?"

13  **A.**   No.

14  **Q.**   Let's go to 332 Delta.  Again, similar document?

15  **A.**   Yes.

16  **Q.**   Do you see the patient at the top?

17  **A.**   Yes.

18  **Q.**   Who is that?

19  **A.**   Crystal King.

20  **Q.**   And let's talk about the writing on this document right

21  here.  Whose writing is that?

22  **A.**   The blood test, the iron studies, B12, folate, factor V

23  Leiden, MTHFR, those are -- that's my handwriting.  Those are

24  laboratory testing.  This 1000 milligrams, that's not my

25  writing.  I don't know who that is.  And the, "Rituxan

1    1000 milligrams, IV, Q2, every 15 days," is my writing.

2    **Q.**   Okay.  Is this what you prescribed for Ms. King?

3    **A.**   Yes.

4    **Q.**   What did you think she was receiving?

5    **A.**   Rituxan.

6    **Q.**   Let's go to 332 echo.  Tell us about this.  What is it?

7    **A.**   This is a chemotherapy progress note, I would say.  This

8    is what the chemotherapy nurses would write if they had

9    problems, if they had complications with the patient, they

10   would say, um, what drugs they received, the times, because

11   billing was per time, and, um -- anyway, it was chemotherapy.

12   **Q.**   Whose writing is on this, can you identify it?

13   **A.**   Could you raise it up, please?

14   **Q.**   Um, does that help?

15   **A.**   Yes.  That's Kelly Jane.

16   **Q.**   Is this a document you would have seen kind of during

17   the time it was created?

18   **A.**   Yes.  I would see it at the end of the day.  The chemo

19   nurse would then fill in all the numbers.  They would keep

20   track while the patients were there.  They would keep track

21   of the time, and then eventually towards the end of the day

22   they would fill in the rest of the stuff depending on how

23   busy they were.  And then they would put the chart with this

24   on my desk, including even after we went electronic, they

25   would still do that.

1    **Q.**   Tell the Jury what you would do -- what was the purpose

2    of having these documents placed on your desk at the end of

3    day?

4    **A.**   So I could review them and find out if the patient had

5    any problems or said anything.  There were times that

6    something that they wrote, like, "patient had some pain,"

7    that may have not been significant for them at the time.

8    Because they are very, very good nurses, and I would pick up

9    on it, and then I would ask them to call the patient the next

10   day to find out what that was about and if this was new.

11   Sometimes they would have prescriptions that they would need

12   and I would write out those prescriptions and call them in or

13   whatever.

14   **Q.**   Does this document or -- did this document at the time

15   help you to understand what had been given to the patient?

16   **A.**   Yes.

17   **Q.**   And in this particular case, let's kind of look towards

18   the middle of that page, who would have written that in

19   there?

20   **A.**   The chemotherapy nurse.

21   **Q.**   And then you would have reviewed that?

22   **A.**   What do you mean by review?  I looked at that, yes.

23   **Q.**   Based at the end of the day whenever that --

24   **A.**   At the end of the day I would look at it, yes.

25   **Q.**   What do you think that this patient Ms. King received on

1   this particular visit?

2   **A.**   Rituxan.

3   **Q.**   That is what you had written for her?

4   **A.**   Yes.

5   **Q.**   Is that what you thought you had ordered for her?

6   **A.**   Yes.

7   **Q.**   322H, as in hotel.  What is this?

8   **A.**   This is our blood counts.  The CPC report, and --

9   **Q.**   When -- I guess, tell the Jury when this comes into

10  play?

11  **A.**   This was, um -- there's two ways this blood count would

12  come into play.  One way would be with a patient visit.  So

13  this was so I could review the CPC when I'm seeing the

14  patient to know that the blood counts were okay.

15         This one in particular was reviewed later on to see

16  the white count is very low, and I would, um -- I'm trying to

17  figure out this event because of the writing, um, but this

18  would be to the chemotherapy nurses.  They would obtain this

19  one when they see the patients because before they give the

20  drug they would always obtain blood counts.

21  **Q.**   Is this a document that you would have reviewed back,

22  for example, on 9-30, 2011, which is the day of this

23  document?

24  **A.**   Yes.

25  **Q.**   When in conjunction to the date that your office

1   received this document would you have looked at this?

2   **A.**   Well, this one in particular, because there was some

3   problems, I would have -- I would have asked her to -- I

4   would -- I'm not recalling the whole conversation, but I --

5   she wouldn't have on her own ever think to lower the IV

6   Benadryl or some problem without seeing the rest of the

7   chart.  I wouldn't know.

8   **Q.**   And whose writing is on the bottom, the handwriting?

