```
 1                    UNITED STATES OF AMERICA
                     UNITED STATES DISTRICT COURT
 2                    MIDDLE DISTRICT OF FLORIDA


 3                             -  -  -
 4              HONORABLE JAMES S. MOODY, JR.
            UNITED STATES DISTRICT JUDGE PRESIDING
 5                             -  -  -

 6   UNITED STATES OF AMERICA,  )
                                )
 7          PLAINTIFF,          )
                                )
 8   VS.                        ) NO. 8:15-cr-183-T-30AEP
                                )
 9   D. ANDA NORBERGS,          )
                                )
10          DEFENDANT.          )
     _____)
11

12
                           TRIAL - DAY 8
13                          **EXCERPT**

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS
                       NOVEMBER 17, 2016
15                       TAMPA, FLORIDA

16

17
                MELISSA A. PIERSON, CA CSR 12499,
18                   IL CSR 084.003138, RPR
                 FEDERAL OFFICIAL COURT REPORTER
19              801 N. FLORIDA AVENUE, 2ND FLOOR
                      TAMPA, FLORIDA 33602
20                    PH:  (813)301-5336
                   USDCtranscripts@gmail.com
21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL:

 2   ON BEHALF OF PLAINTIFF:
             A. LEE BENTLEY, III
 3           UNITED STATES ATTORNEY
             BY:  MR. ADAM SALTZMAN, ESQ.
 4           BY:  MR. JAY TREZEVANT, ESQ.
             ASSISTANT UNITED STATES ATTORNEYS
 5           400 N. TAMPA STREET
             ST. 3200
 6           TAMPA, FL 33602
             (813) 274-6000
 7           ADAM.SALTZMAN@USDOJ.GOV

 8

 9   ON BEHALF OF DEFENDANT:
             FEDERAL PUBLIC DEFENDERS
10           BY:  MS. JENNY L. DEVINE, ESQ.
             400 N. TAMPA STREET
11           ST. 2700
             TAMPA, FL 33602
12           (813) 228-2715
             JENNY_DEVINE@FD.ORG
13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                              I-N-D-E-X

2    **WITNESS:**

3    D. Anda Norbergs

4        Con't. Direct Examination by Mr. Sartis:        4
         Cross-Examination by Mr. Trezevant:            14
5        Redirect Examination by Mr. Sartis:           123

6

7

8

9

10

11                      **E X H I B I T S**

12   Defendant's Exhibit No. 2                          6
     Defendant's Exhibit No. 4                          6
13   Defendant's Exhibit No. 6                          6

14   Government Exhibit No. 200B                        35
     Government Exhibit No. 200D                        37
15   Government Exhibit No. 47                          56
     Government Exhibit No. 600                         88
16

17

18

19

20

21

22

23

24

25

```
 1                  TAMPA, FLORIDA; NOVEMBER 17, 2016

 2                            - - -

 3              (COURT IN SESSION AT 9:16 A.M.)

 4                         *   *   *   *

 5         THE COURT:  Good morning.  The Defense may proceed.

 6         MS. SARTIS:  Thank you, your Honor.

 7         MR. SARTIS:  Thank you, your Honor.

 8         (Jury enters at 9:17 a.m.)

 9              (WITNESS: D. Anda Norbergs.)

10              CON'T DIRECT EXAMINATION

11  BY MR. SARTIS:

12  Q.  Good morning, Dr. Norbergs.

13  A.  Good morning.

14         MR. SARTIS:  If I may approach the witness, your

15  Honor?

16         THE COURT:  Yes.

17  BY MR. SARTIS:

18  Q.  Dr. Norbergs, I've handed you what is marked as

19  Plaintiff's Exhibits 2, 4 and 6.  Do you see those documents?

20  A.  Yes.

21  Q.  Without telling us specifically about them, do you

22  recognize these documents?

23  A.  Yes.

24  Q.  And can you tell us first, what is Plaintiff's

25  Exhibit 2?
```

1   **A.**   This is 2010 corporate income tax.

2   **Q.**   For which entity?

3   **A.**   For East Lake Oncology.

4   **Q.**   Can you please identify what is Plaintiff's Exhibit

5   No. 4?

6   **A.**   2011 East Lake Oncology income tax.

7   **Q.**   And Plaintiff's Exhibit No. 6?

8   **A.**   2012 East Lake Oncology tax return, income tax.

9   **Q.**   And are these collectively the returns that were

10   produced for East Lake Oncology for those respective dates?

11   **A.**   Yes.

12   **Q.**   And you are the principle of East Lake Oncology,

13   correct?

14   **A.**   Yes.

15         MR. SARTIS:  Your Honor, at this time I would move

16   Plaintiff's Exhibit 2, 4 and 6 into evidence.

17         MR. TREZEVANT:  We would object on relevance,

18   Judge.

19         THE COURT:  Well, I need to see what they are,

20   then.

21         MADAM CLERK:  Exhibit 6, Government's 6, has

22   already been admitted.

23         THE COURT:  Exhibit 6 is already in evidence she

24   says.  It's Government's Exhibit 6?

25         MR. SARTIS:  Plaintiff's.  I'm sorry, Defendant's

1    Exhibits 2, 4, 6.

2              THE COURT:  Do you have a copy I can look at?

3              MR. SARTIS:  I thought you had a copy up there,

4    your Honor.  If I may retrieve the documents.  If I may

5    approach.

6              THE COURT:  They will be admitted.

7              MR. SARTIS:  Thank you, your Honor.

8    (Defendant's Exhibit Nos. 2, 4, 6

9    admitted into evidence.)

10             MR. SARTIS:  Madam Clerk, may I have the Elmo,

11   please?

12   BY MR. SARTIS:

13   **Q.**   Before we get to these, let me ask you at some point in

14   time there was mention that there was a theft from your

15   office?

16   **A.**   Yes.

17   **Q.**   And can you briefly tell the Jury what that time period

18   was?

19   **A.**   That was during the -- prior to East Lake Oncology and a

20   little bit into East Lake Oncology formation.  It was

21   during -- it was for eight years.  So 20 -- 1999 through

22   2007, an administrator had an elaborate scheme and multiple

23   schemes, um -- it was very devastating for me, and it's hard

24   to talk about it.  I'm sorry.  But, she stole a lot of money,

25   most of it drug company money.

1  Q.   And based upon that event that transpired in your former

2  practice, did that cause you to do anything legally?

3  A.   I had to because a lot of the loans and the drug company

4  medications were personally guaranteed.  I had to go into

5  Chapter 19 (sic), which is reorganization of my personal --

6  Q.   That is bankruptcy?

7  A.   Yes.

8  Q.   Okay.

9       MR. TREZEVANT:  Excuse me, your Honor, if -- if she

10  can speak up, and I missed the chapter.

11       THE COURT:  I think she said Chapter 19.  I don't

12  know if there is a Chapter 19.

13       THE WITNESS:  It's reorganization.  I'm sorry for

14  that error.

15       THE COURT:  What's the next question?

16  BY MR. SARTIS:

17  Q.   Did then -- East Lake Oncology is that when you went

18  into private practice after the bankruptcy?

19  A.   Well, I was in the phase of going into private practice

20  at that time.  Our whole Cornerstone Cancer Center, which is

21  what we were, all of us oncologists and radiation

22  oncologists, we were selling the building and kind of going

23  our own ways.

24  Q.   And your own way was East Lake Oncology?

25  A.   Yes.

1    **Q.**   Let me show you the 2010 tax return for East Lake

2    Oncology, which is Defendant's Exhibit 2.  Dr. Norbergs, can

3    you tell if these are receipts for East Lake Oncology?

4    **A.**   The company brought in income 1.9231 -- $1,923,457,000.

5    **Q.**   Out of the total gross receipts in line two, tell us the

6    cost of the goods that you provided, also goods sold?

7    **A.**   Most of those goods were the chemotherapy drugs and

8    medical supplies.  I think that was it, $1,000,032,000.

9    **Q.**   And the total, then, income for the practice, in line

10   six?

11   **A.**   The total left over would be $620,000.

12   **Q.**   Did you pay your nurses?

13   **A.**   Yes.

14   **Q.**   Did you pay your office staff?

15   **A.**   Yes.

16   **Q.**   Look at line eight, please.  Does that number

17   demonstrate the costs of their salaries?

18   **A.**   Yes.

19   **Q.**   And what is that number, please?

20   **A.**   $257,356.

21   **Q.**   And you see below that line 11.  Apparently your

22   practice had to pay rent?

23   **A.**   Yes.

24   **Q.**   And the total rent for the 2010 tax year?

25   **A.**   108,405.

1   **Q.**   And then licenses and taxes, below?

2   **A.**   $23,086.

3   **Q.**   Let's go back up for a second.  Do you see "compensation

4   of officers?"

5   **A.**   Yes.

6   **Q.**   Can you tell the Jury, please, what "compensation of

7   officers" encompasses?

8   **A.**   It would be officers of the company, since there is only

9   one officer, that's me.  It would be what I would receive

10  personally with everything through my company.

11  **Q.**   Were you listed -- did you see a salary as an employee?

12  **A.**   Not at that time.

13  **Q.**   So is it your testimony your compensation for East Lake

14  Oncology for the year 2010 was $2,000?

15  **A.**   Yes.

16  **Q.**   Let me show you Defendant's Exhibit No. 4, which is the

17  2011, 1120S for East Lake Oncology.  Do you see that?

18  **A.**   Yes.

19  **Q.**   And again, what are the gross receipts for 2011?

20  **A.**   $1,831,936.

21  **Q.**   And the cost of goods sold for 2011?

22  **A.**   $1,433,240.

23  **Q.**   Line six, total income?

24  **A.**   $688,696.

25  **Q.**   And again, you paid salaries and wages to your

1    employees?

2    **A.**    Yes.

3    **Q.**    And that number, please?

4    **A.**    $306,681.

5    **Q.**    Again, you paid rent?

6    **A.**    Yes.

7    **Q.**    And how much was that?

8    **A.**    $105,918.

9    **Q.**    Leaving how much for compensation of officers in

10   paragraph seven?

11   **A.**    $1,500.

12   **Q.**    Let's shift to Defendant's Exhibit No. 6, which is the

13   2012, 1120S for East Lake Oncology.  Do you see that?

14   **A.**    Yes.

15   **Q.**    Gross receipts for the year are how much?

16   **A.**    $2,274,522.

17   **Q.**    And again, the cost of goods sold?

18   **A.**    $1,325,907.

19   **Q.**    Leaving the practice total income of how much in line

20   six?

21   **A.**    $948,000.

22   **Q.**    And again you paid salaries and wages?

23   **A.**    57 -- $500,723.

24   **Q.**    And the practice, again, obligated for rent?

25   **A.**    Yes.  $107,910.

1  **Q.**   And taxes and licenses?

2  **A.**   $42,761.

3  **Q.**   Leaving a total compensation of officers, paragraph

4  seven, how much?

5  **A.**   $23,346.

6  **Q.**   Dr. Norbergs, do you have any other income, other than

7  East Lake Oncology, for these years?

8  **A.**   Yes.

9  **Q.**   Tell the Jury, please, what other income you had for

10  these years?

11  **A.**   I'm partially disabled, and I receive private

12  disability.

13  **Q.**   Was there any other household income available for you?

14  **A.**   I would borrow money from my fiance', then, and my

15  parents.

16  **Q.**   Dr. Norbergs, why even go through the exercise of

17  maintaining this practice?

18  **A.**   I love my patients.  My patients were going -- starting

19  a career at age 17 was something -- it's more of a calling.

20  It's not money.  It's a calling, and I love medicine.  That

21  was all I ever wanted to do since I was age eight.  And I

22  love oncology, and I had patients for 25 years.  They

23  followed me through all my practices.  They are in remission

24  or they would go out of remission, and they -- I mean, I

25  would have surgeries or something and half of them wouldn't

1   even take my covering doctor.  They waited for me to come

2   back.  I had a very close relationship -- our office had a

3   close relationship with our oncology patients, and really, I

4   think, it was my oncology patients that really helped me get

5   through all the theft and the betrayal?

6   **Q.**   Dr. Norbergs, from the time period, let's enumerate this

7   indictment 2010 to 2012, this period, did you have any reason

8   to believe that non-FDA-approved drugs had entered into the

9   marketplace?

10  **A.**   No.  I did not believe there were non-FDA drugs

11  available.

12  **Q.**   Dr. Norbergs, during that time period did you know that

13  you had received non-FDA-approved drugs into East Lake

14  Oncology?

15  **A.**   No.  No, I didn't -- I did not receive -- I didn't know.

16  **Q.**   Dr. Norbergs, again, during this time period, did you

17  know that East Lake Oncology had billed Medicare for

18  non-FDA-approved drugs?

19  **A.**   No, I did not.

20  **Q.**   Now, in all fairness, you recognize that there are FDA

21  guidelines for reimbursements, correct?

22  **A.**   Correct.

23  **Q.**   And you are aware, are you not, that you are liable to

24  Medicare to repay the amounts that you --

25              MR. TREZEVANT:  Objection, leading.

 1              THE COURT:  Sustained.

 2    BY MR. SARTIS:

 3    Q.   Are you -- do you -- are you aware of the FDA guidelines

 4    regarding the submissions to Medicare?

 5    A.   Some of them, yes.  I can't remember all of them.

 6    Q.   Are you aware you are responsible to pay back

 7    Medicare --

 8              MR. TREZEVANT:  Objection, leading.

 9              THE COURT:  Sustained.  "What awareness, if any..."

10              MR. SARTIS:  I'm sorry, your Honor.

11              THE COURT:  "What awareness, if any, do you have

12    about..." fill in the blank.

13    BY MR. SARTIS:

14    Q.   What awareness, if any -- thank you, your Honor -- do

15    you have regarding your obligation to pay back Medicare for

16    the monies paid to East Lake Oncology for non-FDA-approved

17    drugs?

18    A.   I would have to pay it back.

19    Q.   And you were aware of that?

20    A.   Yes.

21              MR. SARTIS:  If I may have a moment, your Honor?

22              THE COURT:  All right.

23              MR. SARTIS:  Thank you, Dr. Norbergs.  Thank you,

24    your Honor.  I have nothing further.  If I may return these

25    exhibits to the table?

```
 1                    THE COURT:  All right.  Cross.

 2                    MR. TREZEVANT:  Yes, sir.  Thank you.

 3                         CROSS-EXAMINATION

 4    BY MR. TREZEVANT:

 5    Q.   Good morning, Dr. Norbergs.

 6    A.   Good morning.

 7    Q.   Dr. Norbergs, you said -- let me make sure I heard this

 8    correctly.  Did you say yesterday that you actually entered

 9    med school at the age of 17?

10    A.   Yes.

11    Q.   And where did you go to med school, ma'am?

12    A.   University of Missouri, Kansas City.

13    Q.   And then following that did you graduate -- how long did

14    it take to go through medical school?

15    A.   I graduated in November of 1980, with a combined degree

16    of a bachelor's degree and an MD degree.

17    Q.   And so, if you entered at 17 into medical school, how

18    long did it take you to go through medical school?

19    A.   Six-and-a-half years.

20    Q.   And so, you were 23/24 when you graduated medical

21    school?

