```
1                    UNITED STATES OF AMERICA
                   UNITED STATES DISTRICT COURT
2                    MIDDLE DISTRICT OF FLORIDA

3
                            -  -  -
4                 HONORABLE JAMES S. MOODY, JR.
               UNITED STATES DISTRICT JUDGE PRESIDING
5                           -  -  -

6   UNITED STATES OF AMERICA,   )
                                )
7            PLAINTIFF,          )
                                )
8   VS.                         ) NO. 8:15-cr-183-T-30AEP
                                )
9   D. ANDA NORBERGS,           )
                                )
10           DEFENDANT.          )
    _____)
11

12
                       TRIAL - DAY 1
13
                        **EXCERPT**
14
               REPORTER'S TRANSCRIPT OF PROCEEDINGS
15                    NOVEMBER 7, 2016
                       TAMPA, FLORIDA
16

17

18             MELISSA A. PIERSON, CA CSR 12499,
                   IL CSR 084.003138, RPR
19              FEDERAL OFFICIAL COURT REPORTER
               801 N. FLORIDA AVENUE, 2ND FLOOR
20                 TAMPA, FLORIDA 33602
                   PH:  (813)301-5336
21                USDCtranscripts@gmail.com

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL:

 2    ON BEHALF OF PLAINTIFF:
              A. LEE BENTLEY, III
 3            UNITED STATES ATTORNEY
              BY:  MR. ADAM SALTZMAN, ESQ.
 4            BY:  MR. JAY TREZEVANT, ESQ.
              ASSISTANT UNITED STATES ATTORNEYS
 5            400 N. TAMPA STREET
              ST. 3200
 6            TAMPA, FL 33602
              (813) 274-6000
 7            ADAM.SALTZMAN@USDOJ.GOV
              JAY.TREZEVANT@USDOJ.GOV
 8

 9

10    ON BEHALF OF DEFENDANT:
              TRAGOS, SARTES & TRAGOS, PLLC
11            BY:  MR. GEORGE E. TRAGOS, ESQ.
              BY:  MR. PETER SARTES, ESQ.
12            601 CLEVELAND STREET
              ST. 800
13            CLEARWATER, FL 33755
              (727) 441-9030
14            george@greeklaw.com
              peter@greeklaw.com
15

16

17

18

19

20

21

22

23

24

25
```

```
1                         I-N-D-E-X

2    WITNESS:

3    Dr. Mary Mayleben

4        Direct Examination by Mr. Trezevant:        5
         Cross-Examination by Mr. Tragos:           63
5

6

7

8

9

10

11

12                    E X H I B I T S           ADM

13

14   Government's Exhibit No. 1A                  18
     Government's Exhibit No. 1B                  18
15   Government's Exhibit No. 1C                  18
     Government's Exhibit No. 1D                  33
16   Government's Exhibit No. 31A                 56
     Government's Exhibit No. 35A                 56
17

18

19

20

21

22

23

24

25
```

```
 1                    TAMPA, FLORIDA; NOVEMBER 7, 2016

 2                              - - -

 3                 (COURT IN SESSION AT 2:22 P.M.)

 4                          *   *   *   *

 5   (Whereupon, Jury selection and

 6   opening statements were heard

 7   but not asked to be transcribed.)

 8            THE COURT:  All right.  The Government may call

 9   their first witness.

10            MR. TREZEVANT:  Yes, your Honor.  The Government

11   would call Mary Mayleben.  If we can re-arrange our computer?

12   Thank you, your Honor.

13            MADAM CLERK:  Good afternoon.  Please raise your

14   right hand.

15            THE WITNESS:  I do.

16            MADAM CLERK:  Please state your name and spell your

17   first and last name for the record.

18            THE WITNESS:  Dr. Mary Mayleben, M-A-R-Y,

19   M-A-Y-L-E-B-E-N.

20            MADAM CLERK:  Thank you.  You may have a seat.

21            THE COURT:  Proceed.

22                                        *

23                                        *

24                                        *

25                                        *
```

1    **DR. MARY MAYLEBEN**

2    Called as a witness herein, having been first duly sworn

3    was examined and testified as follows:

4    **DIRECT EXAMINATION**

5    **BY MR. TREZEVANT:**

6    **Q.**   Good afternoon, Dr. Mayleben.

7    **A.**   Good afternoon.

8    **Q.**   Dr. Mayleben, could you tell this Jury what you do for a

9    living?

10   **A.**   I am employed by the State of Florida as a

11   Pharmaceutical Program Manager for the Department of Business

12   and Professional Regulations.

13         MADAM CLERK:  Ma'am, can you please speak into the

14   mic, please.

15         THE WITNESS:  I just noticed that.  Don't get too

16   close.  Sorry.  Is that better?

17         I work for the State of Florida, Department of

18   Business and Professional Regulations, Division of Drugs,

19   Devices and Cosmetics as a Pharmaceutical Program Manager.

20   **Q.**   For how long have you worked in the position of

21   Pharmaceutical Program Manager?

22   **A.**   I've worked in that position since 2010 to the present.

23   **Q.**   And could you explain the scope and responsibility of

24   the Division of Drugs, Devices and Cosmetics, in which you

25   work.  Going forward, is it all right with you if I refer to

1    that as the DDC?

2    **A.**    That would be great.

3    **Q.**    Okay.  Is that how you refer to it?

4    **A.**    We do.  It's much easier than Drugs, Devices and

5    Cosmetics.

6    **Q.**    All right.  If you could explain the scope and

7    responsibility of the DDC, ma'am?

8    **A.**    Yes.  The DDC is tasked with protecting the health and

9    welfare of the citizens of Florida, as well as the visitors

10    in regards to prescription drugs, OTC drugs that are

11    manufactured in the State of Florida, as well as cosmetics

12    manufactured in the State of Florida.

13         In addition, we also monitor and are tasked with

14    insuring the safety of prescription drugs that are

15    distributed, either by it being sold or shipped into or

16    within the State of Florida.

17         To that end, we have multiple permits that we have

18    available for businesses to obtain to get properly licensed

19    to conduct business under those regulations.

20    **Q.**    All right.  Where does your position, Pharmaceutical

21    Program Manager, fit within the DDC organizational chart?

22    **A.**    There is the Director of DDC, which is the top person in

23    the Division.  Right under the Director is the Chief of

24    Compliance and Enforcement, and I would report directly to

25    her.  So I'm third in command after the Director, Chief and

1  then myself.

2  **Q.**   And what are your personal duties and responsibilities?

3  **A.**   My responsibilities include hiring and training our

4  inspectors, which include drug inspectors and medical gas

5  inspectors.  I also work closely with the Director and the

6  Chief of Compliance in drafting legislative statute and rules

7  and reviewing those.  Also establishing policies within the

8  Department, or within the Division, and also as a liaison

9  with other regulatory and law enforcement agencies.

10  **Q.**   And you mentioned drug inspectors under your

11  supervision.  What is their role?

12  **A.**   The drug inspectors, um, first, must be a registered

13  pharmacist as a requirement.  And they are tasked primarily

14  with, um, when an entity or a business wants to get into

15  business, and let's use an example a prescription drug

16  manufacturer or drug wholesaler, they would -- it's for all

17  of our permits, but they would submit an application, and

18  then once that application is reviewed and considered

19  complete, then the entity, depending upon what type of

20  permit, could get an inspection.  So that Drug Inspector

21  would conduct opening inspections, if that entity was in the

22  State of Florida.  Also, the Drug Inspector would conduct

23  routine inspections; and also desk audit.  So the routine

24  inspections or desk audits are done on both in the state and

25  out-of-state entities that have licenses with us.  They also

1    would conduct investigations for noncompliance, and also go

2    into facilities that should have permits or licenses with us

3    and we suspect unlicensed activity.  So they would also do

4    unlicensed activity cases.

5              THE COURT:  Let me stop you a minute.  Mr. Kelly,

6    can you hear okay?  All right.  Proceed.

7    BY MR. TREZEVANT:

8    **Q.**   Yes.  Ms. Mayleben -- Dr. Mayleben, you also mentioned

9    medical gas inspectors.  Could you just very generally

10   explain what medical gas inspectors are, what they do?

11   **A.**   Yes.  We have medical gas inspectors that primarily

12   their focus is on the medical grade gases.  That would be

13   oxygen, USP, nitrogen, nitrous oxide, and they would go into

14   those businesses that deal with either the gas manufacturing,

15   gas distribution or gas retail establishments that provide

16   oxygen to patients.

17   **Q.**   In your oversight role, do you have -- what, if any,

18   oversight role do you have for drug manufacturers, drug

19   distributors or, drug wholesalers, and pharmacist?

20   **A.**   We require that anyone that is manufacturing a drug in

21   the State of Florida, whether it be an over-the-counter drug

22   or a prescription drug, has a permit with us prior to them

23   operating.  Um, and they would be required to comply with all

24   state and federal regulations regarding that drug

25   manufacturing.

1          As far as a drug wholesaler or a distributor, we

2    also would require anyone that is either going to sell or

3    ship a drug, prescription drug, into the State of Florida or

4    within the State of Florida to also have a permit with us.

5    **Q.**   And do you hold any professional licenses, ma'am?

6    **A.**   Yes.  I, myself, hold a Registered Pharmacy in four

7    states, and I'm also a Doctor of Pharmacy.

8    **Q.**   Is one of those states Florida?

9    **A.**   Yes, it is.

10   **Q.**   Now, touching on your education, backing up just

11   briefly, do you have a college degree?

12   **A.**   Yes.  I got a Bachelor of Science Degree in pharmacy --

13   in the School of Pharmacy.

14   **Q.**   From where?

15   **A.**   That is from Northeastern University in Boston.

16   **Q.**   And following that degree did you ever study and take

17   your Boards?

18   **A.**   I did.  After a five-year degree then I sat and took my

19   Boards and passed the National Association of Boards of

20   Pharmacy exam that's required before you can actually

21   practice pharmacy.

22   **Q.**   And then, did you attend any post-graduate programs?

23   **A.**   I attended a two-year, what is called, a Doctor of

24   Pharmacy program.  That's a post-BS degree, that's two-year

25   Pharm D, and then, post the Pharm D, I also took a two-year

1    clinical residency.

2    **Q.**   What was that clinical residency?  What exactly was

3    that?

4    **A.**   The clinical residency involved working very closely

5    with a team of physicians where we would be assigned a team

6    and then we would basically rotate with that team of

7    physicians and be assigned to various different types of

8    patients, whether it be like a diabetic floor, or maybe it

9    could be a renal floor for kidney, whatever the area was, you

10   would be assigned to that team, and as a pharmacist on the

11   team, we were responsible for providing input to the

12   physicians, also recommending dosing of drugs, and also

13   ordering studies for the drug monitoring to make sure the

14   drugs were dosed appropriately based upon a person's

15   conditions -- disease conditions.

16   **Q.**   Prior to your present position as a Pharmaceutical

17   Program Manager, did you work in any other capacity within

18   the DDC?

19   **A.**   Yes.  Prior to being the Program Manager I served as a

20   drug inspector from 2000 to 2005, so about five years.

21   **Q.**   And then, prior to that, at any time, did you ever work

22   in the private sector as a retail pharmacist?

23   **A.**   Yes.  I worked in the retail sector right after I

24   graduated, and also in, um, the late 80's I worked for a

25   major chain.

