1                    UNITED STATES OF AMERICA
                UNITED STATES DISTRICT COURT
2                  MIDDLE DISTRICT OF FLORIDA

3
                     - - -
4              HONORABLE JAMES S. MOODY, JR.
         UNITED STATES DISTRICT JUDGE PRESIDING
5                      - - -

6 UNITED STATES OF AMERICA,  )
                        )
7         PLAINTIFF,       )
                        )
8 VS.                 ) NO. 8:15-cr-183-T-30AEP
                        )
9 D. ANDA NORBERGS,        )
                        )
10         DEFENDANT.       )
_____)

11

12                     **TRIAL - DAY 2**

13                     **\*\*EXCERPT\*\***

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS
15              **NOVEMBER 8, 2016**
               TAMPA, FLORIDA
16

17

18        MELISSA A. PIERSON, CA CSR 12499,
            IL CSR 084.003138, RPR
19       FEDERAL OFFICIAL COURT REPORTER
      801 N. FLORIDA AVENUE, 2ND FLOOR
20         TAMPA, FLORIDA 33602
        PH:  (813)301-5336
21        USDCtranscripts@gmail.com

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2    ON BEHALF OF PLAINTIFF:
              A. LEE BENTLEY, III
 3            UNITED STATES ATTORNEY
              BY:  MR. ADAM SALTZMAN, ESQ.
 4            BY:  MR. JAY TREZEVANT, ESQ.
              ASSISTANT UNITED STATES ATTORNEYS
 5            400 N. TAMPA STREET
              ST. 3200
 6            TAMPA, FL 33602
              (813) 274-6000
 7            ADAM.SALTZMAN@USDOJ.GOV
              JAY.TREZEVANT@USDOJ.GOV
 8

 9

10    ON BEHALF OF DEFENDANT:
              TRAGOS, SARTES & TRAGOS, PLLC
11            BY:  MR. GEORGE E. TRAGOS, ESQ.
              BY:  MR. PETER SARTES, ESQ.
12            601 CLEVELAND STREET
              ST. 800
13            CLEARWATER, FL 33755
              (727) 441-9030
14            george@greeklaw.com
              peter@greeklaw.com
15

16

17

18

19

20

21

22

23

24

25
```

1                              I-N-D-E-X

2

**WITNESS:**

3

Dr. Mary Mayleben

4

    Con't. Cross-Examination by Mr. Tragos:          4
5     Redirect Examination by Mr. Trezevant:          21

6

7   Dr. Arthur Simone

8

    Direct Examination by Mr. Saltzman:             24
9

10

11

12

13                       **E X H I B I T S**          **ADM**

14

15   Government's Exhibit No. 101B                    77
     Government's Exhibit No. 101C                    77
16   Government's Exhibit No. 103A                    77
     Government's Exhibit No. 103B                    77
17   Government's Exhibit No. 103C                    77
     Government's Exhibit No. 104A                    77
18   Government's Exhibit No. 105B                    77
     Government's Exhibit No. 106                     77
19

20

21

22

23

24

25

```
 1              TAMPA, FLORIDA; NOVEMBER 8, 2016

 2                        – – –

 3              (COURT IN SESSION AT 10:09 A.M.)

 4                      *   *   *   *

 5   (Whereupon, a Juror discussion

 6   was had but not asked to be transcribed.)

 7              THE COURT:  All right.  You may proceed with your

 8   cross.

 9              MR. TRAGOS:  Thank you, your Honor.

10                    DR. MARY MAYLEBEN

11   Called as a witness herein, having been previously duly sworn

12   was examined and testified as follows:

13                 CONT. CROSS-EXAMINATION

14   BY MR. TRAGOS:

15   Q.   Ma'am, the prosecutor, excuse me, when asking you about

16   chapter 499 of the Florida Statutes referred you to a

17   Section 12 that says, "adulterated and misbranded drugs,

18   false advertisement, failure to maintain records relating to

19   drugs."  Do you remember talking about that?

20   A.   Yes, sir.  But I prefer if we are going to talk about it

21   to actually look at it.