9   **A.**   I'm not sure.  I would think it's Kelly Jane's, but I'm

10  not sure.

11  **Q.**   Is this a note that is trying to convey something to

12  you?

13  **A.**   Yes.  In between when I'm seeing patients, um, they

14  would put very important items, like, on the seat of my chair

15  because I would see the patient, then go into my office and

16  dictate and see a patient.  So they knew this was important,

17  and sometimes they would interrupt me and get verbal orders,

18  and then go and take care of it, and later on write it and

19  just leave it on my desk.  So --

20  **Q.**   How many documents -- patient-related documents like

21  this would you have been looking at throughout the course of

22  the day back in this time period?

23  **A.**   A lot.  A lot.

24  **Q.**   How much of your time did patient care and reviewing

25  things like this concern you?

**A.**   Most of my day.

**Q.**   Let me show you Government's Exhibit 333 alpha.  Do you see that one?

**A.**   Yes.

**Q.**   Let me go to the bottom.  Arthur Berman, right?

**A.**   Yes.

**Q.**   Patient?

**A.**   Yes.

**Q.**   Let me just confirm Arthur Berman, is Mr. Berman the person who testified here a day or so ago or is this somebody else?

**A.**   No, that would be Dr. Berman's father is Arthur Berman.

**Q.**   Again, walk us through this chemotherapy infusion chart. Whose writing, first of all, is all of this, if you can identify it?

**A.**   Well, the top is vital signs, and that is difficult to tell because the nurses would switch back and forth in their jobs.  But vital signs were very important, and I don't even know what date -- this could have been a day that I saw Mr. Berman or not.  I'm not sure.  It was day one.  I would have seen him.  So most of the citing is Peggy's.  Vital signs may have been put in by an office nurse or somebody else assisting the nurse.

**Q.**   You say the first day versus another time.  Does it go on, I hate to use the word auto pilot, but do the nurses kind

1    of take control of the chemotherapy?

2              MR. TREZEVANT:  Objection, leading.

3              THE COURT:  Sustained.

4    BY MR. SARTIS:

5    **Q.**  At some point do you hand off --

6              MR. TREZEVANT:  Objection, leading.

7              THE COURT:  Sustained.

8    BY MR. SARTIS:

9    **Q.**  You have staff in your office, correct?

10   **A.**  Correct.

11   **Q.**  And I want to ask you specifically about chemo nurses.

12   Do they ever --

13             THE COURT:  Haven't you already asked her about

14   chemo nurses and about the office procedure.

15             MR. SARTIS:  I have.  I'm trying to lay a

16   foundation for this particular piece of paper.

17             THE COURT:  You don't mean to be asking the same

18   questions again, right?

19             MR. SARTIS:  I would hope not.  Yes, Judge.

20   BY MR. SARTIS:

21   **Q.**  Do you order the chemotherapy for every patient every

22   time?

23   **A.**  I prescribe the chemotherapy drugs, yes.

24   **Q.**  And then, do you see that patient as they receive that

25   chemotherapy every time?

**A.**    It depends on the protocol.

**Q.**    Tell us about the difference, distinction?

**A.**    Protocols where they would receive chemotherapy, the infusion drugs, those protocols are -- have significant side effects, and so, I would usually see the patient, the blood counts and then order -- prescribe the medication.

If a patient's protocol had "day two," like, I saw Mr. Berman on day one, this time, how was he doing?  Was he feeling good?  Did he tolerate?  I don't know which cycle this was, but it says "day one" at the bottom.  I'm sorry, I missed that.  So I don't know which cycle, and in cycles we would give chemotherapy, like, every four weeks, every three weeks, and during that period that was called one cycle.  So Mr. Berman's cycle was, like, the first day, and the second day he would get Treanda on two days and Rituxan on one day. Rituxan takes almost, like, six hours to give.  So that would be a very long day and process for him.  So we would -- I would usually see him and make sure that he was able to take that medication.

Then on day two, I would not see him because I would presume that if he could tolerate day one or if he didn't have any problems, day two he could tolerate and that was the protocol.

Then after that he would get blood counts weekly, and sometimes daily in case he needed, um, some blood, white

1    count improvement.  So then I would see him the next cycle.

2    **Q.**    And you used Mr. Berman as an example.  Is there an

3    example of what would happen on a regular basis in your

4    office?

5    **A.**    Yes.

6    **Q.**    Let's talk about Government's Exhibit 336 alpha.  Let's

7    talk about who this is, first of all.

8    **A.**    John Nervers.

9    **Q.**    Do you see the date of that event?

10   **A.**    December 28, 2011.