22    A.   Approximately.

23    Q.   And that's typically ahead of schedule, correct?

24    A.   Yes.

25    Q.   Then you said something about attending Cornell?
```

**A.**   Um, I was in -- I did my internship and residency in internal medicine at New York Medical College in New York City.

**Q.**   And how long were you there, ma'am?

**A.**   I was there for three years.

**Q.**   Am I also correct you said -- you were Board certified?

**A.**   Yes.

**Q.**   In what?

**A.**   Internal Medicine and Medical Oncology.

**Q.**   And so, did you have to sit for two separate tests?

**A.**   Yes.

**Q.**   And that you taught some classes?

**A.**   I was an Assistant Professor of Medicine at New York Medical College.  I had a lot of responsibilities.  I was a teacher.  I would see patients.  I would do research.  I was part of the faculty Senate.  I had to present, um, investigational study protocols to the Investigational Review Boards.

**Q.**   And so, is it fair to say you were something of a prodigy, correct?

**A.**   I don't know how to say that.  I don't think I was a prodigy.

**Q.**   You were ahead of schedule?

**A.**   I was earlier, yes.

**Q.**   And you did better than a lot of your peers?

**A.**   Well, my peers were all in the same boat.

**Q.**   The entire group was very, very well educated, a very bright group of people?

**A.**   Yes.

**Q.**   And to get those degrees and to learn all of that, that quickly, took a lot of focus by you, correct?

**A.**   Yes.

**Q.**   A lot of reading?

**A.**   Yes.

**Q.**   You had to understand what you read?

**A.**   Yes.

**Q.**   You had to apply what you read --

**A.**   Yes.

**Q.**   -- to real life situations?

**A.**   Well, in medicine, yes.

**Q.**   Correct.  Right.  That's what I mean.  You had to apply what you read and what you learned in medical school to actual hands-on live situations and you had to demonstrate that to get those degrees?

**A.**   Yes.

**Q.**   Now, East Lake Oncology was created in or about 2009, right?

**A.**   2007.

**Q.**   East Lake Oncology?

**A.**   Yes.

1   **Q.**   Shortly after the bankruptcy of the other entity?

2   **A.**   The other entity did not go into bankruptcy.  It went

3   into a receivership.  I personally went into a bankruptcy.

4   **Q.**   You went into a personal reorganization bankruptcy?

5   **A.**   Yes.

6   **Q.**   So you were part of -- was it a different practice all

7   together that the money was stolen from?

8   **A.**   Yes.

9   **Q.**   How big was that practice?

10  **A.**   I had a partner, which dissolved with the theft, and it

11  was two oncologists producing instead of one.

12  **Q.**   All right.  So then, you went into a reorganization in

13  or around, through 2007, is that fair?

14  **A.**   Through seven and nine.

15  **Q.**   Through seven and nine.  It took a couple years?

16  **A.**   Yes.

17  **Q.**   And at the conclusion of that, in and around 2009, the

18  net result was -- did you get out from under your debts or

19  you owed money?

20  **A.**   It was a reorganization of my debt.

21  **Q.**   And by that was any of the debt reduced?

22  **A.**   Some of it was forgiven.  Some of it was reduced.

23  **Q.**   And the part that was reduced, how much did you owe?

24  **A.**   $25,000.

25  **Q.**   Okay.  So -- and how much was forgiven?

1    **A.**    Um, close to 1.5 million.

2    **Q.**    So then, coming out of that process, while a lot of

3    money may have been taken, you owed $25,000?

4    **A.**    Yes.

5    **Q.**    Okay.  Now, East Lake Oncology -- once you were done

6    with that process and you had completed the reorganization,

7    is that in 2009, about the same time when you submitted your

8    application to the State of Florida to become a healthcare

9    clinic establishment under East Lake Oncology?

10   **A.**    East Lake Oncology did not undergo a reorganization.  It

11   was my personal -- and 2009 is when my final -- my plan was

12   submitted in 2007.  So I was pretty much out of bankruptcy,

13   and when I fulfilled my obligation of 25,000, then we were

14   ready to have the final plan.  Then I was --

15              THE COURT:  Let's take a five-minute break.

16              THE WITNESS:  -- discharged.

17              MR. TREZEVANT:  Yes, sir.

18              CSO OFFICER:  All rise.

19              (Jury takes recess at 9:39 a.m.)

20              (Jury re-enters courtroom at 9:47 a.m.)

21              THE COURT:  Mrs. Williams, would it help you to

22   stand again today?

23              JUROR WILLIAMS:  I'll probably sit over there.

24   Thank you.  Yes, sir.

25              THE COURT:  Proceed.

1          MR. TREZEVANT:  Thank you, your Honor.

2    BY MR. TREZEVANT:

3    **Q.**   So in -- you reorganized your personal debts.  You ended

4    up paying 25,000, which you paid by then, and you were at

5    that time receiving some sort of disability payments,

6    correct?

7    **A.**   I had been receiving disability since 2007.

8    **Q.**   And the disability payments were approximately how much,

9    ma'am?

10   **A.**   Approximately 10 to $11,000 a month.

11   **Q.**   110 to $120,000 a year?

12   **A.**   Correct.

13   **Q.**   At that time, you moved forward with the East Lake

14   Oncology application for a healthcare client establishment?

15   **A.**   In 2009, Florida One, and one of our distributors wanted

16   an HCCE.

17   **Q.**   One of your distributors wanted what, ma'am?

18   **A.**   One distributor wanted an HCCE.

19   **Q.**   Which one was that, ma'am?

20   **A.**   I don't know.  I cannot recall.

21   **Q.**   But you put your application in?

22   **A.**   Yes.

23   **Q.**   And it was approved?

24   **A.**   Yes.

25   **Q.**   Your enrolled in the Medicare program, correct, in 2009?

1    **A.**   Yes.

2    **Q.**   When were you first enrolled in the Medicare program?

3    **A.**   Well, I believe I've been enrolled since I've been in

4    Florida, but Medicare I was -- it went through different

5    enrollment periods because of different companies.  I

6    cannot -- I would presume, since I saw the application in

7    court, it was 2004 that I applied for my license and that was

8    because of my partnership.

9    **Q.**   And you said you were not involved in the Medicaid

10   program, correct?

11   **A.**   Correct.

12   **Q.**   And why is that, ma'am?

13   **A.**   That was a choice by administration previously and it

14   continued.  Medicaid -- it was just a choice.

15   **Q.**   It was a voluntary choice, correct?

16   **A.**   Correct.

17   **Q.**   Because when you looked at the programs you voluntarily

18   elected into Medicare and not into Medicaid, correct?

19   **A.**   Correct.

20   **Q.**   And Medicaid doesn't reimburse as well as Medicare,

21   correct?

22   **A.**   I'm not sure because I wasn't participating in Medicaid.

23   **Q.**   Could you tell us the difference between the two, why

24   you decided not to elect into Medicaid?

25   **A.**   It was an administrative decision.

1  **Q.**  By whom, ma'am?

2  **A.**  Um, previously by my clinic.  The Cornerstone

3  administrator that I was using for my partnerships who stole

4  money.

5  **Q.**  But after you terminated that relationship and went to

6  East Lake Oncology you certainly could have elected into

7  Medicaid had you wanted to, correct, ma'am?

8  **A.**  Correct.

9  **Q.**  But you knew that Medicaid reimbursements were less than

10  Medicare, correct?

11  **A.**  That was not the reason I went.

12  **Q.**  But you did know that, ma'am?

13  **A.**  Yes.

14  **Q.**  Okay.  And East Lake is somewhat a small office, right?

15  **A.**  Yes.

16  **Q.**  How many -- how many -- you had -- if I heard you

17  correctly, you said you had two chemo nurses?

18  **A.**  I had one full-time nurse and one part-time nurse.

19  **Q.**  At East Lake Oncology?

20  **A.**  Yes.

21  **Q.**  And the full-time nurse was who?

22  **A.**  At certain years I had Melissa, Peggy, um, Dana.  I

23  had -- in one period of time there were -- I was having

24  difficulty obtaining nurses.

25  **Q.**  And so your nurses, the -- like when you said Peggy,

1   would that be Margaret Ward that testified yesterday?

2   **A.**   Yes.

3   **Q.**   How much did you pay her, ma'am?

4   **A.**   I cannot recall.

5   **Q.**   Do you have any -- can you approximate?

6   **A.**   In the 20's.  $20 per hour.  I'm really guessing and I

7   really don't want to guess.

8   **Q.**   All right.  Who else did you have there, ma'am, in 2009?

9   **A.**   In 2009?  I think Melissa was there.

10   **Q.**   And Melissa, what was her last name?

11   **A.**   Melissa Tippodow (phonetic).

12   **Q.**   And how much -- was she a chemotherapy nurse?

13   **A.**   Yes.

14   **Q.**   Part time?

15   **A.**   I can't recall if Peggy was full time and Melissa was

16   part time.  Melissa was a graduate nurse studying to be a

17   nurse practitioner.  I had them both.  2009 is hard --

18   **Q.**   How about 2010, is that easier?

19   **A.**   Um, Melissa left when she finished her nurse

20   practitioner.  I know that we gave flexible schedules for our

21   nurses.

22   **Q.**   And then, you had a front desk person, is that right?

23   **A.**   Yes.

24   **Q.**   And how much did you pay for that person?

25   **A.**   Um, you know, these are very difficult numbers to

1  remember.  Could -- if you could show them to me, I would

2  tell you.

3  **Q.**   Okay.  But you don't recall as you sit there?

4  **A.**   No.  They are all in the 10's and 15's, 12's.

5  **Q.**   Per hour.  All right.  So you had a front desk person

6  and then you had Kelly Krouse, is that right?

7  **A.**   Yes.

8  **Q.**   And was that the main staff?

9  **A.**   There were billing people too.

10  **Q.**   And who are the billing people?

11  **A.**   Dawn.  I had --

12  **Q.**   Is that Dawn McKenna?

13  **A.**   Yes.

14  **Q.**   And you had her there full time?

15  **A.**   Yes.

16  **Q.**   And was she the only full time biller?

17  **A.**   I may have had somebody before her in 2009.  I can't

18  recall if she was --

19  **Q.**   But you had one full-time biller?

20  **A.**   And one part time.

21  **Q.**   Okay.  And your patient base was primarily referrals

22  from other physicians of patients diagnosed with either a

23  blood disorder or cancer, is that right?

24  **A.**   Yes.

25  **Q.**   And you testified yesterday you spent a lot of time with

1    patients?

2    **A.**    Yes.

3    **Q.**    Could you tell us did you spend more time with your

4    patients than other oncologists spend with their patients?

5    **A.**    That would be hard to say.  I think so, but there are

6    other oncologists that spend as much time as I do.

7    **Q.**    So you didn't spend any more time with your patients,

8    right, ma'am?

9    **A.**    I'm not sure.

10   **Q.**    You said it was important that they always understood

11   their diagnoses?

12   **A.**    Correct.

13   **Q.**    In that regard you would spend time with them, and you

14   discussed that yesterday on direct examination, right?

15   **A.**    Correct.

16   **Q.**    Was that an important part of your practice?

17   **A.**    Yes.

18   **Q.**    And why is that, ma'am?

19   **A.**    I don't understand the question.

20   **Q.**    Why was that important to you as part of your practice?

21   **A.**    To spend time with my patients.

22   **Q.**    And insure that they understand their diagnoses?

23   **A.**    To -- for my patients to have an understanding of their

24   disease.  It would cause them to be less frightened.  The

25   more they understood, and the more they understood why I was

1    doing something, just to even explain a Pet Scan to a patient

2    takes time.  Otherwise the patient will go in, "I don't need

3    this," or, "I don't want this."  It helps for cooperation

4    between the physician and the patient and to understand what

5    they are getting in medications.

6    **Q.**   So then, in that regard, would you also spend time with

7    them explaining, not only their diagnoses, but their

8    treatment regiment and the importance of that particular

9    treatment regiment for their cancer?

10   **A.**   Yes.

11   **Q.**   Because ultimately the medications they are receiving

12   are critical to the health of those patients, right?

13   **A.**   Yes.

14   **Q.**   Because some of them are literally counting on you to

15   save their lives, right?

16   **A.**   Or make them comfortable, yes.

17   **Q.**   Or in the palatable sense keep them comfortable?

18   **A.**   Yes.

19   **Q.**   And that was important to you?

20   **A.**   Yes.

21   **Q.**   And that's, frankly, an important part of oncology,

22   correct, ma'am?

23   **A.**   Yes.

24   **Q.**   Okay.  And so, when you got -- you enrolled into

25   Medicare.  If we could look at Government Exhibit 200A.  We

1  can agree this is one of your Medicare enrollment

2  applications, right, ma'am?

3  **A.**   Yes.

4  **Q.**   Turning in here it says, at the top, you're a new

5  enrollee in Medicare.  Do you see that?

6  **A.**   Yes.

7  **Q.**   Was that true?

8  **A.**   Yes.

9  **Q.**   Okay.  If we can turn in -- this is going to Bates No.

10  00082, at the top third of this form, that information at the

11  top is correct as far as the information there, "University

12  of Missouri, School of Medicine, year of graduation, 1980,"

13  all of that information, right?

14  **A.**   Correct.

15  **Q.**   And there is -- you have a DEA number.  Do you see that,

16  ma'am?

17  **A.**   No.

18  **Q.**   Let me highlight that.

19  **A.**   Yes.

20  **Q.**   At the top right, after the name "Norbergs," you have

21  MD?

22  **A.**   Yes.

23  **Q.**   And then down below "license information" this is a

24  license, in the middle -- let me read it to you, ME0056118 is

25  listed there in Florida.  Was that your license number?

1   **A.**    That was my medical license, yes.

2   **Q.**    And so, that in the State of Florida, you, yourself,

3   personally had a medical license, right?

4   **A.**    Correct.

5   **Q.**    Did you apply for that license?

6   **A.**    Yes.

7   **Q.**    Why did you do that?

8   **A.**    I wanted to move to Florida.

9   **Q.**    But, I mean, people can move to Florida without applying

10  for a medical license.  Ma'am, why did you apply for a

11  medical license here?

12  **A.**    I wanted to practice -- I was headed down here to

13  practice medicine.

14  **Q.**    So you wanted to practice medicine so you applied for a

15  medical license, right?

16  **A.**    A Florida state medical license, yes.

17  **Q.**    And you understand the State of Florida requires it

18  because you just can't let anybody go out and just practice

19  medicine, right?

20  **A.**    Well, there are standards through Florida, yes.

21  **Q.**    And it's really, frankly, along the lines of -- follows

22  the same logic of a driver's license in that you have a

23  person who's going to drive a car, they want to make sure you

24  can follow the laws and operate it safely, so you have to

25  have a license to do so.  Same thing with medical except it's

1    just a heightened level, correct?

2    **A.**   Yes.

3    **Q.**   And if you are going to drive the public, you need even

4    higher, like, a "C" class license, and it is even higher,

5    we're talking a medical license, correct?

6          MR. SALTZMAN:  Objection, your Honor.  Counsel is

7    testifying, and relevancy.

8          THE COURT:  Overruled.

9          THE WITNESS:  I'm sorry, could you repeat the

10   question?

11   BY MR. TREZEVANT:

12   **Q.**   So then, it makes sense that the state requires someone

13   to apply for and be approved to operate as a physician in the

14   State of Florida and get a license, that makes sense to you

15   ma'am, right?

16   **A.**   Yes.

17   **Q.**   Down in the bottom third of the form is this

18   information, and all of that information there, that's

19   correct?  The correspondence, all of that information was

20   correct, right?

21   **A.**   Yes.

22   **Q.**   Turning to 0084 or -- 00048 bates number, that's your

23   specialty listed here "hematology/oncology," correct?

24   **A.**   Yes.

25   **Q.**   In fact, you are a Board certified oncologist?

1  **A.**    Yes.

2  **Q.**    All right.  So then, turning through to 00099, and we

3  don't need to go back through all of these because these have

4  been covered partially on direct examination and through

5  other witnesses, but you did read Section 14, "Penalties For

6  Falsifying Information," didn't you, ma'am?

7  **A.**    Yes.

8  **Q.**    And you understood that falsifying information, I mean,

9  forget illegal, it was just wrong.  You understood that,

10  right?

11  **A.**    I'm not sure I understand.

12          MR. TRAGOS:  Your Honor, can we have a sidebar,

13  please?

14          THE COURT:  We can if Mr. Sartis requests one.

15          MR. SARTIS:  Your Honor, may we speak at sidebar?

16          THE COURT:  Yes, you may.

17  (Sidebar conference held

18  outside the presence of the Jury.)

19          MR. SARTIS:  We were under the impression we were

20  going -- we were not going to enter into this line of

21  questioning because this would be 404(b) that was not

22  noticed.  Before we get too deep into this, I would like to

23  know, kind of, where he's going.

24          THE COURT:  How did you have that understanding?

25          MR. TREZEVANT:  What are we talking about here?