1   **Q.**   Did you work in a hospital setting?

2   **A.**   Yes.  I worked in several different hospital settings,

3   both teaching hospitals, as well as community hospitals.

4   **Q.**   What about in any other setting?

5   **A.**   I also worked for the State of Florida in their central

6   pharmacy, which provided prescription drug services as a mail

7   order facility for the 67 counties for the State of Florida.

8   **Q.**   During your work tenure, did you ever have any

9   experience working in a medical office setting in which that

10  office ordered and administered prescription drugs for use in

11  the office?

12  **A.**   Yes.  I actually was an office manager for approximately

13  two years in a physician's office where I was responsible for

14  ordering and receiving those prescription drugs.

15  **Q.**   In what state?

16  **A.**   That was in Florida.

17  **Q.**   And so, in your capacity as a pharmacist working in a

18  medical office, did you have to follow and comply with many

19  of the state laws and rules that you now enforce?

20          MR. TRAGOS:  Objection, your Honor, as to

21  applicable time period.

22          MR. TREZEVANT:  I'll clear it up, your Honor.

23  BY MR. TREZEVANT:

24  **Q.**   And when was that, ma'am?

25  **A.**   That was in --

1    **Q.**    Approximately?

2    **A.**    That was approximately 1987 to '89.

3    **Q.**    1987 to 1989.  I'm sorry, when did you say, ma'am?

4    **A.**    Yes.  I believe it was around the late 80's.  Late

5    1980's.

6    **Q.**    All right.  In your capacity as a pharmacist working in

7    the medical office, did you have to file and comply with many

8    of the laws and rules?

9    **A.**    Yes.

10   **Q.**    That you now enforce as a Pharmaceutical Program

11   Manager?

12            MR. TRAGOS:  Objection to relevance and predicate.

13            THE COURT:  Overruled.

14            THE WITNESS:  Yes, I did.

15   BY MR. TREZEVANT:

16   **Q.**    And did you, in fact, follow the laws and rules?

17   **A.**    Yes.

18   **Q.**    Did you ever order prescription drugs that had not been

19   approved by the FDA?

20   **A.**    No, absolutely not.

21   **Q.**    What, if any, methods did you use to insure that the

22   drugs that were received in that medical office were, in

23   fact, approved by the FDA?

24            MR. TRAGOS:  Objection, your Honor, there is no

25   notice of expert witness -- I'm sorry.

1              THE COURT:  Approach the bench.

2              MR. TRAGOS:  Excuse me?

3              THE COURT:  I said, approach the bench.

4    (Sidebar conference held.)

5              THE COURT:  What's the objection?

6              MR. TRAGOS:  Your Honor, they are asking her about

7    her practices in 1989, and No. 1, I think it's irrelevant

8    what her practice was in 1989.

9              Secondly, what relevance does it have with what she

10   did, whether she did practice correctly, whether she ordered

11   any drugs, what relevance does that have to the case?

12             THE COURT:  Response.

13             MR. TREZEVANT:  Yes, your Honor.  I anticipate that

14   she's going to explain that when prescription drugs arrived,

15   she would look at the packaging, and the labelling, and all

16   of those things that are available and that those are part of

17   what she enforces.  Now, it's all the same the rules.  The

18   rules, I don't believe, have changed.  I think she would say

19   they haven't changed such that when the drugs arrive, whether

20   you ordered them or not, if they, in fact, show up, and you

21   undo them, and you look at the drugs themselves, you can tell

22   by the packaging and the labelling whether or not it's an

23   FDA-approved misbranded drug, and she's just talking about

24   her personal experience in the field and the way drugs arrive

25   in the State of Florida at doctors' offices.

```
 1          MR. TRAGOS:  I think that they can ask her under
 2   today's rules what should be done, but asking her what she
 3   did in 1989 in making that evidencing as to our client, I
 4   don't think it's relevant to know what she did in '89.
 5          THE COURT:  The objection is overruled, but tie it
 6   to today's rules.
 7          MR. TREZEVANT:  Yes, your Honor.
 8          (Back before the Jury.)
 9          THE COURT:  I'm not sure you can move that that
10   much.
11          MADAM CLERK:  Just be careful, the connection
12   can --
13          MR. TREZEVANT:  I'm okay now.  Thank you, your
14   Honor.
15          THE COURT:  All right.
16   BY MR. TREZEVANT:
17   Q.   Dr. Mayleben, when you were working in the medical
18   office setting, were the rules -- how, if they were, the
19   rules similar as far as the use of the FDA-approved drugs?
20          MR. TRAGOS:  Objection to the word "similar."
21          MR. TREZEVANT:  To now.
22          THE COURT:  Are the rules the same now as they were
23   then?
24          THE WITNESS:  Yes, sir.  As far as -- the rules are
25   the same in the sense of a drug needs to be properly labeled.
```

```
1    The package -- when you receive the package, it needs to be
2    -- come in, and we look at the packaging to make sure the
3    packaging was intact and hadn't been tampered with.  That the
4    labelling is legible, and that it's easily read, that would
5    include being in English, and that it would have appropriate
6    directions on it based upon the drug.
7    BY MR. TREZEVANT:
8    Q.   So when you were working, ma'am, what would you look for
9    when -- and what steps, if any, would you take to insure that
10   they were FDA-approved drugs?
11   A.   To make sure they are FDA-approved drugs would be that
12   they were different sources than now, but they are similar,
13   not in the sense that now there is many more sources online
14   than recent times then -- but both now and then there were
15   resources where you would look up drugs before ordering them
16   to determine if they were approved drugs, just by the nature
17   of them being on the market, being labeled as such where they
18   have -- as far as the process when we see -- receive the
19   drug, once we are assured we ordered an approved drug, we
20   insure when we got the drug that the labelling was in
21   English, which is a requirement.  That it was labeled -- if
22   it was a prescription drug, it says clearly on there that it
23   is an "RX-only" drug or prescription drug, and based on the
24   drug, what kind of labelling -- additional labelling we would
25   need to be required on there.
```

1          MR. TREZEVANT:  Your Honor, if Ms. Wetherald could

2    approach the witness?

3          THE COURT:  All right.

4    BY MR. TREZEVANT:

5    **Q.**   Ms. Wetherald is going to approach with Government's

6    Exhibits 1A through 1C, and we have provided defense a copy

7    and let them know what we are using.  1A, 1B and 1C, you have

8    those exhibits in front of you, Dr. Mayleben?

9    **A.**   Yes, I do.

10   **Q.**   If you can briefly look through them so you --

11   **A.**   (Witness perusing documents.)  Okay.

12   **Q.**   Are those three exhibits, Government Exhibits 1A, 1B and

13   1C, are they made up of true and correct copies of records

14   maintained on file with the Florida Department of business

15   regulations?

16   **A.**   Yes, they are.

17   **Q.**   And are they required to be kept by the Department?

18   **A.**   Yes, they are required to be kept.  There's a retention

19   period, and in this case, um --

20         THE COURT:  Speak into the microphone.

21         THE WITNESS:  I'm sorry, sir.

22   BY MR. TREZEVANT:

23   **Q.**   Do the exhibits relate to any particular healthcare

24   office or clinic, ma'am?

25   **A.**   Yes, I'm looking at Exhibit 1A.

1    **Q.**   Yes, ma'am.  Just before.

2    **A.**   Yes.

3    **Q.**   Do they relate to any particular healthcare office or

4    clinic?

5    **A.**   Yes, they do.

6    **Q.**   What clinic or office do they relate to?

7    **A.**   Eastlake Oncology.

8    **Q.**   Where was that located, ma'am?

9    **A.**   4114 Woodlands Parkway, Suite 301, Palm Harbor, Florida.

10   **Q.**   Now, as far as Government Exhibit 1B, did you personally

11   secure or produce to the Government one of two pages that

12   make up that exhibit?

13   **A.**   Yes, I did.

14   **Q.**   Which page did you produce?

15   **A.**   I produced the second page of that exhibit.

16   **Q.**   All right.  Is that page also a true and correct copy of

17   the records --

18   **A.**   Yes, it is.

19   **Q.**   -- on file with your Department, ma'am?

20   **A.**   Yes, it is.

21   **Q.**   All right.

22          MR. TREZEVANT:  Your Honor, at this time, the

23   Government would offer Government's Exhibits 1A, B and C into

24   evidence pursuant to Federal Rule of Evidence 902(1).

25          MR. TRAGOS:  May I take a look at the exhibits?

```
 1              THE COURT:  Yes.

 2              MR. TRAGOS:  No objection.

 3              THE COURT:  It will be admitted.

 4   (Government Exhibit Nos. 1A, 1B, 1C

 5   admitted into evidence.)

 6   BY MR. TREZEVANT:

 7   Q.   All right.  If we could first look at Government

 8   Exhibit 1A, the first page.

 9              MR. TREZEVANT:  Excuse me.  If we can switch to the

10   computer?

11              MADAM CLERK:  We are having a slight issue.

12              THE COURT:  Can you use the Elmo?

13              MR. TREZEVANT:  We can, your Honor.

14              THE COURT:  Well, we can't switch to the Elmo

15   either.  Apparently our panel is frozen.

16              Let's take our afternoon break early.  So we'll be

17   in recess for 15 minutes, and then we'll go from 3:00 o'clock

18   to 4:30, hopefully.

19              CSO OFFICER:  All rise.

20   (Jury exits at 2:45 p.m.)

21              CSO OFFICER:  Please be seated.

22              THE COURT:  We're in recess.

23              (Recess taken at 2:47 p.m.)

24              (Jury enters courtroom at 3:05 p.m.)

25              THE COURT:  You may proceed.
```

1          MR. TREZEVANT:  Thank you, your Honor.

2     BY MR. TREZEVANT:

3     **Q.**   Dr. Mayleben, what I have in front of you is

4     Government's Exhibit 1A, and start focusing on the top third

5     of the document.  You can look at the document itself, or you

6     can look on your screen, whichever is more convenient for you

7     to do.  First, what type of document is this?  Do you

8     recognize the document?

9     **A.**   Yes.  This is for a healthcare clinic establishment

10    application.  So this would be the document person who would

11    fill out to apply for a healthcare clinic establishment

12    permit or license, which is also known as an HCCE permit or

13    license.

14    **Q.**   All right.  And let's break that down just a little bit.

15    What do you mean by healthcare clinic establishment?

16    **A.**   A healthcare clinic establishment was a type of permit

17    that was established so that a healthcare practitioner could,

18    if they were part of a business, if they had formed, like, a

19    corporation or limited liability company and they chose to

20    buy their drugs under the business entity, under that tax ID

21    in the business as opposed to taking the funds out of their

22    personal funds, then this was a way that a business would be

23    able to purchase prescription drugs under the authority of

24    having this healthcare clinic establishment permit.

25    **Q.**   And is this a required license for a healthcare clinic

1   establishment?

2   **A.**   Yes.  If you are going to -- if a -- if a healthcare

3   practitioner is going to choose to purchase the drugs under

4   the business entity as opposed to out of their personal

5   funds, they are to get this permit.

6   **Q.**   And so, within your Department or the DDC, which you

7   referred to, the healthcare clinic establishment, do you also

8   sometimes refer to that as an HCCE?

9   **A.**   Yes, we do.

10  **Q.**   Do you consider that the purchaser of the drugs?