22   Q.   I'm sorry, I don't understand that?

23   A.   I said, I do, but if we do, I would like to look at it.

24   Q.   What's the last thing you said, last phrase?

25   A.   I'm sorry?  I said, yes, I do remember, but if we were
```

1    going to talk about it, I would like to look at the Statute.

2    **Q.**   Okay.  Can you see it?

3    **A.**   Yes, I do.  Thank you.

4    **Q.**   And do you see where it says, "second degree

5    misdemeanor," misdemeanor of a second degree?

6    **A.**   Yes, I do.

7    **Q.**   "Misdemeanor second degree," is the lowest possible

8    crime in the State of Florida, is it not?

9    **A.**   I would not be the best person to answer that question.

10   **Q.**   Do you know what a second degree misdemeanor is?

11   **A.**   Generally speaking, yes.

12   **Q.**   What do you think it is?

13           MR. TREZEVANT:  Objection, speculation.

14           MR. TRAGOS:  Your Honor --

15           THE COURT:  Overruled.  Proceed.

16   BY MR. TRAGOS:

17   **Q.**   Okay.  Go ahead.

18   **A.**   Like I said, I'm not an expert on sentencing, but it

19   would be a misdemeanor as opposed to a felony.

20   **Q.**   In fact, do you know that it is, at the maximum,

21   punishable by 60 days in jail?

22   **A.**   No, I do not know that.

23   **Q.**   It's your job to enforce these statutes, correct?

24   **A.**   It is my job, yes, to enforce the -- my job

25   specifically?  My job or the Division's job.

1    **Q.**   I'm asking you is it your job to enforce Chapter 499?

2    **A.**   My job as a program manager -- Pharmaceutical Program

3    Manager is to assist in the inspections and investigations,

4    as well as, um, for this part we're talking about,

5    inspections and investigations, and when there are

6    allegations found to report those findings through --

7    depending upon if we're doing a joint -- a joint -- we would

8    report it up through our own legal department, as well as to

9    -- if we are doing a joint inspection or a joint project with

10   the other regulatory bodies that I would be working with.

11          My job is to -- if I am working with an individual,

12   then I would -- I guess that's generally speaking, how I

13   would answer the question.  I'm not exactly sure what you're

14   asking.

15   **Q.**   Would you like me to repeat the question?

16   **A.**   If you would like to.

17   **Q.**   Is it your job to enforce Florida Statute 499?

18   **A.**   Yes.  Part of my job is to identify, when I become aware

19   of allegations, and then to proceed with enforcement and/or

20   compliance, depending upon the situation.

21   **Q.**   So the answer is yes?

22   **A.**   Yes.  I would say yes, in the qualitative fashion.  I,

23   myself, am not -- I'm not the attorney, nor am I the person

24   that would bring the charges before an administrative or

25   criminal court.

1    **Q.**   So you're not the right witness to be here to tell us

2    what's right or wrong with regard to how somebody conducts

3    themselves with the statute?

4    **A.**   I would not say that's true.  I would be the right

5    person because I would be the person that would be

6    identifying those allegations, those deficiencies, those

7    areas of noncompliance with the law.

8    **Q.**   Is that a qualified answer like your "yes or no" before

9    or unqualified?

10            MR. TREZEVANT:  Objection, argumentative.

11            THE COURT:  Sustained.

12   BY MR. TRAGOS:

13   **Q.**   But you don't know what the punishment is for second

14   degree misdemeanor, even though it's in Chapter 499?

15   **A.**   Sir, I'm not the expert on what -- what the

16   ramifications are of each misdemeanor or felony.  So no, I

17   could not tell you that.  I could tell you what are the --

18   what are the violations in the law.  I could not tell you the

19   consequences of -- if someone was charged with a misdemeanor

20   versus a felony and what type.

21   **Q.**   And 499, I think you testified, is the Chapter you deal

22   with every day, all day?

23   **A.**   Yes, I do.

24   **Q.**   Now, you went through your employment history with the

25   prosecutor.  Were any of those oncology practices?

1    **A.**   When I worked in the clinical floors of the hospital,

2    yes, I did work with oncology patients and oncology

3    physicians.

4    **Q.**   Okay.

5    **A.**   When I worked in my different retail hospital practices,

6    those also involved cancer patients with oncology physicians

7    ordering those prescriptions.

8    **Q.**   You were an office manager, I believe you testified,

9    correct?

10   **A.**   Yes, I was.

11   **Q.**   Where were you an office manager?

12   **A.**   I was an officer manager for a family practitioner in

13   Jacksonville, Florida.

14   **Q.**   And how long did you have that job?

15   **A.**   That was approximately almost two years.

16   **Q.**   And you said that the rules today are the same as they

17   were then?

18   **A.**   I said that the rules, as far as receiving prescription

19   drugs and having prescription drugs regarding if a drug is

20   approved or not are similar, yes.

21   **Q.**   Okay.  And -- all right.  So when you -- so let's talk

22   about the position of office manager with regard to the

23   receiving of drugs.  Okay.  When -- what is your

24   responsibility as an office manager when drugs are received

25   by the practice?

1          MR. TREZEVANT:  Objection as to time, vague.

2          THE COURT:  Overruled.

3          THE WITNESS:  Could you repeat the question,

4    please?

5    BY MR. TRAGOS:

6    **Q.**   What is the responsibility of an office manager with

7    regards to the receiving of drugs into the practice?

8    **A.**   I could not respond to that generally speaking.  I can

9    only speak to my own perspective.  Each office would be run

10   differently, so it depends upon the physician and the staff.

11   **Q.**   Well, let's say the office you were in.

12   **A.**   The office that I worked in I was responsible for

13   ordering prescription drugs, receiving prescription drugs, as

14   well as training the staff there to do the same under the

15   supervision of the physician that was the owner of the

16   practice.

17   **Q.**   So your responsibility was -- a physician relied on you

18   to order the drugs?

19   **A.**   Yes, but the physician provided the direction.

20   **Q.**   And when you received the drugs, did you check to make

21   sure that you got the right drugs?

22   **A.**   Yes.

23   **Q.**   And how would you check?

24   **A.**   I would check by receiving in the drug, seeing what was

25   ordered, what was received, if the packaging was intact, if

1    it was appropriately labeled, if it had, um, anything that

2    would be a red flag as far as in a foreign language, if it

3    didn't have -- if there was a prescription drug, if it didn't

4    have the notification of it being a prescription drug, and

5    basically -- basically just looking at the container overall

6    of the drug.

7            Also, if it had been perhaps water damaged, if it

8    didn't come in, if it was supposed to come in under cold

9    storage, if it had not come in under cold storage, things

10   like that.

11           THE COURT:  Let me stop you a minute.  Ma'am, you

12   have a soft voice.  So you have to try hard to speak up into

13   the microphone.  I'm accused of having a soft voice so they

14   make me have two microphones.

15           THE WITNESS:  All right.  I'll try harder.

16   BY MR. TRAGOS:

17   **Q.**   When the -- if you could, go through the steps that you

18   took -- you ensure, basically, compliance with the rules and

19   regulations, FDA and Chapter 499, correct?

20   **A.**   Yes, sir.

21   **Q.**   So when the drug came in, would you go through the steps

22   that you would take to ensure compliance?

23   **A.**   Well, the first step would be that, um, as I stated, the

24   physician of the practice was responsible for letting us know

25   what types of drugs he wanted in his practice, and um, he

1    established the contracts.  Once those established contracts

2    were put in place by who -- he as a practitioner wanted to

3    buy from, we would then make sure that those drugs were

4    ordered from those suppliers, and those drugs were then, when

5    they were received in, looked at, compared to the inbound

6    paperwork to see if the paperwork was received, the required

7    paperwork, and to see if the drug itself was intact, if it

8    had been tampered with.

9    **Q.**    You say "we," who's the "we?"

10   **A.**    Either myself or the staff that I trained to also do so.

11   **Q.**    Okay.  Go ahead.

12   **A.**    Um, so to see if the drug was -- if the packaging was

13   intact, if it had been tampered with, if it was legible.

14   Like I said, there's been times, not in the practice, but in

15   my work experience where I have seen drugs that had water

16   damage, come in not under proper temperature, packaging

17   storage conditions.  Um, once that drug was opened for

18   administration, it should have package inserts with it.  So

19   if we were stocking a shelf or whatever, we would make sure

20   it had appropriate package inserts, which is part of the

21   labelling, making sure that it was legible labelling, which

22   in this case would be English, that it's identified as a

23   prescription drug.  Um, those would be some of the typical

24   steps.

25   **Q.**    Now, if something came into the office that had to be

1    refrigerated, was there something that would tell you whether

2    or not the temperature was correct or not?

3    **A.**    On the prescription drug itself?

4    **Q.**    Yes.

5    **A.**    Yes.  The prescription drug should clearly show on it

6    it's labelling, which would include the temperature storage

7    requirement.  So typically it would tell you it needed to be

8    stored at room temperature, refrigerated and stored in what

9    temperatures.

10    **Q.**    What about -- you went through this in your testimony,

11    about checking to see if, I guess, the shipper was licensed,

12    correct?

13    **A.**    When I spoke about that, I talked about that in the

14    scheme of Chapter 499, and how a person could identify if a

15    vendor was a licensed entity.  I did not state that in my own

16    practice in that experience because I had that knowledge from

17    my work experience.

18    **Q.**    I'm sorry, I missed -- you had that knowledge --

19    **A.**    I had that knowledge from my work experience.  So I

20    didn't necessarily need to go through that step myself, but

21    what I was talking about when I stated that in my testimony,

22    is that I was talking about that an individual that is buying

23    a prescription drug can go to the website and verify that the

24    supplier, and that happens on a normal occasion, we have many

25    of our users comment how easy it is to find that out and make

1    it a matter of practice before they buy drugs.

2    **Q.**    When you were then doing this, did you check to see if

3    the suppliers were licensed?

4    **A.**    As I stated, I was aware that they were.  So I didn't

5    need to actually go check because I already knew.

6    **Q.**    How did you know?

7    **A.**    Just from my working knowledge as a pharmacist.  I

8    couldn't tell you exactly how I know.  It's part of the

9    innate knowledge, you know, because of your work in that

10   industry.  So at sometime, perhaps, I checked, but I couldn't

11   tell you when I checked because I already had that working

12   knowledge.

13   **Q.**    So you didn't check every time you got a delivery to

14   make sure all the licenses were right?

15   **A.**    No, because we only bought from very few vendors.  So it

16   was very easy.  If you only buy from a couple vendors and you

17   vet those vendors, then you know who you're buying from and

18   they have licenses.  It's easy.  It's not like you have to

19   check every time if you are only buying from a couple

20   vendors.  You're familiar with your vendors.

21   **Q.**    Are you finished?

22   **A.**    You would be familiar with your vendors.

23   **Q.**    I said is your answer finished?

24   **A.**    Oh, I'm sorry.  Yes, sir.

25   **Q.**    Okay.  And you as the office manager were familiar with

1    the vendors that you were using in that practice?

2    **A.**    Yes.

3    **Q.**    So you did not actually physically go check their

4    licenses?

5    **A.**    I couldn't tell you if I did or not.  I don't believe I

6    did because I wouldn't have the knowledge.  I doubt if I did

7    because I knew, but I couldn't tell you definitively that I

8    did.  Like I said, we used very few vendors.

9    **Q.**    And having that knowledge was enough?

10   **A.**    Having the knowledge to know that we were buying from an

11   authorized source that was allowed to distribute prescription

12   drugs in Florida, and that the drugs that we were ordering we

13   had already assured that we were ordering drugs by making

14   sure they were FDA approved drugs.  The doctor would never

15   order drugs unless he knew what the drugs were for and what

16   they were before.  So he was the one making the decisions on

17   what drugs were to be ordered.  So yes, I was comfortable

18   with that.

19   **Q.**    And if a -- your doctor would tell you to order a drug,

20   and a different drug came in, what would you do?

21   **A.**    If a -- if a particular drug was ordered and the -- a

22   different drug came in, in the paperwork -- and my knowledge

23   of what was -- the order that was placed, so if you are

24   saying drug A was ordered and instead drug B came in, then

25   drug B -- I would contact the vendor, let the vendor know

1    that we received the drug in error and make arrangements for

2    that drug to be returned.

3    **Q.**   So you would return the drug that was not the one you

4    ordered?

5    **A.**   Yes.

6    **Q.**   Okay.  That was part of your responsibility as the

7    office manager?

8    **A.**   Yes.

9    **Q.**   Okay.

10   **A.**   Under the direction of the physician.

11   **Q.**   Well, whenever a drug came in, did you say, "Do I have

12   your permission to contact the vendor and send it back?"

13   **A.**   Um, well, I would say -- let's say, for example, if the

14   drug that came in was a common drug that we would use in the

15   practice, then I might say, "Doctor, we got drug B in.  It's

16   not what we ordered, but we are looking like we are running

17   low.  Would you like to keep that drug?"

18   **Q.**   Okay.  So you, as the office manager, would make that

19   suggestion?

20   **A.**   Yes.

21   **Q.**   Even though it wasn't the one you ordered?

22   **A.**   I would ask if he would want to do that because of

23   inventory.

24   **Q.**   How about a drug -- I'm sorry.  Go ahead and finish.

25   **A.**   I'm sorry.  If it was a drug that came in in error, but

1  it was a drug that was commonly stocked in the practice that

2  had already been vetted and approved for the practice, then I

3  would check to find out did he want it returned or did he

4  want to keep it for the practice.

5  **Q.**  What about a totally different name than the one that

6  was ordered?

7  **A.**  If it was a totally different drug that we had never

8  stocked and it came in, that would be returned and say we did

9  not order the drug.

10  **Q.**  And would you do that as the office manager?

11  **A.**  Yes.  And I would also let the physician know because

12  it's his, um -- it's his business and his, basically, purse,

13  so he would want to be advised so he would know that he's not

14  being billed for something or getting billed for something.

15  So for financial reasons it was always advised -- the

16  physician was price advised.

17  **Q.**  In the course of a year in this practice what was the

18  dollar amount of the drugs that would be ordered?

19        THE COURT:  Sustained.

20  BY MR. TRAGOS:

21  **Q.**  This was a general practice, correct?

22  **A.**  Family practitioner.

23  **Q.**  Not an oncologist?

24  **A.**  Not an oncologist.

25  **Q.**  And was -- did the doctor have a right to trust you as

1     the office manager?

2     **A.**     What do you mean by that question?   That's a --

3     **Q.**     Do you understand the word "trust?"

4     **A.**     I do, but trust me for what?

5                  THE COURT:   Approach the bench, please.

6                  (Sidebar conference held.)

7                  THE COURT:   Don't forget, we're trying to move this

8     case along, and you're kind of wandering around and fishing

9     and poking.   If you have some questions, ask it and let's get

10    this over with.   Let's get rid of this witness.

11                 MR. TRAGOS:   Okay.

12                 THE COURT:   Thanks.

13                 (Back before the Jury.)

14                 MR. TRAGOS:   Can I continue with that question or

15    does the Court want me to move on?

16                 THE COURT:   You may continue.

17    BY MR. TRAGOS:

18    **Q.**     Okay.   Did that doctor trust you to maintain the

19    ordering and the incoming of drugs to his practice?

20    **A.**     The doctor trusted me to be a conduit of knowledge and

21    to be responsible in the sense of receiving his direction,

22    following his directions, and then reporting back if his

23    directions deviated in the sense of I would follow his

24    direction on what drugs to order, what type of quantities he

25    wanted to keep, what was his inventory, and then report back

1  on were the drugs received, were there any errors, anything

2  like that, if it came in damaged.  So the doctor trusted me

3  to be a responsible party to communicate back and forth with

4  him to get his wishes fulfilled.

5  **Q.**   Now, during the course of your duties in -- with the

6  State of Florida, have you had occasion to review the

7  practice of medical practices with regards to the incoming

8  and outgoing of prescription drugs?

9          MR. TREZEVANT:  Objection, relevance.

10         THE COURT:  Overruled.

11         THE WITNESS:  Can you ask the question one more

12  time, please?

13  BY MR. TRAGOS:

14  **Q.**   With regards to your duties with the State of Florida,

15  have you had occasion to review how medical practices, what

16  their practices are with regards to the incoming and outgoing

17  of prescription drugs?

18  **A.**   I'm not quite sure what you're asking, if you are asking

19  if I read a certain statute or you're asking whether I'm

20  familiar with the best business practice?

21  **Q.**   I'm asking, have you actually, in real life, looked at

22  medical practices?  Have you done that in the course of what

23  you do?

24  **A.**   Yes, I have.  In other words, I think you're asking have

25  I ever been in medical practices under my jurisdiction in

1    this position or in my previous position with the State?

2    **Q.**   Yes.

3    **A.**   Yes, I have.

4    **Q.**   Okay.  And you say you've got this database that people

5    can check on the licenses?

6    **A.**   Yes, sir.

7    **Q.**   How many people on a daily basis access that database?

8    **A.**   I would not be able to answer that question.  I do know

9    that we have the people --

10          THE COURT:  "I don't know" is a satisfactory

11   answer.

12          THE WITNESS:  Thank you, sir.

13          THE COURT:  You know, if we're going to get out of

14   here today, you just need to say "yes, no, I don't know," and

15   let's get on with it.

16          THE WITNESS:  Yes, sir.

17   BY MR. TRAGOS:

18   **Q.**   Do you know that number, let's say, during the course of

19   a year?

20   **A.**   No.

21   **Q.**   Do you know if anybody contacts that database?

22   **A.**   Yes, I absolutely know many people contact it.

23   **Q.**   How do you know that, if you told me you don't know how

24   many?

25   **A.**   Because on a routine basis with -- when myself and our

1    drug inspectors communicate with people who have permits and

2    want to know how to find out, and when they call and find out

3    and say, "Hey, we see this person on the database, and they

4    look like their permit is expired, can we still buy from

5    them?  What do you think?"  So we get those questions when we

6    are doing routine inspections, they say, "This is my due

7    diligence.  I want to show you what I'm doing.  Here's all my

8    vendors that I buy from, and here's copies of your permits

9    from the database.  I keep up with the expiration dates, and

10   my process is to check these."  So I definitely know that

11   they do that because they are communicating that to us on a

12   regular basis.

13   **Q.**   So these permits expire, these licenses?

14   **A.**   Yes, they do.  So they need to be renewed.

15   **Q.**   So without checking the database someone who may have

16   had a permit earlier may not have a permit today, correct?

17   **A.**   That's correct.

18   **Q.**   And when you checked the database of the list you gave

19   us, you checked all the way back, right?

20   **A.**   Yes, I did.  None of these companies ever had a permit.

21            MR. TRAGOS:  Thank you, your Honor.

22            THE COURT:  All right.  Any redirect.

23            MR. TREZEVANT:  Very briefly, Judge.

24                              *

25                              *

1                    **REDIRECT EXAMINATION**

2   **BY MR. TREZEVANT:**

3   **Q.**   First, if we could, referring to Government Exhibit 1D,

4   499, page 34. Mr. Tragos just asked you a number of

5   questions about the practice that you worked in. The

6   healthcare establishment permit in 499. Do you see that,

7   ma'am?

8   **A.**   Yes, I do.

9   **Q.**   When did that status HCCE, when was that created?

10   **A.**   That was effective January 1, 2009.

11   **Q.**   So was that approximately 20 years after you had worked

12   in an office as the office manager?

13   **A.**   Doing math in my head, um --

14   **Q.**   '89?

15   **A.**   Yes. That would be approximately that, yes.

16   **Q.**   So did they even have HCCE's then?

17   **A.**   No, they did not have HCCE's.

18   **Q.**   Instead of having an HCCE, did they have a designated

19   qualified practitioner of the HCCE?

20   **A.**   No. At that time, they did not have a designated

21   qualifying practitioner or the HCCE permit.

22   **Q.**   All right. And earlier yesterday when you first

23   started -- Mr. Tragos first started asking you questions, he

24   asked you about your duty to enforce 499, and whether you had

25   reported any of this conduct to the State's Attorneys Office.

1   Do you recall that?

2   **A.**   Yes, I recall that.

3   **Q.**   At some point during that exchange you mentioned

4   something called a "criminal hold," do you recall that?

5   **A.**   Yes.

6   **Q.**   What's a criminal hold?

7   **A.**   When we have a case that we have worked on and we are

8   working with our law enforcement partners, we put that case

9   in the status of criminal hold.  So we allow our law

10  enforcement partners to proceed with their case before we

11  proceed with our case.

12  **Q.**   As far as a law enforcement partner, is the Federal

13  Government -- can that be one of your law enforcement

14  partners?

15  **A.**   Yes.  It can be Federal, as in this case, or it could be

16  State or local.

17  **Q.**   So did you simply defer to this case?

18  **A.**   Yes, we deferred this to the Federal Law Enforcement

19  Unit.

20  **Q.**   Now, you also, on cross-examination, were asked a number

21  of questions concerning that as -- your legal view of

22  different Statutes.  Do you recall that?

23  **A.**   This morning?

24  **Q.**   Yes, ma'am.

25  **A.**   Yes.

1  **Q.**   And are you an attorney?

2  **A.**   I am not.

3  **Q.**   Have you had any legal training?

4  **A.**   I have not.

5  **Q.**   Are you doctor of pharmacy?

6  **A.**   Yes, I am.

7           MR. TREZEVANT:  No further questions, your Honor.

8           THE COURT:  Thank you.  You may step down.

9           (Witness excused.)

10 (Whereupon Agent Lee Eric Larson was

11 called as a witness, but not transcribed.)

12          THE COURT:  Bring in the Jury.

13          CSO OFFICER:  All rise.

14          (Jury enters courtroom 3:12 p.m.)

15          THE COURT:  Call your next witness, please.

16          MR. SALTZMAN:  The United States calls Dr. Arthur

17 Simone.

18          MADAM CLERK:  Good afternoon.  Please raise your

19 right hand.

20          THE WITNESS:  I do.

21          MADAM CLERK:  Please state your name and spell your

22 first and last name for the record.

23          THE WITNESS:  It's Arthur Simone, A-R-T-H-U-R,

24 S-I-M-O-N-E.

25          MADAM CLERK:  Thank you.  You may have a seat.

```
1    (Witness sworn.)

2              MR. SALTZMAN:  May I proceed?

3              THE COURT:  Proceed.

4                        DR. ARTHUR SIMONE

5    Called as a witness herein, having been first duly sworn

6    was examined and testified as follows:

7                        DIRECT EXAMINATION

8    BY MR. SALTZMAN:

9    Q.    Good afternoon.  Who do you work for?

10   A.    I work for the US Food and Drug Administration,

11   sometimes known as the FDA.

12   Q.    And how long have you been with the Food and Drug

13   Administration?

14   A.    A little over 14-and-a-half years now.

15   Q.    Within the Food and Drug Administration what group do

16   you work for?

17   A.    Um, throughout the 14 years I've been in The Center for

18   Drug Evaluation and Research.  Currently I'm in the Office of

19   Compliance, and within the Office of Compliance I'm in the

20   Office of Unapproved Drugs and Labelling Compliance.

21   Q.    And the Center for Drug Evaluation and Research, what is

22   that group responsible for?