11   **Q.**    Okay.  We've already seen this, the Government put it up

12   here, let's talk about this section right here.  Can you read

13   that?

14   **A.**    "Patient left without receiving Procrit, 40,000 units.

15   Patient will come in tomorrow to receive Procrit 40,000 for

16   medication."

17   **Q.**    And who's --

18   **A.**    Informed -- yeah, "Informed Dr. Raj."  I'm sorry.

19   **Q.**    Do you know where you were on December 28, 2011?

20   **A.**    Yes.

21   **Q.**    Where were you, ma'am?

22   **A.**    I was out of the country on my honeymoon or -- getting

23   married.

24   **Q.**    Were you in the office that day?

25   **A.**    No.

1    **Q.**   Did you, I guess, see this note contemporaneous to its

2    creation?

3    **A.**   I wouldn't see this note anyway because this was

4    Dr. Raj's patient.

5    **Q.**   Well, let me show you Government's Exhibit 336 Delta.

6    Do you see those dates of service on the left?

7    **A.**   Yes.

8    **Q.**   Where were you on 12-29, 2011?

9    **A.**   Out of the country.

10   **Q.**   Okay.  And this Epoetin Alfa that's the active

11   ingredient, right?

12   **A.**   Epoetin, yes.

13   **Q.**   What is the FDA-approved version of that?

14   **A.**   Well, Epoetin is the FDA-approved --

15   **Q.**   Is there a trade name?

16   **A.**   Um, Procrit.

17   **Q.**   Okay.  And who was it that, I guess, ordered this or was

18   involved in this order?

19   **A.**   I would think it was the office when -- and it would be

20   Kelly because I was not there.

21   **Q.**   And the performing physician is who?

22   **A.**   Dr. Raj.

23          THE COURT:  The parties have stipulated that

24   Dr. Norbergs was out of the country December 26th through the

25   29, 2011.

1          MR. SARTIS:  Thank you, your Honor.

2     BY MR. SARTIS:

3     Q.    Let's go to Government's Exhibit 339 alpha.  Do you see

4     that patient down there?

5     A.    Yes.

6     Q.    Who's that?

7     A.    That's Kathleen Prine.

8     Q.    Your patient?

9     A.    Yes.

10    Q.    The signature line is who?

11    A.    That's Peggy's.

12    Q.    And walk us through the top of this page.

13    A.    "Rituxan given today is not available 3-5."

14    Q.    Do you know what happened, why that Rituxan was not

15    available?

16    A.    It's unknown.  Sometimes if they had weather problems

17    with UPS or FedEx in the Midwest, we wouldn't get the

18    shipment.  This may have been towards the end when we weren't

19    being -- getting reliable timely -- I shouldn't say reliable,

20    but timely shipments.  I'm not sure.

21    Q.    Now, the date on this is March 5, 2012, right?

22    A.    Yes.

23    Q.    Now, right about this time does something --

24          THE COURT:  Okay.  Wait a minute.  The note says

25    the drug was not available on March 5th.  The document, I

1    don't know what date it's dated, but it's probably not dated

2    March 5th.

3              THE WITNESS:  It's March 6th.

4              MR. SARTIS:  Good call, Judge.

5    BY MR. SARTIS:

6    **Q.**    On March 6, 2012, right about this time, is anything

7    occurring during this time period that's important to you and

8    your understanding of what's happening with QSP?

9    **A.**    Yes.

10   **Q.**    Tell the Jury.

11   **A.**    During this time period, um, Avastin, as a counterfeit,

12   was coming out.  Towards the end of March was when I was

13   first aware of it, and I went to the internet to look at

14   components, articles really.

15   **Q.**    That being said, let me show you Government's Exhibit

16   No. 7.  And, in fact, the document I'm showing you is blacked

17   out and shouldn't be.  My apologies.  Okay.  There it is.  Do

18   you recall this February 16, 2012, newspaper article --

19   **A.**    No.

20   **Q.**    -- regarding, "Drug makers warn of counterfeit Avastin?"

21   **A.**    No.

22   **Q.**    Did anyone ever bring this particular news article to

23   your attention?

24   **A.**    Didn't specifically bring it to my attention, but it may

25   have been placed on my desk in a pile.

1    **Q.**   In a pile?

2    **A.**   In a pile.

3    **Q.**   And do you think you would have -- when would you have

4    seen it if it was dated February 16, 2012?

5            MR. TREZEVANT:  Objection, speculation.

6            THE COURT:  Overruled.

7            THE WITNESS:  I don't know when I would have seen

8    it, but not right away because there would be -- it would --

9    probably knowing Kelly as well as I do, it would have fallen

10   in a pile of drug advertisements, and throwaway journals and

11   other things.