```
 1    What are you talking about?
 2             MR. SARTIS:  You're asking -- going into the
 3    Florida Statute, and Chapter 14 of the FDA, and all the
 4    criminal penalties associated with them.  That is what you're
 5    going to do.
 6             MR. TREZEVANT:  The what?
 7             MR. SARTIS:  Are you talking about the fine from
 8    the State, is that where you're going to go?
 9             MR. TREZEVANT:  No.
10             THE COURT:  There's an objection?
11             MR. SARTIS:  I'm not certain.  So I'll just reserve
12    this until Mr. Tragos tells me what else to say.
13             THE COURT:  Mr. Tragos just needed the exercise of
14    coming up here.
15             (Back before the Jury.)
16             THE COURT:  Proceed.
17             MR. TREZEVANT:  Thank you, Judge.
18    BY MR. TREZEVANT:
19    Q.   Ma'am, so that when you looked over these penalties for
20    falsifying information, you understood that it was illegal to
21    submit false information to the Government, to the Medicare
22    program, correct?
23    A.   Correct.
24    Q.   As well as you understood personally that it's just
25    wrong to do that, correct?
```

1  **A.**   Correct.

2  **Q.**   Bates No. 00101, do you see this certification

3  statement, ma'am?

4  **A.**   Yes.

5  **Q.**   Looking at the top of this, this addresses you

6  individually as the practitioner, correct?

7  **A.**   Yes.

8  **Q.**   And tells you you're the only person who can sign this

9  application.  You're the only person who has the authority to

10  sign it on your behalf.  You can't delegate it to any other

11  person, right?

12  **A.**   Correct.

13  **Q.**   And that's because you're the enrollee.  You're the one

14  who's applying to be a part of the Medicare program, right?

15  **A.**   Correct.

16  **Q.**   And you knew that was a government healthcare program,

17  correct?

18  **A.**   Yes.

19  **Q.**   And that ultimately when you submitted claims to that

20  program, you would be paid with federal funds, right?

21  **A.**   Correct.

22  **Q.**   And that -- and -- and there was no question about that?

23  **A.**   No.

24  **Q.**   Okay.  And the certification statement on the next

25  paragraph down talks about standards that must be met for

1    initial and continuous enrollment.  Do you see that, ma'am?

2    **A.**    Um, only the top part.

3    **Q.**    Right.  Where it says, "This certification statement --"

4    **A.**    Yes.

5    **Q.**    "-- contains certain standards that must be met for

6    initial and continuous enrollment in the Medicare program."

7    And then it says, "By signing the certification statement you

8    agree to adhere to all of the requirements listed, and

9    acknowledge that you may be denied entry..." etc., etc.  Do

10   you see that, ma'am?

11   **A.**    Some of it, yes.

12   **Q.**    Are you able to see it on your screen?

13   **A.**    Yes.

14   **Q.**    And that was there when you signed this document,

15   correct?

16   **A.**    Yes.

17   **Q.**    So that you knew this was an important document, right?

18   **A.**    Yes.

19   **Q.**    Okay.  Looking -- I just want to look at a couple

20   paragraphs.  At the very start where it says, "I, the

21   undersigned, certify to the following:"  No. 1 says, "I read

22   the contents of this application and the information

23   contained herein is true, correct and complete, and if I

24   become aware that any information in this application is not

25   true, correct and complete, I agree to notify the Medicare

1   fee-for-service contractor of this fact immediately."  And

2   you understood that when you signed the application, right,

3   ma'am?

4   **A.**   Yes.

5   **Q.**   Okay.  Looking down at paragraph four, where there is

6   the first sentence, "I agree to abide by the Medicare laws,

7   regulations and program instructions that apply to me or to

8   the organization listed in section 4(a) of the application."

9   And here you're actually applying yourself so all of this

10  would apply to you directly, right?

11  **A.**   Yes.

12  **Q.**   And in the next sentence where it says that, "The

13  regulations and the instructions are available through the

14  contractor," you understood that as well, that the rules and

15  regulations are accessible and you can certainly find them

16  and look up what you need to look up, right?

17  **A.**   Yes.

18  **Q.**   Looking down at paragraph eight, where it says, "I will

19  not knowingly present or cause to be presented a false or

20  fraudulent claim for payment by Medicare, and I will not

21  submit claims with deliberate ignorance or reckless disregard

22  of their truth or falsity," and that was there when you

23  signed the form as well, right?

24  **A.**   Yes.

25  **Q.**   "So that even as to deliberate ignorance --" in other

| | |
|---|---|
| 1 | words, you were telling the Medicare program that you were |
| 2 | going to pay attention and do your very best to comply with |
| 3 | the rules and regulations, correct? |
| 4 | **A.**   Correct. |
| 5 | **Q.**   And provide just, truthful information and truthful |
| 6 | claims to the program? |
| 7 | **A.**   Yes. |
| 8 | **Q.**   All right.  If we can go to the next page.  And then you |
| 9 | signed this document, right, ma'am? |
| 10 | **A.**   Yes. |
| 11 | **Q.**   Okay.  If we could look at Government Exhibit 2B -- |
| 12 | 200B.  And you also -- let me pull up the top there because |
| 13 | the writing on this document is tiny.  Where it says, "EDI |
| 14 | enrollment form," except for the fact that it's very |
| 15 | difficult to see, but you signed an enrollment form to allow |
| 16 | you to submit -- let me blow it up. |
| 17 | THE COURT:  200B is not in evidence. |
| 18 | MR. TREZEVANT:  Your Honor, I believe 200B is. |
| 19 | 200D is not. |
| 20 | MADAM CLERK:  200B was only identified on the |
| 21 | record. |
| 22 | THE COURT:  200B, as in boy, was identified, but |
| 23 | not admitted. |
| 24 | BY MR. TREZEVANT: |
| 25 | **Q.**   Ma'am, would you look at 00159 of this document. |

1           THE COURT:  Are you offering it into evidence?

2           MR. TREZEVANT:  I understand, your Honor.

3           THE COURT:  No need to prove up the foundation if

4    you can just offer it and stipulated.

5           MR. TREZEVANT:  We would offer 200B, your Honor.

6           THE COURT:  Any objection?

7           MR. SALTZMAN:  No, your Honor.

8           THE COURT:  All right.  It will be admitted.

9    (Government's Exhibit 200B

10   admitted into evidence.)

11   BY MR. TREZEVANT:

12   **Q.**   So let me blowup the very front of this so you can see

13   it better, and do you see at the top left where it says,

14   "First Coast," ma'am?

15   **A.**   Yes.

16   **Q.**   And "CMS," and this is the document that you signed and

17   submitted so -- that you could submit electronic claims to

18   the Medicare program, correct?

19   **A.**   Could I see the bottom?

20   **Q.**   Yes, ma'am.  Standby, ma'am.  Let me hand you an actual

21   copy of the document.  That will make it easier for you to

22   see as well.

23   **A.**   Thank you.  It's smaller there.

24   **Q.**   And just take a moment and go ahead and look through

25   this document?

**A.**    (Witness peruses document.)  Thank you.

**Q.**    Now, looking up at paragraph one underneath where it says, "The provider agrees --" where it says, "The provider agrees that they will be responsible for all Medicare claims submitted to CMS by itself, its employees or its agents, so that you were the responsible part," because you were the one actually completing the form, correct?

**A.**    Yes.

**Q.**    And looking at paragraph four, where paragraph four -- "Every electronic entry can be readily associated and identified within an original source document.  Each source document must reflect the following information."  And then there are five items there that are really the five items that make up a claim, the beneficiary's name, the beneficiary's Health Insurance Claim Number, the date of service or the dates of service, the diagnoses and the actual procedure or the service performed, and each of those needs to be accurate and truthful when they are submitted to the Medicare program, right?

**A.**    Yes.

**Q.**    And you knew that?

**A.**    Yes.

**Q.**    Looking down at paragraph seven, and that's just you repeating, again, that you will submit claims that are accurate, complete and truthful?

1    **A.**    Yes.

2    **Q.**    Okay.  Now looking over at the second page of the form

3    000158, paragraph 12, just the first sentence there that

4    says, "you acknowledge that the claims will be paid from

5    federal funds," and we've already been through that.  So now,

6    if we can just go to paragraph 14.  Paragraph 14 also adds,

7    "You have the obligation to research any claim discrepancies

8    if you find them," right?

9    **A.**    Yes.

10   **Q.**    And you knew that?

11   **A.**    Yes.

12   **Q.**    Okay.  Now at some point you mentioned that Dr. Raj came

13   on the practice part-time, is that correct?

14   **A.**    Yes.

15   **Q.**    And, um, let me show you this Government Exhibit 200D,

16   as in Delta.  When Dr. Raj -- what was Dr. Raj's full name,

17   ma'am?

18   **A.**    She had shortened it and we called her Dr. Shay LaRaj.

19   **Q.**    And was that, around 2011?

20   **A.**    About that.

21           MR. TREZEVANT:  Your Honor, we offer Government

22   Exhibit 200D into evidence.  200D, as in Delta, your Honor,

23   we offer it into evidence.

24           THE COURT:  It will be admitted.

25   (Government's Exhibit No. 200D

1  admitted into evidence.)

2          THE COURT:  And Ariana has fessed up that 200B was

3  in evidence.  I didn't want you to think we never admit

4  mistakes.  Of course that's the first one I can remember, but

5  if we ever make one, we will admit it.

6          MADAM CLERK:  Sorry about that.

7          MR. TREZEVANT:  Thank you, your Honor.

8  BY MR. TREZEVANT:

9  **Q.**   The 200D reassignment Medicare form, do you see this,

10  ma'am?

11  **A.**   Yes.

12  **Q.**   This was a document that was completed when she joined

13  your practice at East Lake, is that correct?

14  **A.**   Yes.

15  **Q.**   Okay.  If you look at the second page 04321, go figure

16  that's the bates number, that is the effective date of 7-11

17  up there, is that correct?

18  **A.**   Yes.

19  **Q.**   Okay.  So then flipping through in this form what do you

20  understand this form to do?

21  **A.**   That, um, her previous Medicare number she was

22  reassigning to East Lake Oncology as a joint practice.

23  **Q.**   So that when she performed a service at East Lake

24  Oncology, East Lake Oncology could then submit that claim to

25  the Medicare program, correct?

**A.**   Under her provider number, yes.

**Q.**   Under her provider number, right?

**A.**   Yes.

**Q.**   Okay.  And um, 04323 at the bottom half of that
document, there is Dr. Raj's name.  You called her what,
ma'am?

**A.**   Dr. Raj.

**Q.**   Is that your signature?

**A.**   On the bottom?

**Q.**   Yes, ma'am.

**A.**   Yes.

**Q.**   Okay.  Let me show you Government Exhibit 200G1, this
was earlier just to orient you so that you know what the next
question is about.  This actually is the Medicare benefit
policy manual, and you knew that Medicare had a policy
manual, right?

**A.**   I think so, yes.

**Q.**   Because you agreed to follow the rules and the rules are
in the policy manual, right?

**A.**   Yes.

**Q.**   Looking at 200G2, and at the bottom where there are
drugs and biologicals, and you, as an oncologist, a big part
of the practice is actually the administration of drugs and
biologicals to the patients, correct?

**A.**   Yes.

1   **Q.**   I mean, that's at the heart of the practice is the

2   administration of the chemotherapy to the patients, right?

3   **A.**   No.

4   **Q.**   What would be at the heart of it?

5   **A.**   The patients.

6   **Q.**   I understand that, ma'am.  I'm talking about -- forgive

7   me.  Maybe I didn't say it well.  At the core of the actual

8   service provided is, and I understand you cared about the

9   patients, you made that very clear, but I'm talking about the

10  hands-on medicine part of the practice is when a cancer

11  patient goes to an oncologist for chemotherapy, that's a

12  critical aspect of the practice?

13  **A.**   Yes.

14  **Q.**   And so, turning through to 50.4.1, which is two pages at

15  the back of the exhibit, at the very bottom there, "Approved

16  use of a drug."  The rule is fairly straight forward,

17  correct, ma'am, that use of the drug or biological must be

18  safe and effective and otherwise reasonable and necessary,

19  and that makes sense, correct?

20  **A.**   Yes.

21  **Q.**   And that drugs, biologicals are approved for marketing

22  by the Food and Drug Administration are considered safe and

23  effective for purposes of this, and then it goes over to the

24  next page, "Requirements when used for indications specified

25  on the labelling," and it says, "The program," meaning the

1    Medicare program, "May pay for the use of an FDA-approved

2    drug or biological if..." and the very first item there,

3    "...all three of these items here or elements must be met for

4    a claim to be paid.  The first one being it was injected on

5    or after the date of the FDA approval," and you knew that,

6    ma'am, right?

7    **A.**    Yes.

8    **Q.**    And it is reasonable and necessary for the patient, and

9    you knew that, correct?

10   **A.**    Yes.

11   **Q.**    And that's important in any event even if it wasn't FDA

12   approved, but that's important because it's about patient

13   care?

14   **A.**    Yes.

15   **Q.**    And just the other applicable coverage requirements were

16   met.  So that the FDA approval and FDA-approved drug was

17   necessary to be administered before a claim could be

18   submitted to the Medicare program and you knew that, correct?

19   **A.**    Yes.

20   **Q.**    Now, if we could go -- could look at your healthcare

21   clinic establishment agreement and license, and here we're

22   talking about Government Exhibit 1A.  We've seen this

23   document a lot.  So I don't mean to belabor it, but at the

24   very top you actually -- you did submit this document to the

25   State of Florida, Department of Health in October of 2009,

1    right?

2    **A.**   Yes.

3    **Q.**   And you identified yourself as the designated qualifying

4    practitioner, right?

5    **A.**   Yes.

6    **Q.**   And what did you understand that to mean?

7    **A.**   That I was the designated physician.

8    **Q.**   You.  Because at East Lake Oncology, prior to Dr. Raj's

9    arrival in 2011, you were really -- you were the only person

10   with a physician's license, right?

11   **A.**   Correct.

12   **Q.**   You were the oncologist?

13   **A.**   Correct.

14   **Q.**   The others worked for you and at your direction,

15   correct?

16   **A.**   Correct.

17   **Q.**   You ran the practice?

18   **A.**   Yes.

19   **Q.**   You made hiring decisions?

20   **A.**   Yes.

21   **Q.**   Firing decisions?

22   **A.**   Yes.

23   **Q.**   And significant -- any significant purchases had to go

24   through you, correct?

25   **A.**   Yes.

 1    **Q.**    Okay.  Now, if we could look at the next page 0004, and

 2    you identified yourself as the president, right?

 3    **A.**    Yes.

 4    **Q.**    Now, the next page 0005, where it says, "affidavit,"

 5    ma'am, whose writing is that after the "I"?

 6    **A.**    Mine.

 7    **Q.**    So you wrote that in yourself, right?

 8    **A.**    Yes.

 9    **Q.**    And when you did that, prior to signing where it says,

10    "Signature of owner or company officer," you actually

11    understood that you were acknowledging and affirming to the

12    State of Florida, Department of Health that you understood

13    that the healthcare clinic establishment and you, as the

14    designated qualifying practitioner, were required to comply

15    with the provisions of Chapter 499 Florida statutes, right?

16    **A.**    Yes.

17    **Q.**    I mean, you didn't just sign this without caring about

18    that.  You understood that was important, right, ma'am?

19    **A.**    I signed it.  I'm not sure what you're asking.

20    **Q.**    You understood when you signed it that you were swearing

21    and affirming that you would comply with Chapter 499 of the

22    Florida statutes?

23    **A.**    Yes.

24    **Q.**    And you took that seriously, correct?

25    **A.**    Yes.

1    **Q.**   Okay.

2         THE COURT:  When you reach a convenient stopping

3    place we'll take a 15-minute break.

4         MR. TREZEVANT:  Fine, your Honor.

5         THE COURT:  Let's take our 15-minute break.

6         CSO OFFICER:  All rise.

7         (Morning recess taken at 10:29 a.m.)

8         (Jury exits courtroom at 10:30 a.m.)

9         THE COURT:  Earlier there was an objection to the

10   last sentence of jury instruction No. 18, because the

11   sentence referred to a controlled substance, but that

12   references a continuation of the example in the two

13   paragraphs before it.  So I deny the objection.

14        (Jury enters courtroom at 10:49 a.m.)

15        THE COURT:  You may proceed.

16        MR. TREZEVANT:  Thank you, your Honor.

17   BY MR. TREZEVANT:

18   **Q.**   When we ended, we were just finishing with this exhibit,

19   which was Exhibit 1A, the affidavit that you had signed.  Do

20   you recall that, ma'am?

21   **A.**   Yes.

22   **Q.**   Okay.  And so, with that application, once approved, it

23   permitted East Lake Oncology to purchase chemotherapy drugs

24   and to administer -- for you to administer them to your

25   patients at East Lake Oncology and them bill Medicare,

1   correct?

2   **A.**    Correct.

3   **Q.**    And so, just like a driver's license, but a much more

4   heightened version of that in that you're actually going to

5   be administering chemotherapy drugs, which can be very toxic

6   if administered improperly, right?

7   **A.**    I'm not sure what you're asking.

8   **Q.**    Chemotherapy drugs can be -- are very powerful drugs, or

9   can be?

10   **A.**    Yes.

11   **Q.**    And it's important that all the rules, and regulations,

12   and safeguards that are in place be followed to protect the

13   patients, correct?

14   **A.**    Yes.

15   **Q.**    And you took that seriously, ma'am, right?

16   **A.**    Yes.

17   **Q.**    All right.  So if we could look at 499, Government

18   Exhibit 1D, and turn into Section 499.01 and 499.02, which is

19   on page -- page 3, here we're talking about the Florida Drug

20   and Cosmetic Act.  Under 499.002, it says, "Drug

21   administration and enforcement," under 1A where it says, "To

22   safeguard public health and promote public welfare by

23   protecting the public from injury by product use and by

24   merchandising deceit involving drugs, devices and cosmetics,"

25   and you understood that, ma'am, right?  That that was one of

1   the purposes of the Act?

2   **A.**   Was this part of the permit, this medication?

3   **Q.**   Part?

4   **A.**   I'm sorry, this document?

5   **Q.**   Yes, ma'am, 499.

6   **A.**   Okay.  Yes.

7   **Q.**   And that's what we were just talking about, "To protect

8   the public from injury through the use of chemotherapy

9   drugs," and in your case the chemotherapy drug, correct?

10  **A.**   Correct.

11  **Q.**   Then there is "B, to provide uniform legislation to be

12  administered as far as practicable infirmity with the

13  provisions of, and regulations issued under the authority of

14  the Federal Food, Drug and Cosmetic Act, etc."  So all of

15  that is very clear.  That's not confusing language, right?

16  **A.**   No.

17  **Q.**   Under C, "promote thereby uniformity of the State and

18  Florida laws, and their administration and enforcement

19  throughout the United States."

20          Now, if we could turn to Page 15 of that exhibit.

21  Are you more comfortable seeing it on the screen or would you

22  rather I hand it to you as well?

23  **A.**   Hand it.

24  **Q.**   Yes.  And you'll see the page numbers, ma'am, when you

25  get this exhibit, they are at the bottom.  There's a number

1    at the bottom that tells you Chapter 499 Florida statute,

2    page, and then the number.  If you take a moment and look at

3    that and orient yourself, and let me know when you are

4    oriented.  (Witness looks up.)  Do you see the page numbers

5    on the bottom right of each page?

6    **A.**    Yes.

7    **Q.**    Okay.  So Page 15, looking down at paragraph four, where

8    it says, "A person who knowingly purchases or receives from a

9    person not authorized to distribute prescription drugs under

10   this chapter, a prescription drug in a wholesale distribution

11   transaction," and then it goes on to talk about, "a felony,

12   etc."  Do you see where it says, "A person who knowingly

13   purchases or receives from a person not authorized to

14   distribute prescription drugs," do you see that, ma'am?

15   **A.**    Yes.

16   **Q.**    In other words, when you, at East Lake Oncology,

17   purchased the oncology drugs, you needed to purchase them

18   from a person who was licensed and authorized to distribute

19   those drugs to you just as you had to get a license to

20   purchase them, correct?

21   **A.**    Correct.

22   **Q.**    All right.  So if we look at Government Exhibit,

23   briefly, 31A, and looking at the bottom third of this

24   document from CardinalHealth, and that's how you know as you

25   can see the Florida license number at the bottom.  If we

1    could highlight that where it says 23:00331, that's one way

2    you can know that CardinalHealth is, in fact, licensed to

3    distribute those drugs to you, correct?

4    **A.**    Yes.

5    **Q.**    And there may be other ways to also, right?

6    **A.**    Yes.

7    **Q.**    You can verify it, correct?

8    **A.**    Yes.

9    **Q.**    Okay.  That's up to you as the oncologist and the

10   designated qualified person, right?

11   **A.**    Yes.

12   **Q.**    Okay.  Turning to page 19, it's really the very bottom

13   of 18, where it says, "other violations."  Really, at the

14   top.  We're looking at the top of page 19.  So this is just

15   to orient you, but at the very top of the page where it talks

16   about, "Who knowingly is manufacturing, repackaging, selling,

17   delivering, or holding, or offering for sale any drug that is

18   dilated or misbranded or had otherwise been rendered unfit

19   for human or animal use," and you understand the language

20   there, don't you, ma'am?

21   **A.**    Yes.

22   **Q.**    Turning, ma'am, to page 23, and looking at Chapter

23   499.007, "Misbranded drug or device."  When you look at

24   paragraph four here, where it says, "If any statement, words,

25   statement or other information required by or under this part

1   to appear on the label or labelling is not prominently placed

2   thereon with such obsequiousness as compared with other

3   words, statements, or designs, or devices in the labelling

4   and in such terms as to render the word, statement or other

5   information likely to be read and understood under customary

6   conditions of purchase and use, and customarily read and

7   understood under customary conditions in the United States,"

8   means English, correct, ma'am?

9   **A.**   Yes.

10   **Q.**   And then turning and looking at six -- at the bottom.

11   Where it says, "If its labelling does not bear adequate

12   directions for use," and then turning to the next, actually,

13   two pages into page 25, at paragraph 14B, that the label, if

14   it is a drug subject to paragraph 13A, "And if at any time

15   before its dispensed the label does not bear the statement Rx

16   only."  So the drugs need to have "Rx only" displayed,

17   correct?

18   **A.**   Correct.

19   **Q.**   And that's just well known in the medical industry,

20   right?

21   **A.**   Yes.

22   **Q.**   Setting this aside, that's not a secret.  That's always

23   the case and you knew that?

24   **A.**   Yes.

25   **Q.**   Where it talks about the terms of 49901 in permits.  At

1   the bottom of the page where it says, "Prior to operating a

2   permit is required for each person and establishment that

3   intends to operate as..."  So then, you have "A" is the

4   actual -- the manufacturer needs a permit to operate in the

5   State of Florida.  And then looking at the next page, page

6   27, looking up top, paragraph G and I, "an out-of-state

7   prescription drug wholesale distributor."

8   **A.**   Wait a minute.  I don't see that.

9   **Q.**   That's on page 27 at the top, and we're looking --

10  **A.**   Oh, okay.  Yes.  Sorry.

11  **Q.**   -- G, and in a minute I, but, I'm sorry, E.  My page is

12  folded.  "E, an out-of-state prescription drug wholesale

13  distributor," and that would be like Cardinal or McKesson

14  that we have seen, correct?

15  **A.**   Yes.

16  **Q.**   Oncology Supplies would be another one, correct?

17  **A.**   Yes.

18  **Q.**   And so, then we look down where "I" would be a freight

19  forwarder, and a freight forwarder being, you know, as an

20  entity that simply moves the goods in transit pursuant to a

21  certain agreement, right?  Is that what a freight forwarder

22  is?

23  **A.**   Yes.

24  **Q.**   Okay.  And then, down at -- "T" would be your

25  establishment at East Lake Oncology, would be at "T," where

1    it says, "A healthcare clinic establishment," and that's you?

2    **A.**   Yes.

3    **Q.**   Turning to page 29E, "out-of-state prescription drug

4    wholesale distributor permit."  Do you see that, ma'am?  I

5    just want to look at the first sentence of this.

6    **A.**   Yes.

7    **Q.**   Where it says, "An out-of-state prescription drug

8    wholesale distributor is a wholesale distributor located

9    outside the state which engages in the wholesale distribution

10   of prescription drugs into the state, and which must be

11   permitted by the Department and comply with all the

12   provisions required of a wholesale distributor under this

13   part."  So in other words, an out-of-state wholesaler who's

14   distributing drugs to East Lake Oncology must comply and have

15   a license under 499, correct?

16   **A.**   Yes.

17   **Q.**   And there is nothing difficult to understand about that

18   language?

19   **A.**   No.

20   **Q.**   There's a similar provision, I don't need to read it, go

21   to page 30, look at subparagraph I.  There's a similar

22   paragraph for freight forwarder also needs to get a permit.

23   Page 30, subparagraph I.  Two paragraphs up at the bottom.

24   **A.**   Yes.

25   **Q.**   So now, looking at page 34, which is actually your

1    permit and governs East Lake Oncology, when you just --

2    earlier this morning you said, "Well, in 2009 a law was

3    passed," this is the law you are talking about effective

4    January 2009, healthcare clinic establishment permit, right?

5    **A.**    Yes.

6    **Q.**    And so that a healthcare clinic establishment permit is

7    required for a business such as East Lake Oncology for the

8    purchase of a prescription drug by a place of business at one

9    general physical location that provides healthcare, which is

10   what you did at East Lake Oncology, right?

11   **A.**    Yes.

12   **Q.**    The next, "veterinary service," is not applicable, which

13   is owned and operated by a business entity that has been

14   issued a federal employer tax ID number.  So that there it

15   talks about the qualifying practitioner, in the next

16   sentence, meaning a licensed healthcare provider and that was

17   you, right?

18   **A.**    Yes.

19   **Q.**    Looking down a little bit.  It says that, "Your entity

20   must provide who's going to be the person responsible for all

21   legal regulatory requirements related to purchase, record

22   keeping, storage, handling of the prescription drugs."  So

23   that there's duties and responsibilities with being a

24   designated qualifying practitioner, right?

25   **A.**    Yes.

1   **Q.**   And you assume those duties and responsibilities,

2   correct, ma'am?

3   **A.**   Yes.

4   **Q.**   And you took them seriously, right, ma'am?

5   **A.**   Yes.

6   **Q.**   Turning to your direct exam and you are discussing the

7   ordering process.  As I recall, am I correct that you

8   explained to Mr. Sartis as to the ordering process the chemo

9   nurses would inform either you, or Kelly, or both, meaning

10   Kelly Krouse, as to what medications would be needed to order

11   for the upcoming week, is that right?

12   **A.**   Yes.

13   **Q.**   They would give you an actual order form that could be

14   used for the ordering, right?

15   **A.**   Yes.

16   **Q.**   At some point yesterday you said after Kelly had been

17   trained she assumed more of the task as far as ordering the

18   upcoming week's chemotherapy drugs, is that right?

19   **A.**   Yes.

20   **Q.**   So that, as far as you said, it's after she had been

21   trained.  Who trained her, ma'am?

22   **A.**   I did.

23   **Q.**   And, um, when, approximately, did she begin assuming

24   more of that ordering task?

25   **A.**   It was a gradual onset.  She became my manager in 2011.

1  **Q.**   So would it be around then when she would be the primary

2  person who would be actually physically ordering the

3  chemotherapy drugs for East Lake Oncology?

4  **A.**   Well, she was physically faxing and she would do the

5  phone calls before that.

6  **Q.**   And at your direction now?

7  **A.**   Yes.

8  **Q.**   And under your supervision?

9  **A.**   Yes.

10  **Q.**   So that you were overseeing everything she was doing and

11  gradually, as she learned what you wanted her to do and what

12  procedures you wanted her to follow, you allowed her to

13  assume more responsibility?

14  **A.**   Yes.

15  **Q.**   All right.  You also explained, I believe, in an effort

16  to lower your cost you had Kelly Krouse sort of shop around

17  to insure that ELO or East Lake was purchasing its

18  chemotherapy drugs at the best available price, correct?

19  **A.**   Correct.

20  **Q.**   Because like you said, if you don't do that, you

21  literally could end up in a situation where you would be

22  paying the patient to come in, right?

23  **A.**   Correct.

24  **Q.**   Did I understand you correctly to say yesterday that you

25  only shopped brand names when it came to chemotherapy

1  medications?

2  **A.**  I don't recall that I just said brand names only.

3  **Q.**  Oh, okay.  Could you clear that up for me, ma'am.  Did

4  you shop for brand names when --

5  **A.**  I used brand names as my terminology in ordering,

6  prescribing drugs.

7  **Q.**  Okay.  So explain that a little more so I'll understand

8  it and then it will be very clear.

9  **A.**  When I wrote orders, it was in brand names.  They were

10  usually shorter and better understood than Ribomustin, which

11  would be a long name for me to write.

12  **Q.**  Okay.  And so, you understood when you were ordering

13  these drugs, these chemotherapy drugs, the pricing

14  methodology and how ASP and all that have worked, correct?

15  **A.**  Most of it.

16  **Q.**  Most of it.  And you smile, but you were -- were you

17  actually focused on it in and around 2004 and 2005, when it

18  was being phased out, because you were concerned about it

19  because it may affect not only potential products to the

20  physician such as yourself, but to the actual practice of

21  medicine, right?

22  **A.**  I believe so.

23  **Q.**  And you even wrote to CMS or the Medicare program and

24  expressed your concerns about using the ASP methodology?

25  **A.**  I may have.  I've written a lot of -- when asked about

1   comments, I would write them, yes.

2   **Q.**   Let me show you Government Exhibit 47, ma'am.  Take a

3   moment and look at this document.  Do you recognize that,

4   ma'am?

5   **A.**   Yes.

6   **Q.**   That is something you actually wrote and submitted to

7   coding and billing within the Medicare program?

8   **A.**   Yes.

9   **Q.**   And does it concern the ASP pricing methodology and your

10  concerns?

11  **A.**   At that time, yes.

12          MR. TREZEVANT:  Your Honor, the Government would

13  offer Government Exhibit 47 into evidence.

14          THE COURT:  It will be admitted.

15  (Government Exhibit No. 47

16  admitted into evidence.)

17          MR. SARTIS:  Your Honor, could we have a sidebar on

18  this particular document?

19          THE COURT:  Approach the bench.

20  (Sidebar conference held

21  outside the presence of the Jury.)

22          MR. SARTIS:  This is a document that was generated

23  in 2004, I believe, when the CMS agency was soliciting

24  feedback from the medical profession, and she provided what

25  her feedback was in 2004.  I don't know what the relevance is

1    for her feedback to something that was being contemplated by

2    CMS in 2004 in a case alleging conduct from 2010 to 2012, and

3    this has nothing to do with the specific drugs we're talking

4    about in this indictment.  And frankly, I think they are

5    trying to show that her character is questionable, or that

6    the opinions she may have expressed prior to the passing of

7    the new ASP plus six method would somehow taint her ability

8    or willingness to abide by it.

9              THE COURT:  Response.

10             MR. TREZEVANT:  Yes, Judge, this goes directly to

11   her knowledge of ASP, that it's in force, how it works, that

12   she is very concerned about it.  But not only that she knows

13   about it a little bit, she knows all about it, and she

14   actually -- the Government's theory is knowing about it and

15   disagreeing with it she then subverted it by going around it.

16             (Court peruses document.)

17             THE COURT:  Sustain the objection.

18             (Back before the Jury.)

19   BY MR. TREZEVANT:

20   Q.   All right, ma'am.  For now, if you would set that aside.

21   As far as ASP goes and the methodology, you did understand

22   it, right, ma'am?

23   A.   Yes.

24   Q.   And you understood how it worked?

25   A.   At that time.

1  **Q.**   And you understood that basically the drugs, as priced,

2  that Medicare would take the average sales price?

3  **A.**   Yes.

4  **Q.**   And simply add six percent and then that would be the

5  reimbursement rate that would go to the provider such as

6  yourself, correct?

7  **A.**   In 2004 it was ASP that was discussed, not a six

8  percent.

9  **Q.**   Right.  ASP was the methodology that they were moving

10  towards, though, right?

11  **A.**   They were asking comments regarding that law.

12  **Q.**   And by 2009, that was exactly how the reimbursement to

13  providers were working, correct?

14  **A.**   Yes.

15  **Q.**   And yesterday on direct examination when Mr. Sartis was

16  talking to you about Government Exhibit 181, and --

17          MR. TREZEVANT:  Your Honor, this is a

18  demonstrative, and we would ask to use it only as a

19  demonstrative in the cross-examination with the witness.

20          THE COURT:  All right.

21  BY MR. TREZEVANT:

22  **Q.**   If we could go to the Elmo, please.  And ma'am, what

23  I've done, I've calculated using Exhibit 53, Government

24  Exhibit 53 and Government Exhibit 51, and I can give you

25  those exhibits if you like to work through the math yourself,

1    but just to save time and because I write so poorly --

2            MR. SARTIS:  Objection, your Honor.  May I confer

3    with counsel one moment?

4            MR. TREZEVANT:  Yes.

5            THE COURT:  All right.

6    (Discussion had off the record.)

7            MR. SARTIS:  I'm sorry, your Honor, may we approach

8    on this?

9            THE COURT:  Approach the bench.

10   (Sidebar conference held

11   outside the presence of the Jury.)

12           MR. SARTIS:  Okay.  My objection -- I have no

13   objection to them using the demonstrative aid that we have

14   talked about and used over the course of this trial.  The

15   difference is this demonstrative aid that they just put on

16   the screen is not that same demonstrative aid.  What counsel

17   has done is he has now taken a portion of that document and

18   done some additional math based on some calculations and some

19   other documents, from my understanding he's added the six

20   percent to the ASP.

21           THE COURT:  So.

22           MR. SARTIS:  Well, that's not the same

23   demonstrative aid.

24           THE COURT:  So.

25           MR. SARTIS:  So they are going, I guess, to do the

1    math for her, put it up on the screen and say, "is this

2    right?"

3            THE COURT:  She can either agree with it or not

4    agree with it.

5            MR. SARTIS:  Is the Court going to allow us to put

6    that up there?

7            THE COURT:  Yes.

8            MR. TREZEVANT:  I was going to say, your Honor --

9            THE COURT:  Overruled.

10           (Back before the Jury.)

11   BY MR. TREZEVANT:

12   **Q.**   And so -- so that you understand, Dr. Norbergs, we're

13   all on the same page, do you see where it says "EX.53

14   directly," in other words, the ASP column on this exhibit

15   comes from Government Exhibit 53, which has already been used

16   during this trial.  And so, what you're looking at, as you

17   talked about it yesterday, were you saying for these drugs

18   that were in the little brackets, for example, Neupogen you

19   would have paid $143.83, which would be $2.09 less than ASP

20   at the time.  You went through this with your attorney

21   yesterday, correct?  And take your time, ma'am.  I don't want

22   to rush you.

23   **A.**   Um, what are you -- you're asking me to compare the

24   price of ASP plus six?

25   **Q.**   No, ma'am.  No, ma'am.  I'm not referring to any of the

1   writing.  I'm first trying to get you oriented with what you

2   did yesterday, which was talk about the price East Lake --

3   let me show you the title of this so you can see it a little

4   more clearly on the screen.  We can hand you the exhibit with

5   the "no writing" as well, if it will help.  These are actual

6   purchases by East Lake Oncology for drugs from the various

7   distributors, on the left-hand side, such that you see Metro

8   Medical, McKesson, Curescript, etc.?

9   **A.**   Yes.

10   **Q.**   And these were purchases made on these dates of these

11   drugs.  And so, at that price -- and yesterday you went

12   through, and if you look on the chart, the yellow blocks are

13   where you actually ended up paying more than average sale

14   price, correct?

15   **A.**   I'm not sure.

16   **Q.**   So if you look at the top where it says, "Velcade

17   3.5 milligrams," East Lake would have paid $1,396.33, whereas

18   the average sale price was $1,368.58 under ASP, and the

19   difference being $27.75.  You paid -- in other words, East

20   Lake paid more than the average sales price because you're a

21   smaller private clinic than some of the other larger clinics

22   might pay?

23   **A.**   You couldn't get the same buying power sometimes.  But

24   this was McKesson.  There were other distributors.

25   **Q.**   Yes, ma'am.  I'm saying, when you bought it on

1   January 23, 2011, these were actual purchasers you discussed

2   yesterday made by East Lake?

3   **A.**   Okay.

4   **Q.**   So that East Lake actually paid a little more sometimes

5   because you didn't have the buying power of maybe a bigger

6   facility or group of facilities for the same drug for a

7   distributor, correct?

8   **A.**   I'm not sure what other larger -- I did state that

9   larger practices had volume discounts.  I don't know what

10  that volume discount was.

11  **Q.**   Yes, ma'am.  But they would have a volume discount that

12  you would not enjoy at East Lake?

13  **A.**   At times, yes.

14  **Q.**   So at times, where we have all these yellow squares,

15  those would be situations where the average sales price was

16  actually a little bit better or more advantageous than you

17  might pay at East Lake Oncology, all those yellow blocks?

18  **A.**   That's based on ASP.

19  **Q.**   Right.  Average sales price in the marketplace.

20  **A.**   But our reimbursement is based on ASP plus six percent.

21  **Q.**   Yes, ma'am.  So if you look down in the middle, the math

22  is already done there, but I'm happy to let you look at it if

23  you're not sure or if it looks odd to you, but looking from

24  Exhibit 53, and from Government Exhibit 51, if you add the

25  ASP plus six percent, that would be the reimbursement you