11  **A.**   Yes.  The HCCE permits the holder to be the purchaser of

12  the business or actually buyer of the prescription drugs.

13  **Q.**   In the top right-hand corner of this document are you

14  able to see a date there?

15  **A.**   Yes.  It's bates stamped 10-1-2009.

16  **Q.**   Why would that be there, ma'am?

17  **A.**   That is a stamped -- when it's received in, we give it a

18  date stamp as part of the processing when they receive the

19  application and when they process it.

20  **Q.**   And received where?

21  **A.**   Into the Drug, Devising, Cosmetics.

22  **Q.**   Now, you told us earlier that you work for the DDC and

23  this is part of the --

24  **A.**   That is correct at this time.

25  **Q.**   This says the Foreign Department of Health.  Can you

1    explain that?

2    **A.**    Yes.  In 2011 the Division for the Drug, Devices and

3    Cosmetics as a complete entity moved from the Department of

4    Health, where it was housed previously, and then in the fall

5    of 2011 it moved from the Department of Health to the

6    Department of Business and Professional Regulation as its own

7    entity.

8    **Q.**    And if this application is for the healthcare clinic

9    establishments to purchase prescription drugs, are there

10   other similar applications that are utilized by the DDC?

11   **A.**    Yes.  We have many different permit types.  Some of them

12   would be for drug manufacturers, drug wholesalers, freight

13   forwarders.  We have multiple, as we said, medical gas.

14   **Q.**    And when you say wholesale distributor, what do you mean

15   by wholesale distributor?

16   **A.**    A wholesale distributor is a business that is selling or

17   shipping a prescription drug that they themselves did not

18   manufacture.  So if they wanted to distribute it, whether

19   it's by selling or by shipping, they could obtain a wholesale

20   distributor permit that would allow them to basically pass

21   title or physical possession of the drug.

22   **Q.**    And under Florida law, your Department, is it -- is

23   that -- is that a necessary license to wholesale distribute

24   into the state?

25   **A.**    Yes.  Anyone that is -- that chooses to -- anyone to be

1    in compliance with Florida law would need to obtain a permit

2    with the DDC prior to wholesale distributing into the State

3    of Florida.

4              MR. TRAGOS:  Your Honor, we renew our request, at

5    this time, for the instruction.

6              THE COURT:  Overruled.

7    BY MR. TREZEVANT:

8    Q.   And you also mentioned the term "freight forwarder."

9    What is a freight forwarder?

10   A.   A freight forwarder is a type of business that is not

11   selling a prescription drug, but they are responsible for

12   shipping the prescription drug.  So if a manufacturer or drug

13   wholesaler chose to sell a prescription drug, but they didn't

14   want to maybe bother with having the actual facility to store

15   and house prescription drugs, they might choose to use a

16   freight forwarder as a business that would hold, store the

17   prescription drugs, and then they would be shipped on behalf

18   of the seller, whether it was the wholesale distributor or

19   the manufacturer.

20   Q.   Is there a separate license that would be applicable for

21   freight forwarders?

22   A.   Yes, there is.

23   Q.   What about a manufacturer that is actually operating in

24   the State of Florida, do they need a permit?

25   A.   Yes.  If they are operating in the State of Florida and

1   they are manufacturing prescription drugs or over-the-counter

2   drugs, they need a permit.  And if they are manufacturing

3   prescription drugs out-of-state, of Florida, they would also

4   need a permit if they want to sell those prescription drugs

5   directly into Florida.

6   **Q.**   So does Florida require every wholesale distributor or

7   freight forwarder that ships into the state to have a

8   license?

9   **A.**   Yes, either a wholesale distributor or freight

10   forwarder, whether selling or shipping directly in Florida,

11   is required to obtain a license prior to operations with us.

12   **Q.**   And this clinic healthcare establishment that's in front

13   of us here, looking at the lower middle section, does that --

14   does it identify the entity that actually submitted the

15   application?

16   **A.**   Yes.  This business entity is for the business of

17   Eastlake Oncology, PA, is what it states.

18   **Q.**   And what is the listed mailing address?

19   **A.**   4114 Woodlands Parkway, Suite 301, Palm Harbor, Florida.

20   **Q.**   And now looking at the bottom half of the form, is the

21   applicant listed there?

22   **A.**   Yes.  It's a little bit harder to see, but the applicant

23   contact is listed in the grayed area above the white line,

24   and you can see that it states --

25   **Q.**   By what number, ma'am?

1    **A.**    I'm sorry.  By No. 6, where it has the name, last,

2    first, middle initial.  It states "Norbergs D. Anda."

3    **Q.**    Okay.  And then, looking down a little lower, is there a

4    physical location listed?

5    **A.**    Yes.  The address listed, which would be right below

6    No. 6, it says, "As above," which would -- that would mean to

7    us that the physical address location is the same as the

8    mailing address, which was the 4114 Woodlands Parkway.

9    **Q.**    Do you see down -- the next one down where it says at

10   Box 7, "designated qualifying practitioner."  Are you

11   familiar with that term?

12   **A.**    Yes.  Any entity that's going to apply and receive a

13   healthcare clinic establishment permit must designate a

14   qualified practitioner.  That practitioner is the person who

15   is associated with the permit to take the responsibility for

16   all compliance for the permit.

17          MR. TRAGOS:  Your Honor, we request that

18   instruction at this time.

19          THE COURT:  Overruled.

20   BY MR. TREZEVANT:

21   **Q.**    And is there a signature of the designated qualifying

22   practitioner at the bottom right of the form?

23   **A.**    Yes.  There is on the first page, there's a signature.

24   **Q.**    Is that the designated qualifying practitioner?  Is that

25   an important designation to your office?

1    **A.**    Yes.   That's an extremely important designation.   That

2    is who we would hold responsible.

3    **Q.**    Turning now to page 2, and looking in the middle of the

4    form, does it identify the -- who's the president?

5    **A.**    Yes, under the corporate officers, etc., it lists Diana

6    Anda Norberg as the president.

7    **Q.**    And looking lower down, is Ms. Diana Anda Norberg also

8    listed as a registered agent?

9    **A.**    Yes, she is.

10   **Q.**    Turning to page 3, in the middle of page 3, where it

11   says, "affidavit," ma'am.

12   **A.**    Yes.

13   **Q.**    Is this an important part of the form?

14   **A.**    Yes.   This is basically where the qualified practitioner

15   is basically making a statement, and basically this says that

16   "Diana Anda Norberg, on behalf of the applicant business,

17   which is Eastlake Oncology, do solemnly swear or affirm that

18   I understand that the HCCE and the designated qualifying

19   practitioner are required to comply with the provisions of

20   chapter 499 Florida Statute and Rule 64(f)12 Florida

21   Administrative Code.   I further affirm the information

22   submitted to the Department on this applications and any

23   attachments thereto are true and correct."

24           So basically, this statement is a required

25   statement if the application had come in and this had not

1    been filled out or signed, it would have been considered a

2    deficient application.  Because it did have all the parts and

3    it was signed, this basically is -- this person is taking

4    responsibility to comply with the Florida regulations.

5    **Q.**    And do you have -- what was the date listed?

6    **A.**    This is dated September 28th, 2009.

7    **Q.**    And is it signed?

8    **A.**    Yes, it is.

9    **Q.**    Now, if we could go to Government Exhibit 1B, and look

10   at the very top corner or -- top third of this exhibit.  What

11   are we looking at here, ma'am?  What is this document?

12   **A.**    This is actually a copy of the license that was issued.

13   You see the license No. 60 is the prefix for HCCE permit with

14   the license No. 2239.

15   **Q.**    When was it issued relative to the signature date on 1A?

16   **A.**    This was issued on 10-15-2009, and the signature on 1A

17   was September 28th, 2009.  So very shortly thereafter she

18   obtained the permit for East Lake Oncology, PA, and

19   4114 Woodlands Parkway.

20   **Q.**    The permit was good for how long?

21   **A.**    The permits are renewable every two years.

22   **Q.**    What was the expiration date of the permit, ma'am?

23   **A.**    The expiration date was October 31, 2011.

24   **Q.**    Looking at the second page of this exhibit, and the

25   bottom third of this page, what is this document?

**A.**   This document is a renewal issuance of her license.

**Q.**   Of which license?

**A.**   Of the HCCE permit, and you see the license number, the 602293, is the same number as the original license.  So this issue -- this permit was issued as a renewal of the original license that was obtained of the HCCE permit of East Lake Oncology.

**Q.**   As of what date?

**A.**   This was issued 11-14-2011.

**Q.**   And what is the expiration on this license?

**A.**   October 31, 2013.

**Q.**   Turning now to Government Exhibit 1C, and looking at the top third of this exhibit.  What are we looking at?

**A.**   This is a renewal application.  It says, "The application for permit renewal."  The permit that's being renewed is East Lake Oncology, and so, this is what is submitted to renew the original HCCE permit.

**Q.**   So is this the document that was submitted, the alleged renewal that we just looked at Exhibit 1B?

**A.**   Yes, it is.

**Q.**   What is the date on the top right of the document when it was submitted or received?

**A.**   9-16-2011.

**Q.**   And it was by what entity?

**A.**   This was received by the Department of Business and --

1    no, this was Department of Health.  We were prior -- before

2    we moved, the Department of Health, but the Division of

3    Drugs, Devices and Cosmetics.

4    **Q.**    So had it changed from the Department of Health to --

5    **A.**    No.  It did not change until I think it was October or

6    November of 2011.

7    **Q.**    All right.  Ma'am, so at the very top does it list the

8    healthcare clinic establishment permit number we are talking

9    about?

10   **A.**    Yes.  At the very top right underneath the bolted area

11   it lists the permit No. 602239.

12   **Q.**    Is that the same one for East Lake Oncology we have been

13   discussing?

14   **A.**    Yes, it is.  That's the original permit number that was

15   issued.

16   **Q.**    Looking at box No. 3, does it, again, list the

17   designated qualifying practitioner?

18   **A.**    Yes, in box No. 3, the designated qualifying

19   practitioner is D. Anda Norbergs, who was the original

20   designated qualifying practitioner in the original

21   application.

22   **Q.**    So has that changed?

23   **A.**    That has not changed.

24   **Q.**    And if we look at No. 4 what, if anything, is it

25   addressing?

Case 8:15-cr-00183-JSM-AEP   Document 134   Filed 03/27/17   Page 29 of 77 PageID 971

29

**A.**    No. 4 is basically asking if there had been any changes
in ownership or any other directors, partners, corporate
officers.  So in this No. 4, it's indicating there have been
no changes to the owners, partners or corporate offices.

**Q.**    Now, looking down in the bottom half of the document,
East Lake Oncology, all right.  So looking here at the bottom
half of the Document No. 5, have conditions or practices
changed that would make it ineligible?  What is this section
about, in the renewal form?

**A.**    This is basically a statement of -- asking particular
questions regarding the designated qualifying practitioners,
specifically whether the designated qualifying practitioner
has been fined or disciplined, entered a plea for guilty or
conviction, if they have had their license suspended or
revoked, and had they been denied a permit or license in any
state.

**Q.**    Does this indicate that there were no conditions or
practices changed?

**A.**    That is correct.

**Q.**    So as far as East Lake Oncology and its status as an
HCCE, from its initial application in 2009, was it
consistently licensed by the DDC with an expiration in
October -- from 2009 to 2013?