23   A.    We're charged with making sure that the drugs supplied

24   within the United States is of the highest quality possible

25   and safe and effective.
```

1    **Q.**    What are your -- what was your title when you were in

2    the Center for Drug Evaluation and Research?

3    **A.**    Initially I started as a medical officer, which I still

4    am, and currently I'm a senior medical adviser in my current

5    office.

6    **Q.**    What do you do as a medical officer?

7    **A.**    Initially I was in what's called the Office of New

8    Drugs, and within that one of the Divisions that did review

9    work, and at that time, we helped manufacturers who wanted to

10   bring new drug products to market, develop those products and

11   ultimately we either approved them or denied approval.

12   **Q.**    What do you do in your current position?

13   **A.**    In my current position I work within the Division within

14   the office rather, to make sure that unapproved products are

15   not marketed within the United States.

16   **Q.**    And I would just like to go back and talk about your

17   educational background.  Can you tell us about your

18   schooling?

19   **A.**    I started out as an engineer with training in

20   engineering science at a school called New Jersey Institute

21   of Technology.  After that I went into bioengineering at Penn

22   State University and received a Master of Science Degree and

23   Doctor of Philosophy degree there.  Following that I went to

24   Rutgers Medical School now Robert Wood Johnson Medical School

25   and got my medical degree there.

1  **Q.**   Can you please provide us with your overview of your

2  training and professional experience?

3  **A.**   Following medical school I went to the Presbyterian

4  University of Pennsylvania Medical School internship in

5  surgery and medicine and followed that with a residency at

6  Penn State University Medical School in Hershey, and that was

7  training in anesthesiology.

8  **Q.**   After your residency what did you do?

9  **A.**   I was on the faculty at the University of Pennsylvania

10  in their Department of Anesthesiology in Philadelphia.

11  Following that I worked in community hospitals and was on the

12  faculty at Hahnemann University Hospital and Medical College

13  of Pennsylvania and ultimately Drexel University.

14  **Q.**   What was your position on the faculty at those

15  hospitals?

16  **A.**   The faculty position was Assistant Professor of

17  Anesthesiology, but in three of the community hospitals where

18  I worked, I was the Department Chairman for the

19  Anesthesiology Department.

20  **Q.**   And for how many hospitals have you been a Chairman of

21  Anesthesiology?

22  **A.**   Three of them.

23  **Q.**   I'm sorry?

24  **A.**   Three of them.

25  **Q.**   And as -- your current position now in Unapproved Drugs

1   and Labelling Compliance, is that considered a promotion from

2   being a medical officer?

3               MR. TRAGOS:  Objection, opinion, speculation.

4               THE COURT:  Overruled.

5               THE WITNESS:  Yes, it is.

6   BY MR. SALTZMAN:

7   **Q.**   And remind me how many years did you say you were a

8   medical officer for?

9   **A.**   I'm technically still a medical officer.  In the

10  previous position I was primarily a medical reviewer and

11  sometimes, at least one time, a team leader for primarily

12  reviewers.

13  **Q.**   And when you were in that position, did you approve drug

14  applications for the FDA?

15  **A.**   I was one of the team of people that did that, yes.

16  **Q.**   And approximately how many drug applications were you a

17  part of a team to approve the drugs?

18  **A.**   Over 60.

19  **Q.**   And over how many years was that?

20  **A.**   14 years.

21  **Q.**   So how does the position you are in now relating to

22  unapproved drugs, do you have to have been -- previously had

23  a position where you approved drugs?

24  **A.**   Essentially, yes.

25  **Q.**   What is the FDA?

1  **A.**    The Food and Drug Administration is a member of the

2  Department of Health and Human Services, and we regulate the

3  drugs, foods, biological products, animal products in the

4  United States.

5  **Q.**    And what does a company have to do if they want to sell

6  a drug in the United States?

7  **A.**    There's a number of steps that are involved, but on a

8  high level they need to demonstrate convincingly that their

9  product is safe and efficacious and manufactured according to

10  the highest standards possible.

11  **Q.**    And which group is charged with that?

12  **A.**    That would be the Office of New Drugs.

13  **Q.**    And that is within the Center for Drug Evaluation and

14  Research?

15  **A.**    Yes, it is.

16  **Q.**    What is an over-the-counter drug?

17  **A.**    An over-the-counter drug is a drug that's also called a

18  nonprescription drug.  The prescription isn't needed for a

19  person to go out and purchase it.

20  **Q.**    And what is a prescription drug?

21  **A.**    A prescription drug is one that poses greater risk or

22  requires additional expertise.  A prescription is required.

23  A person cannot just go out and obtain it on their own.

24  **Q.**    Do both over-the-counter and prescription drugs require

25  approval by the FDA before they can be marketed?

1    **A.**    Generally speaking, yes.  Although there's a mechanism

2    in place for certain over-the-counter prescription products

3    to bypass the approval process.

4    **Q.**    Why is that?

5    **A.**    The agency has determined if certain products are made

6    using certain active ingredients and inactive ingredients and

7    carry specific labelling, those products can be -- and can be

8    manufactured under current manufacturing processes, they can

9    be marketed under what's called a monograph.

10   **Q.**    How does the FDA determine whether or not a drug should

11   be classified as a prescription drug?

12   **A.**    When a product comes in initially and it's evaluated by

13   us, we look to see if there are certain things that are

14   required for its safe and efficacious use.  So generally

15   those are looked at in three categories, collateral measures,

16   some type of expertise needs to be used to diagnose the

17   condition.  Special medical testing, like, x-rays or blood

18   work, does that need to be conducted to make the diagnosis

19   and use the product safely?  Is the product highly toxic and

20   can impose risk, and if so, would that require medical

21   expertise to watch out for and to treat?  And lastly, it

22   would be the method of use.  So if it's a product that needs

23   to be infused through a vein or injected in a special manner,

24   something a lay person wouldn't be able to do, any of those

25   conditions could make it a prescription-drug product.

Q.    How does the FDA decide who within the FDA will review

an application for a new prescription drug?

A.    Within the office of new drugs, there are multiple

divisions that specialize in different areas of medicine,

cardiology products, renal products.  I was in the position

of looking at analgesics, and addiction products.  When a

company looks at a product they want to develop and

ultimately market, they form a working group or team within

that Division and that has experts in various fields, and all

of us have assignments within the process of bringing that

drug to market.

Q.    And approximately how many people are part of that team?

A.    It's variable, but there are chemists, there are

pharmacists, there are physicians, there are statistician and

others are brought in as needed.

Q.    Does the FDA look at a number of things when going

through the approval process for prescription drugs?

A.    Yes.  And, in fact, for all drugs that go through the

approval process, the things that are there are four elements

that are key, manufacturing to make sure that the drug is as

pure as possible.  Secondly, would be safety of the product.

It's not going to cause more harm than benefit.  Third would

be efficacy or actual benefit of the product.  Lastly the

labelling that's associated with it to let clinicians,

doctors and nurses know how to use the product appropriately.

**Q.**   And are animal and clinical trials reviewed as part of
that process?

**A.**   Yes.  Initially when someone comes in, they will have
developed a product to the point where they think it's ready
to be tested.  Sometimes they will have already tested it in
animals.  Ultimately before they begin studying it in humans
they have to come to the FDA and get permission to do so, and
we look at all the animal data and chemistry data to that
point in time to see if it's safe enough to proceed with
human studies.

**Q.**   Can you explain the FDA evaluation of the manufacturing
of prescription drugs?

**A.**   There are a lot of steps involved in that, but basically
to insure the highest quality possible we look at everybody
from where the materials are purchased for the ingredients
both active ingredient and inactive ingredient.  We are
concerned with the impurities that may be in the ingredient.
We look at how the product is actually made, the facilities
where it's made, the steps that are taken in that process.
Ultimately when the product is finished, we look at the
impurities in that product and levels of those.  We also look
for things such as interaction between the container of the
drug and the drug itself to make sure that something from the
container doesn't work its way into the drug product,
especially for injectables or the drug product doesn't

1    somehow leach out of the fluid that it's in and into the

2    container itself, again, for injectables.

3    **Q.**   What do you mean somehow it reaches out from the

4    container into the product?  What does that mean?

5    **A.**   Sometimes, particularly for liquids, they can interact

6    with their containers.  So in a plastic container there is

7    molecules of plastic that can work their way into the drug

8    and contaminate it.  Sometimes parts of the drug can work its

9    way into the plastic and lose its efficacy or safety.

10   **Q.**   Does the FDA also evaluate the storage of the drug?

11   **A.**   Yes.  That's one of the key parts in order to determine

12   how long the product shelf life is.  In other words, when its

13   expiration date will be.  The company has to do what's called

14   stability testing.  It has to store it and under different

15   conditions for temperature, shaking, humidity, things like

16   that, see how long it can maintain its level of quality.  For

17   each product there are specifications that are set and the

18   drug has to remain in those -- within those specifications

19   for its entire life span.

20   **Q.**   Other than shaking is there any other part of the

21   stability testing that the FDA evaluates?

22   **A.**   Temperature and humidity are two other big ones.

23   Exposure to light is a third sometimes.

24   **Q.**   As a medical officer in the Center of Drug Evaluation

25   and Research, were you involved in the evaluation of all

1  those factors you just mentioned?

2  **A.**    There were usually experts, rather, that would weigh in

3  on those and provide me with their opinion of it, and it was

4  up to me as the medical officer to determine why that would

5  pose a risk to patients or not.

6  **Q.**    Were you involved in the evaluation of the other factors

7  you mentioned, like the active ingredients, the sourcing, the

8  manufacturing, those aspects as well?

9  **A.**    Those were all taken into consideration both before

10  clinical trials were started and people were actually exposed

11  to drug, and also prior to the drug being approved for

12  marketing.

13  **Q.**    Are any FDA approved drugs manufactured outside the

14  United States?

15  **A.**    Yes, there are.

16  **Q.**    Does the FDA, as part of the approval of the drug

17  application, approve that aspect of the manufacturing of the

18  drug?

19  **A.**    In order to be approved the FDA has to be satisfied that

20  the sites where the product is to be manufactured are capable

21  of doing it to the quality that we specified in what's called

22  a new drug application or what the company claims they can

23  do.

24  **Q.**    What does it mean to -- let me rephrase the question.

25  What is the difference between a label and labelling for a

1    prescription drug?

2    **A.**    Actually for all products a label is the little piece of

3    paper that's glued to the container that has the actual drug

4    in it.  So it may be a bottle that has the pills in it, or it

5    could be a vial that has a liquid drug in it.  The label is

6    actually what's attached to that.  The rest of the label or

7    labelling includes things like the carton that that vial or

8    bottle is put into, any other materials that are inserted

9    into it, and other materials that could be associated with

10   the marketing of the product as well.

11           Ideally in practice as well, the label is what

12   guides for prescription products the physicians, the doctors,

13   the pharmacist whoever is actually going to use the product

14   with how to safely and effectively use it.

15   **Q.**    Can you explain the FDA evaluation of the labelling for

16   prescription drugs?

17   **A.**    That's part of the process for approval.  When a company

18   is done with all the research that we believe is required for

19   a particular product, they submit an application to the FDA

20   that has everything in it from how it's manufactured, where

21   it's manufactured, where they are getting their supplies to

22   manufacture it, all the animal studies, all the clinical

23   studies, and part of our review process we go through that

24   information and sort out what we think is essential for

25   doctors to know in order to safely and effectively use the

1    product and how to pick which patients it's most likely to

2    work in.

3    **Q.**    And what types of information is required to be on there

4    about safety and efficacy?

5    **A.**    Generally speaking, we include the indications, the

6    purposes for which you are going to use this drug to treat

7    high blood pressure, to treat cancer.  We include as well

8    some of the information from clinical trials, what type of

9    patients were evaluated, what some of the findings were.  We

10   include the dosing information, how much to give, how often

11   to give it.  We include warnings, things to watch out for,

12   contraindications, patients that should not receive the drug

13   at all if they meet the comments that are made in the

14   contraindication section.  Adverse events that have been

15   reported with the drug both while it was being developed and

16   ultimately when it was being marketed either here in the US

17   or abroad.

18   **Q.**    What is a contraindication?

19   **A.**    A contraindication is a situation in which a patient is

20   not likely to derive any benefit at all from the product

21   compared to the risks they will be exposed to.

22   **Q.**    And what language is labelling in?

23   **A.**    In the United States labelling has to be in English

24   unless it's a territory where another foreign language is the

25   primary language.  And in a current situation that would be

1    in Puerto Rico where the labelling needs to be in Spanish.

2    **Q.**    Is an "Rx only" mark required to be on the packaging?

3    **A.**    That is one of the requirements for prescription

4    products, and it has to actually be the letters "Rx" and the

5    word "only."

6    **Q.**    Who's the audience or the expected reader of labelling

7    for a prescription drug?

8    **A.**    It would be the prescriber.  So we are talking doctors,

9    sometimes nurse practitioners or pharmacists.

10    **Q.**    Do prescription drugs have adequate directions for use?

11    **A.**    Adequate directions for use the way we talk about it in

12    FDA is adequate directions for use by a lay person, and if

13    adequate directions for use by a lay person can't be written

14    for a product, it would be prohibited to be marketed.  So

15    with prescription products where you can't write adequate

16    directions for use for a lay person, there is a way around

17    that, an exemption to that requirement, and that involves

18    approval of labelling of a product by the FDA.

19    **Q.**    And why does the FDA require that warnings be put on

20    labelling for approved drugs?

21    **A.**    That's a big part of the safety concerns we have for the

22    use of the product.  There is no drug product that's

23    completely safe.  Everything has its risk, but with the drug

24    products efficacy is a benefit, and one of the key things we

25    do at the agency is weigh the benefits and the risk and make

1    sure for the proposed use of a product that its benefit

2    outweighs the risk.  Part of what you have to do is let

3    physicians and patients know what the risks are so they can

4    decide on a case-by-case basis which product is the best one

5    for them to use in a given situation.

6    **Q.**    Does the FDA approve the trade name for a drug product?

7    **A.**    We do.  A sponsor will come in and propose a name and

8    the FDA will look at it and decide if it's something that

9    seems reasonable.  There are certain tests.

10   **Q.**    What goes into the evaluation of the actual trade name

11   for a drug?

12   **A.**    There's a group within the FDA that actually looks at

13   the way the name is pronounced, how it can be written, and

14   handwriting analysis to make sure the proposed trade name

15   isn't going to cause a possible error with some other drug

16   currently out there.

17   **Q.**    Let me actually back up.  What is a trade name for a

18   drug?

19   **A.**    So on -- often times the active ingredient in the drug

20   has a very long name difficult to pronounce, and the company

21   wants something that's a little bit easier for people to

22   remember and something they can use to market it by.  That's

23   the trade name.

24   **Q.**    Can a manufacturer of an FDA-approved drug decide to

25   sell the drug under a different name, different trade name

1    other than the approved name by the FDA?

2    **A.**    They can only do that with permission from the FDA.

3    **Q.**    And why not -- why do they need permission?

4    **A.**    Because there are concerns that the new name might

5    create some kind of confusion in the medical field and lead

6    to errors that would harm patients.

7    **Q.**    Can you explain the evaluation as part of the new

8    drug -- as part of an application for a prescription drug of

9    the transportation of the drug?

10   **A.**    Can you repeat that please?

11   **Q.**    As part of the FDA evaluation of the application for a

12   prescription drug, can you explain how the FDA or -- what the

13   FDA looks like at for the transportation element of that?

14   **A.**    The FDA requires that the company that's making and

15   marketing this product assures that the product's identity,

16   purity and quality stays within specifications from the time

17   it's manufactured to the end of its expiration date. And the

18   company has to provide a means for assuring that as well,

19   which the FDA can look at. It's not required for us to look

20   at it during the approval process, but it needs to be in

21   place so that we know that when the product is stored in

22   warehouses or shipped from point A to point B, it's kept

23   within the conditions it's supposed to be stored and there

24   are very specific storage conditions. Some of them are

25   specified with the United States pharmacopeia, or USP that

```
 1   you might see on labels.  And sometimes those are modified

 2   based on the stability testing which a company does to see

 3   what's the best way to store this to keep it within specs the

 4   longest.