12   BY MR. SARTIS:

13   **Q.**   So did you -- was your mail separated?

14   **A.**   Yes.

15   **Q.**   Can you tell the Jury what kind of piles -- what piles

16   did you have?

17   **A.**   Well, I'd have a bill pile, which I gave to my husband

18   to write the checks.  I had a pile of signatures for, like,

19   Hospice, and nursing orders, and information, and other

20   physician consults, patient-related information.  Then I

21   would have a pile for letters and items that I should read

22   sooner rather than later.

23   **Q.**   Thank you.

24           MR. SARTIS:  Thank you.  If we can switch back to

25   me or -- to here.

1    BY MR. SARTIS:

2    **Q.**   Let's switch for a moment and take a look at

3    Government's Exhibit 3A.  Do you recall receiving this drug

4    warning from Genentech?

5    **A.**   It didn't stand out as recalling it.  This would have

6    been a very important document if I had seen it right away.

7    Um, I don't know when I saw this.  Avastin was something I

8    didn't use so I wouldn't have focused on it.  I mean, I

9    wouldn't have read a five-page document on Avastin if I

10   didn't use the drug.

11   **Q.**   And I'm just looking at the bates stamp on this

12   document.  Are you aware one way or the other did this

13   document come from your office?

14   **A.**   I don't know if it was in my office.

15   **Q.**   Let me continue and show you Government's Exhibit

16   No. 4A, April 5, 2012, letter from the Department of Health

17   and Human Services.  Do you recall this letter?

18   **A.**   Yes.

19   **Q.**   And when do you think you received this letter?

20   **A.**   Sometime, I would presume, this is my presumption, in

21   April.

22   **Q.**   If I may inquire for a moment.

23           MR. SARTIS:  Madam Deputy Clerk, is Government's

24   Exhibit 4 alpha -1 in evidence?

25           MADAM CLERK:  -1?  No.

1  BY MR. SARTIS:

2  **Q.**   Dr. Norbergs --

3           MR. SARTIS:  If I may approach, your Honor?

4           THE COURT:  All right.

5           MR. SARTIS:  Your Honor, I believe this is a

6  stipulation to Government's Exhibit 41A-1.  May I introduce

7  this into evidence?

8           THE COURT:  It will be admitted.

9  (Government's Exhibit 41A-1

10  admitted into evidence.)

11  BY MR. SARTIS:

12  **Q.**   Let me show you --

13          MR. SARTIS:  If I can use the Elmo for a second,

14  we're going to use everything, Madam Clerk.

15          MADAM CLERK:  No problem.

16          THE COURT:  Do you see that UPS document?

17          THE WITNESS:  Yes.

18  BY MR. SARTIS:

19  **Q.**   Do you see a delivery time on that document?

20  **A.**   April 10th, 2012, at 10:29.

21  **Q.**   All right.  And apparently it was signed by someone?

22  **A.**   Yes.

23  **Q.**   By who?

24  **A.**   Kelly.

25  **Q.**   When do you think that you would have had a chance to

1    review this document if it came in this UPS packaging?

2    **A.**    Well, in our office we would receive numerous items by

3    UPS or FedEx more commonly.  Even lab results.  So I don't

4    know if it was flagged as super important, but it was in the

5    "read sooner rather than later" pile.

6    **Q.**    And, in fact, let's go back to Government Exhibit 4A,

7    which is this thing (indicating).  Did you see this document?

8    **A.**    Yes.

9    **Q.**    Did you have a reaction to it?

10   **A.**    Yes.

11   **Q.**    Tell the Jury the reaction you had when you saw this

12   document?

13   **A.**    I was very upset.  Um, I went to Kelly and talked to

14   Kelly and made sure that we were not ordering any medications

15   that would be suspicious, or suspect or anything.  Um, and we

16   hadn't been ordering from Richards Pharma, I don't know how

17   long, years -- a year or longer.

18          So at least with Richards I knew that we weren't,

19   but then that started clueing us in that they were

20   counterfeit, they were foreign unlicensed suppliers.  So I

21   was starting to think of the Canadian suppliers and, um,

22   other suppliers.

23   **Q.**    And what, if anything, did you do based on receiving

24   this letter?

25   **A.**    Well, we had already stopped using QSP.

Q.   So if I take you back to Government's Exhibit 171, which

is this thing --

A.   Yes.

Q.   -- and do you see that last green item --

A.   Yes.

Q.   -- February 28, 2012?

A.   Yes.

Q.   So at that point, by the time you got this letter, you

had already stopped using QSP?