```
 1    would get from the Medicare program, ASP plus six, right?
 2              THE COURT:  No.  80 percent.
 3    BY MR. TREZEVANT:
 4    Q.    80 percent of the Medicare reimbursement, correct?
 5    A.    It would be the Medicare allowable.
 6    Q.    The allowable.  So the allowable would be ASP plus six
 7    percent, and then you would get 80 percent of that from the
 8    Medicare program?
 9    A.    Correct.
10    Q.    And you would get 20 percent of that from either
11    co-insurance or the patient?
12    A.    Correct.
13    Q.    All right.  And so, looking at -- in those blocks,
14    Neupogen at $240.83, and following that across, ASP plus six
15    percent reimbursement, taking that number from quarter three,
16    because they work two quarters back, you end up with $249.38.
17    So you only make $9 basically?
18    A.    Yes.
19    Q.    The same for the next one down Treanda $453, you only
20    make an extra five.  So pursuant to the co-insurance you're
21    only making 13 bucks at East Lake Oncology, correct?
22    A.    Per 25 milligrams.
23              MR. SARTIS:  Objection, your Honor, that's
24    inconsistent with what that says.
25              THE COURT:  Overruled.
```

*

BY MR. TREZEVANT:

**Q.**    So that there's not, on most of these drugs -- so that on most of these drugs, assuming the co-pay, or assuming the patient paid his or her 20 percent, there's not a lot to be made on chemotherapy drugs in the reimbursement process from Medicare, correct?

**A.**    It would, um -- there's a margin to be made on medical chemotherapy drugs, but it's not a large margin.

**Q.**    And that's -- and that was because the system was designed to compensate the physician for the office visit, if there is one, correct?

**A.**    Correct.

**Q.**    The administration of the drugs is another separate way that the office gets compensated, correct?

**A.**    Correct.

**Q.**    And then, for items such as IV solutions, and there is different, other smaller incremental reimbursements that East Lake also would get with the administration for IV drugs, right?

**A.**    Some things.  We weren't getting reimbursement for IV fluids.

**Q.**    So that you would get -- but you weren't making -- the system is not designed for the oncologist to be some sort of -- to profit off the drugs themselves, correct?

1          MR. SARTIS:  Objection, foundation.

2          THE COURT:  Overruled.

3          THE WITNESS:  Could you repeat that question?

4     BY MR. TREZEVANT:

5     Q.   Yes, ma'am.  Reimbursement of the Medicare program is

6     not designed for the oncologist or actual practitioner who's

7     administering the chemotherapy drugs to make the money off

8     the drugs themselves.  That's not how the system is designed,

9     correct, not a lot of money in any way?

10    A.   I can't draw a conclusion on what Medicare wanted to

11    design the system for.

12    Q.   What about your own observations, ma'am.  You would

13    agree that was not a big part of East Lake Oncology, you

14    didn't look to that for your profit?

15    A.   Well, I didn't look at a lot of profit.  I just wanted

16    to maintain.  Um, our infusion charges were $100 or more

17    sometimes, and each of these are increments of small profits,

18    but the profits would be made per milligram at times.  It

19    depends on how it was made.  So to say blanket we only make

20    $13 is different than having more of a drug.  Um, yes, it was

21    a very, very complex system, and it was very difficult

22    because it changed every quarter.

23    Q.   The ASP plus six percent calculation changed every

24    quarter?

25    A.   Yes.

1   **Q.**   But that's not something you needed to calculate.  That

2   was something that was just posted on the Medicare website

3   always, right?

4   **A.**   The posting was there, but what I needed to calculate

5   were the drug prices would change all the time, and they were

6   also discounted drug prices all the time.  One distributor

7   would have short-dated Methotrexate, let's say, and that

8   Methotrexate would be at a very discounted price.  So I would

9   order Methotrexate, then that's when we did do stockpiles

10   because Methotrexate was in shortage.  Every drug was

11   specific.  It was a very time consuming effort.

12   **Q.**   And that is one of the tasks you assigned to Kelly

13   Krouse, correct?

14   **A.**   Correct.

15   **Q.**   And you had her out there shopping and looking to figure

16   out just how to purchase these drugs?

17   **A.**   Yes.

18   **Q.**   But you were the one who actually had the ultimate

19   responsibility for buying and securing drugs from licensed

20   wholesale distributors, correct?

21   **A.**   Yes.

22   **Q.**   Okay.  And let's just, real quick, look at Government

23   Exhibit -- if we can switch back to 402B.  Now, this exhibit,

24   ma'am, Arthur Berman, and you remember him, correct?

25   **A.**   Yes.

**Q.**   So basically going through this exhibit, and you went --
I believe you've been through this, where the ASP for -- on
the top right-hand side of this, so the cost of
200 milligrams of Treanda, the average sales price in the
marketplace was $3,550, and you see that on the top right,
ma'am?

**A.**   Yes.

**Q.**   And yet, you were able to secure it at East Lake
Oncology for $2,000, right?

**A.**   Yes.

**Q.**   And that is better than the average sales price,
correct?

**A.**   Yes.

**Q.**   Which is a heck of a savings, right?

**A.**   There are other calculations, but, yes.

**Q.**   I'm talking about just buying the drug, ma'am, versus
$3,558; $2,000, percentage wise, that's a big, big, big
savings that you, at little East Lake Oncology, you're
beating the market by $1,550, right?

**A.**   Yes.

**Q.**   Sort of "eye catching," correct?

**A.**   No.

**Q.**   No.

**A.**   Other drugs also had margins, large margins.  Some drugs
had no margin.  It was an average.

**Q.**   I understand.  But "average sales price" there is a lot

of oncologists in the country, right?

**A.**   Yes.

**Q.**   A lot of consumers for prescription chemotherapy,

prescription drugs across the country, correct?

**A.**   Correct.

**Q.**   And so, with all of those people purchasing drugs, their

average price being 3,550, somehow you were able to beat that

rate by $1,550, right?

**A.**   Yes.

**Q.**   Okay.  And you knew -- let me back up a minute.  I would

like to look at Government Exhibit 50A.  Do you see this

exhibit, ma'am?

**A.**   Yes.

**Q.**   Let's look to the top third.  Now, when this was

delivered to you, I think you said yesterday on direct exam

that -- yesterday you said that you received a lot of

subpoenas, etc., etc., correct?

**A.**   Yes.

**Q.**   But you didn't receive a lot of Federal Grand Jury

subpoenas, correct?

**A.**   Um, maybe for medical records sometimes.

**Q.**   Sometimes.  This one, I believe you testified yesterday,

on advice of your counsel you didn't say anything when they

came and delivered it to you, is that correct?

**A.** Yes.

**Q.** So that you understood when you stepped out to receive the subpoena you had already spoken with your attorney, right?

**A.** Yes.

**Q.** And per your testimony yesterday he told you, "don't say anything. Just take the subpoena." Right?

**A.** Yes.

**Q.** And so, it was at least significant enough to you that there was a conversation with you and your attorney before you received it, right?

**A.** Yes.

**Q.** Which took it a little bit, at least, out of the ordinary subpoenas that you all might get, or you might receive at East Lake Oncology, right?

**A.** Yes.

**Q.** When it was delivered to you by the agent, you were actually told at the time it was delivered to you to stop buying foreign unapproved drugs, right, ma'am?

**A.** No.

**Q.** And it was delivered to you in 2011, correct?

**A.** Yes.

**Q.** And at the bottom of the subpoena it says August 18, 2011, but there's a delay. So you actually received it in September?

1  **A.**    Did it say October or September?

2  **Q.**    Was it September or October, ma'am?  It was September

3  when it was actually delivered, correct?

4  **A.**    I'm not sure.

5  **Q.**    But it was sometime in that period, correct?

6  **A.**    Yes.

7  **Q.**    Now, if you had been told to stop using foreign and

8  unlicensed drugs, do you think you would have recalled that,

9  ma'am?

10  **A.**    Yes.

11  **Q.**    And why is that?

12  **A.**    Because that would indicate that I was using foreign and

13  unlicensed drugs.

14  **Q.**    And for example, shipping drugs into the State of

15  Florida to East Lake Oncology from out of the country, right,

16  ma'am?

17  **A.**    I don't follow.

18  **Q.**    From you, a licensed distributor from outside the United

19  States to East Lake Oncology would be an example of receiving

20  foreign and unlicensed drugs at East Lake Oncology.

21  **A.**    Yes.

22  **Q.**    That's what we're talking about is receiving drugs from

23  entities outside the United States that have no license to

24  distribute the drugs to East Lake Oncology, correct?

25  **A.**    Yes.

1   **Q.**   And you recognized or -- did you say you did not

2   recognize yesterday that you were unfamiliar with the

3   business named Quantum Solutions?

4   **A.**   Did not.

5   **Q.**   What about Cancer Drugs Online?

6   **A.**   Did not.

7   **Q.**   Well, when you got this subpoena, and then we'll come

8   back to those, but let's -- when you received this subpoena,

9   on the back, in paragraph four, I believe, paragraph five,

10  this subpoena was asking you for records of contact with

11  representatives of Global Rx store and/or Martin Bean and

12  Linda Allan, including emails, correspondence, facsimiles,

13  notes, records and telephone conversations, order forms,

14  spread sheets and other summaries of orders and reports.  Do

15  you see that, ma'am?

16  **A.**   Yes.

17  **Q.**   And you understood that you had to gather that material

18  and produce it to the Grand Jury, right?

19  **A.**   Yes.

20  **Q.**   And did you do so?

21  **A.**   Yes.

22  **Q.**   Now, if you look at item two, they also want records of

23  drugs purchased in any item from above from Global Rx Store

24  and/or Oberlin Medical Supply, right?

25  **A.**   Yes.

**Q.** And when you received this subpoena, you knew that you
had, in fact, been purchasing drugs from Oberlin and Global
Rx, correct?

**A.** Yes.

**Q.** And you were aware of that, right?

**A.** Yes.

**Q.** And this is an investigation asking you to gather those
records and documents together and produce them in a federal
criminal investigation to the Government, right?

MR. SARTIS:  Objection, your Honor, foundation.

THE COURT:  Overruled.

THE WITNESS:  Repeat the question, please.

BY MR. TREZEVANT:

**Q.** You understood that you had received this subpoena, and
as a result of this subpoena, you were required to produce
these records on attachment A, item-by-item, in a federal
criminal investigation.  You had to produce these records to
the Government, correct?

**A.** Yes.

**Q.** Now, and you said "about" and you did, in fact, comply,
the business with the subpoena, right?

**A.** Yes.

**Q.** And see, looking at that and looking at the fact that it
was Oberlin Medical and Global Rx, and it certainly raised
your attention and focus on these entities, correct?

1   **A.**   On that one, yes.

2   **Q.**   You were not using them?

3   **A.**   At that time, yes.

4   **Q.**   When did you quit using them, ma'am?

5   **A.**   I cannot recall.

6   **Q.**   Did you quit using them because they were, in fact,

7   foreign and unlicensed drug wholesalers?

8   **A.**   No.

9   **Q.**   Did -- you knew they were, in fact, foreign unlicensed

10  drug wholesalers, correct?

11  **A.**   Incorrect.

12  **Q.**   You did not know that, ma'am?

13  **A.**   No.

14  **Q.**   Where did you -- well, Oberlin was actually a US based

15  drug wholesaler, right?

16  **A.**   They were all US distributors.

17  **Q.**   US distributors?

18  **A.**   Yes.

19  **Q.**   Global Rx was as well?

20  **A.**   Yes.

21  **Q.**   And they were licensed?

22  **A.**   Not sure.  At this point I would say no.

23  **Q.**   But at the time you believed they were licensed?

24  **A.**   I did not check licenses.

25  **Q.**   Why didn't -- ma'am, when you signed your application to

1    get a healthcare clinic establishment license and to bring

2    drugs in, you agreed that you would only purchase from

3    licensed businesses, correct?

4    **A.**    By the law, yes.

5    **Q.**    And did you just not care?

6    **A.**    I did not read the entire statute.

7    **Q.**    So when you affirmed that you had read and understood

8    it, that wasn't true?

9    **A.**    I understand it.  I understand that I needed to follow

10   that statute.

11   **Q.**    And you're saying, but you just didn't take the time to

12   do that, right?

13   **A.**    I think you're putting words in my mouth.

14   **Q.**    Then you explain it to me, ma'am.

15   **A.**    I read that I had to obey the statutes of Florida State.

16   I certified I needed a healthcare permit.  To go into detail

17   of the law I would understand the basics of the law, but to

18   go into every detail of the law, I'm not an attorney, I

19   wouldn't know all the law, but basically, the understanding

20   of the law was there.  The details I did not know.

21   **Q.**    And --

22   **A.**    But affirmed that that is what that piece of paper said,

23   and that is the law and I would follow it.

24   **Q.**    Yes, ma'am.  And 499 that you have in front of you today

25   that we went through earlier this morning, there was nothing

1    complex or "sort of legal" that would require a lawyer to

2    understand that you would need a license to purchase drugs,

3    prescription drugs in Florida, correct?

4    **A.**    Correct.

5    **Q.**    And that you should buy drugs only from licensed

6    wholesale distributors.  That's not a hard concept, right?

7    **A.**    No.

8    **Q.**    So you understood that much?

9    **A.**    I understood that part of the law, yes.

10   **Q.**    And are you -- and you knew that you had affirmed that

11   you would follow that law, right?

12   **A.**    Yes.

13   **Q.**    And so, when you -- are you saying, though, you just

14   didn't follow that law?

15   **A.**    I haven't -- I did not.

16   **Q.**    You didn't look up licensure?

17   **A.**    No.

18   **Q.**    But had they been out of the country, that in and of

19   itself would have caught your attention, right, a distributor

20   outside the country?

21   **A.**    Yes.

22   **Q.**    Okay.  Well, then let's look at Government Exhibit 15B.

23   Do you see this exhibit, ma'am?

24   **A.**    Yes.

25   **Q.**    And you looked at this exhibit yesterday, right, ma'am?

**A.**   Yes.

**Q.**   At the top it says, "Global," and then next to it, it says, "QSP," correct?

**A.**   Correct.

**Q.**   And so Global was Global Rx, you knew that, right?

**A.**   Yes.

**Q.**   And QSP was Quality Specialty Products, correct?

**A.**   Correct.

**Q.**   And down -- midway down where it says "Rituxan known as MabThera," I mean, that's on the face of the document and it's typed, right?

**A.**   Yes.

**Q.**   MabThera is a foreign European name for a drug that is not approved in the US, though, correct?

**A.**   Correct.

**Q.**   Now, looking at page 2 of this exhibit, and this is the exhibit you referred to yesterday on direct examination, right, but there's a second page where it says "Rx-Stores-R-Us" at the top, do you see that?

**A.**   Yes.

**Q.**   Global?

**A.**   Yes.

**Q.**   And then underneath where it says "all English," right, right, you have the different drugs listed there?

**A.**   Yes.

1   **Q.**   And then at the bottom of this page in handwriting, it
2   says -- what's the first one say, ma'am?
3   **A.**   "No overnight service."
4   **Q.**   What's the next item say?
5   **A.**   "UK to New York, then to US."
6   **Q.**   So you knew that the drugs you were buying from Global
7   were coming from the United Kingdom to New York then to you,
8   correct?
9   **A.**   Incorrect.  I didn't write that.
10  **Q.**   These are East Lake Oncology records, though, right,
11  ma'am?
12  **A.**   Yes.
13  **Q.**   And that you would pay by credit card, correct?
14  **A.**   I'm not sure if that is -- was during credit cards or
15  not.
16  **Q.**   And they had a form that you could use to order, right?
17  **A.**   That piece of paper was not a form to use for orders.
18  **Q.**   What did you use this document for, ma'am?
19  **A.**   I didn't use it.
20  **Q.**   Yesterday when you referred to it, when you -- on your
21  direct examination you did go over this document with your
22  attorney, did you not?
23  **A.**   Yes.
24  **Q.**   And let me go back one page, and what did you use this
25  for, ma'am?  Yesterday when you referred to --

1   **A.**    I explained that that was Global prices and QSP prices

2   and that was a price comparison.

3   **Q.**    And Global, as you sit there now, you're saying you just

4   didn't happen to see the second page of this in your office?

5   **A.**    This was in Kelly's books.

6   **Q.**    So only Kelly knew that Global Rx was in England?

7   **A.**    This was Kelly's writing.  I don't know when she did

8   this writing.

9   **Q.**    And ma'am, you gathered these records for Global Rx on a

10  subpoena to produce to the Government, right?

11  **A.**    It was a search warrant.

12  **Q.**    No, ma'am.  I'm talking about when you got the subpoena

13  for Oberlin Medical and Global Rx records, that was to

14  respond to the subpoena first?

15  **A.**    Correct.

16  **Q.**    So when you look at the Global records to produce them

17  pursuant to a subpoena, if you hadn't seen it before, you had

18  to see it then, right, ma'am?

19  **A.**    I don't -- I can't recall.  I really can't recall if we

20  even submitted this document.  I'm not even sure.

21  **Q.**    But you went through and gathered up all the documents

22  that you could to properly comply with that subpoena, right?

23  **A.**    Right.  But it may not have been written at that

24  subpoena time.

25  **Q.**    Let's look at Government Exhibit 11A.  Do you see

1    August 11, 2011, ma'am?

2    **A.**    Yes.

3    **Q.**    That's the record that was submitted in your files,

4    right?

5    **A.**    That was the way the record looked, yes.

6    **Q.**    And it predated the subpoena by a month?

7    **A.**    If that is a factual time, yes.

8    **Q.**    Well, it's your office, ma'am.  So did -- is there any

9    reason for to you glean it's an inaccurate record maintained

10   by your office?

11   **A.**    This fax number is from the sender, not the receiver.

12   **Q.**    All right, ma'am.  And so, this document, though, was a

13   record that you used, and that you looked at, and that

14   compared Global prices to QSP prices, right?  Is that right,

15   ma'am?

16   **A.**    I personally did not look at those comparisons.  Oberlin

17   was, at that time, stopped.  We had not been using Oberlin by

18   then.  So I would not compare prices to Oberlin or QSP.

19   **Q.**    Well, at this time, ma'am, you were comparing Global to

20   QSP, correct?

21   **A.**    Oberlin and Global.  I called it Oberlin, Kelly called

22   it Global.

23   **Q.**    And you're comparing it to QSP in the Fall of 2011,

24   right?

25   **A.**    Kelly was -- compared them.  I was busy with electronic

1    records.

2    **Q.**   And everything that you bought from Global started from

3    outside the United States, correct?

4    **A.**   I'm not sure.

5    **Q.**   And Global didn't have a license to distribute in

6    Florida, neither did QSP, correct?

7    **A.**   At this time I know that, yes.

8    **Q.**   Now, if we can look at Government Exhibit 11A, the

9    outside of this folder, ma'am, you made this, right?

10   **A.**   Yes.

11   **Q.**   You actually created this folder?

12   **A.**   I created this sheet, yes.

13   **Q.**   And why did you do that, ma'am?

14   **A.**   Because we had invoices from a small amount of invoices

15   left over from those years.  So I put them all together

16   because McKesson we had a large amount.  We had a large

17   amount for oncology services, and I didn't want to buy

18   another binder.

19   **Q.**   And so, then you had a large amount from QSP and

20   Oberlin, right?

21   **A.**   We did not have a large amount of Oberlin.

22   **Q.**   What about QSP, ma'am?

23   **A.**   In '09?  I'm not sure.

24   **Q.**   But this was -- so you knew this was in existence, and

25   if I could show you within that Exhibit 11A, do you see this

1  document, ma'am?

2  **A.**   Yes.

3  **Q.**   And at the top left there's a date and time stamp.  Do

4  you see that?

5  **A.**   Yes.

6  **Q.**   May 15, 2009.  That's about when you started dealing

7  with quality supply, correct?

8  **A.**   I understand that, yes.

9  **Q.**   And at that time, if Kelly was even -- was Kelly Krouse

10  even working for you?

11  **A.**   In 2009, yes.

12  **Q.**   She had just started, right?

13  **A.**   No.

14  **Q.**   Well, you said -- I thought you said that you trained

15  her from 2009 to 2011?

16  **A.**   I was training her, but she had been with me for 18,

17  20 years, with the exception of three months.

18  **Q.**   But you were training her from 2009 to 2011 to take over

19  the drug buying aspects of East Lake?

20  **A.**   I'm not -- the dates I'm -- nine?  I thought it was

21  seven.

22  **Q.**   Well, ma'am, your application for your healthcare clinic

23  establishment obligation in January 2009, was after that, was

24  in September 2009, right?

25  **A.**   Yes.

1  **Q.**   So this is May 2009, and this document it says 001/004.

2  Do you see that?

3  **A.**   Yes.

4  **Q.**   And it indicates first of a four-page document?

5  **A.**   Yes.

6  **Q.**   And if we can look at the top third of this document

7  Quality Specialty Products.  And -- and you were aware of

8  this document, right?

9  **A.**   I'm not sure.  Can you show me the rest of the pages?

10  **Q.**   Yes, ma'am.  Let me -- I'll go through it one page at a

11  time and then we'll come back to this page.  Page 2 of four,

12  page 3, and then, 4 you completed.  It's actually an

13  application for a business account?

14  **A.**   Okay.

15  **Q.**   And you've signed it at the bottom, right?

16  **A.**   Yes.

17  **Q.**   Okay.  So let's go back to page 1 and look at the top

18  third of this document.  Where it says "Quality Specialty

19  Products," could you read that first sentence, ma'am?

20  **A.**   "Quality Specialty Products is a Canadian company that

21  has been supplying companies in and individual clients

22  through its group of companies with medications for over five

23  years.  Quality Specialty Products sells health Canadian-

24  approved medications through its Canadian facility and makes

25  available European Union products through its related

1   facility in the United Kingdom.  All European products is

2   EMEA registered indicating that the product is produced in a

3   single manufacturing location in Europe.  The EMEA is a

4   regulatory body which grants Europe-wide licenses.  The

5   language on the outer and inner package depend on the

6   designation of the product and are indicated by the country's

7   specified code within a blue triangle.  Its application for

8   product, English language inserts are available upon

9   request."

10  **Q.**   All right.  And so, there is no question that Quality

11  Specialty Products was a Canadian company, right?

12  **A.**   Right.

13  **Q.**   And that it didn't even advertise that it provided

14  quality approved drugs, right?

15  **A.**   No.

16  **Q.**   It provided drugs in Europe and in Canada, correct?

17  **A.**   Yes.

18  **Q.**   And you engaged Quality Shipping -- Specialty Products

19  from outside, from Canada to East Lake Oncology, correct?

20  **A.**   It went through an American distributor.

21  **Q.**   Quality Specialty Products, ma'am?

22  **A.**   Yes.

23  **Q.**   What was the name of the distributor?

24  **A.**   I don't know.  I presumed now, after court, it was

25  Meiko.

1    **Q.**   You called Meiko and ordered these drugs, ma'am, or you

2    placed orders with Quality Specialty?

3    **A.**   I didn't call.  It was Kelly who called and placed the

4    drugs.

5    **Q.**   Are you suggesting that Kelly called Meiko?

6    **A.**   I don't know who -- Kelly called Aaron.

7    **Q.**   At Quality Specialty Products?

8    **A.**   Correct.

9    **Q.**   And ordered drugs from a Canadian company to be

10   delivered to East Lake Oncology, correct?

11   **A.**   Yes.

12   **Q.**   And so, while you didn't believe for a second that when

13   you ordered a drug from Quality Specialty Products they would

14   drive that from Canada to East Lake, you knew they would ship

15   it to you, right?

16   **A.**   They would ship to the American company and the American

17   company would ship it to me.

18   **Q.**   Right.  So --

19           THE COURT:  When you reach a convenient stopping

20   place we'll break for lunch.

21           MR. TREZEVANT:  This is fine, your Honor.

22           THE COURT:  All right.  We'll break for lunch until

23   1:30 p.m.

24           CSO OFFICER:  All rise.

25           (Jury exits courtroom at 12:06 p.m.)