**A.**    Yes.  From the beginning -- from the beginning of the
issuance of the permit back in 2009, East Lake Oncology held

| | |
|---|---|
| 1 | a permit active through the time period you stated with the |
| 2 | same designated qualifying practitioner as of this time. |
| 3 | **Q.**   Who was the designated qualifying registrant throughout |
| 4 | the entire period? |
| 5 | **A.**   Diana Anda Norbergs. |
| 6 | **Q.**   Looking down at No. 6 at the very bottom.  What is that? |
| 7 | Could you please read what it says on there, "other |
| 8 | information?" |
| 9 | **A.**   "By submitting the appropriate renewal fees to the |
| 10 | Department, I certify compliance with all requirements for |
| 11 | renewal.  I am responsible for knowing these requirements as |
| 12 | set forth in the laws and the rules that govern my |
| 13 | profession." |
| 14 | MR. TRAGOS:  Your Honor, I would request the |
| 15 | instruction. |
| 16 | THE COURT:  Approach the bench. |
| 17 | (Sidebar conference held.) |
| 18 | THE COURT:  You're still objecting to giving an |
| 19 | instruction? |
| 20 | MR. TREZEVANT:  We do, the one that he has |
| 21 | proposed, your Honor.  We would have no problem with this |
| 22 | Court instructing the Jury that she is not -- that the |
| 23 | charges raised in this case are not for violating any state |
| 24 | law -- for a state law.  That would make this very clear |
| 25 | because that's all we are talking about is 499, which is a |

1    state law, but we're not talking about ethical standards.

2    We're not talking about civil rules or civil penalties.  He

3    asked me earlier if I was going to raise the fact she has a

4    civil penalty.  I made it clear we are not raising it, even

5    though she did.  I haven't discussed it and don't intend to

6    discuss it with this witness.

7             THE COURT:  The purpose of this question is what?

8    That she is on notice of some sort?

9             MR. TREZEVANT:  She absolutely is on notice and has

10   knowledge under 499.  When we look at 499, your Honor, you're

11   going to see that 499 is actually specifically, by its very

12   language, says that its mirrored and based upon the federal

13   act, and that it's drafted, in other words, as a mirror, and

14   that it puts her on notice as to misbranding and what you can

15   and can't do.  It's very clear, straight forward.  We're not

16   going to read the whole thing.  That would be crazy.  We're

17   just going to hit those sections that specifically address

18   this case.

19            MR. TRAGOS:  Your Honor, that may be their intent,

20   but they have put before the Jury that she has to obey all

21   the rules and regulations, and if the Jury is not told that

22   those rules and regulations are civil in nature, and that a

23   violation of them doesn't mean that she has committed a

24   crime, but they have repeatedly -- I can cite even on there

25   where it says that she signs that she agrees to the

1    administrative Rule No. 94 point something, and it's all the

2    way through -- and all the way through her testimony.  If

3    they want to get in the criminal violation, that's fine.  I

4    think the Jury needs to know there's a difference between

5    violating the rules of this Department.  Because they got

6    into this thing about this licensure of, what was it --

7              THE COURT:  I heard enough.  I'm going to instruct

8    the Jury that she's not charged with violating state laws or

9    state regulations.  She's charged with federal violations.

10   The testimony they've heard so far goes to her knowledge and

11   her notice of misbranded and non-branded drugs.

12             MR. TRAGOS:  Is the Court saying in such a way to

13   make a conclusion?  That's the only problem, telling the Jury

14   that she is on notice.  That's the problem I have with it.

15             THE COURT:  I think what I said was the Government

16   is offering it to show her knowledge.

17             MR. TRAGOS:  And nothing more.  Okay.

18             (Back before the Jury.)

19             THE COURT:  You've been hearing some testimony

20   about state law and state regulations.  The Defendant in this

21   case is not charged with a crime under state law or state

22   regulations.  She's charged with federal charges.  The

23   Government is offering this information as to the Defendant's

24   knowledge, not that these are -- she's committed state law

25   crimes.  This just goes to her knowledge.  All right.

1    Proceed.

2            MR. TREZEVANT:  Thank you, your Honor.

3    BY MR. TREZEVANT:

4    **Q.**   Dr. Mayleben, looking back at Government Exhibit 1A,

5    page 3, the affidavit signed there, as the Court just

6    instructed, do you see where it says Chapter 499?

7    **A.**   Yes, I do.

8    **Q.**   Is that, in fact, a Florida statute, ma'am?

9    **A.**   Yes.  Chapter 499 is a Florida statute.

10   **Q.**   Um, if we could --

11           MR. TREZEVANT:  If Ms. Wetherald may approach, your

12   Honor.  Could Ms. Wetherald have permission to approach

13   whenever an exhibit or -- do you want me to ask each time?

14           THE COURT:  She has permission to approach.

15           MR. TREZEVANT:  She is approaching with Government

16   Exhibit 1D, and your Honor, we would offer this pursuant to

17   the stipulation.

18           THE COURT:  It will be admitted then.

19   (Government's Exhibit No. 1D

20   admitted into evidence.)

21   BY MR. TREZEVANT:

22   **Q.**   Looking at the top half of this document, ma'am, what

23   exactly is in front of you as Government Exhibit 1D?

24   **A.**   This is a 2009 Florida Statute, Chapter 499, which is

25   the regulation for Drugs, Devices and Cosmetics.

1  **Q.**   Is that provision referred to in the affirmation we just

2  looked at?

3  **A.**   Yes, it is.

4  **Q.**   Are you familiar with this act?

5  **A.**   Yes, I am.

6  **Q.**   Do you refer to it as part of your daily work?

7  **A.**   On an every minute-almost daily basis.

8  **Q.**   And for what year, ma'am?

9  **A.**   This is the 2009 Florida Statutes.

10 **Q.**   All right.  What I would like to do is start, and I

11 certainly don't intend to publish this entire document, but I

12 do want to look at certain sections of the document.  If we

13 could first look down at the table of contents, here on the

14 first page, the very first 1499.01.  Could you read that,

15 ma'am?

16 **A.**   499.001 says, "A Florida Drug and Cosmetic Act."

17 **Q.**   And the item directly below it?

18 **A.**   And right under it, "499.002 is the purpose,

19 administration and enforcement of an exemption from this

20 part."

21 **Q.**   All right.  If we could look now, turn to page 3 of the

22 exhibit, and looking at 499.002, "Purpose administration and

23 enforcement of an exemption," from this part under 499.002,

24 looking from 1A, B and C, first, could you read what is

25 under, "This part is intended to..." in Section A?

**A.**   Yes.  Section A is, "This part is intended to safeguard

the public health and promote the public welfare by

protecting the public from injury by product use and by

merchandising deceit involving drugs, devices and cosmetics."

**Q.**   And Section B, ma'am?

**A.**   "Provide uniform legislation to be administered so far

as practicable in conformity with the provisions of, and

regulations issued under the authority of the Federal Food,

Drug and Cosmetics Act, and that portion of the Federal Trade

Commission Act which expressly prohibits the false advisement

of drugs, devices and cosmetics."

**Q.**   Finally, Section C.

**A.**   "Provide thereby uniformity of state and federal laws

and their administration and enforcement throughout the

United States."

**Q.**   So the structure of the statute in front of us does it

relate in any way to the Federal Food, Drug and Cosmetics

Act?

**A.**   Yes, in areas that are applicable it mirrors it very

closely.

**Q.**   Is it fair to say it's not exact, though?

**A.**   It is not exact.

**Q.**   Looking at Section 2, just below, that one little

paragraph, if you could publish that, ma'am.

**A.**   "The Department shall administer and enforce this part

1    to prevent fraud, adulteration, misbranding or false

2    advertising in the preparation, manufacturing, repackaging or

3    distribution of drugs, devices and cosmetics."

4    **Q.**   All right.  Now, if you could turn to Page 26, the

5    bottom of the page, 499.01, dealing with permits.  What does

6    this section deal with, ma'am?

7    **A.**   This is a section that establishes all the different

8    types of permits and what those permits are for.  Section (1)

9    lists the permit types, and Section (2) goes into the detail

10   on the permit types.

11   **Q.**   So in Section (1), does it actually -- the first

12   paragraph say, "Prior to operating, a permit is required for

13   each person and establishment that intends to operate as?"

14   **A.**   Yes, it does.

15   **Q.**   All right.  And so, looking at the next page, page 27 of

16   Exhibit 1D, what could you tell us, what is that

17   Subsection D?

18   **A.**   1(d) is a prescription.

19   **Q.**   No, ma'am.

20   **A.**   1(d) is a prescription drug wholesale distributor, and

21   1(e) is an out-of-state wholesale prescription drug

22   distributor.  Do you want me to read the other ones

23   highlighted there?

24   **Q.**   Well, first, we have a -- what is an out-of-state

25   prescription drug wholesale distributor?

**A.**    An out-of-state prescription drug wholesale distributor

would be a business located outside the State of Florida that

wants to sell or ship directly into Florida.  If they were

going to do that, they need a permit with us.  If they

weren't going to sell or ship into Florida, then they would

not need a permit with us.

**Q.**    Would that be the same as required for an HCCE, or would

it be its own permit?

**A.**    It would be its own permit.  All permits have a prefix.

This is a prefix of a 60, and this would have a different

prefix number.

**Q.**    Looking down at Subsection I there, what is listed

there, ma'am?

**A.**    An "I" lists the freight forwarder, which would also

need a permit prior to operating.

**Q.**    Is that what we were discussing earlier in your

testimony concerning freight forwarder?

**A.**    Yes, it is.  Yes, it is.

**Q.**    All the way down is "healthcare clinic establishment"

listed here?

**A.**    Yes.  Under "T", is Healthcare Clinic Establishment,

which is also listed as a permit that is required prior to

operating.

**Q.**    Now, under Subsection 2, what does Subsection 2 deal

with?

**A.**   Subsection 2 gets into the details of each permit type,
and gives a little bit more detail on the permit type.

         MR. TRAGOS:  I'm sorry, can we have, for the
record, which Subsection 2 --

         MR. TREZEVANT:  Under 499.01.  I apologize.

BY MR. TREZEVANT:

**Q.**   So under 499.012, what is addressed there?

**A.**   That goes into the details of different permit types.

**Q.**   So turning to page 29, Subsection E, where it says,
"out-of-state prescription drug wholesale distributor
permit," is that the type of permit we were just discussing
concerning out-of-state drug wholesalers?

**A.**   Yes.  This would be a permit that out-of-state
prescription drug wholesalers would need, and it goes into
detail of what is required to get that permit.

**Q.**   And I -- I -- it says what it says, but just for
understanding purposes, could you simply read just the first
sentence of that paragraph?

**A.**   Sure.  "An out-of-state prescription drug wholesale
distributor is a wholesale distributor located outside this
state which engages in the wholesale distribution of
prescription drugs into this state, and which must be
permitted by the Department and comply with all provisions
required by the wholesale distributor under this part."

**Q.**   And now, turning to page 30, and all the way down near

1  the bottom, Subsection I talks in terms of a freight

2  forwarder permit.  Could you simply read the first sentence.

3  **A.**   "A freight forwarder permit is required for any person

4  that engages in the distribution of a prescription drug as a

5  freight forwarder unless the person is a common carrier."

6  **Q.**   And could you generally explain the difference, to the

7  Jury, of a freight forwarder and what you might mean by

8  "common carrier?"