 5   Q.   You just talked about a number of things that the FDA

 6   looked at when evaluating an application for a drug.  What is

 7   the most important of those?

 8   A.   All of those things are important.  In fact, if someone

 9   or company falls short on any one of them, that could prevent

10   a drug product from being approved until that issue is

11   addressed, and by that, I am talking safety, efficacy,

12   labelling, the different components of manufacturing.

13   Q.   What is a generic name for a drug?

14   A.   If I may step back a little bit?

15   Q.   Sure.

16   A.   When a company wants to come in and market a product,

17   the way it's done there's a number of ways bringing a product

18   to market.  Some of them -- and there are four of them.  New

19   drug application, which is generally used when a company

20   comes in with the first-in-its-class type of drug.  And there

21   is also a generic application, which is called an abbreviated

22   new-drug application.  So depending on -- and there is also

23   something called a biologic licensing application for

24   products that are made with living material instead of a

25   bunch of chemical reactions and the equivalent of the generic
```

1   version of that, which is called biosimilars.

2          So what's required for those generic versions is

3   often times a little bit less because they rely on the

4   agency's previous findings of the safety and efficacy for

5   what we call the innovator product, the first one to come in.

6          What happens with the generic you can say, "I'm

7   very similar to this other product that's already been

8   approved.  I want to market it."  There are certain steps

9   they have to go through to show they are similar enough to

10  show we are convinced.  Safety and efficacy is ineffective.

11  The dosing isn't effective and there are no other issues

12  surrounding this product, and in particular, its

13  manufacturing that would alter its ability to simulate the

14  innovative product or used as a replacement for the

15  innovative product.

16  **Q.**   Is there a difference between a generic drug and the

17  generic name for a drug?

18  **A.**   Yes, there is, and this sometimes gets complicated.  The

19  active ingredient for a drug is sometimes used as the generic

20  name for the drug and that's been okayed with FDA.  I can

21  give an example.  So sometimes -- one, the numbing medicines,

22  a local anesthetic commonly used called Lidocaine and the

23  active ingredient in Lidocaine is Lidocaine hydrochloride.

24  And the first one who came out with that product chose a

25  trade name for it called Xylocaine.  If you look in our

1    listing of drugs that have been approved for marketing, you

2    have Xylocaine at the top and you have a bunch of products

3    called Lidocaine, and all of them have Lidocaine

4    hydrochloride as the active ingredient.

5    **Q.**    Can you explain what are active ingredients and inactive

6    ingredients?

7    **A.**    Yes.  The active ingredients are the ones that actually

8    do the work of the drugs.  They are what kills the germs if

9    you've got a sore throat or some type of infection.  They are

10   the ones that destroy cancer cells if you have cancer.  It's

11   the ones that lower your blood pressure if you have

12   hypertension.  The inactive ingredients are everything else

13   that go into the product, things like preservatives, other

14   items, ingredients used to make this powder that you have

15   into a pill, or the liquids that are used to dissolve the

16   powder to make it an injectable, those are inactive

17   ingredients.

18   **Q.**    Does the FDA ever approve an application just based on

19   the active ingredient of the drug?

20   **A.**    No.  In fact, that's an important point.  The FDA

21   doesn't approve active ingredients and technically we don't

22   even approve the drug products.  We approve the application

23   for them.  That involves everything from the manufacturing,

24   all the safety and efficacy that's been studied for that

25   particular product with its active and inactive ingredients

1  and labelling that's associated with it.

2  **Q.** Does labelling for prescription drugs does that ever

3  change?

4  **A.** Yes. Frequently it does. There are a couple of major

5  reasons. Sometimes a company has a product that's approved

6  for one indication, and I'm just making this up, but let's

7  say, um, lung cancer, and then they decide later on to study

8  it to treat prostate cancer and they find it works. They'll

9  come back and update. They'll submit a supplement to their

10  new-drug application saying, "We want to change our labelling

11  to include both of these new indications."

12          Another thing that's a bit more common is safety

13  updates, a lot of times when products are studied initially

14  before they are approved it would be anywhere from a few 100

15  to a few thousand patients that have been exposed to the

16  product, and once it gets marketed, millions of people may

17  used it. Often times while millions of people are using it

18  we'll find a lot of other safety issues we didn't know about

19  before because the numbers are so small. On a regular basis

20  we review the safety data that we have, and if necessary,

21  update the label to include it.

22  **Q.** What is a cold-chain drug?

23  **A.** There are some drug products where in order to preserve

24  their integrity and their efficacy they need to be kept in a

25  very specific temperature range. Generally 2 to 8 degrees

1    Centigrade, which is about 36 to 46 degrees Fahrenheit.  If

2    the drug goes out of that temperature range by very much or

3    for a prolonged period of time, it can change the product and

4    make it either less safe or less efficacious or both.

5    **Q.**   When does it need to be at that temperature?

6    **A.**   From the time it's manufacturing is complete.  In other

7    words, when the vial is filled with the drug product to the

8    time it gets to the end user, either the pharmacy that holds

9    it or sometimes clinicians' offices.

10   **Q.**   And if a cold-chain drug is not stored in that range you

11   just mentioned, what could happen to the actual product

12   itself?

13   **A.**   Well, the product itself can deteriorate sometimes

14   within very short periods of time, and putting it back into

15   refrigeration afterwards doesn't undo that damage.  So it's a

16   major concern for companies that make such products.

17   **Q.**   How can an end recipient who receives the drug ensure

18   that it was maintained at that temperature that you said that

19   it's required to be maintained at?

20   **A.**   One of the things that the companies have to do that

21   manufacture these products is assure us, the FDA, that they

22   have some method in place.  A very common method is to ship

23   the drug with a little computer chip inside that measures the

24   temperature every few minutes and records it.  And then, the

25   end users can take that chip, download it onto their computer

1    and make sure the product stayed within the required

2    temperature range.  That's a common method.  Any other method

3    that the companies have tested and have used to keep it

4    within that range or assure us that it does stay within that

5    range would be acceptable.

6    **Q.**    What are biologics?

7    **A.**    Biologics are products that require living organisms to

8    make them.  Typically a lot of drugs that we call small

9    molecule drugs they are made by a series of chemical

10   reactions you mix A with B and you get C.  Some molecules are

11   so difficult it's hard to do with a series of chemical

12   reactions.  Proteins are one such molecule, but cells within

13   the body, cells within other organisms, bacteria, make

14   proteins all the time and companies have learned to

15   genetically modify these cells to make a desired protein.

16   When this is the way the drug -- active ingredient is made

17   using living material it's called a biologic.

18   **Q.**    Are biologics required to be stored cold?

19   **A.**    Many of them are because they tend to be these large

20   proteins which are very temperature sensitive.

21   **Q.**    Going back to the chip you mentioned that is sometimes

22   shipped with drugs, was that required to be done in 2011 and

23   2012?

24   **A.**    For cold chain products?

25   **Q.**    Yes, sir.

**A.**    Yes.  Any time -- one of the requirements for getting

approval is that the company study the stability of the

product and they do have to look at things like temperature,

humidity and shaking.  That's how they determine how long it

will last on the shelf, and that's how they get assigned

their expiration date.  If there are issues identified early,

this has to stay cold, or it's not going to be good for more

than a week, they've got to make the necessary adjustments.

So whether it stores within that two to eight-degree

centigrade temperature range, or keep it out of light, or

keep it in a low-humidity environment that's all part of the

labeling.  People are aware of the product.  When the end

user gets the product they can verify that it's still good.

**Q.**    Is there a difference in the appeal process with regard

to the biologics versus other drugs?

**A.**    The requirements are very similar in terms of

demonstration and safety, efficacy, adequate labeling,

checking on the manufacturing, but some of the details

differ.

**Q.**    What is a drug shortage?

**A.**    Sometimes for one reason or another there is not enough

drug in the US supply chain to satisfy the need.

**Q.**    What happens?  What does the FDA do when there's a drug

shortage?

**A.**    It depends what the problem is.  Sometimes a

1    manufacturer can't get an active ingredient.  Sometimes they

2    have a malfunctioning piece of equipment that can change it.

3    If there is a product that's just a little bit out of the

4    specification, we'll evaluate and see, does that pose any

5    additional risk or substantial risk to the patients?  If not,

6    we mail out that product to continue to be marketed.  In a

7    worse-case scenario where there is none left, and it's what

8    we call "medically necessary" drugs, something that could be

9    life saving, we'll consider other methods to meet the need

10   and possibly even importation of drugs from other countries.

11   **Q.**    And if a drug is imported from other countries under

12   FDA's approval, what does the FDA look at before that

13   happens?

14   **A.**    We do make sure the facilities where the drug is

15   manufactured abroad would be up to our standards.  We do

16   consider it, analyzing the product itself to make sure there

17   is nothing special safety wise in it that would affect how it

18   would be used in the United States, if it would be -- to be

19   used as a substitute for the approved product.  And we also

20   go out of our way to make sure that the physicians and

21   patients know that there's a shortage, and this product is

22   being permitted in to substitute it.

23          And labelling for that product, if it was generated

24   abroad and English wasn't the language that was incorporated,

25   the labelling has to be in English.

1  Q.   How long does the FDA permit the importation of drugs

2  that are in shortage?

3  A.   Only until the manufacturers of the product are able to

4  resupply the market.

5  Q.   Are you familiar with what it means for a drug to be

6  unapproved?

7  A.   Yes.

8  Q.   Are you familiar with what it means for a drug to be

9  misbranded?

10  A.   Yes.

11  Q.   Are you familiar with what it means for a drug to be

12  counterfeit?

13  A.   Yes.

14  Q.   What does that mean?  What is a counterfeit drug?

15  A.   A counterfeit drug is something that claims that it's

16  something it's not, the way counterfeit money is.  It could

17  be a product that uses labelling from an approved product and

18  you try to mimic it and go to market with it.

19  Q.   What does it mean for a drug to be misbranded?

20  A.   There are a number of things that make a drug

21  misbranded, one of the more common things is that the

22  labelling is either false or misleading, or that it's

23  inappropriate labelling.

24  Q.   And what's the difference between a drug being

25  counterfeited and a drug being misbranded?

1   **A.**   All counterfeit drugs would be misbranded because their

2   labelling is false and misleading.  They are trying to say

3   they are something that they are not.

4          Other products could be misbranded even if they are

5   not counterfeit.  So a company that has an approved product,

6   if they change the label adding an indication without having

7   gone through the processes in place at the FDA, that would be

8   misbranded.  If they don't update their safety warnings and

9   things like that, that could be misbranded.  If a product is

10   brought in from another country and doesn't have labelling

11   that's been approved by the FDA, that would be misbranded.

12   **Q.**   What does it mean for a drug to be unapproved?

13   **A.**   To be unapproved it means the FDA has not evaluated for

14   its purity, quality, its safety and efficacy, and for the

15   appropriateness of its labelling.

16   **Q.**   Are you familiar with the misbranded drugs in your

17   current position?

18   **A.**   Yes.

19   **Q.**   And what -- in your current position what do you do as

20   it relates to misbranded drugs?

21   **A.**   In the United States we have what's called a close

22   system.  So the only drugs that are supposed to be marketed

23   in this country are those where the FDA can assure the public

24   that if you use these for their intended purposes, and you

25   use these the way it's described in the labelling, the

1    product should be safe and efficacious and the benefit you

2    give it should outweigh the risk.

3         If anything, other than those approved products,

4    which would be unapproved products, work their way into the

5    system, they can undermine all of that effort to assure

6    safety and efficacy.

7    **Q.**   For drugs that are not approved by the FDA, but purport

8    to have the same active ingredient as an approved FDA drug,

9    does that mean the drug is safe and effective to use?

10   **A.**   No, it's not.

11   **Q.**   Why not?

12   **A.**   It gets back to what we were talking about before,

13   different inactive ingredients can have different effects.

14   Manufacturing processes play an important role here from

15   everything from the container the is drug in, how it's

16   stored, how it's shipped.  We are very careful, even as I

17   talked before, about generic products that have the same

18   active ingredients and claim to be very similar to it.  There

19   are still steps they have to assure us at the FDA that they

20   are indeed close enough to the original product that they can

21   market it as generic.

22   **Q.**   Is it possible that an unapproved drug with the same

23   active ingredient as an approved drug could be the same after

24   it's manufactured?

25   **A.**   It's possible.

1  **Q.**  And if these two drugs could be the same, can the FDA

2  say that the unapproved drug is safe and effective?

3  **A.**  No, we can't.

4  **Q.**  And why not?

5  **A.**  The FDA -- it's actually not an uncommon thing.

6  Sometimes the company makes a product in one factory, some of

7  it's shipped abroad, some of it's shipped to the United

8  States.  For the product that's shipped to the United States,

9  they are required to meet all their obligations under that

10  new drug application.  So all those specifications, all those

11  assurances for how the product is going to be shipped, where

12  it's going to be stored, things like that, they have to be in

13  place.  For products that go elsewhere in the world, that's

14  not under FDA's purview.  So what happens to it, if it's made

15  the exact same way, but it's headed somewhere else, we have

16  no way of verifying whether it was within specification or

17  not, whether it was shipped appropriately or not, or stored

18  appropriately or not.  That could affect significantly,

19  safety and efficacy of the product.

20  **Q.**  Let's talk a little bit about the analysis you did in

21  this case.  Did you make determination about whether certain

22  products are qualified as drugs?

23  **A.**  Yes, I did.

24  **Q.**  How did you determine whether or not a product is

25  qualified as a drug?

**A.**    It's based on the intended use of the product, and it is

very specific definitions we use at Food and Drug

Administration.  So if a product is intended to diagnose,

treat, cure, mitigate disease in man, it's a drug.  If it's

something other than a food product and it affects the

structure or function of the body of man, it is a drug.

**Q.**    And how do you determine whether a drug qualifies as a

prescription drug?

**A.**    Again, there are some very specific definitions we use.

So before I mentioned adequate directions for use by a lay

person, and I also talked about the three areas that would

make it a prescription.  So something that requires what we

call collateral measures of use, something where medical

expertise would be needed to diagnose a condition, such as

cancer, pneumonia, high blood pressure, something where

outside testing would be needed, x-rays, blood work, things

like that help diagnose the disease, those are collateral

measures of use.  If they are required, it would be a

prescription drug.

        If the product had a lot of toxicity associated

with it such as elevated blood pressure, it could weaken the

immune system, whereas the physician would have to follow the

patient to make sure they are safe while using the product,

that would make it a prescription drug.

        Lastly, the methods of use.  If it's something that

1    requires special expertise, it has to be infused through a

2    vein, injected, or sometimes used with X-ray guidance to get

3    the product to the right point in the body, that would make

4    it a prescription drug.

5    Q.    And what does it mean for a drug to be a "new drug?"

6    A.    A drug is a new drug unless it's something that's

7    generally recognized by experts with training and knowledge

8    in the field to be safe and effective.

9    Q.    And how do you determine whether or not a product was a

10   new drug?

11   A.    For it to be generally recognized as safe and effective

12   there's basically three or four steps.  So first, adequate

13   and well controlled clinical trials have to be conducted with

14   that drug product, that specific product.  The findings of

15   those trials need to be published in the literature.  Experts

16   in the field need to evaluate all of that literature and

17   generally conclude that the product is indeed safe and

18   efficacious, and at the end of the day the FDA would take the

19   advice of those experts and weigh in on it ourselves, and if

20   we concurred with them, we would issue a public statement

21   saying this is indeed a generally recognized safe and

22   effective product.

23   Q.    How do you determine whether or not a product is an

24   approved or unapproved new drug?

25   A.    There are several databases that are available to look

1    at that.  A couple of them -- actually three of them are

2    available publicly, drugs@FDA is one of them.  There is

3    something called The Orange Book, which is all of the small

4    molecule drugs.  There is another thing called The Purple

5    Book, which deals with biologics.  Lastly, there is the

6    system at the FDA where we archive all of the information

7    that comes in related to any of the drug products that we've

8    ever approved or not approved, and that has a fancy name, but

9    we call it DARRTS for short, but it's Document Archiving

10   Reporting and Regulatory Tracking System.

11   **Q.**   How do those help you in evaluating whether a drug is an

12   approved or unapproved new drug?

13   **A.**   You look at individual drug products, or sponsors, or

14   if, you know -- the drug application number you can look

15   those up and see if the product has been approved or

16   currently approved in the United States.

17   **Q.**   You mentioned earlier you consider adequate and well

18   controlled studies for the -- as a generally recognized safe

19   and effective evaluation.  Do you consider studies that are

20   conducted outside the United States or just those inside the

21   United States?

22   **A.**   For purposes of generally recognized as safe and

23   effective, we would consider studies that were conducted

24   anywhere in the world, but they'd have to be published in the

25   literature in English because it would have to be American

1   experts that would weigh in as to whether it's generally

2   recognized as safe and effective.

3   **Q.**   If a drug is considered an unapproved new drug, what

4   does that mean regarding its safety and effectiveness?

5   **A.**   If it's an unapproved new drug, that means actually one

6   of two things.  Either the FDA has never weighed in on its

7   safety and efficacy because we were never given any data to

8   evaluate; or the other possibility would be that we were

9   asked to weigh in on it and we found that it wasn't safe and

10  efficacious and did not approve it.

11  **Q.**   In your analysis in this case how many -- in your

12  analysis in this case, did you evaluate a drug known as

13  Ribomustin?

14  **A.**   Yes, I did.

15  **Q.**   Did you evaluate a drug known as Eprex?

16  **A.**   Yes, I did.

17  **Q.**   Did you evaluate a drug known as Neulastim?

18  **A.**   Yes, I did.

19  **Q.**   Did you evaluate a drug known as MabThera?

20  **A.**   Yes, I did.

21  **Q.**   What evaluation for Eprex, MabThera and Neulastim did

22  you receive to do your evaluation?

23          MR. TRAGOS:  Your Honor, I object.  I believe we

24  are in an area that maybe we need to be cautious about.

25          THE COURT:  That's the legal basis, objection,