A.   We stopped using those drugs, yes.

Q.   Let me show you Government's Exhibit 6C.  Do you recall

this?

A.   Yes.

Q.   How did you find out?  How did you get this document?

A.   If you look at the bottom of the document, there is --

it was pulled, and it has 3-21, 2012.  That is when I pulled

it.  When I was looking through the internet looking for

Avastin information when we were hearing about the

counterfeit medications.

Q.   As a doctor during this time period, was there a

discussion that you were involved in regarding the emergence

are counterfeit or misprinted products?

A.   No, I was not -- there was no discussion with doctors --

Q.   Did you --

A.   -- or colleagues or --

1    **Q.**   Is it something you undertook on your own?

2    **A.**   Yes.

3    **Q.**   Whose handwriting is on this document?

4    **A.**   I don't know who underlined.  The "is" looks like Kelly

5    and the "QSP" I don't know why the "QSP" was put up there.

6    It could have been done later.  This was sitting on my desk

7    for a long time.

8    **Q.**   When you received this document, that obviously

9    indicates QSP specifically, what did you do, if anything?

10   **A.**   Well, I quit doing -- I hadn't used QSP.  I mean, I had

11   stopped using QSP, and I was pretty upset about it.  I mean,

12   this is bad.

13            MR. SARTIS:  How long are you going to let me go

14   for today, Judge?

15            THE COURT:  I'm just getting ready to ask you if

16   you are about through.

17            MR. SARTIS:  No, but I'm going to start a new topic

18   area.

19            THE COURT:  Is that a threat?

20            MR. SARTIS:  It's a promise, Judge.  I guess what I

21   want to know is if you are going to let me go on for a while

22   or shut it down now?

23            THE COURT:  You should shut it down.

24            MR. SARTIS:  All right.

25            THE COURT:  We'll be in recess until 9:00 o'clock

1   tomorrow morning.

2              CSO OFFICER:  All rise.

3              THE COURT:  How much longer do you have.

4              MR. SARTIS:  Your Honor, I will guess that I have

5   another hour with her on direct, hour, hour-and-a-half.

6   Because that's when I'm going to start putting all the tax

7   stuff in.

8              THE COURT:  If you remember, in the beginning you

9   thought your case would take less than a day, if I can get

10  the Government to ever finish, your part would take less than

11  a day.

12             MR. SARTIS:  I'm less than a day.  I didn't start

13  until late morning.  I've still got another hour-and-a-half.

14             THE COURT:  How long will the Government's cross

15  be?

16             MR. TREZEVANT:  It's -- they -- it's going to be a

17  while, Judge.  They asked a lot of questions and I have some

18  follow-up to --

19             THE COURT:  So how long is the Government's cross

20  going to be?

21             MR. TREZEVANT:  Ms. Wetherald says three hours,

22  Judge.  I think it would be less, but I tend to think that a

23  lot.  I told the Court this in the past.

24             THE COURT:  My money is on Ms. Wetherald.  So we

25  should be ready for closing tomorrow afternoon, it sounds

1    like, right?

2            MR. SARTIS:  I'm going to rest after this.

3            THE COURT:  All right.  Is there going to be any

4    redirect case?

5            MR. TREZEVANT:  If there is, Judge, it will just be

6    one or two witnesses, very fast.  We're going to go back and

7    discuss that right now.

8            THE COURT:  How much time do you want for closing

9    tomorrow?

10           MR. TRAGOS:  I think the Government and I will be

11   about 30 minutes a piece.

12           MR. SALTZMAN:  This was not discussed earlier.

13   Your Honor, I haven't quite figured that all out, but there's

14   a lot to get through.  I think I'm probably going to need an

15   hour to hour-and-a-half total.

16           THE COURT:  I'll give each side an hour.  See you

17   tomorrow morning.

18               (Court recessed at 4:30 p.m.)

19

20

21

22

23

24

25

1        CERTIFICATE OF REPORTER

2

3   COUNTY OF HILLSBOROUGH      )

4                              )  SS.

5   STATE OF FLORIDA            )

6

7   I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER, REGISTERED

8   PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

9   COURT FOR THE MIDDLE DISTRICT OF FLORIDA, DO HEREBY CERTIFY

10  THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS

11  AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME

12  WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF

13  COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT

14  THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC

15  NOTES.

16

17

18  DATE: 1/2/2017

19

20  S:/MELISSA A. PIERSON

21  MELISSA A. PIERSON, CA/CSR 12499

22  IL/CSR 084.003138, RPR

23  FEDERAL OFFICIAL COURT REPORTER

24

25