1          THE COURT:  Is the verdict form I just handed to
2     you at the last break acceptable?
3          MR. TRAGOS:  It appears to be.
4          MR. TREZEVANT:  It does appear to be, Judge.
5          THE COURT:  All right.  See you at 1:30 p.m.
6          MR. TRAGOS:  Thank you.
7          (Noon recess taken.)
8          (Court back in session at 1:31 p.m.)
9          THE COURT:  Do you just think of problems every
10    time we take a break?
11         MR. SARTIS:  I think of stuff to raise with the
12    Court.
13         THE COURT:  You ought to consider taking naps.
14    What?
15         MR. SARTIS:  I just want to put on the record,
16    Judge, I understand Mr. Trezevant is showing Dr. Norbergs
17    documents in evidence.  He can ask whatever question he wants
18    to ask.  My only question, would he ask her if she has seen
19    the document before starting to ask her questions about it?
20    It will shorten my redirect immensely.
21         THE COURT:  You are talking about the documents,
22    comparable prices between Global?
23         MR. SARTIS:  That's one of them, and the other
24    document on the screen before we left for lunch, which is the
25    packet QSP application.

1              MR. TREZEVANT:  11A.

2              THE COURT:  I'll let you clear that up on cross.

3              MR. SARTIS:  Okay.

4              THE COURT:  Bring in the Jury.

5    (Jury enters courtroom at 1:33 p.m.)

6              THE COURT:  You may proceed on cross.

7              MR. TREZEVANT:  Thank you, your Honor.

8    BY MR. TREZEVANT:

9    **Q.**   Now, when we ended we were looking at an excerpt from

10   Government Exhibit 11A, pages out of that exhibit.

11   Particularly the Bates number we are looking at ELOSW02867.

12   And so, looking at the middle paragraph of that document will

13   you read that paragraph, ma'am?

14   **A.**   "Product will typically be shipped on the same or next

15   day if inventory is available.  We carry sufficient

16   quantities of most products listed to ship immediately.

17   There are occasions the shipping may be delayed, i.e.,

18   inventory needs to be ordered from manufacturers.  You will

19   be made aware of the delays that this may cause, but

20   typically a week or two.  Once inventory is shipped delivery

21   will take a maximum of five days to arrive from our UK office

22   in approximately 5 to 10 days from our Canadian office."

23   **Q.**   All right.  If we could skip -- just show the next two

24   pages, but go to the fourth page of the fax or -- the third

25   page and stop briefly.  Looking at the top half of this

1    document, that "QSP offers" you look at the first four,

2    you're looking at United Kingdom and Canada as the source of

3    the drugs, right, ma'am?

4    **A.**    Correct.

5    **Q.**    Okay.  Looking at the next page, the fourth page of the

6    fax, 2866, as far as the top third of that, is this an

7    application for a business account?

8    **A.**    Yes.

9    **Q.**    "East Lake Oncology," do you see that, ma'am?

10   **A.**    Yes.

11   **Q.**    And you actually opened this business account, correct?

12   **A.**    Yes.

13   **Q.**    With QSP, yes?  And though on this form the writing --

14   whose writing is this that's completing the form?

15   **A.**    Kelly.

16   **Q.**    And when we come down to the -- looking at the second --

17   right there (indicating) where it says "bank name Sun Trust."

18   **A.**    Yes.

19   **Q.**    Do you see that?

20   **A.**    Yes.

21   **Q.**    And the bank address 3500 East Lake Road, account

22   No. 00057959735.  Do you see that, ma'am?

23   **A.**    Yes.

24   **Q.**    And that was the bank account at Sun Trust that you

25   opened, correct?

1    **A.**    I would presume.  I don't know the number.

2    **Q.**    Well, let me show you Government Exhibit 600.

3    **A.**    Did you say 1000 --

4    **Q.**    Let's pull it up.  There is one, yes, ma'am?

5    **A.**    Okay.  Yes.

6    **Q.**    That's the same account number?

7    **A.**    Yes.

8    **Q.**    If you'll flip through that Exhibit 600, ma'am, right in

9    front of you.  Yes, the one in the folder.  If you can flip

10   through that.  Are those checks out of that account?

11   **A.**    Yes.

12   **Q.**    Signed by you?

13   **A.**    Yes.

14          MR. TREZEVANT:  Your Honor, we offer Government

15   Exhibit 600.

16          THE COURT:  It will be admitted.

17   (Government Exhibit No. 600

18   admitted into evidence.)

19   BY MR. TREZEVANT:

20   **Q.**    Looking at Government Exhibit 600, is this exhibit made

21   up of checks signed by you on behalf of East Lake Oncology to

22   Quality Specialty Products?

23   **A.**    Yes.

24   **Q.**    And on each of those checks does it say 406-1364 Mc

25   Philips Street, Winnipeg?

1  **A.**   Yes.

2  **Q.**   In Canada, right, ma'am?

3  **A.**   Yes.

4  **Q.**   So there is no question that you know Quality was in

5  Canada, right?

6  **A.**   I knew Quality was in Canada, yes.

7  **Q.**   And that East Lake Oncology routinely for years ordered

8  it's chemotherapy drugs from Quality Specialty Products,

9  correct?

10  **A.**   East Lake Oncology ordered its -- some oncology drugs,

11  yes, from Specialty.

12  **Q.**   And it was a foreign unlicensed distributor, correct?

13  **A.**   I know that now, yes.

14  **Q.**   Well, you knew it was foreign then, right?

15  **A.**   No, the distributor was in America.

16  **Q.**   What distributor, ma'am?

17  **A.**   The distributor the drugs came from.

18  **Q.**   Ma'am, when you ordered drugs from McKesson, you would

19  pay McKesson, correct?

20  **A.**   Yes.

21  **Q.**   And when you ordered drugs from Oncology Supply, they

22  would bill you and you would pay that bill, correct?

23  **A.**   Yes.

24  **Q.**   You didn't pay FedEx or UPS that delivered it to your

25  door?

**A.**    No.

**Q.**    Because you didn't call FedEx or UPS, correct?

**A.**    No.

**Q.**    And you didn't -- no one from your office was` calling UPS, FedEx, or Meiko, or anyone else to deliver the drugs. They called Quality Specialty Products, right?

**A.**    Kelly called and had contact with QSP.

**Q.**    In Canada?

**A.**    I'm not sure.  It was an 800 number.

**Q.**    But you can -- you made out checks and paid quality in Canada?

**A.**    Yes.

**Q.**    Okay.  Now, looking at Government Exhibit 6B, yesterday when you looked over in the purple in "UK" you had "unknown," you know that stands for United Kingdom, right, ma'am?

**A.**    It should be for "unknown."  It's my handwriting.

**Q.**    All right.  The purple pen.  Let's look at the next one down.  All right.  So here where this sticky says, "where are drugs shipped from?"  That was a question you posed to Kelly, is that correct?

**A.**    I'm not sure.  I do not remember that sticky, nor do I remember the date of that sticky.

**Q.**    And she replied -- she found out and then let you know, "Directly to us," meaning, to East Lake Oncology, correct?

**A.**    I do not remember the sticky nor the date of the sticky.

1    **Q.**    "And what guarantee do we have drugs are going through

2    customs?"  And then, "No problem, shipped parcel to parcel."

3    **A.**    The sticky may have been a later date.  I do not know

4    what date it was.

5    **Q.**    All right.  Let's look at the other one on the left.

6    "Be able to order 5/19/09.  Takes about five to six days to

7    get to us."  And you read that yesterday on direct exam,

8    right?

9    **A.**    Yes.

10   **Q.**    And 5/18, in fact, May 18, '09, is a holiday, isn't it

11   ma'am, in Canada?

12   **A.**    I don't know.

13   **Q.**    Have you ever heard of Victoria Day?

14   **A.**    Yes.

15   **Q.**    That's a Canadian holiday, right?

16   **A.**    Yes.

17   **Q.**    And it's May 18th, of '09 was Victoria Day, correct?

18   **A.**    I don't know that.

19   **Q.**    All right.  Looking at -- looking at Government

20   Exhibit 12A.  This is a -- if we could -- credit application.

21   Do you see it, ma'am?

22   **A.**    Yes.

23   **Q.**    And the date is March of '11, March 25, 2011, for -- and

24   it's being sent to QSP from your business, correct?

25   **A.**    Correct.

1   Q.   And it's a credit application.  So the relationship that

2   was started in '09 with Quality Specialty Products is

3   continued here with this credit account application, correct?

4   A.   I'm not sure I'm following you.

5   Q.   Well, you started the relationship with Quality Supply

6   Products (sic) in May of '09, correct?

7   A.   Correct.

8   Q.   And at the top of this sheet, the top third, here it's a

9   credit account application being submitted by your practice

10  East Lake Oncology and yourself, with Kelly Krouse as the

11  contact person to QSP.  It's a credit account application.

12  You recognize that, right?

13  A.   Yes.

14  Q.   And what is this submitted for?  What was the purpose of

15  this form?

16  A.   So that I would have 30 to 60 days to pay on the account

17  instead of having a credit card account.

18  Q.   And looking down below, right here (indicating), you had

19  to list some references, correct?

20  A.   Correct.

21  Q.   And you listed McKesson, Henry Schein and Oncology

22  Supply.  Why did you select those, ma'am, as your references?

23  A.   They asked for trade references.  They were our largest

24  accounts.

25  Q.   These three?

**A.**   Yes.

**Q.**   And, ma'am, you know each of those were also licensed, correct?

**A.**   I know that now.

**Q.**   All right.  Down below, "Expect monthly purchasing 25 to $30,000."  Who signed that document?

**A.**   I did.

**Q.**   In March 2011, correct?

**A.**   Yes.

**Q.**   As the president?

**A.**   Yes.

**Q.**   Now, looking down at 21B -- oh, before we go away from that.  Ma'am, your signature, looking at the bottom of this document, that's the address you wrote all the checks to, to Quality, right?

**A.**   Yes.

**Q.**   In Canada?

**A.**   Yes.

**Q.**   All right.  Looking at the notes 21B, whose handwriting is that?

**A.**   That is mine.

**Q.**   And you are directing what to happen here?

**A.**   As far as Quality Supply Products?  Eprex, Herceptin and Velcade to be bought.

**Q.**   For those drugs to be purchased from Quality Specialty

1    Products, some overnight, correct?

2    **A.**   Correct.

3    **Q.**   And down lower to get Zometa from Global?

4    **A.**   Correct.

5    **Q.**   If we could go to 35A, Oncology Supply, and you see

6    that, ma'am?

7    **A.**   Yes.

8    **Q.**   Now, if we could put this on the left, this is a

9    licensed distributor, correct?

10   **A.**   Yes.

11   **Q.**   Had a good reputation?

12   **A.**   Yes.

13   **Q.**   Now, if on the right-hand side we could pull up

14   Government Exhibit 11A.  With Government Exhibit 11A if we

15   could go to page 182, and this is -- if we could magnify in

16   the middle.  This was Oberlin, right?

17   **A.**   Yes.

18   **Q.**   And Oberlin, what is being ordered there?

19   **A.**   Zoledronic Acid.

20   **Q.**   And Oberlin was not licensed, correct?

21   **A.**   I know that now.

22   **Q.**   Well, there's not even a license on the invoice, or

23   packing sheet or anything, correct?

24   **A.**   I did not look for a license at the time.

25   **Q.**   But under Florida law you would have had to look for a

1  license because it would have just been on the document

2  itself as required under 499, right?

3  **A.**   I'm not sure.

4  **Q.**   But you see the license number here under Oncology

5  Supply, right?

6  **A.**   Yes.

7  **Q.**   Okay.  Let's look at page 175, on the right-hand side.

8  Now, what are you ordering here Zoldria -- what's being

9  ordered there?

10  **A.**   Zoledronic Acid.

11  **Q.**   When you -- when you placed your order, it says Zoldria,

12  correct?

13  **A.**   I placed my order and asked for Zometa and Zoledronic

14  Acid is the generic or chemical name for Zometa.

15  **Q.**   But Zoldria is neither Zometa nor is it Zoledronic Acid,

16  is it, ma'am?

17  **A.**   I'm not sure.

18  **Q.**   Well, as you look at it there Z-O-L-D-R-I-A, you see

19  that right there, ma'am?

20  **A.**   Yes.

21  **Q.**   You understand that's an Indian, as in from India, drug,

22  and not an FDA-approved, correct?

23  **A.**   I don't know if it's FDA-approved or not.  Drugs do come

24  from India.

25  **Q.**   Here when you bought it from Oberlin, they came from

1   India and it was a non-FDA-approved drug, Zoldria, what you

2   purchased, correct?

3            MR. SARTIS:  Objection, your Honor, facts not in

4   evidence, counsel testifying.

5            THE COURT:  Overruled.

6            THE WITNESS:  Can you repeat the question?

7   BY MR. TREZEVANT:

8   **Q.**   Zoldria was ordered by your office, correct?

9   **A.**   Zometa was ordered by my office.

10  **Q.**   And when -- well, let's look at 189, Government

11  Exhibit 11A.  So here five items make up the quantity, do you

12  see this, ma'am, where it says, "Quantity for each Zoldria

13  have for only," and then the fifth would be the Zometa and

14  the space below, do you see that, ma'am?

15  **A.**   Yes.

16  **Q.**   So that received at your office is the Zoldria and the

17  Zometa, correct?

18  **A.**   I don't know.  I did not open the package.

19  **Q.**   But you do know as you sit there that Zoldria is from

20  India and is an unapproved FDA drug, correct?

21  **A.**   That's what you have told me.  No, I do not know Zoldria

22  is an unapproved FDA drug.

23  **Q.**   And that would account for the curious marks on a box.

24  If a box arrived from India, you wouldn't be surprised if it

25  had a script on it instead of an English language that you

1    recognize, correct?

2             MR. SARTIS:  Objection, your Honor, asked and

3    answered, beyond the scope, and facts not in evidence.

4             THE COURT:  Sustained on facts not in evidence.

5    BY MR. TREZEVANT:

6    **Q.**   Now, if we can go to 103A.  Did you say that you did not

7    recognize Quantum Solutions, ma'am?

8    **A.**   I did not.

9    **Q.**   Didn't you, in fact, know that Quantum Solutions and

10   Cancer Drugs Online were one in the same?

11   **A.**   I did not.

12   **Q.**   And at that -- at the bottom, if you look at the very

13   bottom of this page, all orders, FOB, shipping location, UK,

14   United Kingdom, is that correct, ma'am?

15   **A.**   It says that, yes.

16   **Q.**   And what's being ordered from Quantum Solutions?

17   **A.**   Zometa, 4 milligrams for 5 milliliters Zoledronic Acid.

18   **Q.**   All right.  And then the next page of this exhibit at

19   the top it says, "Cancer Drugs Online," doesn't it, ma'am?

20   **A.**   Yes.

21   **Q.**   Because Quantum was doing business and you can order

22   from either Quantum or Cancer Drugs Online?

23   **A.**   That I do not know.

24   **Q.**   All right.  Ma'am, briefly, we took a look at some of

25   your business tax returns when you testified.  If we can go

1    to the Elmo briefly and look first, I believe it's Defense

2    Exhibit 2, the front page, East Lake Oncology, and where --

3    look at the gross receipts, the 1.9 million.  Do you see

4    that, ma'am?

5    **A.**   Yes.

6    **Q.**   That's the -- that's the revenue coming into the

7    business, right?

8    **A.**   Correct.

9    **Q.**   Almost $2 million, correct?

10   **A.**   Correct.

11   **Q.**   And as a business owner, there are certain items that

12   you elect to purchase and you can actually charge to your

13   business to improve your quality of life, right, ma'am?

14   **A.**   I'm not sure I understand that question.

15   **Q.**   Well, let's turn into the red tab, and I've written

16   this -- circled this.

17          MR. SARTIS:  Objection, that's not in evidence.

18          THE COURT:  I thought you put this whole document

19   into evidence?

20          MR. SARTIS:  I put 1120S into evidence.  That's all

21   I put in.

22          THE COURT:  Sustained.

23          MR. TREZEVANT:  Wait.  Excuse me.  Can we approach

24   sidebar?

25          MR. SARTIS:  Which Exhibit number is this, do you

 1    think?

 2              MR. TREZEVANT:  I thought it was Defense Exhibit 2,

 3    1120S.

 4              THE COURT:  Well, my Exhibit 2 is one page.  Are

 5    those pages additional pages to the same document?

 6              MR. TREZEVANT:  I was under the impression they

 7    were the remainder of the document.

 8              THE COURT:  All right.  Approach the bench.

 9    (Sidebar conference held

10    outside the presence of the Jury.)

11              MR. SARTIS:  I put in this (indicating).  Okay.

12    Your Honor, I put in the 1120S, which is the tax document for

13    East Lake Oncology.  What Mr. Trezevant is showing are the

14    depreciation and amortization schedules for 4462.  So I

15    didn't put those in.

16              MR. TREZEVANT:  See the full page?  If you go to

17    the back --

18              MR. SARTIS:  The question is -- it's not in

19    evidence.  I didn't put it in evidence.

20              THE COURT:  So you put in an incomplete document?

21              MR. SARTIS:  No, sir.  I put in the 1120S.

22              THE COURT:  Those are supporting schedules to the

23    1120S?

24              MR. SARTIS:  The depreciation schedule.

25              THE COURT:  "I claim depreciation."  You have to

1    show on your tax return when you depreciate.  Is the

2    Government offering the remainder of the schedule?

3              MR. TREZEVANT:  We are, your Honor.

4              THE COURT:  Do you want to admit it as your

5    exhibit?

6              MR. SARTIS:  I want to admit it as our exhibit.

7              THE COURT:  I will admit it and the Defense can add

8    it to their Exhibit 2.

9              MR. TREZEVANT:  I'm going to do the same thing.

10             MR. SARTIS:  I don't have the documents.  So we're

11   going to have to make copies of them afterwards.

12             THE COURT:  You don't have the schedules?

13             MR. SARTIS:  I do -- I don't have the originals.  I

14   don't have copies for evidence.

15             THE COURT:  Okay.

16             (Back before the Jury.)

17             THE COURT:  Apparently these documents are the

18   schedules that go with Defendant's Exhibit 2.  They just put

19   in the face sheet, but they've agreed to put in the entire

20   document as a Defense exhibit.  They will be added to Defense

21   Exhibit 2.

22   BY MR. TREZEVANT:

23   **Q.**   So, ma'am, within your business, you're including and

24   depreciating as a business item a 2008 BMW, correct?

25   **A.**   Correct.

1   **Q.**   And if we could go to Defense Exhibit 4, and again,

2   Defense Exhibit 4, you go down to your receipts, about

3   1.8 million came in.  And again, if we flip through to the

4   red tab, here in 2012, you're now depreciating a different

5   BMW.  Now it's a 2011, correct?

6   **A.**   Correct.

7   **Q.**   If we could turn now to Government Exhibit 14B.

8           THE COURT:  Well, the schedules you just had on the

9   screen need to be added to Defense Exhibit 4.

10          MR. TREZEVANT:  Yes, sir.  We will maintain them

11  and share them.

12          THE COURT:  All right.

13          MR. TREZEVANT:  Does the Court want us to do it

14  now?

15          THE COURT:  No.  You can do it at the next break.

16          MR. TREZEVANT:  Thank you, your Honor.

17  BY MR. TREZEVANT:

18  **Q.**   Looking at 14B, this page, ma'am.  Do you see the title?

19  **A.**   Yes.

20  **Q.**   "Quantum Solutions/Cancer Drugs Online."  Now, this you

21  looked at yesterday.  On the right that's your handwriting,

22  right?

23  **A.**   Yes.

24  **Q.**   That's QSP pricing on the right, correct?

25  **A.**   Correct.

1  **Q.**  And you are comparing it with the prices of what entity?

2  **A.**  Quantum Solutions.

3  **Q.**  Or what's right below that, ma'am?

4  **A.**  Cancer Drugs Online.

5  **Q.**  So you understood they were one business, correct, one

6  in the same?

7  **A.**  Yes.

8  **Q.**  Looking at 103A.  Now, back here, there is Quantum and

9  Cancer Drugs Online, the same business, correct?

10  **A.**  Correct.

11  **Q.**  And when Kelly would call, she was talking with a person

12  named Art?

13  **A.**  I didn't talk to her.

14  **Q.**  But you knew she would call and talk to Art?

15  **A.**  No.

16  **Q.**  Looking at page 5 of the exhibit.  Either way, at the

17  bottom of this shipping form, they start out in Britain,

18  arriving in Tampa for delivery at your office, correct?

19  **A.**  Yes.

20  **Q.**  Looking at 153 -- Government exhibit -- looking at

21  Government Exhibit 103, turning first to the order that was

22  placed for -- if you look there, we're talking about Zometa,

23  but from Turkey, correct?

24  **A.**  Correct.

25  **Q.**  Which is a non-FDA-approved drug, correct?

1    **A.**   Not sure.

2    **Q.**   Well, you couldn't buy it in the United States, though,

3    could you, ma'am?

4    **A.**   Drugs are made all over the world, including Turkey,

5    India, Amsterdam, Switzerland.

6    **Q.**   You couldn't buy it in the United States, though, could

7    you, ma'am?

8    **A.**   I'm not sure.

9    **Q.**   Turkish Zometa?

10   **A.**   If it's manufactured in Turkey, yes, we can buy it in

11   the United States.

12   **Q.**   But you didn't buy it in the United States, did you?

13   **A.**   I didn't see this invoice.

14   **Q.**   It was purchased and shipped from the UK, right?

15   **A.**   I don't know.  It says that, yes.

16   **Q.**   Because a non-FDA cancer drug can't be purchased in the

17   United States, correct?  Not legally.

18   **A.**   A non-FDA drug cannot be purchased in the United States.

19   **Q.**   And here if we go and look at page -- page 4, this is

20   coming from the licensed Z Pharmacy shipped from Europe?

21   **A.**   That is, but -- yes.

22   **Q.**   Shipped directly to East Lake Oncology.  So let's look

23   at page 7 of that exhibit, at the very top half.  So it's

24   coming from something called Pego (phonetic) in Warwick,

25   United Kingdom.  Do you see that, ma'am?

1    **A.**   Yes.

2    **Q.**   Dispatched to where, to who?  To you, right?

3    **A.**   To my office, yes.

4    **Q.**   If we could go away from that.  Kelly was ordering these

5    drugs at your direction, correct, ma'am?

6    **A.**   Yes.

7    **Q.**   So if we look at 21E, there it is.  Whose handwriting is

8    that?

9    **A.**   Mine.

10   **Q.**   In July of 2011?

11   **A.**   Yes.

12   **Q.**   It's saying what?  Please order what?

13   **A.**   Erbitux 100 milligrams X100, Herceptin 440 milligrams X3

14   and Zometa 4 milligrams X5.

15   **Q.**   From what company, ma'am?

16   **A.**   QSP.

17   **Q.**   And that's July.  And then, here we are -- again, if we

18   look at Government's Exhibit 21G, whose handwriting is this?

19   **A.**   Mine.

20   **Q.**   To place another order, correct?

21   **A.**   Correct.

22   **Q.**   And that's October of 2011.

23   **A.**   Okay.

24   **Q.**   And looking at 21B, if we could pull it up, again, your

25   handwriting, ma'am?

1    **A.**   Yes.

2    **Q.**   And here you're going -- you're talking about two

3    different pharmacies, right?

4    **A.**   I believe it's three.

5    **Q.**   What are the three pharmacies?

6    **A.**   QSP, Global or Warwick.

7    **Q.**   QSP is America.  Global was United States.  Where was

8    Warwick, ma'am?

9    **A.**   I'm not sure.

10   **Q.**   Where was Warwick, ma'am?

11   **A.**   I'm not sure.

12   **Q.**   None of those were licensed to distribute chemotherapy

13   drugs to your facility, correct?

14   **A.**   At the time I did not know that.

15   **Q.**   If we could go to 21C.  At the bottom third of this

16   document, what's being compared there, ma'am?  Do you see

17   where it says "QSP?"

18   **A.**   Yes.

19   **Q.**   Warwick?

20   **A.**   Yes.

21   **Q.**   And Global?

22   **A.**   Yes.

23   **Q.**   And the prices are being compared there, correct?

24   **A.**   Correct.

25   **Q.**   For different cancer drugs, correct?

1   **A.**   Correct.

2   **Q.**   At your direction, correct?

3   **A.**   Could I see the rest of it?  Does it have a date on it?

4   **Q.**   Yes, ma'am.  I'm sorry.  At the very top.  Let's look.

5   May 6, 2011.  If we could go all the way across.  At the very

6   top through -- go to "QSP overnight, if possible."  That's

7   your direction, right?

8   **A.**   Correct.

9   **Q.**   So all of this is going on under your supervision?

10   **A.**   Correct.

11   **Q.**   All right.  Now, ma'am, you also mentioned yesterday

12   when you testified that in your profession, I believe the

13   phrase you said, "word travels fast," right?

14   **A.**   Yes.

15   **Q.**   What did you mean by that?  Could you explain?

16   **A.**   That physicians would speak to each other.

17   **Q.**   About pressing issues?

18   **A.**   Sometimes.  Sometimes other things.

19   **Q.**   But as far as -- I mean, could you elaborate a little

20   bit?  "Word travels fast."  How did you mean it when you said

21   it?

22   **A.**   Could you bring up what -- in what context I said that?

23   **Q.**   Yes, ma'am.  I believe it was in the context of some of

24   the publications concerning the fake Avastin.

25   **A.**   Oh, yes.  That came in, and then in about March, at that