9  **A.**   Common carrier would be -- typically mean the Postal

10  Service, UPS, FedEx, someone responsible for the actual

11  movement as opposed to a freight forwarder, which would

12  typically store the drugs onsite for a period of time and is

13  responsible for storage -- proper storage, temperature, etc.,

14  of the drug as opposed to a common carrier is recognized and

15  would be -- a common carrier is licensed as a common carrier

16  that has a designation that's different than a freight

17  forwarder.  In simple terms, it gets there quickly.  A

18  freight forwarder typically is storing it for a while and has

19  higher responsibilities because it may be stored for some

20  time.

21  **Q.**   Turning a couple of pages to page 34, Subsection T.

22  Does that identify what is required for a healthcare clinic

23  establishment permit?

24  **A.**   Yes, it does.

25  **Q.**   And is that the type of permit we're talking about that

1    was held by East Lake Oncology?

2    **A.**    Yes, it is.

3    **Q.**    And this was effective as of what date?

4    **A.**    Effective January 1, 2009.

5    **Q.**    And could you read the first sentence there?

6    **A.**    "Effective January 1, 2009, a healthcare clinic

7    establishment permit is required for the purchase of a

8    prescription drug by a place of business at one general

9    physical location that provides healthcare for veterinary

10   services, which is owned and operated by a business entity

11   that has been issued a federal tax identification number."

12   **Q.**    And then, the second sentence, ma'am.

13   **A.**    "For the purpose of this paragraph the term 'qualifying

14   practitioner' means a licensed healthcare practitioner

15   defined in the statute 456.001, or a veterinarian licensed

16   under Chapter 474 who's authorized under the appropriate

17   Practice Act to prescribe and administer a prescription

18   drug."

19   **Q.**    Looking at T(1), just the first -- the next paragraph

20   down, just -- if you could just read the first sentence?

21   **A.**    "An establishment --" we're talking here about a

22   healthcare clinic establishment.  "An establishment must

23   provide, as part of the application required under 499.012,

24   designated -- designation of a qualified practitioner who

25   would be responsible for complying with all legal and

1    regulatory requirements related to the purchase, record

2    keeping, storage and handling of the prescription drugs."

3    **Q.**    And then, looking at Subsection 4 on the next page,

4    page 35 -- the top of page 35, what does that say, ma'am?

5    **A.**    "The purchase of prescription drugs by the healthcare

6    clinic establishment is prohibited during any period of time

7    when the establishment does not comply with this paragraph."

8    **Q.**    All right.  Now, going backwards to page 23, do you see

9    on page 23, Section 499.007?

10   **A.**    Yes.

11   **Q.**    And what does it say following that, ma'am?

12   **A.**    This statute 499.007 relates to -- what it says here, is

13   a misbranded drug or a device, and lays out when a drug or

14   device is considered misbranded.

15   **Q.**    Moving down to item four or -- paragraph four under that

16   section.  Are you familiar with that, ma'am?

17   **A.**    Yes, I am.

18   **Q.**    And what does it say there?

19   **A.**    "If any word, statement or other information required by

20   or under this part to appear on the label or labelling is not

21   prominently displayed or placed thereon with such

22   conspicuousness as compared with other words, statements,

23   designs or devices in the labelling, and in such terms as to

24   render the word, statement or other information likely to be

25   read or understood -- I'm sorry -- to be read and understood

1  under customary conditions of purchase and use."

2  **Q.**    And the language, "Read and understood under customary

3  conditions of purchase and use," does that relate in any way

4  to what you were talking about earlier when you were talking

5  about when you would open up a package when you were in

6  private practice?

7  **A.**    Yes.  "Likely to be read and understood under customary

8  conditions of purchase and use," one of the things that's

9  referring to is being able to be --

10         MR. TRAGOS:  Objection, your Honor.  Speculation,

11  and basic knowledge.

12         THE COURT:  Overruled.

13         THE WITNESS:  It's referring to being able -- to be

14  able to be read and understood would be, um, in the United

15  States of America the acknowledged language is English.  So

16  part of that would be that it should be in English so that

17  the average person would be able to read it and understand

18  it.

19  BY MR. TREZEVANT:

20  **Q.**    But this is a -- but this is a Florida statute, though,

21  correct, ma'am?

22  **A.**    Yes, it is a Florida Statute.

23  **Q.**    All right.  Looking down at item No. 6, where it says,

24  "If its labelling does not bear," what are we talking about?

25  **A.**    Here it's saying, "If its labelling does not bear

1  adequate directions for use."

2  **Q.**    All right.  Now, if we could go to page 25, item No. 14

3  in conjunction with B.  If you could read that, ma'am.

4  **A.**    Okay.  "If it is a drug subject to paragraph 13(a) --"

5  when you go back to 13(a), that's talking about a

6  prescription drug -- "and if at any time before it is

7  dispensed its label does not bear the statement, 'caution

8  federal law prohibits dispensing without prescription and RX

9  only,' handle RX only," it an "RX only" there.

10  **Q.**    So when you were talking about unpackaging the drugs and

11  looking at the labelling, "RX only," was that one of the

12  items you were looking for?

13  **A.**    Yes.  When we are ordering a prescription drug, we would

14  expect it to have the labelling indicating that it was an RX

15  drug, RX office manager.

16  **Q.**    In the State of Florida?

17  **A.**    Yes.

18  **Q.**    Turning your attention now to paragraph 12 -- I mean

19  page 12, 499.005.  At the bottom of the page, could you

20  please read starting, "after prohibited acts."

21  **A.**    "It is unlawful for a person to perform or cause the

22  performance of any of the following acts in this state.

23  No. 1, is the manufacturing, repackaging, sale, delivery, or

24  holding, or offering for sale any drug, device or cosmetic

25  that is adulterated, or misbranded, or has otherwise been

1   rendered unfit for human or animal use."

2   **Q.**   So what -- again, what does "misbranded" mean?

3   **A.**   So in this case if the product did not have language on

4   it that was easily read, if it was not clearly identified as

5   a prescription drug, then those drugs would be considered

6   misbranded, and therefore, unlawful under 499.005.

7   **Q.**   Looking at page 13, items 12 and 14, at the bottom of

8   the page, and reading that in conjunction with the

9   introductory language of, "unlawful for a person to perform

10  or cause the performance of any of the acts," what does 12

11  say, ma'am?

12  **A.**   12 says, "The possession of any drug in violation of

13  this part."

14  **Q.**   What about 14?

15  **A.**   And 14 is, "The purchase or receipt of a prescription

16  drug from a person that is not authorized under this chapter

17  to distribute prescription drugs to that purchaser or

18  recipient."

19  **Q.**   Turning to Page 15 at the top, 499.0051, where it says,

20  "criminal acts?"

21  **A.**   Yes, sir.

22  **Q.**   Below where it says item No. 14 -- 4, at the bottom of

23  the page.

24  **A.**   No. 4, under criminal acts states, "Knowing purchase or

25  receipt of a prescription drug from an unauthorized person, a

1    person who knowingly purchases or receives from a person not

2    authorized to distribute prescription drugs under this

3    chapter a prescription drug and a wholesale distribution

4    transaction commits a felony of the second degree."

5    **Q.**    What does that mean, "unauthorized to distribute under?"

6    **A.**    What that means is that they -- a wholesale distributor,

7    the person -- the purchaser of that prescription drug needs

8    to be purchasing it from an entity or a business that has a

9    permit to distribute the drug.  In other words, that entity

10   would need to have a permit with Drugs, Devices and Cosmetics

11   to sell or to ship that drug to the entity that's purchasing

12   the drug or buying the drug.

13   **Q.**    Turning to page 17, at item 12, in the same section,

14   could you read 12, "Along with A --"

15   **A.**    "Along with A?"  I'm not sure what you mean by --

16   **Q.**    12, and then, (a) below.

17   **A.**    I'm sorry.  Okay.  Under Criminal Acts (12),

18   "Adulterated and misbranded drugs, false advertisement,

19   failure to maintain records relating to drugs.  Any person

20   who violates any of the following provisions commits a

21   misdemeanor of the second degree punishable as provided in

22   775.082 or Section 775.083, but if the violation is committed

23   after a conviction of such person under this subsection has

24   become final, such person commits a misdemeanor of the first

25   degree punishable as provided in --"

1          MR. TRAGOS:  I'm sorry a misdemeanor in the second

2     degree or first degree?

3          THE WITNESS:  The first section is -- would you

4     like me to reread it?

5          MR. TRAGOS:  I'm sorry, your Honor, I thought she

6     said first degree.

7          THE WITNESS:  The second part of the section is,

8     "Such person commits a misdemeanor in the first degree."  The

9     beginning of it is, "A misdemeanor of the second degree."  In

10    the middle of that statement it says, "If the violation is

11    committed after a conviction of such person under this

12    subsection has become final, such person commits a

13    misdemeanor of the first degree punishable as provided under

14    Section 775.082 or Section 775.083, or as otherwise provided

15    by in this part."

16         Subsection A then says, "The manufacture,

17    repackaging, sale, delivery, or holding or offering for sale

18    any drug that is adulterated, or misbranded or has otherwise

19    been rendered unfit for human or animal use."

20    BY MR. TREZEVANT:

21    **Q.**   And then, moving down to Section C in the same under

22    Item 12.

23    **A.**   Section C states, "The receipt of any drug that is

24    adulterated or misbranded and the delivery or preferred

25    delivery of such drug for pay or otherwise."

1    **Q.**   And then, just turning to page 18 -- the bottom of 18

2    and the very top of 19, 14 carrying over to the next page

3    (A), if you can start with 14.

4    **A.**   "Other violations under this part are any person who

5    violates any of the following provisions commits a felony of

6    the second degree punishable as provided under Section

7    775.082, 775.083, or 775.084, or as otherwise provided in

8    this part."

9    **Q.**   And is Section 499 -- oh, let me go up to (A) first.

10   I'm sorry.  If you could read that, ma'am.

11   **A.**   Section A, under this part, "Is knowingly manufacturing,

12   repackaging, selling, delivering, or holding or offering for

13   sale any drug that is adulterated, or misbranded or is

14   otherwise been rendered unfit for human or animal use."

15   **Q.**   And under Section 499, are there also rules -- certain

16   provisions concerning record keeping?

17   **A.**   Yes.  We have -- along with the Florida Statute we have

18   the Florida Administrative Code, which are Rules that

19   accompany the Statute, and also are enforceable.

20   **Q.**   But looking just at the Statute, ma'am, under --

21   **A.**   Oh, under the Statute we also have "recordkeeping"

22   addressed in 499.0121(4) and (6).

23   **Q.**   So if we were to look at page 48 of Florida Statute 499,

24   which is Government 1D, did you say 4(C)?

25   **A.**   Yes.  4(C).  The recordkeeping requirements in

1    Subsection 6 under 499.012, Subsection 6 is what they are

2    talking about, must be followed for all incoming and outgoing

3    prescription drugs.

4    **Q.**   And (6), that is down below on the page?

5    **A.**   Yes.  It's at the bottom of the page.  It starts at the

6    bottom of the page.

7    **Q.**   If you could just do (6) and then (A) on the next page,

8    I think that is all for this.

9    **A.**   Okay.  "The Department shall adopt rules that require

10   keeping such records of prescription drugs as are necessary

11   for the protection of the public health."