```
 1    caution?
 2            MR. TRAGOS:  Legal basis, your Honor, the Court has
 3    made a ruling on some particular items --
 4            THE COURT:  Approach the bench.
 5    (Sidebar conference held.)
 6            MR. SALTZMAN:  If I may, your Honor, I think I
 7    could address the issue.  I asked the question in that
 8    specific way because for three drugs he did not look at the
 9    label.  He only looked at the actual invoices, and so I was
10    purposefully -- I was not prepared for that beforehand.  So I
11    wanted to make sure he wasn't referred to labelling for any
12    of the drugs.  So I asked it in that way.
13            MR. TRAGOS:  I didn't know what his answer was
14    going to be.  I wanted to make sure he didn't review
15    labelling as well.
16            MR. SALTZMAN:  Your Honor, I don't know if you plan
17    on taking another break this afternoon, but based on what the
18    Court says, when we started this afternoon, after the last
19    break, um, it would be helpful if we were able to reach out
20    to the Meiko drop shipper to get in touch with him during the
21    break to be able to close that loop so that way I know how to
22    frame a question for him so I don't go into an area where we
23    shouldn't go.
24            THE COURT:  We'll take a break about 4:15.
25            MR. TRAGOS:  While we're up here, I just want to
```

1    raise about that -- the possibility of a mistrial, that the

2    Defense would move for a mistrial if you did that, and that

3    we were concerned about entering into that area, in essence,

4    we have been warned.

5              THE COURT:  Okay.  Proceed.

6    (Back before the court.)

7    BY MR. SALTZMAN:

8    **Q.**   I think the question was as part of your evaluation did

9    you review invoices for Eprex, Neulastim and MabThera?

10   **A.**   Yes, I did.

11   **Q.**   Did you also review invoices for Ribomustin?

12   **A.**   Yes, I did.

13   **Q.**   Um --

14             MR. SALTZMAN:  Your Honor, permission to approach

15   the witness.

16             THE COURT:  All right.

17   BY MR. SALTZMAN:

18   **Q.**   I've handed you what's been marked as Government

19   Exhibit 101A and 102.  Do you recognize these two exhibits?

20   **A.**   Yes, I do.

21   **Q.**   And what are Exhibits 101A and 102?

22   **A.**   They are both invoices that I looked at previously.

23   **Q.**   Could we publish to the Jury Exhibit 101A?  If we can go

24   to, I believe it's page 2, and if we can zoom in on the

25   bottom half.  Is this the -- one of the invoices you looked

1     at and the description of Ribomustin?

2     **A.**    Yes, it is.

3     **Q.**    And when you looked at this invoice, did you initially

4     make a determination as to whether Ribomustin, that is at

5     issue in this exhibit, was a drug?

6     **A.**    Um, I took into account two parts of this page.

7     **Q.**    Okay.  If we can zoom out, and maybe if we can just zoom

8     in on the -- below "QSP" and the bottom.  What did you look

9     at?

10    **A.**    The basis of my determination relied upon the fact that

11    the last line of the order where it says, "Quantity one

12    Ribomustin, known as Treanda in the US, suggested that

13    Ribomustin must be used in substitute or act in addition to

14    Treanda.  Treanda is a product that is approved and it's used

15    in oncology in the United States.

16          And I also relied on the fact that it was being

17    shipped to and billed to an oncology clinic here in Florida,

18    and based on that, my assumptions were for these analyses

19    that Ribomustin was being used as a substitute for Treanda

20    for use in oncology in patients.

21    **Q.**    Did you determine whether Ribomustin was a prescription

22    drug?

23    **A.**    My analyses were all then based on the use of Treanda in

24    the United States, and Treanda is a drug and a prescription

25    drug, so if Ribomustin was being used as a substitute for it,

1   it too would be a prescription drug.

2   **Q.**   And if we can publish Exhibit 102.  If we can zoom in on

3   the top half.  Do you have Exhibit 102 in front of you?

4   **A.**   Yes, I do.

5   **Q.**   Was that one of the exhibits that you used to evaluate

6   Ribomustin?

7   **A.**   Yes, it is.

8   **Q.**   And what did you rely on in this invoice in your

9   analysis?  What information in the invoice?

10  **A.**   The same as in the previous invoice, and the bottom line

11  on my screen where it says, "Ribomustin known as Treanda in

12  the US, determining 100 milligrams," and the fact, again,

13  that it was being ordered and shipped to an oncology

14  practice.

15  **Q.**   Did you make a determination as to whether Ribomustin

16  was a new drug?

17  **A.**   Yes, I did.

18  **Q.**   And did you make a determination as to whether

19  Ribomustin was an unapproved new drug?

20  **A.**   Yes, I did.

21  **Q.**   And what was your conclusion for both of those?

22  **A.**   That Ribomustin is a new drug, and that it's an

23  unapproved drug in the United States.

24  **Q.**   And how did you come to that conclusion?

25  **A.**   In the search of the literature that I conducted to

1    determine whether it was a product generally recognized as

2    safe and effective, it failed to identify studies that were

3    adequate and well controlled that could be used to make that

4    determination, therefore, it was a new drug.  And I was

5    unable to find Ribomustin listed in any of our data sets of

6    approved products.  I concluded it was an unapproved new

7    drug.

8    **Q.**   Was that your conclusion for both the drug that's

9    referenced in Exhibits 101A and 102 that we just looked at?

10   **A.**   Yes.

11   **Q.**   Could a drug named Ribomustin have adequate directions

12   for use?

13   **A.**   It could not have adequate directions for use for a lay

14   person to be sure, and the only way to have any kind of

15   labelling that would allow it to be exempt from that adequate

16   directions-for-use criteria would be if it had an approved

17   "new drug" application or biologic licensing application in

18   the United States, and it had neither of those, so it does

19   not have adequate directions for use.

20   **Q.**   If a drug purports -- a drug is identified as Ribomustin

21   known as Treanda in the United States, does that make

22   Ribomustin safe and effective?

23   **A.**   No, it does not.

24   **Q.**   In your database searches did you find information

25   indicating that the manufacturer for Ribomustin sought FDA

1    approval for a "new drug" application?

2    **A.**    May I refer to my notes?

3    **Q.**    Please.   Just tell us, would that help refresh your

4    memory?

5    **A.**    Yes.

6    **Q.**    Please just tell us what you're looking at, and after

7    you look at it, please close your binder and then look up.

8    **A.**    I prepared documents indicating my searches, and what I

9    found in the searches, both in the literature to determine

10   whether a product might be generally recognized as safe and

11   efficacious, and also my searches of the database through the

12   FDA, and I just wanted to verify something for the search of

13   databases, in my search of the databases, there's a number of

14   things you can look for, depending on which database you are

15   using.  So you can look for the tradename, and for this

16   product I did look for Ribomustin and found nothing.  You can

17   also look under the name of the active ingredient to see if

18   you find a product that has the active ingredient that's

19   called Ribomustin.   I did search that and found nothing.

20            The last part was you can search for the

21   manufacturer that marketed the product, anyone that has a

22   name associated with it.  In this case I just wanted to

23   verify the only name I had associated with this product was

24   the QSP that's shown at the top of that document, Quality

25   Specialty Products, and Quality Specialty Products has not

1    sought approval for any product in the United States.

2  **Q.**    What is a "new drug" application?

3  **A.**    The "new drug" application is the means by which a

4  company can get a product approved for marketing into the

5  United States.  That's the mechanism that they use to

6  demonstrate to us, FDA, that it's safe and effective,

7  convince us that they are able to make it to the highest

8  quality standards, and for us to work with them to come up

9  with labelling that's appropriate for that particular

10 product.

11 **Q.**    And is that -- there's a database that stores all the

12 new drug applications at the FDA?

13 **A.**    Yes.

14 **Q.**    Is that where you looked to determine whether or not

15 there was a new drug application for Ribomustin?

16 **A.**    I searched all of them for that.

17 **Q.**    And are there other types of applications that a

18 manufacturer could submit to get approval for a drug?

19 **A.**    As I mentioned before, there's a "new drug" application.

20 There is one that's used for generic products called an

21 abbreviated new drug application.  There is also a biologics

22 license application, and then, the equivalent of generics for

23 those biologic products, which is called biosimilars, and I

24 searched for all of the above and found nothing for

25 Ribomustin.

1    **Q.**    And when you say you searched for all of the above, do

2    you mean you searched for all of those types of applications?

3    **A.**    Yes, for all types of application.

4    **Q.**    And your finding was what?

5    **A.**    Ribomustin was never approved by the FDA.

6    **Q.**    Did you run any searches to see if the drug was approved

7    by a German equivalent of the FDA?

8    **A.**    No, I did not.

9    **Q.**    Why not?

10   **A.**    The only products that are allowed in the market in the

11   United States are those which have been approved by the FDA

12   or one of alternative mechanisms such as we talked about

13   before, over-the-counter products.  This being a prescription

14   product it would require an application to have been approved

15   and there was no approved application.  What happens in

16   Germany is for the German's to worry about.  What happens in

17   FDA -- in the United States, rather, is for the FDA to worry

18   about.

19   **Q.**    If Germany -- if the German equivalent of the FDA had

20   approved Ribomustin, would that now change your opinion as to

21   whether or not the FDA should allow it in the United States?

22   **A.**    Our standards are developed for use in our country.  Um,

23   the standards that are used to approve products in Europe,

24   Japan, Canada are different.  They look for different things

25   and I'm not sure of their specifics.  I'm only sure of our

1    specifics.  We do have a reputation for being the gold

2    standard in the world in terms of making sure unsafe products

3    don't make it to market.  We have a reputation for being the

4    most rigorous too, in terms of quality and making sure that

5    we are vigilant with it.  So the fact that it's approved in

6    Germany is nice, but if they wanted to market in the United

7    States, they would still have to go through the processes

8    involved in the FDA.

9    **Q.**   Does the fact that the invoice says that Ribomustin is

10   known as a drug in the United States, does that make the drug

11   FDA approved?

12   **A.**   No, it does not.

13   **Q.**   And why not?

14   **A.**   It would actually have to have an approved application

15   for it.  It's just suggested to me that it was to be used as

16   a substitute.

17   **Q.**   Um, I handed you previously what has been marked as

18   Government Exhibit 113 and 116, and if I could ask you also

19   to keep 101A and 102 in front of you, and since 102 is on the

20   screen, perhaps we could go to, I believe, the bottom

21   section.  Do you see on the top line there something that's

22   referred to as MabThera?

23   **A.**   I do.

24   **Q.**   Did you conduct research of a product named MabThera?

25   **A.**   I did.

1   **Q.**   Are the exhibits that I just mentioned Exhibits 101A,

2   102, 113 and 116, are those the invoices that you used to

3   conduct your review of MabThera?

4   **A.**   To be clear, it's 113 and 116?

5   **Q.**   Yes.  101A, 102, 113 and 116.

6   **A.**   Yes, they are.

7   **Q.**   Do each of these reference MabThera, in the same way as

8   what is displayed on the screen at 102, known as Rituxan in

9   the United States?

10  **A.**   Yes, they do.

11  **Q.**   And did you initially determine whether or not the

12  MabThera that is referenced in these exhibits was a drug?

13  **A.**   I did.

14  **Q.**   And I've asked you a moment -- how you came to that

15  conclusion, but what did you conclude?  Was it a drug?

16  **A.**   I concluded that it was a drug.

17  **Q.**   Did you determine whether or not MabThera was a

18  prescription drug?

19  **A.**   I did.

20  **Q.**   And what was your conclusion there?

21  **A.**   That it was a prescription drug.

22  **Q.**   And how did you come to the conclusion that it was a

23  drug and a prescription drug?

24  **A.**   Using the same as before that it's -- it is suggested

25  that MabThera known as Rituxan in the United States it was

1   being used as a replacement for Rituxan, which is commonly

2   used in oncology patients, and that it was ordered by and

3   shipped to the oncology practice here in Florida.

4   **Q.**   If we could just publish Exhibit 101A.  If we can go to

5   page 3.  Is this, what you are referencing 101A, that says,

6   "MabThera, known as Rituxan in the United States?"

7   **A.**   Yes, it does.

8   **Q.**   If we can look at Exhibit 113, and if we can go to page

9   2.  If we can zoom in on the top, and this is another invoice

10   from QSP that you looked at?

11   **A.**   Yes, it is.

12   **Q.**   And is the date on the document February 17, 2012, the

13   order date?

14   **A.**   Yes, it is.

15   **Q.**   Was this going to be shipped to Dr. D. Anda Norbergs,

16   East Lake Oncology?

17   **A.**   Yes, it is.

18   **Q.**   Was that part of the information you used to make a

19   determination as to whether or not MabThera was a

20   prescription drug?

21   **A.**   Yes.

22   **Q.**   And if we could look at -- zoom out and go to the

23   product description, and are there two references at the

24   bottom to MabThera, known as Rituxan in the United States,

25   there?

1    **A.**    Yes.

2    **Q.**    And is that what you looked at to come to your

3    conclusions about the MabThera at issue in Exhibit 113?

4    **A.**    Yes.  That was my basis for relying on the Rituxan

5    labelling approved at that time for determining whether this

6    -- if it's used as a substitute, would be a drug and a

7    prescription drug.

8    **Q.**    And if we could look at Exhibit 116 to do that same

9    analysis.  If we can zoom in on the top.  Does this have an

10   order date of February 26, 2012?

11   **A.**    Yes, it does.

12   **Q.**    Is this also going to East Lake Oncology, this invoice?

13   **A.**    Yes, it is.

14   **Q.**    If we could zoom out and look at the product

15   description.  Is this exhibit at the bottom line do you see,

16   "MabThera, known as Rituxan in the United States?"

17   **A.**    Yes, I do.

18   **Q.**    Is this what you relied on to make a decision as to

19   whether or not MabThera, known as Rituxan in the United

20   States, was a prescription drug?

21   **A.**    Yes, it is.  That and the MabThera ordered higher up in

22   that list.

23   **Q.**    Oh, as well as on the second line?

24   **A.**    Yes.

25   **Q.**    And did you make a determination as to whether MabThera

1   was a new drug?

2   **A.**   I did.

3   **Q.**   And did you make a determination as to whether MabThera

4   was an unapproved new drug?

5   **A.**   I did.

6   **Q.**   And what was your conclusion?

7   **A.**   That it was both a new drug and an unapproved new drug.

8   **Q.**   And how did you come to that conclusion?

9   **A.**   Based on my search of the literature, um, to look for

10   adequate and well controlled studies that would permit it to

11   be considered by experts as a generally recognized safe and

12   effective drug, and I found no adequate and well controlled

13   studies that would permit that.  And then, my search of the

14   FDA database of approved product and not finding any MabThera

15   in there.

16   **Q.**   When you say, "Your search of the database of approved

17   products," was that for the new drug application and other

18   applications you mentioned earlier?

19   **A.**   For all of the applications.  New drug application,

20   biologic licensing -- or license application, biosimilars and

21   abbreviated "new drug" application.

22          THE COURT:  When you reach a convenient stopping

23   place we'll take another break.

24          MR. SALTZMAN:  I could be another five minutes,

25   your Honor.