```
 1    time, the -- I heard it through oncology meetings, I heard it
 2    through my nurses.  We started hearing about the Avastin and
 3    it was counterfeit.
 4    Q.   And so, if we could briefly look at Government
 5    Exhibit 4B, at the top third of this page.  All right.
 6    Ma'am, do you see where that was issued January of 2012,
 7    right?
 8    A.   Yes.
 9    Q.   And where it says, "FDA notifies healthcare providers
10    about the risks of purchasing unapproved injectable cancer
11    medications from unlicensed sources."  Do you see that,
12    ma'am?
13    A.   Yes.
14    Q.   So this is this unknown source, right?
15    A.   That would be quantitative.  Big deal/little deal.
16    Q.   How about a significant issue?
17    A.   For me, I did not read it.  I did not see it.
18    Q.   Ever?
19    A.   No.  I've seen it in this courtroom.  I've seen it in
20    evidence.
21    Q.   And so, are you saying you never saw it until you came
22    to this courtroom?
23    A.   I never checked the FDA web page for it, no.
24    Q.   If you received -- given that -- you did receive a
25    letter -- well, we'll come back to this.  All right.
```

```
 1              Let's look at 6C.  All right.  This item right
 2    here, ma'am.
 3              THE COURT:  Let's take a five-minute break.
 4              CSO OFFICER:  All rise.
 5    (Jury recesses at 2:12 p.m.)
 6    (Court, Counsel return to
 7    courtroom at 2:18 p.m.)
 8              THE COURT:  How much longer do you have on cross?
 9              MR. TREZEVANT:  I think about 15 minutes, your
10    Honor.
11              THE COURT:  All right.
12              MR. TRAGOS:  Your Honor, before the Government's
13    rebuttal, could the Court give us some time to argue about
14    that rebuttal?
15              THE COURT:  Argue it right now.
16              MR. TRAGOS:  Okay.  It's my understanding that the
17    -- and we have always given each other the up and up on what
18    witnesses we're going to call, and the Government is going to
19    call two rebuttal witnesses.  One is an agent that is going
20    to testify he's an agent that was there at the subpoena
21    service on the Oberlin subpoena where Agent Larson said he
22    said, "Don't buy unapproved FDA drugs," and the Defendant
23    said she didn't hear that.  They are going to put an agent on
24    that was there that's going to say he heard Agent Larson say
25    that and we would object to that.
```

1          One, the issue is whether she heard it or not, not

2     whether the agent said it.

3          Secondly, if he does say that the agent said it,

4     then that is hearsay, and because it's being offered

5     obviously for the truth of the matter asserted, and

6     therefore, it doesn't go to the issue of whether or not the

7     Defendant heard it, which is the relevant aspect of it.  It's

8     similar to, and I can't cite the rule, but they are stuck

9     with the Defendant's answer.  If they try to impeach her with

10    that, that they can't bring the extrinsic evidence, but the

11    Defendant did answer it.  She said she didn't hear it and

12    they really can't combat that she didn't hear it.  That's one

13    witness.

14          The other witness is a former employee, and

15    honestly I'm not sure what she's going to say --

16          MR. TREZEVANT:  We're not calling her anymore, your

17    Honor.  That was in case the 600's came in.  We're fine.  She

18    was just to prove they were all mailed.

19          MR. TRAGOS:  Okay.  Then it's just the agent, and

20    they are going to put the agent on to give that testimony.  I

21    don't know if it's any broader than that.  That's the

22    testimony they want to put in of the agent.

23          MR. SALTZMAN:  It's a little broader.

24          THE COURT:  Response.

25          MR. SALTZMAN:  Your Honor, it's not being offered

1    for the truth.  It's being offered to show that it was said

2    and to show what her knowledge was based on what the FDA

3    agent said.

4              The agent who's here and was with

5    Special Agent Larson at the time, he also will testify that

6    he said it.  He'll corroborate that it was said, and it will

7    provide that he said it clearly such that the Doctor could

8    have heard it.  So it's being offered to rebut her claim that

9    she's now made in their case that it was not said, it was not

10   heard, and so, it's offered for that purpose.

11             MR. TRAGOS:  Did they sing it together or what?

12   They both said --

13             THE COURT:  I don't need argument on that.  What he

14   said will not come into evidence.  What he said does not

15   rebut anything this witness has testified about.

16             That still leaves remaining whether or not Agent

17   Larson made the statement.

18             MR. SALTZMAN:  I'm sorry, your Honor, can you

19   repeat the last part.

20             THE COURT:  I said, we still have the issue about

21   whether or not that witness can testify about whether

22   Agent Larson made the statement.

23             MR. SALTZMAN:  And he can testify to that, your

24   Honor.

25             THE COURT:  I didn't mean it in that manner.  I

 1    meant under the Rules of Evidence whether he can say that.

 2            MR. SALTZMAN:  Sorry.  Under the Rules of Evidence

 3    it's not being offered for the truth of what the -- the

 4    statement was a direction.  It was not a statement being

 5    offered for the truth.

 6            THE COURT:  Let's not go there yet.  I'm trying to

 7    recall this witness's testimony.  Was her answer that she

 8    could not hear that, she did not hear that or that statement

 9    was not made?

10            MR. TRAGOS:  She did not hear it.

11            THE COURT:  And you know that because that's what

12    the preparation was?

13            MR. TRAGOS:  It depends.  Is this my argument or --

14    your Honor, she didn't say, "He didn't say it."

15            THE COURT:  I'm going to allow him to testify, but

16    only as to what he heard Agent Larson say.

17            MR. SALTZMAN:  Your Honor, may I go speak to him to

18    make sure that's clear.  I don't want him to go beyond the

19    scope of the Court's order.

20            THE COURT:  All right.

21            MR. SALTZMAN:  Thank you, your Honor.

22            MR. SARTIS:  Your Honor, can I jump in on this?

23            THE COURT:  Too late.

24            MR. SARTIS:  Based on the fact that we heard about

25    this agent right before lunch, and now that the Court has