12          And under (A), "The wholesale distributor must

13   establish and maintain inventories and records of all

14   transactions regarding the receipt and distribution or other

15   distribution of prescription drugs.  These records must

16   provide a complete audit trail from receipt to sale or other

17   disposition, be readily retrievable for inspection and

18   include at a minimum the following information."

19   **Q.**   And then there are various items, is that correct,

20   ma'am?

21   **A.**   Yes, there is various information there.

22   **Q.**   Turning to page 50, item No. 10, what does that state

23   there?

24   **A.**   Item No. 10 states, "That compliance with federal law,

25   state and local law is required.  A wholesale distributor

```
1    must operate in compliance with applicable federal, state and

2    local laws and regulations."

3              MR. TRAGOS:  I'm sorry, where is 10?

4              MR. TREZEVANT:  The next page, page 52.

5              MR. TRAGOS:  What tab or --

6              THE WITNESS:  It's under 499.0121.

7              MR. TRAGOS:  0121, compliance.  Okay.  Thank you.

8    BY MR. TREZEVANT:

9    Q.   And then, finally, looking at Page 57, 499.023, what is

10   this provision dealing with?

11   A.   This is dealing with addressing, "That a person may not

12   sell or distribute --" would you like me to read it for you?

13   Q.   Yes, ma'am.

14   A.   "-- new drugs, sale, manufacture, repackaging,

15   distribution.  A person may not sell, offer for sale, hold

16   for sale, manufacture, repackage, distribute or give away any

17   new drug unless an approved application has become effective

18   under Section 505 of the Federal Act, or unless otherwise

19   permitted by the Secretary of the United States, Department

20   of Health and Human Services for shipment in interstate

21   commerce."

22   Q.   All right.  Now, if you could set that aside for now,

23   and so focusing now on the 2011/2012 time period, if you

24   would consider that time period.  What, if any, tools were in

25   place to assist a healthcare clinic, entity or really any
```

1    person in the State of Florida to determine whether a drug

2    manufacturer, a wholesale distributor, a freight forwarder

3    was licensed, as necessary, under Chapter 499?

4    **A.**   The Division of Drugs, Devices and Cosmetics has a

5    public website available that's very easy to access.

6    **Q.**   What do you mean by that, ma'am?

7    **A.**   I would say that it's similar to, like, if you did

8    online shopping, if you just Google, you can look it up.  You

9    find it quickly, and then, you can go in and, um, if you were

10   wondering -- like, if I was a doctor, or if I was a pharmacy

11   and I wanted to buy a drug, I could go in and search by name.

12   I could search by a part of a name.  I could search by -- if

13   I had the whole name.  If I had just heard part of the name

14   and I thought I wanted to find that one, do they have a

15   permit?  So it's very user friendly.  You can search by name.

16   If you have a permit number, and you want to find out if a

17   permit number is still valid and hadn't expired, you can

18   search by the permit number.  So it's very readily available

19   to search.

20   **Q.**   And was it available in 2011 and 2012?

21   **A.**   Yes, it was.

22   **Q.**   And as far as, um, when you're talking about the permit,

23   are you talking about the permits required under 499?

24   **A.**   Yes.  I'm talking about permits required under 499.

25   **Q.**   If you were a purchaser in the State of Florida during

1  2011 or 2012, and you upheld a permit, and you were

2  purchasing from a wholesaler or freight forwarder that was

3  out-of-state, would he -- would both the freight forwarder

4  and the wholesale distributor out-of-state selling directly

5  to a purchaser, would all three of those have to have a

6  permit?

7  **A.**   Yes, they would, and often times that purchaser, in the

8  State of Florida, accesses that database on a routine basis

9  to check that out.

10 **Q.**   Now, if a person didn't want to access a website, would

11 it be possible to contact the Department by telephone?

12 **A.**   Yes.  We have a -- we have office hours.  Someone is

13 available 8:00 to 5:00, Monday through Friday, by phone.  We

14 also have email that we respond to.  We have very -- we try

15 to get back to those entities quickly with responses.

16 **Q.**   Prior to coming in to testify today, were you asked by

17 the Government to search the Department of Business and

18 Professional Regulations to determine whether certain

19 entities or businesses were licensed as required under

20 Chapter 499 to sell, or distribute or freight forward

21 prescription drugs into the State of Florida?

22 **A.**   Yes, I was.

23 **Q.**   Ms. Wetherald is going to approach and show you

24 Government Exhibit 1E first, and then we may need to switch

25 to the Elmo.  Do you recognize that exhibit, ma'am?

**A.**   Yes, I do.

**Q.**   Is that a table that you reviewed that relates to the
entities that you searched for?

**A.**   Yes, it is.

MR. TREZEVANT:  Your Honor, we're going to ask to
simply use Government Exhibit 1E as a demonstrative exhibit.
We don't want to offer it into evidence.  We don't feel the
need to offer it into evidence, just simply as a
demonstrative.

MR. TRAGOS:  We would object, your Honor, because
of the -- there has been no dates placed on this exhibit as
to when -- what date she checked for that's relative to the
indictment or some other dates.

MR. TREZEVANT:  I can clear that up,
your Honor.

THE COURT:  Overruled.

BY MR. TREZEVANT:

**Q.**   Now, before we go any further, Dr. Mayleben, when you
look for the different entities --

MR. TRAGOS:  Excuse me.  Your Honor, may we have a
sidebar?

THE COURT:  Approach the bench.

(Sidebar conference held.)

MR. TRAGOS:  Your Honor, in looking at this list,
the Court remembers -- the Court allowed a subpoena from the

```
 1    California Oberlin investigation.  The Court is going to
 2    allow that to come into evidence based on the fact that the
 3    Government was saying this puts her on notice that she was
 4    violating the law, but how is the fact that Oberlin is not a
 5    licensee relevant in this case since Oberlin is not one of
 6    the crimes charged, and has nothing to do with the crimes
 7    charged in this case?  That most of -- at least half, not
 8    most -- most of the corporations or entities listed that
 9    she's going to say that she checked on are not entities that
10    are involved in the sale of drugs to her pursuant to this
11    indictment.  So they are going back to Oberlin again.  So
12    they are going beyond and now they are saying that she
13    violated the law by buying from Oberlin when that's not
14    charged in the indictment.
15            THE COURT:  Response?
16            MR. TREZEVANT:  As Mr. Saltzman said earlier today,
17    the manner and means actually charges from '09 to 2013.  It
18    says, "Quality --" I don't have it in front of me.  It says,
19    "Quality Specialty Products and other entities that were
20    out-of-state and unlicensed."  That was actually charged in
21    the manner and means.  That's the actual scheme charged in
22    this case in the second superseding indictment.  So that
23    these are a list that I believe the records will reflect, as
24    we go along during the trial, and it's going to show that
25    all -- none of these ever were licensed, and so, it's not
```

1    just an error or accident.  This is actually what's charged

2    and what she did.

3            MR. TRAGOS:  There is not a single transaction in

4    that indictment, and they are all listed by count, that has

5    anything to do with Oberlin, that has anything to do with

6    Richards Pharma, which is on here.  Not a single count.  They

7    can do a broad language and say others, but when they nail

8    down the count as schemes, none of the counts deal with not a

9    single charge with any of these people.

10           THE COURT:  Overruled.  How much longer do you have

11   with this witness?

12           MR. TREZEVANT:  About 15 to 20 minutes, Judge.

13           THE COURT:  Proceed.

14   BY MR. TREZEVANT:

15   **Q.**   All right.  Dr. Mayleben, in -- where it says "entity,"

16   could you explain, looking at Oberlin Medical Supply and QS

17   Med Supplies as related addresses on the right, what type of

18   searches you ran to determine whether they had been licensed

19   or were licensed by your Department ever, is that correct?

20   **A.**   Yes.  I was able to determine if they had ever been

21   licensed at all.  I ran the searches by the full names listed

22   as well as partial.  So, like, for example, Oberlin Medical

23   Supply, I would have put in just Oberlin to see if I pull up

24   anything.  The QS Med Supplies, I would have put in QS Med

25   Supplies, as well as QS Med, as well as Just QS.

1          THE COURT:  When did you do this?

2          THE WITNESS:  I did this last Friday.

3          THE COURT:  All right.  Proceed.

4          THE WITNESS:  Um, and so -- and I also looked for

5    the specific addresses listed, as well as any other possible

6    addresses.  So the database will pull up, whether you have a

7    permit -- because we do have companies that have multiple

8    permits and have many different addresses.  So I did not

9    search specifically by address, but I searched by the company

10   and by partial names of the companies to make sure I covered

11   the whole company possibilities.  And then I also, you know,

12   tried to verify if that company was listed under any

13   addresses.

14   BY MR. TREZEVANT:

15   **Q.**   And in this list, if you could read just down to the

16   bottom of the screen that is in front of you.

17   **A.**   Okay.

18   **Q.**   Starting at "Oberlin Medical," and without reading the

19   addresses, but did you search for the addresses, ma'am?

20   **A.**   Yes.  I searched for the name, and then I also

21   searched -- I did not search specifically, just by address.

22   I searched by the name, with or without the full name and

23   with or without the address.

24   **Q.**   All right.  If you would just read down the entities to

25   the bottom of the screen that is visible on this.

1    **A.**    Oberlin Medical Supply, QS Med Supplies, QS Supplies

2    CASHOO, QSP, Quality Specialty Products, Meiko America, Inc,

3    Cancer Drugs Online, Richards Pharma.

4    **Q.**    Okay.  If we can turn to page 2.  How many are listed on

5    this page, ma'am?

6    **A.**    Three.  Montana Health Solutions, Quantum Solutions,

7    SRL, and RX Stores R US.

8    **Q.**    And for the entities that you just read, did any of

9    those entities -- have any of those entities ever held a

10   permit or license under the DDC that would permit them to

11   bring drugs or ship drugs into the State of Florida?

12   **A.**    No.  None of these entities, by any search, partial

13   search, full search, any type of search, with address,

14   without address, yielded that it showed that none of these

15   entities had a permit with Drug, Devices and Cosmetics at any

16   time.

17   **Q.**    If we could now go away from the Elmo, and if I could

18   show you Government Exhibit -- showing you Government

19   Exhibit 31A and 35A -- 31A and 35A, and we would offer these

20   pursuant to the stipulation -- be admitted pursuant to the

21   stipulation.

22           THE COURT:  They will be admitted.

23   (Government Exhibit Nos. 31A and 35A

24   admitted into evidence.)