```
 1              THE COURT:  All right.
 2   BY MR. SALTZMAN:
 3   Q.   Could a drug --
 4              MR. SALTZMAN:  Your Honor, actually, I think we'll
 5   take our break now, if that's okay.
 6              THE COURT:  All right.  We'll take a 15-minute
 7   break.  I'm tired, so I assume you're tired.  When we come
 8   back, my intention is to go for another hour or less and then
 9   we'll conclude for the day.  All right.  Let's take our
10   break.
11              CSO OFFICER:  All rise.
12              (Afternoon recess taken at 4:16 p.m.)
13              (Court in session at 4:30 p.m.)
14              MR. SALTZMAN:  Judge, if I can, this relates to the
15   issue before where we approached at sidebar, or I can address
16   the issue from here --
17              THE COURT:  Do it now.
18              MR. SALTZMAN:  From here?
19              THE COURT:  Yes.
20              MR. SALTZMAN:  Um, we have conferred with the drop
21   shipper for the drug Ribomustin, which is one of the
22   labelling that we are dealing with.  What they have told us
23   that, I expect the testimony will be, and obviously I'm
24   consulting with the Court on this because I don't want to do
25   anything that could potentially prompt a mistrial as the
```

1    Judge had indicated, but what we have found out is that the

2    testimony we could expect is that the actual drugs that came

3    into be Meiko, the drop shipper, actually came in a box that

4    had the boxes of drugs.  Those drugs were never tampered

5    with, never done anything with, never opened and that's what

6    was then shipped out to individual doctors.

7         What we are asking Dr. Simone to look at when he

8    evaluates these drugs to make a determination as to whether

9    or not these drugs are misbranded or -- unapproved, I should

10   say, we're asking him to look at the drugs that came from the

11   actual manufacturer, as the Court knows.  That determination

12   and evaluation is not an issue of whether or not those drugs

13   necessarily were shipped to Dr. Norbergs.  It's the issue as

14   to whether or not that labelling that was in a foreign

15   country was approved or unapproved.  It has -- whether or not

16   -- there is one of two choices as to the labelling in the

17   product that Dr. Norbergs received.  Either she received the

18   actual drugs that were -- that came from these foreign -- the

19   manufacturers of the drugs before a foreign country, or she

20   received something else that was not approved at all.

21   Because the testimony that we have heard is that Quality

22   Specialty Products and Cancer Drugs Online are not permitted

23   to distribute drugs in the State of Florida.  So there is no

24   FDA-approved drug that could have been provided to

25   Dr. Norbergs because the actual distributor of the drug, as

1   we heard from Mary Mayleben --

2           THE COURT:  This could go on forever.  What are you

3   asking?

4           MR. SALTZMAN:  Right.  Based on, I guess -- right.

5   What I'm asking, if we can have him look at the, um,

6   labelling that came from the manufacturing, which would

7   require obviously that the labelling be admitted into

8   evidence, to then make his determination as to whether or not

9   the drugs are unapproved or approved so that way we can then

10  make an argument as to what the -- how the drugs that

11  Dr. Norbergs received were not the approved drugs by the FDA.

12          THE COURT:  And what is it you don't understand

13  about my ruling so far?

14          MR. SALTZMAN:  Your Honor, I think we were thinking

15  about it from a different perspective and that was the

16  perspective I was trying to articulate as to where the

17  shipping is not necessarily something that -- it needs to be

18  connected for purposes of his analysis.  Because what he is

19  analyzing is foreign labelling of the drugs, and then it's an

20  argument as to whether or not these are the drugs that Dr.

21  Norbergs received.

22          THE COURT:  But what you're trying to show is what

23  the labelling was when she received the drugs, right?

24          MR. SALTZMAN:  Yeah.  And the labelling that is

25  from the only manufacturer of those drugs.  There is no other

```
1    manufacturer of those drugs.  They are the manufacturer that

2    we sought the labelling from.

3             THE COURT:  And you want me to assume, and you want

4    this Jury to assume that all drop shippers never change

5    labelling, never change the package, it just -- whatever they

6    receive they in turn ship out.  That's what I'm telling you

7    I'm not letting you do.  If you put a drop shipper on the

8    stand and testify that --

9             MR. SALTZMAN:  At its origin the drug is wrong, so

10   therefore, wherever it goes it is not going to be --

11            THE COURT:  Yes, but you are confusing apples and

12   oranges.  He can testify, if he wants to, about what you just

13   said, that just because it comes from somewhere else and was

14   not FDA approved, by definitions it is unapproved drugs.

15   That has nothing to do with labelling.  But you want to put

16   on top of that what the labelling was, as received by

17   Dr. Norbergs, and I'm telling you I'm not going to let that

18   happen.  You put a drop shipper on there and whatever they

19   shipped to Dr. Norbergs, they can tell the Jury what the

20   package looked like, what the label looked like, and then

21   this expert witness can testify to his heart's content about

22   those labels.  I don't understand what's so confusing about

23   this?

24            MR. TREZEVANT:  Your Honor, can I be heard briefly?

25            THE COURT:  All right.
```

```
 1          MR. TREZEVANT:  I'll be very quick.  What we are

 2   suggesting or -- what we are arguing, Judge, is, absent the

 3   shipping, absent what any shipper did, forget all of that, we

 4   are suggesting that if at the actual manufacturer who

 5   manufactured the drug, this expert has looked at that label

 6   at the manufacturer level before it ever left the gate to go

 7   anywhere and he can say, I believe, that based on that it was

 8   mislabeled, to the point that all it could do after that

 9   would maybe be somehow properly labeled by some repacker down

10   the road, but as far as the actual manufacturer, we're trying

11   to get in evidence from this witness that the actual

12   manufacturer, no shipper involved, the label itself, by that

13   very manufacturer, that was misbranded -- yeah, misbranded at

14   the source, not in the chain.  It was misbranded originally.

15          THE COURT:  This witness would have to testify that

16   he does not know that she saw those labels or that she was

17   miss -- she or anyone else was mislead by the labels.

18          MR. TREZEVANT:  This witness --

19          THE COURT:  The two choices would be:  You don't

20   know that she received the labels.  She received the packages

21   either with the same labels, or with no labels, or with a

22   proper label affixed by the drop shipper.  You don't know

23   which of those three occurred, right?