```
 1    indicated the Court is going to allow his testimony, I'm at a
 2    loss because then I would intend to call attorney Rob
 3    Williams, who's the attorney that Agent Larson testified was
 4    the person he met with and told him not to have any
 5    communication with his client, Dr. Norbergs.  So I'm not --
 6    have not called the man to even prepare him and let him know
 7    we would bring him in to potentially testify.  I ask the
 8    Court that you allow me to keep my case open until I've had a
 9    chance to talk to him and get him down here to testify to
10    that fact.
11            THE COURT:  We'll cross that bridge if you get him
12    down here.  First, you have to ask Agent Larson about that,
13    wouldn't you?
14            MR. SARTIS:  No.  I can ask Rob Williams directly.
15    I can put him on the stand, "Do you recall the Oberlin
16    subpoena?  Yes.  Did you have any communications with the
17    agents?  Yes, I did.  What are those communications?  (Now
18    I'm speculating.)  I told them I intended to deliver his own
19    subpoena to him -- to Dr. Norbergs directly.  They were to
20    have no contact or no communication with my client."
21            THE COURT:  I'm not going to hear a big battle
22    about this.  I don't know if you can get the witness down
23    here.  If you can get him here, then we'll worry about it.
24            Bring in the Jury.
25            MR. TRAGOS:  Your Honor, is it okay if we give one
```

1   of our people here our phone to make that phone call to

2   Mr. Williams?

3         THE COURT:  Yes.

4   (Jury enters courtroom at 2:22 p.m.)

5         THE COURT:  Proceed.

6         MR. TREZEVANT:  Thank you.

7   BY MR. TREZEVANT:

8   **Q.**  On the screen in front of you, ma'am, do you see

9   Government Exhibits 6C?  Let me blow it up for you.  We can

10   hand you the actual exhibit, if you would rather see that.

11   **A.**  I would rather see it.  It's very blurred and light.

12   **Q.**  Yes, ma'am.

13   **A.**  Thank you.

14   **Q.**  All right.  Do you have it in front of you, ma'am?

15   **A.**  Yes.

16   **Q.**  All right.  And you were not administering Avastin to

17   your patients, right?

18   **A.**  Correct.

19   **Q.**  But you did see this article, correct?

20   **A.**  Correct.

21   **Q.**  And this article -- and the first line makes clear that

22   it is dealing and focused on Avastin where it says, "A US

23   distributor of phoney vials of a widely used cancer drug

24   Avastin aroused suspicion at doctors' offices as early as

25   July, well before health regulators issued their own warning,

1    and sparked new alarm over counterfeit medication."  It has

2    QSP written in the top right corner, correct?

3    **A.**    Correct.

4    **Q.**    Did you write that, ma'am?

5    **A.**    No.

6    **Q.**    Kelly Krouse wrote that, correct?

7    **A.**    Correct.

8    **Q.**    And you recognize her handwriting?

9    **A.**    Yes.

10   **Q.**    And she gave you this article?

11   **A.**    I'm not sure about that, but I feel I probably searched

12   the internet.

13   **Q.**    And Kelly Krouse was the one who underlined in blue ink

14   the FDA said the drugs came from the overseas supplier called

15   Quality Specialty Products, which does business in the United

16   States, with a distributor identified as Montana Healthcare

17   Solutions, correct?

18   **A.**    Yes.  I think it's Kelly's handwriting.  That's hard to

19   tell when it's underlined as is.

20   **Q.**    And then, down below where it says "UK Discovery," do

21   you see that, ma'am?

22   **A.**    Yes.

23   **Q.**    And that's United Kingdom, right?

24   **A.**    Yes.

25   **Q.**    And there it's talking about the FDA and counting a wide

1    variety of fake drugs coming into the country.  So you were

2    aware of that, correct?

3    **A.**   I'm sure I read over the article, but intentionally I'm

4    not -- I do not know.  I do recall seeing this article.

5    **Q.**   Well, I mean, you do -- you did get this article,

6    correct?

7    **A.**   Correct.

8    **Q.**   And it's about QSP?

9    **A.**   Correct.

10   **Q.**   It's nowhere in this article, nor is there any reason

11   for you or for anyone to believe that anyone was ordering

12   fake drugs intentionally, correct?

13   **A.**   I'm not sure what you mean.

14   **Q.**   In other words, the article doesn't suggest that doctors

15   were intentionally ordering fake drugs.  They were just

16   ordering drugs and the drugs were counterfeit?

17   **A.**   I haven't read it intensely.  Would you like --

18   **Q.**   Go ahead.

19   **A.**   Okay.  (Witness peruses document.)  Yes, I finished it.

20   And no, it does not say that the doctors -- what was --

21   **Q.**   That the doctors had any idea.  The doctors were duped.

22   **A.**   Yes.

23   **Q.**   That's pretty clear from reading the article, correct?

24   **A.**   Yes.

25   **Q.**   And it's talking about QSP as the distributor, the

1  actual distributor that duped the doctors, right?

2  **A.**  Correct.

3  **Q.**  And, um, you didn't spring to action or do anything

4  regarding this article, did you, ma'am?

5  **A.**  We weren't ordering QSP at that time.  We had stopped

6  using QSP.

7  **Q.**  Ma'am, isn't it true you didn't stop using QSP until you

8  started having delivery issues and contact issues with QSP?

9  **A.**  I was told we were having delivery issues.  I did not

10  know the reason, and we stopped using QSP.

11  **Q.**  And, in fact, QSP wasn't even answering their phone

12  anymore, correct?

13  **A.**  According to Kelly, yes.

14  **Q.**  Because QSP had the sunlight shined on it by these

15  articles, correct?

16  **A.**  Now I know that, and in March I found that out.

17  **Q.**  But you still tried to call QSP after that -- that day,

18  right?

19  **A.**  I'm not sure when Kelly called.

20  **Q.**  Now, if you look at seven -- Government Exhibit 7 --

21  **A.**  Seven what?

22  **Q.**  -- is the newspaper article, and I believe the second

23  page is a little more clear.  Well, there is no date on it.

24  I apologize.  Let me go back to the first -- so we can get

25  the date.  February 16, 2012.  Do you see that, ma'am?

1  **A.**   I see it on the side.

2  **Q.**   All right.  And if we -- if you look at the very top,

3  it's very, very small.  There we go.  It's hard to read up

4  there, yes, ma'am, but you do see it down the side

5  February 16, 2012?

6  **A.**   Correct.

7  **Q.**   And this article, if we go to page 2, again, this is

8  about the Avastin, but looking at the bottom paragraphs --

9  two paragraphs, you see that, ma'am?

10  **A.**   Yes.

11  **Q.**   "In a related action the FDA said late Tuesday it has

12  contacted 19 medical practices that may have purchased

13  unapproved drugs, including Avastin, from a company called

14  Quality Specialty Products."  You see that, right?

15  **A.**   Yes.

16  **Q.**   And that was in Canada, right?

17  **A.**   Yes.

18  **Q.**   And the FDA requested that the medical practices stop

19  using any remaining products from QSP, correct?

20  **A.**   Yes.

21  **Q.**   And so, you understood that this was an issue as of that

22  date, right?

23  **A.**   I did not receive that article.

24  **Q.**   Ever?

25  **A.**   I can't say ever.  I don't know when I saw it.  It was

1  in my "to be seen" pile.

2  **Q.**   And it was put in there February of 2012, correct?

3  **A.**   Sometime after that article was written, yes.

4  **Q.**   And then, you actually got a letter from the FDA in

5  April, right?

6  **A.**   Correct.

7  **Q.**   And that would be Government Exhibit 4A, which we've

8  seen, and at the top April 5th, 2012, I believe the delivery

9  date is April 10th, to your office?

10  **A.**   Yes.

11  **Q.**   And this is a very important letter, right?

12  **A.**   Yes.

13  **Q.**   It says, looking at it, could you read the first

14  paragraph, please?

15  **A.**   "According to the information received by US Food and

16  Drug Administration your medical practice purchased

17  multiple -- excuse me -- multiple medications from a foreign

18  distributor named Richards Pharma, also known as Richards

19  Service, Warwick Healthcare Solutions, or Ban Dune Marketing.

20  Many of the products sold and distributed by this distributor

21  have not been approved by the FDA.  The manufacture and

22  handling of these products may not be of a suitable quantity

23  to ensure safety or efficacy, and the products have not been

24  proven to be safe and effective pursuant to the FDA

25  standards.  The Agency is very concerned that products

1    distributed by this distributor may cause harm to patients,

2    because they may be unsafe or ineffective."

3    **Q.**    And the next paragraph, "The agency is very concerned

4    that one of the products -- one of multiple products is a

5    counterfeit version of Altuzan."  Right?

6    **A.**    Yes.

7    **Q.**    And Altuzan was being made in Turkey, right?

8    **A.**    Yes.

9    **Q.**    And you were ordering from these very same companies and

10   also receiving Turkish drugs, right?

11   **A.**    Not at that time.

12   **Q.**    Not in April of 2012, ma'am?

13   **A.**    No.

14   **Q.**    Are you sure?

15   **A.**    My clinic ordered it.  I did not order it.

16   **Q.**    And you were ordering from Quality Supply still, right?

17   I mean, Quality Specialty?

18   **A.**    No.

19   **Q.**    What about Quantum (sic) Solutions?

20   **A.**    I did not order any drugs from Quantity Solution.

21   **Q.**    You approved it, though, correct, ma'am?

22   **A.**    Incorrect.

23   **Q.**    Everything happened under your watch, right?

24   **A.**    Not by then.

25   **Q.**    By when, April?

**A.**   By pretty much in 2011 towards the end.  On September 20th is when we started electronic records and training for those.  I was spending four hours a day extra on top of my schedule learning how to template and use the electronic records.  I was not having any extra time for anything.

**Q.**   So that, ma'am, after you saw this article in -- the newspaper article, and all the other information, the Grand Jury subpoenaed stuff, are you suggesting that you became less vigilant in your business over what you were ordering?

**A.**   I'm not sure I understand what you're asking me.

**Q.**   Well, ma'am, why wouldn't you become more vigilant over what you were ordering if you knew that all these counterfeit and mismarked drugs were coming in from outside the country?

MR. SARTIS:  Objection, your Honor, facts not in evidence.

THE COURT:  Sustained on argumentative.

BY MR. TREZEVANT:

**Q.**   Ma'am, after you saw the letter, did you -- did you -- what, if anything, did you do to make sure you weren't ordering from sources -- unlicensed foreign distributors?

**A.**   In June, when my patient came and brought in that letter, I went straight to my manager, Kelly, and I said, "We have stopped using the drugs, right?"  And that's when Kelly told me that she was using more.  I was not aware of it and I

1    told her not to do it from now on.  I could not do anything

2    about what she had done.

3    **Q.**   So many -- the letter was in April, correct?

4    **A.**   Correct.

5    **Q.**   And so, what does that have to do with June?

6    **A.**   In June my patient brought a copy of that letter.

7    **Q.**   Which letter, ma'am?

8    **A.**   This April 5th letter.

9    **Q.**   The one that was mailed to you at your business?

10   **A.**   Yes.

11   **Q.**   A patient got ahold of a letter mailed to you?

12   **A.**   He Googled my name.  His friend Googled my name and the

13   FDA had posted this on the FDA web page, and it came up and,

14   um, he gave it to his friend who gave it to my patient and my

15   patient gave it to me.

16   **Q.**   And when you saw it, ma'am, you realized, did you not,

17   that you had purchased from the very same suppliers, correct?

18   **A.**   Yes.

19   **Q.**   And because the Avastin was just one of the products,

20   you had no way to know whether the products you had been

21   delivering to your patients was also not simply water or

22   counterfeit, correct?

23              MR. SARTIS:  Objection.

24              THE COURT:  Sustained.

25   BY MR. TREZEVANT:

```
1    Q.   When you got the products into East Lake Oncology,

2    ma'am, ordered those products, you never tested them to make

3    sure they were what you ordered, correct?

4    A.   No.

5    Q.   You used them on patients, correct?

6    A.   Yes.

7    Q.   So there was no way for you to know anything about the

8    quality of the products you were ordering, correct?

9    A.   Correct.

10   Q.   The only way to be sure was to order FDA-approved

11   products, correct?

12   A.   Correct.

13   Q.   And you didn't do that, did you, ma'am?

14   A.   At that time I thought they were FDA-approved.

15   Q.   And when you found out, whenever you found out,

16   yesterday I believe you testified that you were very upset,

17   is that correct?

18   A.   Yes.

19   Q.   Why were you upset, ma'am?

20   A.   For multiple reasons.

21   Q.   One of them being that you had no way of knowing the

22   quality of medications that you had been giving your

23   patients?

24            THE COURT:  Sustained.

25   BY MR. TREZEVANT:
```

1    **Q.**   Did you, ma'am, place a call to Medicare to let them

2    know, "Holy cow," you know, that you had just found out you

3    had been billing non-FDA-approved drugs and owed Medicare

4    money back?

5    **A.**   Medicare wasn't the first thing in my mind.

6    **Q.**   Well, then did you call the FDA?

7    **A.**   No.

8    **Q.**   You didn't?

9    **A.**   There was nothing I could do.  The drugs were given.

10   **Q.**   And you didn't call your patients and tell them either,

11   did you, ma'am?

12   **A.**   No.

13   **Q.**   Shouldn't they have been told, ma'am?

14   **A.**   I didn't know which patients received the

15   non-FDA-approved drugs and which patients received the

16   FDA-approved drugs.

17          MR. TREZEVANT:  No further questions of this

18   witness, your Honor.

19          THE COURT:  Redirect.

20          MR. SARTIS:  Yes, your Honor.

21                    **REDIRECT EXAMINATION**

22   **BY MR. SARTIS:**

23   **Q.**   Dr. Norbergs, let me try and do it in some order here.

24   Let's discuss that April 2004 letter in Government

25   Exhibit 4A.  You know which one I'm talking about, correct?

1   **A.**   Yes.

2   **Q.**   Did you receive a letter like this one in 2009 telling

3   you, "don't buy from QSP?"

4   **A.**   No.

5   **Q.**   Did you receive a letter like this from the FDA in 2010

6   telling you --

7          THE COURT:  Sustained.  She testified when she

8   received the letter.

9   BY MR. SARTIS:

10  **Q.**   Okay.  Did you receive any correspondence from the FDA

11  prior to this letter telling you not to engage in QSP?

12          MR. TREZEVANT:  Asked and answered.

13          THE WITNESS:  No.

14          THE COURT:  Sustained.

15  BY MR. SARTIS:

16  **Q.**   Did you see any newspaper articles in 2009 through 2012,

17  before the ones we've seen in evidence, telling you, "Don't

18  buy from QSP?"

19          MR. TREZEVANT:  Objection, asked and answered.

20          THE COURT:  Overruled.

21          THE WITNESS:  No.

22  BY MR. SARTIS:

23  **Q.**   In fact, let me ask that question.  Do you believe that

24  you are obligated to read every newspaper article in every

25  newspaper that has anything to do with any medical issue?

1    **A.**   I hope not.

2    **Q.**   Do you spend every day trolling the FDA website?

3    **A.**   No.

4    **Q.**   Dr. Norbergs, did you buy products from Walgreens?

5    **A.**   Yes.

6    **Q.**   Did you check their products --

7            MR. TREZEVANT:  Objection, beyond the scope,

8    argumentative.

9            THE COURT:  Overruled.

10   BY MR. TREZEVANT:

11   **Q.**   Did you -- I'll ask the question again.  Did you

12   purchase items from Walgreens for the practice?

13   **A.**   I may have, B12.

14   **Q.**   Did you check Walgreens licenses to make sure that they

15   had a state license to dispense drugs?

16   **A.**   No.

17           MR. TREZEVANT:  Objection, speculation.

18           THE COURT:  Overruled.

19   BY MR. SARTIS:

20   **Q.**   Did you check with them to confirm whether they had

21   complied with all of the FDA requirements?

22           THE COURT:  Sustained.

23   BY MR. SARTIS:

24   **Q.**   Dr. Norbergs, I'm going to show you, again, what is

25   Government -- Government's Exhibit 171.  Do you recall this

1    document?

2    **A.**    Yes.

3    **Q.**    Ma'am, did you produce this document?

4    **A.**    No.

5    **Q.**    Do you know who did produce this document?

6    **A.**    The Government.

7    **Q.**    Okay.  In this document, ma'am, for this time frame in

8    2010 through 2011, do you see that?  Let's start with that.

9    **A.**    Yes.

10   **Q.**    Did you make any purchases that you believed were

11   non-FDA-approved?

12   **A.**    No.

13   **Q.**    Let me move this page up here, and you see where there

14   is -- the numbers start appearing, the MabThera

15   non-FDA-approved section from March 15th, 2011.  Do you see

16   that?

17   **A.**    Yes.

18   **Q.**    And I'll have to move to the next page.  Through --

19   let's just go to February 2nd, 2012.  Do you see that?

20   **A.**    Yes.

21   **Q.**    Did you believe that you were purchasing drugs that were

22   non-FDA-approved at that time?

23   **A.**    No.

24   **Q.**    Let's continue for a moment in the next two transactions

25   from February 7, 2012 and February 10, 2012.  Do you see

1    those?

2    **A.**    Yes.

3    **Q.**    Do you believe that those transactions of those drugs

4    that you purchased were non-FDA-approved?

5    **A.**    No.

6    **Q.**    Again, Mr. Trezevant asked you, after you saw these

7    articles, these letters, "Why didn't you stop?"  Do you

8    recall that question?

9    **A.**    Yes.

10   **Q.**    Based on the Government's Exhibit 171, did you --

11          MR. TREZEVANT:  Objection, leading, asked and

12   answered.

13          THE COURT:  Overruled.

14   BY MR. SARTIS:

15   **Q.**    Did you purchase, ma'am, anything from -- any MabThera

16   from QSP after February 28th, of 2012?

17   **A.**    No.

18          MR. SARTIS:  If I may, your Honor, confer for a

19   moment?

20   (Brief interruption.)

21          MR. SARTIS:  Your Honor, we have a stipulation, if

22   the Court wants to approach sidebar, for the Court to

23   instruct the Jury or make the Jury --

24          THE COURT:  Approach the bench.

25   (Sidebar conference held

```
 1    outside the presence of the Jury.)

 2              THE COURT:  What's the stipulation.

 3              MR. SARTIS:  Your Honor, I think the Government --

 4    I don't want to start this without Mr. Trezevant.  I'm sorry.

 5    It is my understanding that the Government stipulates that

 6    Dr. Norbergs was not one of the 19 doctors mentioned in that

 7    article that received notice from the FDA.

 8              THE COURT:  Okay.

 9              MR. TREZEVANT:  I think your Honor already told

10    them that she didn't.

11              THE COURT:  You can just state it in the record.

12              MR. SARTIS:  Okay.

13              THE COURT:  This exhibit has been beaten to death.

14    What are you going to do with it?

15              MR. SARTIS:  That's it.  I beat it to death.  The

16    one that's on the screen?

17              THE COURT:  Yes.

18              MR. SARTIS:  That's it.  I'll take it down now.

19              THE COURT:  You may announce your stipulation.

20    (Back before the Jury.)

21              MR. SARTIS:  The Government and the Defense have a

22    stipulation that Dr. Norbergs was not one of the 19

23    physicians that were notified by the FDA that is mentioned in

24    the newspaper article, which is Government's Exhibit 7.

25              THE COURT:  All right.  Proceed.
```

1        MR. SARTIS:  Thank you, your Honor.

2    BY MR. SARTIS

3    Q.   Let's talk for a moment about the line items in

4    Defendants Exhibit 2.  Do you recall those?

5    A.   Yes.

6    Q.   Do you need me to put those up there?

7    A.   If you don't want numbered details.

8    Q.   Mr. Trezevant asked you if you took depreciation for the

9    business use of your personal vehicle?

10   A.   Yes.

11   Q.   Did you actually get that money in cash?

12   A.   No.

13   Q.   That is -- what is that depreciation?  Do you even know?

14   A.   It's a tax depreciation.  No.  My accountant does it.

15       THE COURT:  "To whom or to what did you pay rent?"

16       THE WITNESS:  To my landlord at East Lake Point.

17       THE COURT:  I'm sorry?

18       THE WITNESS:  At East Lake Point.

19       THE COURT:  Okay.  Is that a corporation of some

20   sort.

21       THE WITNESS:  I think -- I believe it was EMM, the

22   landlord.

23       THE COURT:  And did other people share the building

24   as well?

25       THE WITNESS:  Yes.

1      THE COURT:  All right.

2      MR. SARTIS:  If may clarify, your Honor?

3  BY MR. SARTIS:

4  **Q.**   Let's talk about your office.

5  **A.**   Yes.

6  **Q.**   Tell the Jury, please, where your office was?

7      THE COURT:  If you are going to talk about it,

8  please do it briefly.  Somebody in the Jury wanted know who

9  the rent was paid to.  That's the only reason I asked the

10  question.

11     MR. SARTIS:  Disregard.  Okay.  Presuming that is

12  to everybody's satisfaction.

13     THE COURT:  I think they wanted to know she wasn't

14  paying to herself.

15  BY MR. SARTIS:

16  **Q.**   I'll ask, did you pay rent to yourself?

17  **A.**   No.

18  **Q.**   Or any entity that you had ownership interest in?

19  **A.**   No.

20  **Q.**   Let me show you Government's Exhibit 11A.  Do you recall

21  this?

22  **A.**   Yes.

23  **Q.**   The documents contained in this packet, is this

24  something that you reviewed on a regular basis?

25  **A.**   No.

1  **Q.**   Let's talk about QSP and Oberlin, correct?

2  **A.**   Correct.

3  **Q.**   Were you using Oberlin in 2012?

4  **A.**   No.

5  **Q.**   Were you using Oberlin in 2011?

6  **A.**   No.

7  **Q.**   At the time you received the subpoena from the

8  Government on Oberlin, had you ceased using Oberlin as a

9  company?

10  **A.**   Yes.

11  **Q.**   Speaking of that, you complied with the terms of the

12  subpoena, correct?

13  **A.**   Correct.

14  **Q.**   Did you personally provide the documents requested of

15  the Government in the subpoena?

16          MR. TREZEVANT:  Objection, asked and answered.

17          THE COURT:  Sustained.

18  BY MR. SARTIS:

19  **Q.**   I was going to show you Government Exhibit demonstrative

20  181, but I think we've beaten it to death.  You didn't

21  produce that document?

22  **A.**   Which document?

23  **Q.**   The one that ASP --

24  **A.**   The one in yellow?

25  **Q.**   Yes.

1    **A.**    No, I did not produce that document.

2    **Q.**    And there were some mathematical equations added to

3    that, that Mr. Trezevant showed you?

4    **A.**    Correct.

5    **Q.**    You didn't produce those calculations?

6    **A.**    Yes.

7    **Q.**    That entire document was produced by the Government,

8    correct?

9    **A.**    Correct.

10           MR. SARTIS:  I'm sorry, your Honor, I'm just trying

11   to make sure I get the right Exhibit number.  Madam Clerk, if

12   we can switch to the Government's computer for a second?

13   BY MR. SARTIS:

14   **Q.**    I'm showing what you has been marked as Government

15   Exhibit 35.  Do you recall this?

16   **A.**    Yes.

17   **Q.**    All right.  And you see "Oncology Supply" at the top,

18   correct?

19   **A.**    Correct.

20   **Q.**    One of your distributors?

21   **A.**    Correct.

22   **Q.**    And did you -- you were aware that Oncology Supply was

23   distributed by ASD Specialty Healthcare, Inc., surgeries or

24   something.  Does even half of that company sounds familiar to

25   you?

1  **A.**   No.

2  **Q.**   The fact that it's a DBA does that concern you?

3  **A.**   No.

4  **Q.**   Okay.  I think we already testified or -- somebody

5  testified this is, in fact, one of the distributors that you

6  used, correct?

7  **A.**   Correct.

8  **Q.**   American company, correct?

9  **A.**   Correct.

10 **Q.**   Do you have any idea what the ownership interest in this

11 company is in DBA's or the company that are the parent to

12 this particular company?

13 **A.**   No.

14 **Q.**   Thank you.  Thank you.  Novartis.  Have you heard of

15 Novartis?

16 **A.**   Yes.

17 **Q.**   Do you have any idea where Novartis is headquartered?

18 **A.**   In Europe.

19      MR. TREZEVANT:  Objection, beyond the scope.

20      THE COURT:  Sustained.

21 BY MR. SARTIS:

22 **Q.**   Mr. Trezevant showed you a document, and I believe it's

23 11A, and I'll check that.  It was the QSP form you filled out

24 so you could actually have an account with them.

25 **A.**   Yes.

**Q.**   Do you recall that?  Give me one second, Doctor, and

I'll get this figured out.  Dr. Norbergs, give me one second.

We're going to pull those up.  It is the packet Mr. Trezevant

told you about that had the four pages from QSP.

**A.**   Yes.

**Q.**   As soon as we get this up, I'll ask you a question about

that.  Dr. Norbergs this is page 1 of this fax?

**A.**   Yes.

**Q.**   Did you see page 1 of this fax at the time that it was

sent to your office?

**A.**   I'm not sure.

**Q.**   Okay.  This is page 2 of that fax.  Do you recall seeing

this page contemporaneous to the time it was sent to your

office?

**A.**   Actually, no.

**Q.**   Okay.  Page 3, please.  Dr. Norbergs, do you recall

seeing this page at the time that this was sent to your

office from QSP?

**A.**   I'm not sure.

**Q.**   Okay.  And one more.  Dr. Norbergs, this is the

application, correct?

**A.**   Yes.

**Q.**   Who -- is this your handwriting?  Who filled this out?

**A.**   Kell.

**Q.**   It is your signature, though, correct?

1    **A.**    Correct.

2    **Q.**    So there is no question about that?

3    **A.**    No question.

4    **Q.**    Would you have seen this document and reviewed it prior

5    to executing it?

6    **A.**    The application, yes.

7    **Q.**    Okay.

8          MR. SARTIS:  Thank you, your Honor.  If I may have

9    one moment.  I believe that is it.  Thank you.  Nothing

10   further.

11         THE COURT:  All right.  You may step down.

12   (Witness excused.)

13   (Which were all proceedings

14   asked to be transcribed.)

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF REPORTER

2

3    COUNTY OF HILLSBOROUGH      )

4                                )  SS.

5    STATE OF FLORIDA            )

6

7    I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER, REGISTERED

8    PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

9    COURT FOR THE MIDDLE DISTRICT OF FLORIDA, DO HEREBY CERTIFY

10   THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS

11   AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME

12   WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF

13   COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT

14   THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC

15   NOTES.

16

17

18   DATE:  1/4/2017

19

20   S:/MELISSA A. PIERSON

21   MELISSA A. PIERSON, CA/CSR 12499

22   IL/CSR 084.003138, RPR

23   FEDERAL OFFICIAL COURT REPORTER

24

25
```