25                               *

```
 1   BY MR. TREZEVANT:
 2   Q.   Okay.  Looking first at 31A, this document, ma'am,
 3   looking at the top half --
 4           MR. TRAGOS:  I'm sorry, the stipulation was to
 5   authenticity.  We would object as to relevance.
 6           THE COURT:  Since I don't have the document, can
 7   you bring me a copy of the document?
 8           MR. TREZEVANT:  Should we approach, Judge?
 9           THE COURT:  No, just bring me a copy of the
10   document, please.
11           (Court peruses document.)
12           THE COURT:  Approach the bench.
13           (Sidebar conference held.)
14           THE COURT:  What's the relevance?
15           MR. TREZEVANT:  Your Honor, on its face -- on its
16   face this is a record that shows Cardinal Health shipping to
17   East Lake Oncology, PA, owned by, shipped to -- directly to
18   the Defendant at that address.  It is from Cardinal Health.
19   The witness will testify, if permitted, that this is an
20   example of a document that actually is within the permitting
21   rules, and that she recognizes Cardinal Health from her
22   position as a licensed wholesale manufacturer or drug
23   wholesaler, and refers to the license number, which she
24   referred to earlier, they would have a 23 prefix.  It's lower
25   down on the Document 23.00331, as an example of a document
```

1    when it comes with the packaging and you pull it out, if the

2    Court will recall, Mr. Saltzman explained in his opening that

3    these items would typically -- would all be given to the

4    Defendant so that the Defendant would have both examples

5    receiving, like, Cardinal Health she received this one.  This

6    is an example of one following the law, complying with the

7    law, that actually has the license number on it, and our

8    witness will say this is what it looks like.  This is

9    required in the recordkeeping provisions of 499 that she just

10   referred, and this is an example of one done properly.

11       So as we proceed through the trial, I anticipate there is

12   going to be other packing slips that are not going to look

13   anything like this, and they are not going to have license

14   numbers, or licensed importers, or wholesalers or freight

15   forwarders.

16              THE COURT:  Response.

17              MR. TRAGOS:  These are not the same type of drugs.

18   They are not even the same drugs that are in the indictment.

19   If they have something with the same type of drug, I

20   understand that, but randomly to pick invoices and say,

21   "Uh-huh, she doesn't -- she should know better."  Plus there

22   has been no evidence that she even saw this invoice.

23              THE COURT:  Overruled.

24              (Back before the Jury.)

25              THE COURT:  It will be admitted.

BY MR. TREZEVANT:

**Q.**    Dr. Mayleben, looking first at Government Exhibit 31A, the top half of this document, first, top right, what type of document is this, ma'am?

**A.**    This is an invoice.

**Q.**    And are you familiar with these types of documents?

**A.**    Yes.  I review these on a regular basis.

**Q.**    Looking at the top left "Cardinal Health Specialty Pharmaceutical Distributor.  Do you recognize Cardinal Health?

**A.**    Yes, I do recognize this business.

**Q.**    And is that a licensed company?

**A.**    Yes, it is.  It is.

**Q.**    Properly permitted under 499?

**A.**    Yes.  It is a company that is permitted with Drugs, Devices and Cosmetics.

**Q.**    Is the information on this document similar -- there is information on this document that we just -- consistent with what we just looked at in Section 499, Florida Statutes?

**A.**    Yes.  When we looked under recordkeeping in the Florida Statutes, um, it talked about the record needed to have certain elements.  This invoice has the name of Cardinal Health, who the drugs are being sold to.  It's being billed or sold to East Lake Oncology, at 4114 Woodlands Parkway, and being shipped to the same East Lake Oncology, Diana Anda

1    Norbergs.  If you want to drop lower then --

2    **Q.**    Look at the bottom half of this document.

3    **A.**    It also lists the prescription drug names.  So this is a

4    document that's required for any prescription drugs that when

5    you are selling or shipping prescription drugs into or within

6    the State of Florida, there are certain minimal recordkeeping

7    requirements regardless of what prescription drug it is, you

8    would need to have these kind of records.  You could include

9    over-the-counter drugs on them also, but it's required for

10   prescription drugs.

11          So it also lists the name of the drug, quantity of

12   the drug that was ordered and shipped, the pricing, and then

13   at the bottom of the form, um, it does also list here the

14   statement of the Florida license number, which is in -- this

15   particular one is Cardinal Health.  This particular one is

16   licensed as Permit No. 2300331.  So this document is a really

17   quick look at when we, as drug inspectors, are looking at

18   documents; or when a buyer is buying their drugs, they can

19   quickly look at this and can find a lot of good information

20   regarding their purchase.

21   **Q.**    Now, when you were talking earlier about unpacking drugs

22   yourself, is this the type of information you would look for?

23   **A.**    Yes.

24   **Q.**    And as far as quantity, and type of drug, and all of

25   that, directly above the "wholesale distributor number with

```
1   DDC," is that for any prescription drug?
2   A.   All prescription drugs are required to have --
3   Q.   Looking at Government Exhibit 35A, again, looking at the
4   top half of this form, are you familiar with Oncology Supply?
5   A.   Yes.  This is Oncology Supply, and as you see next to
6   it, distributed by ASD Specialty Healthcare, Inc.
7                MR. TRAGOS:  Which number is that?
8                MR. TREZEVANT:  35A.
9                MR. TRAGOS:  You said Oncology Supply?
10               MR. TREZEVANT:  Yes.
11   BY MR. TREZEVANT:
12   Q.   Do you recognize that as a licensed --
13   A.   Yes.  I'm familiar with this firm.
14   Q.   Do they hold a license with the DDC?
15   A.   Yes, they do.
16   Q.   And again, looking in the middle of this form --
17   A.   Yes.  If you look in the middle of this form, at the
18   top, we see it's an invoice.  In the middle we have the
19   names --
20               THE COURT:  Wait just a minute.
21               MR. TRAGOS:  Can I approach to take a look at that
22   exhibit?
23               THE COURT:  All right.
24               MR. TRAGOS:  Okay.  Your Honor, thank you.
25   BY MR. TREZEVANT:
```

1    **Q.**   Dr. Mayleben, okay, so as to the middle of the form is

2    that followed generally with what we were talking about in

3    499 as far as what's required?

4    **A.**   Yes.   In this document it has the names of the

5    prescription drugs, information regarding quantity, pricing,

6    and it also -- in the middle of this page also lists the

7    Florida out-of-state prescription drug wholesale permit

8    number listed there as 2300660.   So that would be the permit

9    that authorized this entity to sell the prescription drug

10   into Florida.

11   **Q.**   And how difficult would it be to verify that with the

12   DDC, the 2300660?

13   **A.**   If you had this on a document and you saw it, this end,

14   you could easily go to the same public website and rather

15   than look it up by name, verify that the permit matched the

16   actual name of the company.

17   **Q.**   If we could go away from this document.   Now,

18   Dr. Mayleben, at any point in time did you ever participate

19   in a federal search and seizure at East Lake Oncology?

20   **A.**   Yes, I did.

21   **Q.**   And what year was that, ma'am?

22   **A.**   2013.

23   **Q.**   What was your role during the search and seizure?

24   **A.**   I was a subject-matter expert.

25   **Q.**   And so generally what does that mean?

1   **A.**   I was basically there to assist the agents in

2   identifying drugs, reviewing records, and just providing any

3   assistance as far as answering any questions they may have.

4   **Q.**   And did you write or author any reports or statements

5   about your participation in that search?

6   **A.**   No, I did not.

7              MR. TREZEVANT:  One moment, your Honor.  Your

8   Honor, we would pass this witness.

9              THE COURT:  Cross.

10                     **CROSS-EXAMINATION**

11  **BY MR. TRAGOS:**

12  **Q.**   Ms. Mayleben --

13  **A.**   Yes.  Dr. Mayleben.

14  **Q.**   You are a PhD?

15  **A.**   Doctor of Pharmacy, Pharm D.

16  **Q.**   Pharm D?

17  **A.**   Yes.

18  **Q.**   Let's start where the prosecutor ended, your

19  participation in the execution of a search warrant.  How did

20  you find out that the search warrant was going to be

21  executed?

22  **A.**   I believe I was notified by the agent -- one of the

23  agents, and was asked if I would be able to be available for

24  any questions or assistance they might have.

25  **Q.**   Have the agents contacted you before about Dr. Norbergs?

**A.**    Can you clarify the question as far as "before?"  I
mean --

**Q.**    Before the search warrant -- was the search warrant the
first time that an agent had contacted you?

**A.**    Honestly, I cannot remember that for sure.

**Q.**    Okay.  You are, um -- I guess your agency is the, I
think the prosecutor said, it's kind of like the FDA of
Florida, kind of?

**A.**    Similar, yes.

**Q.**    All right.  And you are a person that keeps up with
what's going on with the FDA, correct?

**A.**    Yes.

**Q.**    And when the FDA sends out notices, letters, alerts,
those kinds of things, you review those, correct?

**A.**    Um, if you're talking about, like, warning letters and
public notices, that is what you're talking about?

**Q.**    Yes.

**A.**    Yes, I do review those.  I wouldn't say I review every
single one of them, but I do review them.

**Q.**    Why don't you review every single one of them?

**A.**    Because it's such a broad FDA cert's sends out notices
on things that don't pertain -- like, food, that don't
pertain to Drugs, Devices and Cosmetics.

**Q.**    If they send out reviews about drugs, do you review
those?

**A.**    Yes, I do.

**Q.**    When did you find out about a company called QSP?

**A.**    QSP?  Personally, I have -- I couldn't give you the year
of when I found out about it, but I know that personally I
had heard of QSP as being a company that had been known to,
um, being -- shipping drugs that they shouldn't have been
shipping.  I believe I might have heard that through both,
um, news articles, as well as, um, just talking to people in,
um, within the scope of my business.

**Q.**    How about Oberlin?

**A.**    Oberlin?  The question is when did I hear about it?

**Q.**    Yes.

**A.**    I couldn't give you an exact date on that.

**Q.**    Can you give me a year?

**A.**    Um, well, I would say that at the time of the, um, visit
to Dr. Norbergs office in 2013, I did review certain records
while I was there.  So I may have seen some records, but I
could not recall because I don't have any of those records in
my possession.  So it would be hard for me to give you an
exact date on that.

**Q.**    So before you saw Oberlin records at Dr. Norbergs
office, you didn't know about Oberlin?

**A.**    No, I did not say that.  I said I could not tell you
definitively when I have heard of Oberlin.

**Q.**    Well, you are aware that in California Oberlin was

1    raided and prosecuted?

2    **A.**    Sir, I have heard many things, but I don't know -- have

3    all those facts in my head.  I couldn't definitively give you

4    answers to that kind of a question.

5    **Q.**    Well, when you hear a company is, like, let's say, QSP,

6    I'm trying -- I want to make this clear.  Before you

7    participated in the raid at Dr. Norbergs' office, you had

8    heard of QSP?

9    **A.**    I believe so.

10   **Q.**    Okay.  And you believe that you heard of QSP through the

11   FDA?

12   **A.**    No.  I did not say that.  I said I think I believe -- I

13   believe, but that is pure speculation.  I don't have facts on

14   it.  In my position --

15            MR. TREZEVANT:  Objection, your Honor, she is

16   speculating.

17            THE COURT:  Overruled.  She's already answered the

18   question.

19   BY MR. TRAGOS:

20   **Q.**    And how often does the FDA issue warning letters,

21   bulletins, those kind of things?

22   **A.**    I couldn't tell you.  I don't report to the FDA.

23   **Q.**    I know that, but you read them?

24   **A.**    Yes, I do read them, but you couldn't answer that

25   question.

1   **Q.**   A lot?

2   **A.**   Sir, I really couldn't answer that question.

3   **Q.**   Do you get them once a week?

4   **A.**   I would say no.  Not warning letters once a week, no.

5   **Q.**   Excuse me?  I'm sorry.

6   **A.**   I would say not necessarily warning letters once a week.

7   I'm on a couple different -- it's very easy to be signed up

8   for various communications with the FDA.  So if you want to

9   know about recalls, if you want to know about warning

10  letters, many things you can publicly sign up and be a

11  recipient of the emails.  So it's very easy to be staying

12  abreast of things.  So I do actually get quite a few.  So

13  it's hard for me to tell you when, and where, and how, but

14  they are very readily available.