24          MR. TREZEVANT:  That somebody may have tampered

25   with it and fixed the label in the process?
```

1          THE COURT:  May have removed the labels, may have

2    changed the boxing, may have substituted the boxing received

3    from the manufacturer and the labelling with proper boxes and

4    labels.  You don't know that.  You're not prepared to prove

5    that.

6          MR. TREZEVANT:  No, sir, we are not.  But we are

7    prepared to prove that it was at its source it started

8    mislabeled.

9          THE COURT:  If you want to prove that, without --

10   and acknowledge that you don't know how she received it, I

11   think you're entitled to do that.

12         MR. TRAGOS:  Your Honor, how would it be relevant

13   if they cannot say that that was the condition she received

14   it in?  There would be no relevance.  It just allows them to

15   argue to the Jury to speculate that she received it in that

16   condition.  And it would be -- it just -- how do I

17   cross-examine him when they are going to be putting on that

18   this is the label, and it's the wrong label, can you prove it

19   yet?  No.  But the Jury is going to have that label.  He's

20   going to base an expert opinion on that label, and there is

21   no connection between that label and my client.  He is

22   already able to say, "MabThera, unapproved drug."  He's able

23   to say that.  But this label is a piece of physical evidence

24   that's going to come in and they are going to argue to the

25   Jury, "Jury, you can speculate that this label is the one she

1    got in."

2            And I also challenge the statement about this box.

3    Because the testimony is what I've seen is Meiko did not

4    receive MabThera or whatever, directly from the manufacturer.

5    That it went directly through some place in the UK.  Because

6    the testimony is all drugs that were received by Dr. Norbergs

7    came through the United Kingdom.  So there's a person in

8    between Meiko and the manufacturer, plus he's going to have

9    to testify that this is the manufacturer for this drug that

10   he got, and he can't do that, and they can't connect it up.

11   They can't do it.

12           THE COURT:  I'm going to let them testify about the

13   labels as it left the manufacturer, and they have to

14   acknowledge that they don't know that the labels were there

15   when Dr. Norbergs received it, or they don't know that it had

16   been corrected in some manner.

17           MR. TRAGOS:  Your Honor, I just don't know how --

18   if you're allowed to speculate, the Jury like that, are we

19   going to stipulate that, of course telling them they have to

20   stipulate to that, in order to ask this question?  I'm

21   uncomfortable him sitting here arguing this.  I don't know

22   what his testimony is going to be when I cross-examine him

23   about that label, if we are allowed to put a label in, and

24   there is no evidence that that label ever got to my client.

25   It's like any other piece of evidence that comes in and there

1    is no evidence that it ever was -- they are basing their

2    opinion on it that it ever got to my client, that my client

3    ever saw it.

4              THE COURT:  Okay.  Are you ready to proceed?

5              MR. SALTZMAN:  Yes, your Honor.  And we'll start by

6    moving for the admission of the labelling.

7              THE COURT:  Now, you're still calling the witness

8    from Meiko to testify what boxes they shipped out and what

9    the labels are like when they ship them out?

10             MR. SALTZMAN:  Yes, based on the information I just

11   told you, although that will only be for the Ribomustin,

12   which was only one of the drugs.  It will not be fore Zometa.

13   They were not the shipper for Zometa, but the same theory

14   would apply, that it is correct that we will not say that

15   this was the labelling -- we'll have to acknowledge we can't

16   say this is the labelling that Dr. Norbergs received.

17             MR. TRAGOS:  Are we just going to do the Meiko one

18   or are you going to allow them to do all of them?

19             THE COURT:  I'm going to allow them to do all of

20   them insofar as what the labelling was like when it left the

21   manufacturer.  All right.  Bring in the Jury.

22             (Jury enters courtroom at 4:42 p.m.)

23             CSO OFFICER:  Please be seated.

24             THE COURT:  You may proceed.

25             MR. SALTZMAN:  Your Honor, at this time, the

1   Government would move for the admission of Exhibit 101B, and

2   103B, based on prior discussions.

3           MR. TRAGOS:  Your Honor, I would object that the

4   Declarations of Authentication as to -- these need to be

5   introduced first.  Again, we're not objecting to that, but I

6   do want the declarations entered into evidence.

7           THE COURT:  All right.

8           MR. TRAGOS:  On these particular documents.

9           MR. SALTZMAN:  Your Honor, my understanding --

10          MR. TRAGOS:  We're not objecting to the

11  authenticity of it, but the Declarations --

12          MR. SALTZMAN:  Your Honor, could we approach?  I

13  want to make sure we're clear on this.

14          THE COURT:  You told me you had a Declaration from

15  the manufacturers?

16          MR. SALTZMAN:  We do, your Honor.

17          THE COURT:  He says put them into evidence.  Is

18  that hard to understand?

19          MR. SALTZMAN:  No.  That's fine.

20          THE COURT:  We can do it later.  Give it a number

21  later.  Put it in evidence later.  Please ask your next

22  question.

23          MR. SALTZMAN:  Thank you, your Honor.  We also move

24  for the admission of Exhibits 103C, and 101C as translations

25  of 101B and 103B, as agreed to between the parties.

1          THE COURT:  They will be admitted.

2          MR. SALTZMAN:  At this point, permission to

3   approach the witness with Exhibits 101B, 101C, 103C, 103B,

4   103A, 104A, 105A, and 106.

5          MR. TRAGOS:  Can we do these one drug at a time?

6          THE COURT:  Those exhibits will be admitted.

7   (Government's Exhibit Nos. 101C, 103C, 101B, 103B, 103A,

8   104A, 105A, 106 admitted into evidence.)

9   BY MR. SALTZMAN:

10  **Q.**   Could a drug -- referring back to Exhibit 116, going to

11  page 2, could a drug -- zooming in on the bottom portion,

12  sorry, above that middle portion.  That's fine.  Could a drug

13  named MabThera, known as Rituxan in the United States, be

14  approved for use?

15  **A.**   My search for MabThera did not identify an approved

16  application.  So it would not have adequate directions for

17  use or appropriate labelling that was approved by the FDA to

18  substitute for it.

19  **Q.**   Did you know what country or market the MabThera that

20  you were looking at was meant for?

21  **A.**   No, I don't.  Not off the top of my head.

22  **Q.**   And did you have any labelling when you made a

23  determination as to whether MabThera was an unapproved drug?

24  **A.**   Can I check?

25  **Q.**   If that will refresh your memory.

1    **A.**    Yes.  I did not have a label for it.

2    **Q.**    How did you come to the conclusion that if you didn't

3    have labelling for the drug that it didn't have labelling

4    itself, did not have adequate directions for use?

5    **A.**    If it was intended as a substitute for Rituxan, and

6    Rituxan is a drug -- prescription drug, and a new drug, and I

7    was unable to identify literature that would support a

8    finding that MabThera is generally recognized as safe and

9    effective, and it too is a new drug, since it has not been

10   approved by FDA, it does not have labelling that would

11   substitute for adequate directions for use by a lay person.

12   **Q.**    And do you know if the FDA-approved product Rituxan --

13   well, yeah, is a cold chain store drug?

14   **A.**    It is.

15   **Q.**    And did you run searches to see if MabThera was approved

16   by any other country equivalent to the FDA?

17   **A.**    No, I did not.

18   **Q.**    And why not?

19   **A.**    Again, because my concern, and that of the FDA, are the

20   products that are brought to market in the United States, not

21   abroad.

22   **Q.**    And if an invoice says that a drug is known as a drug in

23   the United States, does it make it FDA approved?

24          THE COURT:  Asked and answered.

25   BY MR. SALTZMAN:

1    **Q.**   If I could request -- ask you to look at Exhibit 101B

2    and if I could display it on the screen, on the left side,

3    101A.

4              MR. TRAGOS:  B is not in evidence, your Honor,

5    could we have a sidebar for a moment?

6              THE COURT:  Approach the bench.

7              (Sidebar conference held.)

8              MR. TRAGOS:  101, is all I'm going to say, simply,

9    the authentication of the records pursuant to their

10   authentication they have sent us, but this is -- 101 is

11   September 9, 2011 Order.  The Certificate of Authentication

12   is -- the way it was labeled between September 22, 2011 and

13   December 7, 2011, it is after the date of the order that's

14   connected that they are trying to connect it with.

15             THE COURT:  Response.

16             MR. SALTZMAN:  Um, it's in the indictment as

17   received on that day.  Well, the labelling would still apply

18   for the drug that was received on December 7, 2011.  So at

19   least for that order the labelling would still apply to that

20   one.

21             THE COURT:  All right.

22             MR. TRAGOS:  Okay.  101 is September 8th, before.

23             THE COURT:  Was that the shipping order or --

24             MR. TRAGOS:  This is the delivery.  This is the

25   invoice of September 8th.  The labelling that they have isn't

1    effective until September 22nd, 2011.

2              THE COURT:  Okay.

3              MR. TRAGOS:  We would object.

4              THE COURT:  I'll sustain that, but they are going

5    to put in, the other one?

6              MR. SALTZMAN:  Yes.

7              (Back before the Jury.)

8    BY MR. SALTZMAN:

9    **Q.**   Um, did you review -- sorry.  If we can display

10   Exhibit 102 on the left side, Exhibit 101B on the right side.

11   On the left side in Exhibit 102.  In the center do you see

12   Ribomustin listed there?

13   **A.**   Yes, I do.

14   **Q.**   Is Exhibit 101B the labelling you reviewed for

15   Ribomustin?

16   **A.**   Yes, it is.

17             MR. TRAGOS:  Your Honor, same objection, this is

18   Elasta -- Elastelis (sic)?

19             MR. SALTZMAN:  No, this is Ribomustin.

20             MR. TRAGOS:  What's the company?

21             MR. SALTZMAN:  (Inaudible)

22             MR. TRAGOS:  Your Honor, this is also outside the

23   dates.

24             THE COURT:  Approach the bench.

25             (Sidebar conference held.)

 1          THE COURT:  What's the date of the delivery

 2    invoice?

 3          MR. TRAGOS:  December 8th.

 4          MR. SALTZMAN:  I think that's just a bad copy.

 5    It's December 6th.

 6          MR. TRAGOS:  The copy I have, I thought it said --

 7          THE COURT:  I thought the Declaration went through

 8    December 22nd.

 9          MR. TRAGOS:  No, December 7th.

10          MR. SALTZMAN:  December 7th.  If you look on the

11    shipment date invoice we are looking at it says December 6th

12    also, but the shipment date says December 6th.  It's just a

13    bad copy.  It's a fax.

14          MR. TRAGOS:  That's not eight?

15          MR. SALTZMAN:  No.

16          MR. TRAGOS:  Okay.

17          MR. SALTZMAN:  Based on the order form and

18    otherwise.

19          MR. TRAGOS:  Okay.

20          (Back before the Jury.)

21    BY MR. SALTZMAN:

22    Q.   If you can display Exhibit 101B on the left, sorry, and

23    Exhibit 101C on the other side.  101B and 101C together.

24    When looking at the Ribomustin at issue in Exhibit 102 that

25    you just testified about, did you consult the labelling as

1   shown on here Exhibits 101B and 101C?

2   **A.**   Yes, I did.

3   **Q.**   And reviewing this information, did that help you in

4   reaching your conclusion as to whether or not Ribomustin was

5   a prescription drug?

6   **A.**   Yes, it did.

7   **Q.**   And which labelling, between the two that are displayed

8   here, help -- helped you reached that conclusion?

9   **A.**   I can't see the one on the left that well, but I relied

10  on an English translation.

11  **Q.**   If we can zoom in on 101C, for the bottom half of the

12  document.  Is that the translation that you relied on?

13  **A.**   In part, yes.

14  **Q.**   Did you also rely on, um, other pages that are in

15  Exhibit 101C in front of you?  And if we can display 101C on

16  its own, and if we could flip to the next page.  Was this

17  something else you relied on?

18  **A.**   Yes, it is.

19  **Q.**   And is that describing Ribomustin as a 100 milligram

20  dosage?

21  **A.**   Yes, it does.

22  **Q.**   And if we could skip another two pages.  If we can go to

23  page 7 of the document.  If we could zoom in on the upper

24  left.  Did you also rely on this aspect of the labelling?

25  **A.**   Yes, I did.

**Q.**   How would you describe this aspect of the labelling?

**A.**   Broadly speaking, this whole page looks like what would be the equivalent of what we call a package insert in the United States.

**Q.**   And what information in the package insert did you rely on to make a determination as to whether or not Ribomustin is a new drug?

**A.**   I only used labelling to determine whether it qualified as a drug or a prescription drug.  The new drug determination was based on a search of the literature for adequate and well controlled studies of Ribomustin.

**Q.**   Okay.  So let me ask the question differently then. What did you rely on in the insert that's displayed on the screen to make a determination that Ribomustin was a prescription drug?

**A.**   I looked for the intended uses and safety information that was incorporated into this, as well as methods of administration.

**Q.**   And if we can display 101B, and if we can just zoom in on the middle.  Did you review Exhibit 101B as part of your analysis?

**A.**   Yes, I did.

**Q.**   Did you find any English on the box for -- that's depicted here for this -- did you find any English on -- in Exhibit 101B?

1    **A.**    No, I did not.

2    **Q.**    And if you could go to page 7, and zoom in on the top

3    portion, did you review this when you looked at the

4    Ribomustin?

5    **A.**    I did.

6    **Q.**    And did you see any English on this part of the

7    labelling?

8    **A.**    I did not.

9    **Q.**    Before today did you have an opportunity to review

10   Exhibit 101B closely?

11   **A.**    The German labelling?  Yes, I did.

12   **Q.**    Did you find any symbol on there that said Rx only?

13   **A.**    No, I did not.

14   **Q.**    Did you make a determination as to whether or not

15   Ribomustin was a new drug --

16   **A.**    I did.

17   **Q.**    -- that's at issue in this labelling here, that's

18   displayed on the screen?

19   **A.**    I did a crude translation of the labelling, but that

20   would be separate from the new drug.  The crude translation

21   provided me with enough information to determine that it was

22   a drug and it would qualify as a prescription drug.

23   **Q.**    And based on your review of the translation at

24   Exhibit 101C, did you make a determination as to whether that

25   Ribomustin was a new drug?

**A.**   Again, that was to determine whether it's a drug and

prescription drug, and it was the literature search for the

new drug determination.

**Q.**   And?

**A.**   And I did find it to be a drug, and a prescription drug,

and to be a new drug.

**Q.**   And did you find it also to be an unapproved new drug?

**A.**   That is correct.

**Q.**   And was that based on the same type of searches that you

ran earlier that you describe for Ribomustin, known as

Treanda in the United States?

**A.**   Yes.

**Q.**   Did you conduct a review of a substance named Zometa?

**A.**   Yes, I did.

**Q.**   You have in front of you Exhibits 103A, 103B, 103C, 104,

105A and 106.

**A.**   103A, 104, 105A, and 106, 103B and C as well.  Yes, I've

got those.

**Q.**   Are these exhibits that you've looked at to review a

substance named Zometa?

**A.**   Yes, they are.

**Q.**   If we could display Exhibit 103A, and if we could zoom

in on the top portion.  Do you see on this document the order

date of December 21, 2011?

**A.**   I do.

Q.   Does it say at the top also "Cancer Drugs Online" in red
handwriting?

A.   Yes, it does.

Q.   And would you go to the middle portion.  Do you see a
reference to Zometa in the item description?

A.   I do.

Q.   And if we go to page 7.  If we can zoom in on the middle
of the document.  Do you see a reference to country of
manufacturer as Turkey?

A.   I do.

Q.   And if we can look at Exhibit 104, and zoom in at the
top.  Do you see a date on the document of March 29, 2012?

A.   I do.

Q.   Was this a document that you looked at to conduct your
review?

A.   Yes, it is.

Q.   And if we can look at the item description in the
middle.  Is the item description, name, and product, origin
say, "Zometa, vial 4 milligrams, 5 milligrams Zoledronic
Acid, Turkey," underneath?

A.   Yes.

Q.   If we can look at Exhibit 105A, and if we can zoom in at
the top.  Is this an order date of May 17, 2012?

A.   It is.

Q.   And if we could zoom in on the middle, under name and

1  product of origin, is it Zometa, Turkey?

2  **A.**   Yes, it is.

3  **Q.**   And lastly, Exhibit 106, zoom in at the top.  Is the

4  order date on here listed as June 14, 2012?

5  **A.**   It is.

6  **Q.**   And in the item description does it also say Zometa and

7  Turkey?

8  **A.**   It does.

9  **Q.**   Did you initially determine whether Zometa at issue in

10  this case was a drug?

11  **A.**   I did.

12  **Q.**   Um, we'll go into how you reached that conclusion in a

13  moment, but did you -- what did you determine?

14  **A.**   That it was a drug and that it was a prescription drug.

15  **Q.**   Okay.  And let's display Exhibit 103C.

16         MR. TRAGOS:  One moment, your Honor.

17  BY MR. SALTZMAN:

18  **Q.**   If we could rotate the document and then also zoom in on

19  where it says "Zometa."

20         MR. TRAGOS:  Your Honor, may we have a sidebar for

21  an objection.

22         THE COURT:  Approach the bench.

23         (Sidebar conference held.)

24         MR. TRAGOS:  Your Honor, although the documents are

25  authentic, the certification does not state that these were

1     the documents that were in place at the time of the offense

2     that we're talking about here during the scope of this

3     indictment.  It just says the documents they received are

4     authentic and true documents.

5              THE COURT:  I didn't understand what you said.

6              MR. TRAGOS:  Okay.  It's getting late.  There's an

7     authentication that what they have is a business record,

8     which I'm not disputing.  However, this does not state that

9     those documents were the documents in effect during the

10    course -- at the time period of the criminal activity that

11    the Government is talking about.  In other words, that those

12    labels or the labels on the bottles that correspond to the

13    dates that the Defendant allegedly received them, it does not

14    say that.

15             THE COURT:  Response.

16             MR. SALTZMAN:  Your Honor, the Agent testified that

17    he, and I displayed the beginning dates for the Zometa order

18    and the end dates for the Zometa order, and he testified that

19    the request for the Zometa labelling that was in existence

20    between those two dates, and that is what he then testified

21    that he received.

22             THE COURT:  Who prepared the Declaration?

23             MR. SALTZMAN:  I believe it was prepared by the

24    company.

25             THE COURT:  You think the company made the

1   Declaration of what they were submitting to you?

2         MR. SALTZMAN:  I mean -- I provided them with a

3   form and they then filled it out.

4         THE COURT:  Did it occur to you to put in the dates

5   that corresponded with this case?

6         MR. SALTZMAN:  Your Honor, I did provide to the

7   Defense the email that had the request that included the

8   dates that were asked for.

9         THE COURT:  Well, it does say that these labels

10  were made at or near the time of the occurrence of the

11  matters set forth therein.

12        MR. SALTZMAN:  Yes.  Your Honor, that's what I was

13  about to look at.  On the labelling itself it has proof

14  dates -- proof dates saying the dates in which they went

15  into -- essentially, went into effect.

16        THE COURT:  All right.  The objection is overruled.

17        (Back before the Jury.)

18  BY MR. SALTZMAN:

19  **Q.**   If we could just zoom in on the bottom part where it

20  says, "Zometa."  Was this what -- this is Exhibit 103C, is

21  this what you looked at to make your determination as to

22  whether Zometa was a drug?

23  **A.**   In part, yes.

24  **Q.**   If we could look at page 3.  What is that that we are

25  looking at?

1   **A.**   I'm sorry?

2   **Q.**   What is shown in the exhibit -- page 3 of Exhibit 103C?

3   **A.**   It's called package insert for Zometa.

4   **Q.**   And did you review this to make a determination as to

5   whether the Zometa that you reviewed was a drug?

6   **A.**   I did.

7   **Q.**   And what about -- was displayed on this screen was

8   helpful for you when you reviewed this to make your

9   determination as to whether this Zometa was a drug?

10  **A.**   It's intended uses that are listed in section one.

11  **Q.**   And what -- if we could zoom in on -- exactly.  What

12  does it say there that helped you come to a conclusion that

13  Zometa was a drug?

14  **A.**   If you go down the left-hand side, the fourth time, the

15  line begins with, "Zometa."  It states, "Zometa is used in

16  treating the patients with bone metastases, spread of cancer

17  and tumor related hypercalcemia malignancy to drop the high

18  level of calcium in the blood of the patient.  It is also

19  used in treating multiple myelomas, which is a type of cancer

20  that develops in the bone and to prevent skeletal- related

21  events in advanced cancer patients with bone metastases."

22  All of these items would qualify as treatment of and the

23  later prevention of disease in man, and that would make the

24  product a drug product.

25  **Q.**   Did you determine whether or not this Zometa was a

1  prescription drug?

2  **A.**  I did.

3  **Q.**  And what did you look at to make that determination?

4  **A.**  Again, it's intended uses.  Because to determine all of

5  these things, whether a patient has bone metastases, or

6  hypercalcemia, or is at risk for skeletal-related events

7  would require medical expertise and likely additional

8  clinical testing.

9       And I also looked further in the label for some of

10  the safety issues related to the product.

11       And the other thing that you spotted on the box

12  earlier, that it was an IV infusion, suggested its method of

13  use would also qualify it as a prescription product.

14  **Q.**  Did you make a determination as to whether this Zometa

15  was a new drug?

16  **A.**  I did.

17  **Q.**  And did you make a determination as to whether this

18  Zometa was an unapproved new drug?

19  **A.**  I did.

20  **Q.**  And what was your conclusion?

21  **A.**  That it was both a new drug and an unapproved new drug.

22  **Q.**  How did you come to that conclusion?

23  **A.**  For this particular Zometa product there were no

24  adequate and well controlled studies that were reported in

25  the literature, and therefore, that would serve as a basis

1   for it being generally recognized as safe and effective,

2   therefore, it qualifies as a new drug.  And there were no

3   applications for this particular Zometa product that had been

4   approved by the FDA.

5   **Q.**   Could this drug have adequate directions for use then?

6   **A.**   No, it cannot.

7   **Q.**   And why not?

8   **A.**   Again, adequate directions for use by a lay person are

9   essentially impossible with a prescription product, and the

10   labelling that's associated with this product is not

11   something that was okayed by FDA or approved by FDA as part

12   of a new-drug application or biologics licensing application.

13   **Q.**   And if we could display Exhibit 103B, and if we could

14   rotate it and zoom in where it says, "Zometa."  And do you

15   see any English in Exhibit 103B?

16   **A.**   No, I do not.

17   **Q.**   And if we can go to page 3, and if we could zoom in on

18   the left column.  In reviewing this part of the document, did

19   you see any English?

20   **A.**   No, I did not.

21   **Q.**   Did you review the entirety of Exhibit 103B to see if

22   there's an "Rx only" symbol?

23   **A.**   I did, and there was not.

24   **Q.**   Do you know what language this is?

25   **A.**   Not with certainty.

1  **Q.**  Had the FDA reviewed this label that's displayed in

2  Exhibit 103B?

3  **A.**  No, we have not.

4  **Q.**  And is the active ingredient that's noted in the

5  labelling in 103B, or when you reviewed the translation at

6  103C, do you recall what that active ingredient was?

7  **A.**  Are you talking about the Zoledronic Acid?

8  **Q.**  Is that the active ingredient for a product named

9  Zometa?

10  **A.**  It is.

11  **Q.**  Is there a product in the United States that's FDA

12  approved that has the same active ingredient?

13  **A.**  There is.

14  **Q.**  And that drug name also is Zometa, you said?

15  **A.**  It is.

16  **Q.**  If there's a drug named Zometa in the United States, how

17  did you determine that this drug that's at issue in

18  Exhibit 103B is not FDA approved?

19  **A.**  There is the quick way -- an FDA-approved product would

20  have to have all labelling in English unless it was marketed

21  in Puerto Rico where it would be in Spanish, and this is

22  clearly not English or Spanish.

23          The other thing was to search the databases to make

24  sure that this Zometa product was not approved anywhere.

25  There was no application that was submitted and approved by

1  any of the names associated on the labelling of this product

2  for companies.

3  **Q.**   If you can take a look at Exhibit 102, 111 through 113,

4  and 116, and while you are pulling those I'll ask you, did

5  you conduct a review of a product named Neulastim?

6  **A.**   Yes, I did.

7  **Q.**   Are there references to that drug in the company I just

8  mentioned?

9  **A.**   Can you give me the numbers again, please.  In 102 there

10 is.

11 **Q.**   If we can display Exhibit 102, and on the bottom portion

12 of the document do you see a reference to Neulastim, on the

13 second line?

14 **A.**   Yes.  "Neulastim known as Neulasta in the United

15 States."

16 **Q.**   What is the difference between Neulastim and Neulasta in

17 the name?

18 **A.**   The only difference are the last letters.

19 **Q.**   And did you determine initially whether Neulastim is a

20 drug?

21 **A.**   Yes.  Again, using the same bases for that analysis as

22 before that it was intended as a substitute for Neulasta, a

23 product used by oncology patients and ordered and shipped to

24 an oncology clinic.

25 **Q.**   And did you make a determination whether this was a

1    prescription drug?

2    **A.**    Yes, I did.  Again, based on Neulasta status.

3    **Q.**    And did you come to that conclusion by reviewing the

4    invoices I just mentioned at Exhibits 102, 111 through 113,

5    115 and 116?

6    **A.**    Yes, I did.

7    **Q.**    And do each of them describe this particular product in

8    the same way, Neulastim, known as Neulasta in the United

9    States?

10   **A.**    Yes, they do.

11   **Q.**    Did you make a determination as to whether Neulastim as

12   opposed to Neulasta was a new drug?

13   **A.**    I did, and found it to be a new drug.

14   **Q.**    Did you make a determination as to whether Neulastim was

15   an unapproved new drug?

16   **A.**    I did.

17   **Q.**    And what was your conclusion?

18   **A.**    That it was an unapproved new drug.

19   **Q.**    And how did you reach that conclusion?

20   **A.**    Again, for the new drug determination there were no

21   adequate and well controlled studies in the literature that

22   would support a finding that it was generally recognized as

23   safe and effective.  Therefore, it's a new drug and there

24   were no approved applications for it in the FDA databases.

25   **Q.**    Could a drug named Neulastim as opposed to Neulasta have

1   directions for use?

2   **A.**   No, it could not.

3   **Q.**   And why not?

4   **A.**   Again, because it is a prescription drug there is no way

5   to have directions adequate for use by a lay person, and not

6   being the subject of an approved application there is no

7   labelling for this product that has been vetted and approved

8   by FDA.

9   **Q.**   Do you know if the FDA's approved product Neulasta is a

10   cold-chain-store product?

11   **A.**   It is.

12   **Q.**   Did you conduct a review for a substance named Procrit?

13   **A.**   I did.

14   **Q.**   If we could display Exhibit 110.

15   THE COURT:  When you have reached a convenient

16   stopping place we will take a break -- I mean, we'll end for

17   the day.

18   MR. SALTZMAN:  Your Honor, we can stop here -- now.

19   That's fine.

20   THE COURT:  How much longer do you have on direct?

21   MR. SALTZMAN:  This is going to be the last

22   invoice, so however long that has taken, maybe ten minutes,

23   15 minutes, maybe, total.

24   THE COURT:  We'll be in recess until 9:00 o'clock

25   tomorrow morning.