15  **Q.**   Well, if you find that somebody is violating Chapter

16  499, it is your duty and it is the duty of the State

17  Prosecutor to prosecute those people, isn't it?

18  **A.**   If we find a violation of Chapter 499, it is our duty to

19  proceed within the manner of our, um, policies and

20  procedures, how we would proceed regarding each violation.

21  It's not -- it depends upon the violation.

22  **Q.**   Well, isn't it true that -- do you still have Chapter

23  499 there in front of you, Exhibit 1D?

24  **A.**   Yes.

25  **Q.**   If you would look at page three, paragraph four.  That

1    would be (4).  Do you see that, ma'am?

2    **A.**    Yes, I do.

3    **Q.**    Could you read (4) for us, please?

4    **A.**    "Each State attorney, County attorney --" is it under

5    002?  Is that where we are at?

6    **Q.**    Yes.

7    **A.**    Okay.  Under (4), "Each State attorney, County attorney

8    or Municipal attorney to whom the Department or designated

9    agent reports any violation of this part shall cause

10   appropriate proceedings to be instituted in the proper Courts

11   without delay and to be prosecuted in the manner required by

12   law."

13   **Q.**    So the State prosecutors are required, if you report

14   this, to take action against the people you report, right?

15   **A.**    I really couldn't answer to what a State prosecutor is

16   required to do.  I would say that we, as DDC, if you're

17   talking about this specific case, we have this case on

18   criminal hold.

19   **Q.**    Ma'am, I'm asking you what the statute says.  Does the

20   statute not say, "Shall cause appropriate proceedings..."

21   you just read paragraph four?

22   **A.**    If you read paragraph five, this part, "Does not require

23   the Department to report for the institution of proceedings

24   under this part minor violations of this part or --" that's

25   one example, but also if it's under "criminal hold."  So we

1  have policies within the Division of when we report.  Not

2  every violation is reported because it's -- all of them are

3  depending upon how they are being handled.  It is not a

4  requirement to report.

5  **Q.**   When you found out about QSP, did you report it to the

6  state attorney to shut them down so they would stop doing

7  this?

8  **A.**   No.  Since we were working with federal law enforcement,

9  and we knew that this was a criminal case, we deferred to

10  our -- our law enforcement partners.  If they are state law

11  enforcement, we defer to them.  If they are federal, we defer

12  to them.  So basically our law is we can take it criminally,

13  and we have definitely done that on occasion where we go to

14  the State prosecutor's offices and they do prosecute them at

15  the State level.  Since this one was being prosecuted at a

16  Federal level we didn't interfere with that prosecution.

17  **Q.**   So you did not do anything to stop QSP?

18  **A.**   I thought we were talking about East Lake Oncology.

19  **Q.**   No.  I said QSP.

20  **A.**   QSP?  No, we had -- I had no evidence of QSP selling or

21  shipping into Florida.  If I would have had invoices, packing

22  slips or drugs, if we were to go into a facility in the State

23  of Florida and we found those drugs onsite, absolutely we

24  would request either a voluntary quarantine or seizure.  We

25  would open a case on the out-of-state entity, and then we

1   would prosecute that case.

2   **Q.**   Have you opened a case against QSP?

3   **A.**   As I said, as far as I know, we do not have the records

4   for that case to be opened.

5   **Q.**   And no one has given them to you, right?

6   **A.**   I could not tell you definitively -- I was not prepared

7   to answer the question.  If you like me to, and if I need to

8   I can certainly let you know if we ever had a case or not.

9   **Q.**   Are you only prepared to answer the prosecutor's

10  questions?

11  **A.**   No, sir.  I didn't expect the question.  I would be glad

12  to answer the question, if I knew it.  What I can tell you is

13  it is our routine practice and procedure that if we come --

14  become aware, and it happens if we become aware of a business

15  entity, whether they are in the state or out-of-state, that's

16  selling or shipping prescription drugs and they do not have a

17  permit, we definitely take action on that.  We take that as a

18  very serious charge.

19          MR. TRAGOS:  Could I have the Elmo, please?

20  BY MR. TRAGOS:

21  **Q.**   Okay.  If you'll take a look at 1E that's been

22  introduced into evidence.  These are the companies that you

23  checked on.

24          THE COURT:  That's not in evidence.  It was for

25  demonstrative --

1          MR. TRAGOS:  Offered for demonstrative.

2     BY MR. TRAGOS:

3     **Q.**    These are the companies you say you checked on, correct?

4     **A.**    Yes, sir.

5     **Q.**    Oberlin Medical Supply, right?

6     **A.**    Yes.

7     **Q.**    And you checked on them because the Government asked you

8     too, right?

9     **A.**    Yes, last Friday.

10    **Q.**    And before that they never asked you to check on

11    Oberlin, did they?

12    **A.**    I never checked on them by myself, no.

13    **Q.**    QS Med Supplies, before Friday, had the Government ever

14    asked you to check on them?

15    **A.**    No, I did not check on them.

16    **Q.**    QS Supplies CASHOO, did the Government ever ask you to

17    check on them before Friday?

18    **A.**    No, I did not check on them.

19    **Q.**    QSP and Quality Specialty Products, before Friday, the

20    Government ever ask you to check on them?

21    **A.**    Not that I am aware of.  I might have checked on them

22    myself.  Just like I said, I've heard of them before, but as

23    far as I know --

24          THE COURT:  The question was did the Government

25    before --

```
 1              THE WITNESS:  No.  I'm sorry, sir.  No.

 2    BY MR. TRAGOS:

 3    Q.    Meiko America, Inc., did the Government ever ask you to

 4    check on them?

 5    A.    No.

 6    Q.    Have you ever heard of them before?

 7    A.    Yes.

 8    Q.    When did you hear of them?

 9    A.    As stated previously, I probably heard of and saw some

10    of these records during the time I was at Dr. Norbergs

11    office.  I cannot tell you definitively, but I am aware of

12    some of these names from the time of that search -- search.

13    Q.    Have you taken any action against Meiko America, Inc.?

14    A.    I'm not prepared to answer questions on if we have taken

15    any action because we have a large database of cases.  So

16    unless I was asked specifically to look these up I could not

17    definitively tell you we have a case open, or have we ever

18    taken action.

19    Q.    Ma'am, let me -- what is your job, if you don't know if

20    you're taking some action?

21    A.    Sir, we have hundreds -- we have more than a thousand

22    departments.  We have in-state and out-of-state permits, and

23    we have many people doing cases.  So -- and this is over

24    years of time.  So if you're asking me if I'm able to

25    remember all those cases, I am not able to remember them.  I
```

1  certainly would be able to look them up, if needed, but I
2  could not tell you that on the stand right now today.
3  **Q.**   So when the Government asked you to look up Meiko, you
4  didn't do anything else other than look it up to see if they
5  had a license, right?
6  **A.**   Yes.  Last Friday I looked these companies up to find
7  out if they had any licenses or permits with the Division.
8  **Q.**   And when the Government asked you to do that, you didn't
9  look up anything in your database about Meiko, right?
10  **A.**   No.  I was asked to find out if they had any permits
11  with the Division.
12  **Q.**   Ma'am, please listen to my question.  Did you do
13  anything else other than look up and see if they had a
14  license?
15  **A.**   No, I did not.
16  **Q.**   Cancer Drugs Online, are you familiar with that?
17  **A.**   I see it's on the list, yes.
18  **Q.**   Do you know anything about that company?  Have you done
19  any checking in your database about that company?
20  **A.**   To verify that they do not have any licenses with the
21  Division.
22  **Q.**   Ever heard of them before?
23  **A.**   Again, as with all of these, I may have seen them, I may
24  not.  I cannot testify accurately to that.
25  **Q.**   Same answer for Richard Pharma?

1    **A.**    Yes, sir.

2             THE COURT:  How much longer do you have with this

3    witness?

4             MR. TRAGOS:  Quite a bit, your Honor.

5             THE COURT:  All right.  We'll recess until tomorrow

6    morning.  Do any of you plan to vote tomorrow and have not

7    yet voted?  All right.  The polls are open at 7:00 o'clock

8    a.m., I believe.  We'll be in recess until 9:30 tomorrow

9    morning.

10            MR. TRAGOS:  Your Honor, I only have two questions

11   left with this exhibit and I can put it away.  Can I ask

12   those two questions?

13            THE COURT:  All right.

14   BY MR. TRAGOS:

15   **Q.**    Montana Health Solutions, same answers?

16   **A.**    Yes, sir.

17   **Q.**    Quantum Solutions, same answers?

18   **A.**    Yes, sir.

19   **Q.**    RX Store R US same answer?

20   **A.**    Yes, sir.

21            MR. TRAGOS:  That's it, your Honor.

22            THE COURT:  All right.  We are in recess until

23   tomorrow morning at 9:30.

24            MR. TREZEVANT:  Excuse me, your Honor.

25            THE COURT:  Remember not to see any news reports or

1    listen to any news reports about this case if they should

2    happen to come before you.  All right.  See you tomorrow

3    morning.

4              CSO OFFICER:  All rise.

5              (Jury exits courtroom at 4:38 p.m.)

6              CSO OFFICER:  Please be seated.

7              THE COURT:  How are we doing time wise?

8              MR. TREZEVANT:  Fine, your Honor.

9              THE COURT:  Are you going to finish your case by

10   Wednesday?

11             MR. TREZEVANT:  Of this Wednesday?

12             THE COURT:  Yes.

13             MR. TREZEVANT:  Unfortunately no, sir.

14             THE COURT:  When will you finish your case?

15             MR. TREZEVANT:  We believe next Tuesday or

16   Wednesday, Judge.

17             THE COURT:  All right.  And how long does the

18   Defense expect their case to take?

19             MR. TRAGOS:  No more than one or two days.  If they

20   finish by Wednesday, we will be done by Friday.

21             THE COURT:  All right.  I would like for the

22   Government to see if they can be finished with their case by

23   Tuesday afternoon, if possible.

24             MR. TREZEVANT:  We will do everything we can,

25   Judge.

1           THE COURT:  All right.

2           MR. TRAGOS:  If the Court would instruct the

3    witness about not talking to the Government or anybody.

4           MR. TREZEVANT:  We are not going to speak with her

5    now that she has taken the stand, Judge.

6           THE COURT:  All right.  Don't talk to the

7    Government --

8           THE WITNESS:  Yes, sir.

9           THE COURT:  -- until after your testimony is

10   completed.  See you tomorrow morning.

11           (Court adjourned at 4:40 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3    COUNTY OF HILLSBOROUGH    )

 4                              )  SS.

 5    STATE OF FLORIDA          )

 6

 7    I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER, REGISTERED

 8    PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

 9    COURT FOR THE MIDDLE DISTRICT OF FLORIDA, DO HEREBY CERTIFY

10    THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS

11    AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME

12    WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF

13    COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT

14    THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC

15    NOTES.

16

17

18    DATE:  MARCH 20, 2017

19

20    S:/MELISSA A. PIERSON

21    MELISSA A. PIERSON, CA/CSR 12499

22    IL/CR 084.003138, RPR

23    FEDERAL OFFICIAL COURT REPORTER

24

25
```