```
 1              CSO OFFICER:  All rise.

 2              (Jury leaves at 5:24 p.m.)

 3              MR. TRAGOS:  Does the Court know what it's doing

 4    Thursday?

 5              THE COURT:  What?

 6              MR. TRAGOS:  Does the Court know what it's doing

 7    Thursday?  Does the Court have conflicts?

 8              THE COURT:  Yes.

 9              MR. TRAGOS:  Are we going to get back in session

10    the afternoon on Thursday?

11              THE COURT:  Well, I thought we would talk about

12    that tomorrow.  How is the timing going?  Are we ahead of

13    schedule?

14              MR. SALTZMAN:  Your Honor, we're slightly behind

15    schedule.  I think we might make up speed "in the air," for

16    lack of a better term, at some point, but we are slightly

17    behind the schedule that we had anticipated.

18              THE COURT:  If you didn't ask the same questions

19    over and over, it might help.

20              MR. SALTZMAN:  I will endeavor to eliminate

21    questions, your Honor.

22              THE COURT:  See you tomorrow morning.

23              (Court adjourned at 5:25 p.m.)

24

25
```

1                    CERTIFICATE OF REPORTER

2

3     COUNTY OF HILLSBOROUGH      )

4                                 )  SS.

5     STATE OF FLORIDA            )

6

7     I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER, REGISTERED

8     PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

9     COURT FOR THE MIDDLE DISTRICT OF FLORIDA, DO HEREBY CERTIFY

10    THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS

11    AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME

12    WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF

13    COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT

14    THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC

15    NOTES.

16

17

18    DATE:  3/22/2017

19

20    S:/MELISSA A. PIERSON

21    MELISSA A. PIERSON, CA/CSR 12499

22    IL/CSR 084.003138, RPR

23    FEDERAL OFFICIAL COURT REPORTER

24

25