1            UNITED STATES OF AMERICA
             UNITED STATES DISTRICT COURT
2             MIDDLE DISTRICT OF FLORIDA

3
                        – – –
4            HONORABLE JAMES S. MOODY, JR.
          UNITED STATES DISTRICT JUDGE PRESIDING
5                       – – –

6    UNITED STATES OF AMERICA,    )
                                  )
7            PLAINTIFF,           )
                                  )
8    VS.                          ) NO. 8:15–cr–183–T–30AEP
                                  )
9    D. ANDA NORBERGS,            )
                                  )
10           DEFENDANT.           )
     _____)

11

12

          **TRIAL – DAY 3**
13            **\*\*EXCERPT\*\***

14    **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
              **NOVEMBER 9, 2016**
15             TAMPA, FLORIDA

16

17

          MELISSA A. PIERSON, CA CSR 12499,
18            IL CSR 084.003138, RPR
         FEDERAL OFFICIAL COURT REPORTER
19       801 N. FLORIDA AVENUE, 2ND FLOOR
               TAMPA, FLORIDA 33602
20            PH:  (813)301–5336
             USDCtranscripts@gmail.com

21

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2    ON BEHALF OF PLAINTIFF:
              A. LEE BENTLEY, III
 3            UNITED STATES ATTORNEY
              BY:  MR. ADAM SALTZMAN, ESQ.
 4            BY:  MR. JAY TREZEVANT, ESQ.
              ASSISTANT UNITED STATES ATTORNEYS
 5            400 N. TAMPA STREET
              ST. 3200
 6            TAMPA, FL 33602
              (813) 274-6000
 7            ADAM.SALTZMAN@USDOJ.GOV
              JAY.TREZEVANT@USDOJ.GOV
 8

 9

10    ON BEHALF OF DEFENDANT:
              TRAGOS, SARTES & TRAGOS, PLLC
11            BY:  MR. GEORGE E. TRAGOS, ESQ.
              BY:  MR. PETER SARTES, ESQ.
12            601 CLEVELAND STREET
              ST. 800
13            CLEARWATER, FL 33755
              (727) 441-9030
14            george@greeklaw.com
              peter@greeklaw.com
15

16

17

18

19

20

21

22

23

24

25
```

1                              I-N-D-E-X

2

    **WITNESS:**

3

    Dr. Arthur Simone

4

        Direct Examination by Mr. Saltzman:               5
5       Cross-Examination by Mr. Tragos:                 14
        Redirect Examination by Mr. Saltzman:            60

6

7   Kelly Krouse

8       Direct Examination by Mr. Saltzman:              81

9

10

11

12

13

14

15

16

17                          **E X H I B I T S**          **ADM**

18

19  Court's Exhibit No. 502                               5
    Court's Exhibit No. 503                               5
20  Court's Exhibit No. 1 (sealed)                       49
    Court's Exhibit No. 3                               126

21
    Government's Exhibit Nos. 21A - 21H                  80
22

23

24

25

```
 1                    TAMPA, FLORIDA; NOVEMBER 9, 2016

 2                              - - -

 3               (COURT IN SESSION AT 9:09 A.M.)

 4                          *   *   *   *

 5          THE COURT:  Bring in the Jury, please.

 6          MR. TRAGOS:  Your Honor, I believe the Government

 7    has the operational plan.  The Court wanted it for in camera

 8    review.

 9          MR. SALTZMAN:  May I approach, your Honor?

10          THE COURT:  Please.

11          MR. TRAGOS:  We have it marked as a Court's

12    exhibit, your Honor, or however the Court wants to do it.

13          THE COURT:  I didn't hear that.

14          MR. TRAGOS:  We have it marked as a Court's exhibit

15    or sealed exhibit.

16          (Jury enters courtroom.)

17          THE COURT:  Good morning.

18          THE JURY:  Good morning.

19          THE COURT:  You may proceed.

20          MR. SALTZMAN:  Thank you, your Honor.  At this

21    time, the Government would move for the admission of

22    Exhibit 502, which is a certificate of authenticity of

23    business records for the Exhibit at Exhibit 102B, based on

24    the Defense's request.

25          THE COURT:  It will be admitted.
```

1   (Court's Exhibit No. 502

2   admitted into evidence.)

3        MR. SALTZMAN:  And the Government also moves for

4   the admission of Exhibit 503, which is a Certificate of

5   Authenticity of business records, and it authenticates --

6        THE COURT:  It will be admitted.

7        MR. SALTZMAN:  -- Exhibit 103B.

8   (Court's Exhibit No. 503

9   admitted into evidence.)

10                        **DR. ARTHUR SIMONE**

11  Called as a witness herein, having been previously duly sworn

12  was examined and testified as follows:

13                    **CON'T. DIRECT EXAMINATION**

14  **BY MR. SALTZMAN:**

15  **Q.**   Dr. Simone, did you conduct a review of a substance

16  named Eprex?

17  **A.**   Yes, I did.

18  **Q.**   If we can zoom in on the top portion of the document.

19  To review the substance Eprex, did you review the invoice

20  that is at Exhibit 110?

21  **A.**   Yes, I did.

22  **Q.**   And does that invoice -- do you have a copy of the

23  invoice in front of you?

24  **A.**   Yes.

25  **Q.**   Does that invoice describe Eprex as known as Procrit in

1   the United States?

2   **A.**   It does.

3   **Q.**   Does that invoice -- is it addressed to East Lake

4   Oncology?

5   **A.**   For shipping and billing, yes.

6   **Q.**   To perform your review of the substance known as Eprex,

7   is that what you relied on, that information?

8   **A.**   Yes, it is.

9   **Q.**   Did you initially determine whether Eprex, that is at

10  issue here, is a drug?

11  **A.**   I did.

12  **Q.**   And I'm going to ask you about your conclusion in a

13  moment, but what was your determination?

14  **A.**   That it was a drug.

15  **Q.**   Did you determine whether it was a prescription drug?

16  **A.**   I did.

17  **Q.**   And what was your conclusion?

18  **A.**   That it was a prescription drug.

19  **Q.**   Can you explain, based on your review of this invoice,

20  how you determined that the Eprex at issue here was a

21  prescription drug?

22  **A.**   I took into account two facts, and I made an assumption

23  about those.  One was that it's listed as Eprex, known as

24  Procrit --

25  **Q.**   Dr. Simone, can you pull the microphone a little closer

1    to you?  It's hard to hear you.

2    **A.**   The fact that Eprex is listed as known in the United

3    States as Procrit, I took it to mean that it was intended to

4    be used as a substitute product, and Procrit is generally

5    used on oncology patients or -- commonly used on oncology

6    patients, and that the product was being shipped to an

7    oncology clinic.  Therefore, I relied upon the information in

8    the Procrit label to make a determination as to whether it

9    was a drug and a prescription drug.

10   **Q.**   What information in the Procrit label allowed you to

11   come to that conclusion?

12   **A.**   For the drug part I relied upon indications for which

13   Procrit is approved, and then, based on those indications and

14   the need for medical expertise, clinical laboratory testing,

15   and in the labelling for Procrit, some of the toxicities that

16   are associated with the product and its method of use, I

17   determined it was a prescription product.

18   **Q.**   Did you make a determination as to whether Eprex was a

19   new drug?

20   **A.**   I did.

21   **Q.**   Did you make a determination as to whether Eprex was an

22   unapproved new drug?

23   **A.**   I did.

24   **Q.**   What was your conclusion?

25   **A.**   That it was both a new drug and unapproved new drug.

1   **Q.**   Can you explain how you reached that conclusion?

2   **A.**   For the new drug determination I searched the literature

3   for adequate and well controlled studies of Eprex and was

4   unable to find any.

5          Secondly, in terms of the unapproved drug status or

6   the approved drug status, I searched the FDA databases for

7   approved drugs named Eprex associated with Quality Specialty

8   Products, QSP.

9   **Q.**   Could the drug Eprex that's referenced in this invoice

10  could that have adequate directions for use?

11  **A.**   No, it could not.

12  **Q.**   And why not?

13  **A.**   It would lack adequate directions for use by a lay

14  person because it's a prescription product, and it lacks

15  adequate labelling because it doesn't -- it's not the subject

16  of an approved application where labelling was reviewed and

17  determined to be adequate by FDA.

18  **Q.**   Do you know if the FDA-approved version of Procrit is a

19  cold-chain-store drug?

20  **A.**   I do know, and it is.

21  **Q.**   And in your database searches that you just spoke about,

22  did you find information indicating that a manufacturer of

23  Eprex at some point sought approval of that drug through a

24  new-drug application?

25  **A.**   Yes.   There actually was an Eprex product, which was

1   approved in the United States.

2   **Q.**   When was that, approximately?

3   **A.**   I can tell you exactly, if you let me check my notes?

4   **Q.**   Would that refresh your memory?

5   **A.**   Yes.  It was approved in February 1999, and it was

6   approved under a biologics licensing application, which was

7   later revoked in December of 2003.

8   **Q.**   Is the FDA-approved version of Eprex still allowed to be

9   sold in the United States?

10  **A.**   No, it's not.

11  **Q.**   And was -- could it be sold in the United States as

12  referenced in this invoice on December 28th, of 2011?

13  **A.**   No, it could not.

14          MR. SALTZMAN:  Permission to approach, your Honor?

15          THE COURT:  Yes, you may.

16  BY MR. SALTZMAN:

17  **Q.**   I just handed you two exhibits, Government's Exhibit 60

18  and Government's Exhibit 60A, as in Alpha.  If you could look

19  first at Government Exhibit 60.  Are you familiar with that

20  exhibit?

21  **A.**   Yes, I am.

22  **Q.**   Did you create it?

23  **A.**   I did not, but I reviewed it.

24  **Q.**   Is that exhibit accurate?

25  **A.**   Yes, it is.

1    **Q.**   And can you tell us what is in that exhibit?

2    **A.**   It's a table that contains three columns.  The first

3    column is titled "FDA-approved drug," the second column is

4    listed as, "Active ingredient," and the third column is

5    titled, "Not FDA-approved."

6    **Q.**   Are there five drugs listed in that chart?

7    **A.**   There are five drugs.

8    **Q.**   And are those the five drugs you reviewed for this case?

9    **A.**   Yes, they were.

10   **Q.**   And if you could look at Exhibit 60A.  Have you seen

11   this document before today?

12   **A.**   No, I have not.

13   **Q.**   Can you please look at it in relation to Exhibit 60 to

14   see if there are any differences between the two of them?

15   **A.**   There is one difference.

16   **Q.**   And what is that difference?

17   **A.**   In Document 60, the last of the not-FDA-approved

18   products is listed as Zometa, and Document 60A, that last

19   product is listed as Zometa, and in parentheses (Turkey).

20   **Q.**   And is Zometa, in parentheses (Turkey), the drug that

21   was part of your analysis based on the invoices that you

22   looked at?

23   **A.**   Yes.  It was a product that appeared to be Turkish

24   labelling.

25   **Q.**   Did you confirm the accuracy of the active ingredients

1    in that chart, that the active ingredients correspond with

2    the FDA-approved drugs that are listed next to it?

3    **A.**   I did check it, and they do match the FDA-approved --

4    **Q.**   And how did you determine what to put in the entry under

5    the column that's not FDA-approved, or to confirm the

6    accuracy of the information that was in that column?

7    **A.**   I relied upon the information that was provided to me

8    primarily from the invoices, and then, lastly, from the

9    translated versions of package inserts for Pharma products.

10   **Q.**   Is Exhibit 60A accurate?

11          MR. TRAGOS:  Objection.

12   BY MR. SALTZMAN:

13   **Q.**   To reflect your analysis.

14          THE COURT:  Rephrase the question.

15   BY MR. SALTZMAN:

16   **Q.**   Does Exhibit 60A reflect the analysis that you did in

17   this case?

18   **A.**   Yes, it does.

19          MR. SALTZMAN:  At this point, your Honor, I request

20   permission to use Exhibit 60A as a demonstrative.

21          THE COURT:  You may.

22          MR. SALTZMAN:  And if we could display Exhibit 60A.

23   BY MR. SALTZMAN:

24   **Q.**   And can you just explain for the Jury how you -- how

25   this chart is depicted in terms of what the headers are for

1    the chart, and what's in each row underneath it?

2    **A.**    Yes.  If I can start on the right-hand side, the

3    not-FDA-approved column lists the tradenames of the products

4    that I was given to review in this case.  The middle column

5    is the active ingredient for either the product itself, in

6    the case of Ribomustin and Zometa, or the active ingredient

7    for the FDA-approved product for which the Neulastim, Eprex

8    and MabThera were known as in the United States or -- listed

9    as "known as" in the United States in their invoices.  The

10   column on the left, those are FDA-approved products that

11   contain those active ingredients.

12   **Q.**   Once an unapproved new prescription drug leaves a

13   manufacturing facility that is outside of the United States,

14   absent seeking FDA approval for that drug, is there any way

15   to turn that drug into an FDA-approved-prescription drug

16   prior to its use within the United States?

17   **A.**   No.

18   **Q.**   Once an unapproved new prescription drug leaves a

19   manufacturing facility within the United States, absent

20   seeking FDA approval for that drug, is there any way to turn

21   that drug into an FDA-approved-prescription drug prior to its

22   use within the United States?

23   **A.**   An unapproved drug coming out of a manufacturing

24   facility being converted to approved?  No.

25   **Q.**   And once an unapproved new-prescription drug leaves a

1  manufacturing facility outside of the United States, is there

2  any way for that unapproved new-prescription drug to have

3  proper labelling for use in the United States?

4  **A.**   No, there is not.

5  **Q.**   And absent going to the FDA, is there any way for an

6  unapproved new-prescription drug to have its label or

7  packaging replaced or modified that would allow it to be

8  considered an FDA-approved drug?

9  **A.**   No, there is not.

10  **Q.**   And the answers that you just provided to the last four

11  questions, would that apply to the drugs that are listed in

12  the right column in Exhibit 60A, under the header, "Not FDA

13  approved?"

14  **A.**   That is correct.  It would apply.

15      MR. SALTZMAN:  No further questions, your Honor.

16      THE COURT:  Cross.

17      MR. TRAGOS:  Your Honor, could I have a sidebar?

18      THE COURT:  Approach the bench.

19  (Sidebar conference held.)

20      MR. TRAGOS:  Your Honor, I need to renew a request,

21  and I'm sure it won't be the last time I renew it, but that

22  Jury instruction that we provided to the Court about "FDA

23  regulations not being a crime to violate them," the

24  prosecutor went through a litany of FDA regulations with this

25  man.  Can something be unapproved, then approved later, can

1    it be this, can it be that?  And I believe that the Jury

2    should be instructed at this time and given that instruction

3    that we provided to the Court, so that the Jury knows that

4    this is only indications of intent, and that it is not a

5    crime to violate the regulations or rules of the FDA, and

6    this man has testified repeatedly about those.

7              THE COURT:  Denied.

8              MR. TRAGOS:  Okay.

9              THE COURT:  When you know you are going to

10   cross-examine a witness, you can get your exhibits ready in

11   advance.  You don't have to wait until it's your turn to

12   start gathering exhibits.

13             MR. TRAGOS:  Yes, sir.

14             (Back before the Jury.)

15                     **CROSS-EXAMINATION**

16   **BY MR. TRAGOS:**

17   **Q.**   Let me start with -- um, could we have the Elmo, please?

18   Let me start with demonstrative Exhibit 60A.  Do you remember

19   this, sir?

20   **A.**   Yes, I do.

21   **Q.**   The Government just showed it to you.  Okay.  And the

22   name on the left and the name on the right, the common factor

23   between those is they both have the same active ingredient,

24   correct?

25   **A.**   They -- the one on the right purports to, the one on the

1     left, I can assure you, does.

2     **Q.**   Okay.  So the same active ingredient in both products,

3     just different names?

4     **A.**   As far as --

5     **Q.**   Okay.  And Exhibit 101A, page 2 of that exhibit, do you

6     see that, sir?

7     **A.**   I do.

8     **Q.**   Okay.  And the Ribomustin, known as Treanda in the US,

9     do you see that?

10    **A.**   I do.

11    **Q.**   And it says "Germany," correct?

12    **A.**   Yes.

13    **Q.**   Is Germany part of the European Union?

14    **A.**   It is.

15    **Q.**   Okay.  Now, sir, if you look at Exhibit 102, do you see

16    that, sir?

17    **A.**   I do.

18    **Q.**   Okay.  And you see MabThera down there?

19    **A.**   I do, yes.

20    **Q.**   "Known as Rituxan in the US?"

21    **A.**   Yes.

22    **Q.**   And that is the same MabThera and Rituxan that the

23    Government showed you in Exhibit 60A, correct?

24    **A.**   Yes.  Correct.

25    **Q.**   Do you see Neulastim -- "Neulastim, known as Neulasta in

1   the US?"

2   **A.**   Yes.

3   **Q.**   By the way, do you see "European Union" after the word

4   "MabThera?"

5   **A.**   I do.

6   **Q.**   Do you see "European Union" after the word "Rituxan?"

7   **A.**   Do I.

8   **Q.**   And Neulasta and Neulastim refers to the same Neulastim

9   and Neulasta that is Government's Exhibit 60A, correct?

10  **A.**   Correct.

11  **Q.**   With the -- how do you pronounce that active ingredient?

12  **A.**   Filgrastim.

13  **Q.**   Okay.  Now, did the Government provide you also with

14  page 2 of Exhibit 102?

15  **A.**   Yes, they did.

16  **Q.**   And this is the order form for QSP, correct?  That's

17  what it purports to be.  I know you don't know that

18  personally, right?  That's what it purports to be.

19  **A.**   Correct.

20  **Q.**   On there it shows what's supposed to be ordered and do

21  you see MabThera there?

22  **A.**   No, I do not.

23  **Q.**   Do you see Neulasta there?

24  **A.**   No, I do not.

25  **Q.**   Excuse me?

1   **A.**   Yes, I do see Neulasta, not Neulastim.

2   **Q.**   Neulastim is the FDA-approved drug?

3   **A.**   Correct.

4   **Q.**   So on this order form they are all FDA-approved drugs,

5   correct?

6   **A.**   Those two products for sure.

7   **Q.**   Now, sir, I asked you to take a look at Exhibit 104.  Is

8   this a document that you were given by the Government?

9   **A.**   Yes, it is.

10  **Q.**   And do you see there that there is -- this says, "Cancer

11  Drugs Online, contact Kelly Krouse."  This is an order,

12  correct?  "Order, medications being ordered," do you see

13  that?

14  **A.**   I do.

15  **Q.**   And what is being ordered there?

16  **A.**   Zometa, four milligrams.

17  **Q.**   And is Zometa an FDA-approved drug?

18  **A.**   There's a FDA-approved Zometa, yes.

19  **Q.**   And when you are looking at that, does that appear to be

20  the FDA-approved order?

21  **A.**   I couldn't say one way or the other, but it certainly

22  could be the FDA-approved product, yes.

23  **Q.**   Okay.  Now, again, looking at 104, again, this was

24  provided to you by the Government, correct?

25  **A.**   Yes, it was.

1    **Q.**   And this says, "Zometa, four milligrams," which was what

2    was on the order form, right?

3    **A.**   Yes, it was.

4    **Q.**   But this one has "Turkey," do you see that?

5    **A.**   Hmm-hmm, yes.

6    **Q.**   Okay.  Now, this also says Zoledronic Acid?

7    **A.**   Correct.

8    **Q.**   Is that the active ingredient?

9    **A.**   It is.

10    **Q.**   Okay.  And from looking at this, can you tell that this

11    is the Zometa that is approved or unapproved?

12    **A.**   Not based on the information that's there.

13    **Q.**   So based on this invoice you can't tell whether this was

14    approved or unapproved Zometa?

15    **A.**   That is correct.

16    **Q.**   Now, let me ask you to take a look at Exhibit 111.  Do

17    you see that, sir?

18    **A.**   I do.

19    **Q.**   And this is a document that was shown to you by the

20    Government as well?

21    **A.**   Yes.

22    **Q.**   Okay.  And it purports to be an order form for QSP.  Do

23    you see that?

24    **A.**   Yes.

25    **Q.**   And that's an order form Neulasta, correct?

1    **A.**    Correct.

2    **Q.**    Is Neulasta an FDA-approved drug?

3    **A.**    It is.

4    **Q.**    And the signature purports to be of a Dr. Norbergs,

5    correct?

6    **A.**    It does.

7    **Q.**    On the order form.  Is that a yes?

8    **A.**    That's a yes.

9    **Q.**    Okay.  Now, here we have the invoice from QSP to

10   Dr. Norbergs, East Lake Oncology.  Do you see that?

11   **A.**    I do.

12   **Q.**    On that invoice it says, "Neulastim, known as Neulasta

13   in the US."

14   **A.**    It does.

15   **Q.**    Okay.  Now, is Neulastim known as Neulasta in the US?

16   **A.**    There is no Neulastim that is known as a drug product in

17   the United States.

18   **Q.**    No FDA?

19   **A.**    No FDA-approved.

20   **Q.**    Right.  But chemically they are the same product,

21   correct?

22   **A.**    Not necessarily so.

23   **Q.**    Same active ingredient?

24   **A.**    Purported.

25   **Q.**    But you just testified that that 60A was accurate.  Are

1   you saying you lied?

2         THE COURT:  Sustained.

3   BY MR. TRAGOS:

4   **Q.**   The same active ingredient, correct?

5   **A.**   Purported to be the same active ingredient, yes.

6   **Q.**   You don't know different, do you?

7   **A.**   Not for this product, correct.

8   **Q.**   It also said, "Keep refrigerated," right?

9   **A.**   It says, "Refrigerated," yes.

10  **Q.**   Which would indicate it should be a refrigerated

11  product?

12  **A.**   That's what it would suggest to me, yes.

13  **Q.**   Now, let me ask you to take a look at Exhibit 113.  Do

14  you see that, sir?

15  **A.**   I do.

16  **Q.**   Is this a document you reviewed?

17  **A.**   It is.

18  **Q.**   And do you see it is an order form for QSP?

19  **A.**   It is.

20  **Q.**   And on there it says, "Neulasta," correct?

21  **A.**   Correct.

22  **Q.**   That is an FDA-approved product?

23  **A.**   It is.

24  **Q.**   And on there it says, "Rituxan," correct?

25  **A.**   It does.

1   **Q.**   And that is an FDA-approved product?

2   **A.**   It is.

3   **Q.**   So this order form purports to order FDA-approved

4   products, correct?

5   **A.**   Correct.

6   **Q.**   And here we have an invoice from QSP to East Lake

7   Oncology.  Do you see that, sir?

8   **A.**   I do.

9   **Q.**   And this is a document you reviewed, correct?

10  **A.**   Correct.

11  **Q.**   And on there it says that what was sent to the East Lake

12  Oncology was Neulastim, known as Neulasta in the United

13  States, correct?

14  **A.**   It does.

15  **Q.**   And it says, MabThera, known as Rituxan in the US?

16  **A.**   Correct.  It states that.

17  **Q.**   Excuse me?

18  **A.**   It does state that.

19  **Q.**   Now, let's talk about Zometa for a minute.  Now, you did

20  a particular separate report with regards to Zometa, correct?

21  **A.**   Correct.

22  **Q.**   Where you looked at Zometa and you determined what its

23  active ingredient was?

24  **A.**   I did not make that determination.

25  **Q.**   You did not say, "Zometa, active ingredient Zoledronic

1    Acid?"

2    **A.**   I listed that.  That was what was claimed on the label,

3    but I did not analyze the product for that, and my memo did

4    not rely on the active ingredient itself.  It relied on other

5    aspects of the labelling.

6    **Q.**   Okay.  Who, um, makes Zometa?

7    **A.**   I'd have to check my notes for the approved sponsor for

8    that.

9    **Q.**   Do you have those with you?

10   **A.**   I do.

11           MR. TRAGOS:  With the Court's permission?

12           THE COURT:  Yes.

13           THE WITNESS:  (Witness peruses his documents.)  In

14   my search for Zometa I found two new drug applications, um,

15   both of which are held by Novartis Pharmaceuticals

16   Corporation in East Hanover, New Jersey.

17   BY MR. TRAGOS:

18   **Q.**   And is Novartis a related or subsidiary company to a

19   larger company, the one in Hanover?

20   **A.**   That I don't know offhand.

21   **Q.**   Okay.  Are you familiar with the Novartis in

22   Switzerland?

23   **A.**   I know there are branches of Novartis in the European

24   Union, yes.

25   **Q.**   And this one you say you based it on the labelling.  Did

1    the labelling not say, "Zometa, associated with Novartis

2    Eurolari (phonetic), Novartis Pharma, Switzerland?"

3    **A.**    I'm sorry, was that a question?

4    **Q.**    Yes.

5    **A.**    The labelling that I had gave several Novartis names and

6    Novartis Eurolari and Novartis Pharma, AG, were the two names

7    that I identified on it, and so I specifically looked for

8    Novartis as submitters for the new-drug application.

9    **Q.**    But you have not identified Novartis Pharma of

10   Switzerland?

11   **A.**    No.  The only Novartis I found was Novartis

12   Pharmaceuticals Corporation, East Hanover, New Jersey.

13   **Q.**    Tell me, do you have your report there dated October 12,

14   2016?

15   **A.**    Yes.

16   **Q.**    Would you read the first paragraph of your executive

17   summary, out loud, please.

18            MR. SALTZMAN:  Your Honor, objection, hearsay.

19            THE COURT:  Overruled.

20            THE WITNESS:  The part that begins, "The office

21   of..."

22   BY MR. TRAGOS:

23   **Q.**    Yes.

24   **A.**    "The office of unapproved drugs and labelling compliance

25   was asked to review labelling and other information for

1    Zometa associated with Novartis Eurolari, Novartis products,

2    Novartis Pharma, AG, Novartis Pharma Switzerland and Novartis

3    Pharma Stein, AG, to determine if the product is considered

4    to be a drug, a new drug, a prescription drug and/or an

5    approved new drug."

6    **Q.**   So, in fact, you did find that it may be associated with

7    the Novartis Pharma of Switzerland, didn't you?

8    **A.**   No.  In fact, these things are separated in the approval

9    process or -- actually in the submission process.  None of

10   those Novartis Groups that I just read off had submitted a

11   new-drug application for Zometa.

12   **Q.**   That's not what I'm asking, sir.  I'm asking, did you

13   associate or find an association between any Zometa, approved

14   or unapproved, with Novartis Pharma Switzerland?

15   **A.**   I'm checking the results for each of my searches.  To

16   answer your question, no, I did not.

17   **Q.**   In fact, all you did was check to see in the FDA whether

18   there was an association with Zometa and Novartis,

19   Switzerland, is that correct?  You did not check the world,

20   did you?

21   **A.**   The -- I believe the answer to your question is yes.

22   Yes.  Ultimately, yes.

23   **Q.**   Sir, are you familiar with the European Medicines

24   Agency?

25   **A.**   I am.

1  **Q.**   And how are you familiar with them?

2  **A.**   They are the organization, um, charged overall with, um,

3  maintaining the European drug supply, and in part, with

4  approving new drugs in Europe.

5  **Q.**   Basically the FDA of the European Union?

6  **A.**   Somewhat our equivalent there, yes.

7  **Q.**   Are you aware that as of March 20, 2001, that they

8  approved Zometa for the European Union?

9  **A.**   I am not.

10  **Q.**   Sir, what is Zometa used for?

11  **A.**   Again, I'm going to refer to my notes, if I may, just

12  for the approved product anyway.  So it's primarily geared

13  towards the effects of malignant disease affecting bone,

14  making bone more vulnerable to fracturing and causing bone to

15  release calcium into the blood stream elevating calcium

16  levels to possibly toxic level, and Zometa is used to control

17  that.

18  **Q.**   In fact, sir, you concluded that the use of Zometa

19  associated with Novartis Eurolari, Novartis products,

20  Novartis Pharma, AG, Novartis Pharma Switzerland and Novartis

21  Stein, AG, in this matter, makes it a drug as defined by the

22  Federal Food, Drug and Cosmetics Act, correct?

23  **A.**   Correct.

24  **Q.**   And you did say Novartis associated with Novartis Pharma

25  Switzerland, didn't you?

**A.**    Zometa associated with those Novartis groups, yes.

**Q.**    So you did find there was an association?

**A.**    The only association I had is what was contained in the labelling I was provided.

**Q.**    And the labelling said that?

**A.**    The labelling listed it, yes.

**Q.**    I'm sorry, the labelling said that?

**A.**    The labelling that I was provided to review --

**Q.**    Yes.

**A.**    -- was what had those Novartis names listed on it.

**Q.**    Including Novartis Switzerland?

**A.**    I believe so, and I can verify, if you like.

**Q.**    And you said that in your report, didn't you?

**A.**    I believe I can check.

**Q.**    Excuse me, I'm just asking, did you say that in your report?

**A.**    Yes, I do.

**Q.**    Now, you did a Zometa-Novartis, was it, a Google search?

**A.**    I'm sorry?

**Q.**    You did a Google search or some kind of search for studies for literature?

**A.**    You mean for adequate and well controlled studies?

**Q.**    Yes.

**A.**    That search I used the PubMed search engine.  PubMed is a product of the National Library of Medicine, which is part

1    of the National Institutes of Health, and they provide the

2    most comprehensive index of medical and bioscience journals.

3    **Q.**    And these are public, correct?

4    **A.**    Yes.

5    **Q.**    So you did a search of a public database?

6    **A.**    Correct.

7    **Q.**    The FDA also maintains a private database, does it not?

8    **A.**    Not of published literature.

9    **Q.**    Of studies, correct?  Correct?  Of clinical studies of

10   medications the FDA has its own confidential website or

11   search engine, correct?

12   **A.**    No, it doesn't, but perhaps to get to your point, when a

13   company does conduct studies of any product, the results of

14   those studies are reported to the FDA and are archived by the

15   FDA.

16   **Q.**    And they can be confidential as well, correct?

17   **A.**    They are proprietary information, yes.

18   **Q.**    Proprietary means I can't walk into the FDA and ask for

19   it, right?

20   **A.**    That's correct.

21   **Q.**    So you didn't search that group of stuff, did you?

22   **A.**    Indirectly, I did.

23   **Q.**    Indirectly?

24   **A.**    Yes.  When I search to see if there's an application

25   that's held by any of these companies, if I had identified

1   one, then you could be assured that there must have been

2   adequate and well controlled studies submitted to that

3   application in order to get it approved.  Not having found

4   any new-drug applications or biologic licensed applications,

5   there was no "NDA" that was submitted containing adequate and

6   well-controlled studies that were reviewed.

7   **Q.**   Well, how many studies, um -- well, tell me about your

8   searches.  You did a search for, what, Zometa and Novartis,

9   correct?

10  **A.**   We're talking about literature searches now?

11  **Q.**   Yes.

12  **A.**   In PubMed there are two things you can do.  One, you

13  enter search terms, and the other is you can limit your

14  search in certain ways.  In these searches I limited looking

15  for randomized controlled trials, humans, studied only in

16  humans, and English, and under search term I did three

17  searches for this product.  I searched Zometa and Novartis,

18  Zoledronic Acid and Novartis, and then Zometa alone.

19  **Q.**   And how many results did you get for Zometa/Novartis?

20  **A.**   For Zometa and Novartis there were three citations.

21  **Q.**   And for Zoledronic Acid and Novartis?

22  **A.**   There were 16 citations.

23  **Q.**   And for Zometa?

24  **A.**   There were eight citations.

25  **Q.**   Okay.  And you reviewed all of these studies, correct?

1   **A.**   I did.

2   **Q.**   And one was in the Journal of Clinical Pharmacology,

3   correct?

4   **A.**   Do you know where in my --

5   **Q.**   In appendix three of your report.

6   **A.**   Which search was it?

7   **Q.**   Excuse me, search No. 1.

8   **A.**   Okay.  And citation, which of the --

9   **Q.**   I'm sorry?

10  **A.**   Which of the abstracts are you looking at?

11  **Q.**   I'm looking at number search, it says, "Appendix 3,

12  Appendix of Citations from PubMed Searches."  Do you see

13  that, sir?

14  **A.**   Yep.

15  **Q.**   And search one?

16  **A.**   Yes.

17  **Q.**   That's from the Journal of Clinical Pharmacology,

18  correct?

19  **A.**   The first item, yes.

20  **Q.**   And that's dated 2002?

21  **A.**   Correct.

22  **Q.**   Search two, do you see that, sir?

23  **A.**   I do.

24  **Q.**   And that is from Simon Oncology?

25  **A.**   Yes.

1   **Q.**   And that's 2001?

2   **A.**   Correct.

3   **Q.**   Search three, Simon Oncology 2001?

4   **A.**   Correct.

5   **Q.**   Then I've got a general search two, on the next page, do

6   you see that?

7   **A.**   I do.

8   **Q.**   No. 1 there is Lancet Oncology in 2010?

9   **A.**   Right.

10  **Q.**   Another one from Lancet Oncology 2013?

11  **A.**   Correct.

12  **Q.**   And then the New England Journal of Medicine 2012, do

13  you see that?

14  **A.**   Yes.

15  **Q.**   New England Journal of Medicine, that's in the US,

16  right?

17  **A.**   It is.

18  **Q.**   That's New England, United States?

19  **A.**   Yes, it is.

20  **Q.**   Respected publication?

21  **A.**   Some would argue highly respected, yes.

22  **Q.**   Some would argue highly respected?

23  **A.**   Yes.  Especially those from New England.

24  **Q.**   And then there is another clinical study you looked at,

25  No. 4 there, Lancet Oncology, and that's 2014?

1  **A.**   Correct.

2  **Q.**   And then, again, in 2011, we have a New England Journal

3  of Medicine, correct?

4  **A.**   Correct.

5  **Q.**   And then in 2014, Lancet Oncology?

6  **A.**   Correct.

7  **Q.**   And then in 2012, Lancet Oncology?

8  **A.**   Correct.

9  **Q.**   And then in 2009, the J Bone Miner Research?

10  **A.**   Correct.

11  **Q.**   And then in 2011, Lancet Oncology again?

12  **A.**   Correct.

13  **Q.**   And then the Clinical Cancer Research published a study

14  in 2003, that you reviewed, correct?

15  **A.**   Correct.

16  **Q.**   And then Lancet Oncology in 2012.  Lancet Oncology again

17  in 2011.  Lancet Oncology, again, in 2010.  Then we go to

18  search three, and we have the publication Oncologist, 2008,

19  do you see that, sir?

20  **A.**   I do.

21  **Q.**   And then another study by the Journal of Clinical

22  Oncology in 2007, correct?

23  **A.**   Correct.

24  **Q.**   And then the Clinical Breast Cancer Study in 2009?

25  **A.**   Correct.

1    **Q.**   And then, we have the Journal of Medicine and Imaging

2    Radial Oncology -- excuse me, Radiant Oncology in 2014?

3    **A.**   Correct.

4    **Q.**   And then, the European Urology in 2015?

5    **A.**   Correct.

6    **Q.**   And then, you looked at all these studies --

7    **A.**   I did.

8    **Q.**   -- in order to determine whether or not this Zometa was

9    safe?

10    **A.**   I reviewed these studies to see if any of them were

11    adequate and well controlled studies of Zometa associated

12    with the Novartis Companies mentioned on the labelling for

13    its use -- intended use based on the Zometa product approved

14    in the United States.

15    **Q.**   And you rejected every single one of these studies,

16    didn't you?

17    **A.**   I did.

18    **Q.**   You found something wrong with every one of them?

19    **A.**   I did.

20           MR. TRAGOS:  Approach the witness, your Honor?

21           THE COURT:  All right.

22    BY MR. TRAGOS:

23    **Q.**   I'm showing you Defense Exhibit 9.  Is that a copy of

24    the clinical studies you reviewed?

25    **A.**   Yes, it is.

1          MR. TRAGOS:  Your Honor, at this time the Defense

2    would move in evidence Exhibit 9.

3          MR. SALTZMAN:  Your Honor, objection.

4          THE COURT:  Sustained.

5    BY MR. TRAGOS:

6    **Q.**   Now, sir, you did a report for the Government, um, on

7    Neulastim, correct?

8    **A.**   Correct.

9    **Q.**   And excuse me.  What is the date of that report?

10   **A.**   I've signed one on October 12, 2016.

11   **Q.**   Okay.  And the active ingredient -- by the way, that

12   report you said Neulastim in lieu of Neulasta, do you see

13   that, sir?

14   **A.**   Yes.

15   **Q.**   What does "in lieu of" mean?

16   **A.**   As a replacement for or instead of.

17   **Q.**   As a replacement for or instead of.  So you said

18   Neulastim in lieu of Neulasta, and you said the active

19   ingredient there is Pegfilgrastim?

20   **A.**   Correct.

21   **Q.**   And it says that in your report, "When Neulastim when

22   used in lieu of Neulasta it is intended to decrease the

23   incident of infection as manifest by fibril, etc., etc.,

24   etc.," is that right?

25   **A.**   That's correct.

1   **Q.**   So that was what Neulastim, when used in lieu of

2   Neulasta, is intended to do, correct?

3   **A.**   If you're using it instead of Neulasta for the purpose

4   of Neulasta, that's what you would be using it for, correct.

5   **Q.**   And that is the same thing that Neulasta does, correct?

6   **A.**   If Neulasta is being used as a substitute -- I'm sorry,

7   if Neulastim is being used for a substitute of Neulasta, yes,

8   that would be the intended use.

9   **Q.**   Now, you testified about labelling, I believe.  Do you

10  remember that testimony, a long time ago?  There is actually

11  two kinds of labelling.  There is labelling for a lay person

12  in certain drugs, and then we -- that labelling is no good if

13  the drug is a prescription drug because then you do a

14  labelling for a medical professional, correct?

15  **A.**   Essentially, yes.

16  **Q.**   All right.  So when you were talking about

17  understandable labelling, we have to, I guess, talk about

18  what our audience is, correct?  Is that yes?

19  **A.**   Correct.  I'm sorry.

20  **Q.**   So if it's nonmedical-professional labelling, it's one

21  thing, it has to be one thing or one criteria for it.  If

22  it's a medical professional, it's a different criteria for

23  your labelling, correct?

24  **A.**   Criteria in what sense?

25  **Q.**   In the sense of who's going to understand it.

1    **A.**    That is correct.

2    **Q.**    Okay.  And you stated in your report, "Neulastim, when

3    used in lieu of Neulasta, is not safe for use except under

4    the supervision of a practitioner licensed to administer such

5    drug due to its toxicity," correct?

6    **A.**    That's correct.

7    **Q.**    So the only time it's safe to use Neulastim in lieu of

8    Neulasta is if a doctor uses it or a medical professional?

9    **A.**    If there were an approved Neulastim product, that would

10   be correct.

11   **Q.**    Well, you didn't say that.  What you said was, and again

12   if I'm misquoting you, please tell me --

13   **A.**    Go ahead.

14   **Q.**    -- "Neulastim, when used in Neulasta is not safe for use

15   except under the supervision of a practitioner licensed by

16   law to administer such drug."

17   **A.**    That is what I said, yes.

18   **Q.**    Now, we went through some examples of the invoices for

19   QSP where it said, "Neulastim, known as Neulasta in the US."

20   Do you remember that?

21   **A.**    Yes.

22   **Q.**    And sir, isn't it true that when it says that, it

23   indicates to the reader that the product is intended for use

24   in that setting in lieu of Neulasta?

25   **A.**    That is how I interpreted it, yes.

1   **Q.**   So what that wording to you says is the reader of that

2   wording, the company who wrote it, intends for the reader to

3   think they can use it in place of Neulastim?

4   **A.**   I could see how that would be the case, yes.

5   **Q.**   Okay.  Again, sir, you are familiar with the European

6   Medicines Agency, correct?

7   **A.**   I am.

8   **Q.**   I think we covered that.  It's kind of like the FDA of

9   Europe.  Are you aware, sir, that Neulastim was approved by

10  them in August 2010?

11          MR. SALTZMAN:  Objection, your Honor.

12          THE COURT:  Legal basis.

13          MR. SALTZMAN:  Relevance.

14          THE COURT:  Sustained.

15  BY MR. TRAGOS:

16  **Q.**   Are you aware that Neulasta was approved by the European

17  Medicines Agency in 2002?

18          MR. SALTZMAN:  Objection.

19          THE COURT:  Sustained.

20  BY MR. TRAGOS:

21  **Q.**   Now, sir, are you familiar with the -- we talked about

22  this MabThera, correct?

23  **A.**   Correct.

24  **Q.**   And did you do a report on MabThera?

25  **A.**   I did.

1   **Q.**   And when did you do that report?

2   **A.**   I signed off on that report October 12, 2016.

3   **Q.**   And MabThera, in your report, you put, "In lieu of

4   Rituxan," correct?

5   **A.**   Correct.

6   **Q.**   And what is the active ingredient?

7   **A.**   I have listed there Rituximab.

8   **Q.**   Excuse me?

9   **A.**   I have listed there Rituximab.

10  **Q.**   Okay.  And again, you state that, "MabThera, when used

11  in lieu of Rituxan, is not safe for use except under the

12  supervision of a practitioner licensed by law to administer

13  such drug," correct?

14  **A.**   That is correct.

15  **Q.**   And of MabThera, you also say, "When ordering the

16  product that is known as Rituximab in the US, as a physician

17  associated with an oncology practice, indicates product

18  intended for use in that setting in lieu of Rituxan,"

19  correct?

20  **A.**   Where are you reading?

21  **Q.**   I'm reading on page 3, right under where you say,

22  "Invoices indicate the product is known as Rituxan in the

23  US."  Did you find that, sir?

24          MR. TRAGOS:  May I approach the witness, your

25  Honor?

1          THE WITNESS:  I'm not seeing that.

2          THE COURT:  Yes.

3          THE WITNESS:  It states, "The ordering of product

4    that is 'known as Rituxan in the US' by a physician

5    associated with an oncology practice indicates that the

6    product is intended for use in that set in lieu of Rituxan."

7    BY MR. TRAGOS:

8    **Q.**   So that labelling, in your opinion, is intended to tell

9    a practitioner he can use it in lieu of Rituxan, or she can

10   use it, correct?

11   **A.**   I think it's fair that that's what it suggests, yes.

12   **Q.**   Now, you did another search for MabThera, correct?  A

13   computer search like we talked about before?

14   **A.**   Yes, yes.

15   **Q.**   To find clinical studies?

16   **A.**   I did.

17   **Q.**   And how many search results did you get for putting in

18   MabThera?

19   **A.**   For putting in MabThera alone, with randomized

20   controlled trials, human and English search limits, 11

21   citations were identified.

22   **Q.**   And one of those was a British Journal of Cancer,

23   September 17, 2013, correct?

24   **A.**   Correct.

25   **Q.**   Lancet Oncology, May 2006, correct?

1    **A.**    Correct.

2    **Q.**    Clinical Journal of American Society of Nephrology?

3    **A.**    Correct.

4    **Q.**    By the way, that's a US study?

5    **A.**    I'm not sure where the studies was conducted.

6    **Q.**    No. 3, Clinical Journal of American Society of

7    Nephrology?

8    **A.**    In all likelihood it is a US journal.

9    **Q.**    Excuse me?

10    **A.**    In all likelihood it is a US journal.

11    **Q.**    The Journal of Arthritis and Rheumatology, 2011 April

12    issue?

13    **A.**    Correct.

14    **Q.**    No. 4.

15    **A.**    Yes.

16    **Q.**    The ANN Oncology, March 2011?

17    **A.**    Annals of Oncology, yes.

18    **Q.**    The Journal of Clinical Oncology, May 2010?

19    **A.**    Correct.

20    **Q.**    Lancet Oncology May 2008?

21    **A.**    Correct.

22    **Q.**    Lancet Oncology May 2006?

23    **A.**    Correct.

24    **Q.**    The -- do you know what the "ANN" means before that

25    hematology?

1    **A.**    Annals.

2    **Q.**    The Annals of Hematology, October 2002, correct?

3    **A.**    It's either hematology or Hematological Journal.

4    **Q.**    That's October 2002?

5    **A.**    I'm sorry, you're looking at No. 9?

6    **Q.**    Yes.

7    **A.**    Annals of Hematology, 2002, yes.

8    **Q.**    Okay.  And No. 10, the Hematology Journal, 2001?

9    **A.**    Correct.

10   **Q.**    No. 11, what's CRIT, do you know what that is?

11   **A.**    Critical review.

12   **Q.**    Critical Review Oncology Hematology, July 11, 2001,

13   correct?

14   **A.**    Correct.

15   **Q.**    And those are the 11 citations from your search that you

16   reviewed, correct?

17   **A.**    That is correct.

18   **Q.**    And in every one of those 11 citations, you rejected all

19   of them, correct?

20   **A.**    Correct.  None of those citations were reports of

21   adequate and well controlled studies for MabThera for its

22   intended use.

23           MR. TRAGOS:  Approach the witness?

24           THE COURT:  You may.

25                                    *

1  BY MR. TRAGOS:

2  **Q.**   Sir, I'm going to ask you to take a look at Defense

3  Exhibit 11, and ask you if that is a copy of the clinical

4  studies that you reviewed?

5  **A.**   It is.

6  **Q.**   Okay.

7           MR. TRAGOS:  Defense would move this in evidence.

8           MR. SALTZMAN:  Objection, your Honor.

9           THE COURT:  Sustained.

10  BY MR. TRAGOS:

11  **Q.**   Sir, in that MabThera, would you please look at page 14

12  of your report.  Do you see that, sir?

13  **A.**   I do.

14  **Q.**   It says, "product labelling for Rituxan."  Is this one

15  of the labels that was given to you by the Government?

16  **A.**   No.  This was one of the labels I identified myself.

17  **Q.**   You did this yourself?

18  **A.**   Yes.

19  **Q.**   Okay.

20  **A.**   It was the label that was in effect as of April 2011.

21  **Q.**   Sir, are you familiar with the approval of MabThera by

22  the European Medicines Agency?

23  **A.**   I am not.

24  **Q.**   Okay.  Sir, did you do a report on Ribomustin?

25  **A.**   I did.

Q.   And that report is dated October 12, 2016?

A.   It is.

Q.   And you labeled that, "the name is Ribomustin (in lieu of Treanda)," correct?

A.   Correct.

Q.   And you state there that Ribomustin -- by the way, is Ribomustin the FDA-approved name?

A.   No, it's not.

Q.   What is the FDA-approved name?

A.   Treanda.

Q.   Okay.  And Ribomustin, when used in lieu of Treanda, is intended for treatment of chronic leucitic leukemia, correct?

A.   Correct.

Q.   And again, you state, "Ribomustin, when used in lieu of Treanda, is not safe for use except under the supervision of a practitioner licensed to practice law to administer such drug?"

A.   Correct.

Q.   And in your review of the receipts from QSP back to Dr. Norbergs, you saw the term "Ribomustin, known as Treanda in the US," correct?

A.   That's correct.

Q.   And again, you believed that that statement was intended to be used to influence or convince a physician that they can use Ribomustin in lieu of Treanda, correct?

1   **A.**    That it's -- yes, that it's intended as a substitute.

2   **Q.**    Sir, did you do a report with regards to Eprex,

3   E-P-R-E-X, in lieu of Procrit?

4   **A.**    I did.

5   **Q.**    And in that report -- by the way, you used the words

6   there also, "in lieu of," correct?

7   **A.**    I did.

8   **Q.**    In your review of documents, the Government showed you

9   the word "Eprex" was seen in the receipts that QSP sent back

10   to Dr. Norbergs, correct?

11   **A.**    That's correct.

12   **Q.**    And there it also says, "In lieu of --" excuse me,

13   "known as Procrit in the US?"

14   **A.**    That's correct.

15   **Q.**    Same wording as the other ones?

16   **A.**    Yes.

17   **Q.**    And when you were doing your study, did you do a search

18   like you did in the other -- for the other drugs for clinical

19   studies?

20   **A.**    I did.

21   **Q.**    And what were the results of your search?

22   **A.**    I did two searches, both with the limits of randomized

23   clinical trials, human and English.  The first search, I used

24   the search term "Eprex" alone, and that resulted in 22

25   citations.  The second one was Epoetin Alfa and Quality

1    Specialty, and that resulted in zero citations.

2    **Q.**   So when you did "Eprex," you found 22 citations?

3    **A.**   That is correct.

4    **Q.**   Okay.  And this is a study, by the -- let's go to those,

5    if we could, appendix three.  The first one is a study by the

6    Clinical Drug Investigations.  Do you see that?

7    **A.**   Correct.

8    **Q.**   The second one, if you could translate what "P-L-O-S,"

9    do you know what that means?

10   **A.**   I do not, but "PLOS-1."

11   **Q.**   And then the International Urology and Nephrology

12   Journal, do you see that?

13   **A.**   I do.

14   **Q.**   Another study, and another study

15   Neuropsychopharmacological Magazine, May 2014.  Do you see

16   that?

17   **A.**   I do.

18   **Q.**   And then, we have the Journal of Clinical Laboratory,

19   2012, do you see that?

20   **A.**   I do.

21   **Q.**   Then we have the Journal of Clinical Nephrology,

22   January 2012?

23   **A.**   Correct.

24   **Q.**   Then we have the Drug Research and Development, 2011?

25   **A.**   Correct.

1   **Q.**   Then we have at Trials Magazine, October 2010?

2   **A.**   Correct.

3   **Q.**   And then we have the Nephrology Dial and Transplant

4   Journal, December 2010?

5   **A.**   Correct.

6   **Q.**   Then we have the Journal of Clinical Nephrology,

7   November 2009?

8   **A.**   Correct.

9   **Q.**   Then we have the J Bone Joint Surgery, August 2008?

10   **A.**   Correct.

11   **Q.**   Then we have the Nephrology Journal, October 2007?

12   **A.**   Correct.

13   **Q.**   Then we have a Nephrol Dial Transplant Journal,

14   October 2007?

15   **A.**   Correct.

16   **Q.**   Then the American Journal of Kidney Disease, May 2006?

17   **A.**   Correct.

18   **Q.**   Then we have the BMC Nephrology Journal, May 2005?

19   **A.**   Correct.

20   **Q.**   Then we have the Transfusion Journal, July 2001?

21   **A.**   Correct.

22   **Q.**   Then we have the Clinical Nephrology Journal,

23   March 2001?

24   **A.**   Correct.

25   **Q.**   Then the Bio Pharmacological Drug Disposition Journal,

1    in September 2000, correct?

2    **A.**    Correct.

3    **Q.**    And then we have the European Journal of Surgery in

4    March 1998?

5    **A.**    Correct.

6    **Q.**    Then we have the Journal of Pediatric Medicine,

7    August 1996?

8    **A.**    Correct.

9    **Q.**    And then we have the Journal of Pediatric Medicine,

10   again, June 1994?

11   **A.**    Correct.

12   **Q.**    Then we have the Pharmacology Weekly, April 1992?

13   **A.**    Correct.

14   **Q.**    And these are all items you found when you put the

15   search in for MabThera?

16   **A.**    These are the citations PubMed found when it searched

17   for MabThera.

18   **Q.**    Right.  Well, the computer search engine you used?

19   **A.**    Correct.

20   **Q.**    And what is your -- what was your final -- I mean,

21   Eprex.  I'm sorry.  Your search for Eprex --

22   **A.**    I'm sorry?

23   **Q.**    -- which is the non-FDA approved drug, correct?

24   **A.**    Correct.

25   **Q.**    And when you looked at these, did you determine that any

1   of them were authoritative for you, to be used?

2   **A.**   Each of these citations, for all of the searches, lacked

3   at least one element that would have qualified it as an

4   adequate and well-controlled trial for the substance -- the

5   drug product that was mentioned when used in lieu of an

6   approved US product.

7   **Q.**   So you rejected all 22?

8   **A.**   I did.

9   **Q.**   Sir, let me ask you to look at Defense Exhibit 10.  Is

10  that a copy of the studies that we have been speaking of?

11  **A.**   It is.

12          MR. TRAGOS:  At this time, we move it into

13  evidence, your Honor.

14          MR. SALTZMAN:  Sustained -- objection, your Honor.

15          THE COURT:  Sustained.

16  BY MR. TRAGOS:

17  **Q.**   Doctor, how many reports did you do on Ribomustin?

18  **A.**   I have one dated April 2nd.

19  **Q.**   Excuse me?

20  **A.**   I have one that's dated April 2, 2016, and one dated

21  October 12, 2016, and I'm not sure, but it looks like either

22  I have a portion of one, and one dated October 12, 2016.

23  **Q.**   October 12, 2016?

24  **A.**   Correct.

25          MR. TRAGOS:  May I approach the witness, your

1    Honor?

2              THE COURT:  Yes.

3    BY MR. TRAGOS:

4    **Q.**   Doctor, do you have two reports in front of you there?

5    **A.**   You have the two that I have, both dated October 12,

6    2016.

7    **Q.**   I know, but they are different?

8    **A.**   They are.

9    **Q.**   Well, why did you generate two reports on October 12,

10   2016?

11   **A.**   With the first report, the one that was 22 pages in

12   length -- with the first report that's 22 pages in length,

13   the only firm I had was Quality Specialty Products that was

14   associated with it.  So this was the one based on the

15   invoice.  So this is why it's listed as, "Ribomustin in lieu

16   of Treanda."

17             For the second report, also dated October 12th,

18   this was conducted with the labelling that was provided to me

19   for the product that's actually -- goes by the name of

20   Ribomustin, and therefore, the firms are the three firms that

21   are listed there, Mundipharma GmbH, Astellas Pharma GmbH and

22   Temmler Werke GmbH.

23   **Q.**   So which reports are you relying on?

24   **A.**   Both, actually.

25   **Q.**   So you actually have done two reports on the same day

1    for Ribomustin?

2    **A.**    I signed off on the two reports on the same day.

3              THE COURT:  How much longer do you have on cross?

4              MR. TRAGOS:  Quite a bit.

5              THE COURT:  When you reach a convenient stopping

6    place, we will take a break.

7              MR. TRAGOS:  Now might be good.

8              THE COURT:  All right.  Let's take a 15-minute

9    break.

10             CSO OFFICER:  All rise.

11             (Jury exits courtroom at 10:29 a.m.)

12             (Court back in session at 10:45 a.m.)

13             THE COURT:  I reviewed the operational plan.  There

14   is nothing in there that's *Jencks* material.  We'll make it

15   part of the exhibits as Court Exhibit No. 1, and under seal.

16   Here you are, Ariana.  Bring in the jury, please.

17   (Court Exhibit No. 1

18   admitted into evidence under seal.)

19             MR. TRAGOS:  Your Honor, the issue about these

20   labels not being on the -- not having evidence they are on

21   the bottles at the practice, are we going to do that by

22   stipulation?

23             THE COURT:  I don't believe that was part of the

24   stipulation.  I don't believe that's been part of the

25   evidence one way or the other.

1          MR. TRAGOS:  The Court said that they are coming

2     in, but that -- they are not going -- we're not going to say

3     that those labels are on the -- were on the bottles at the

4     practice.

5          THE COURT:  And the Government has not had a

6     witness say that.

7          MR. TRAGOS:  Right, but I think the Jury is

8     inferring -- I mean, look at the testimony, the Jury sure is

9     inferring that.

10          THE COURT:  If you have some cross on that issue,

11     you're more than welcome to make it.

12          MR. TRAGOS:  Okay.

13          CSO OFFICER:  All rise.

14          (Jury enters courtroom at 10:46 a.m.)

15          CSO OFFICER:  Please be seated.

16          THE COURT:  Proceed.

17          MR. TRAGOS:  Thank you, your Honor.  All right.

18     BY MR. TRAGOS:

19     **Q.**   So now we have two reports dated October 12, 2016, and

20     when you did the one report, was that before the Government

21     gave you the labels?

22     **A.**   The literature searches that I conducted --

23          THE COURT:  Speak into the microphone, please.

24          THE WITNESS:  Sorry.  The literature searches that

25     I conducted for the product with the labelling were performed

1    on March 21, 2016, and the literature search that was based

2    on the invoice alone was performed on October 3, 2016.  So it

3    was actually later.

4    BY MR. TRAGOS:

5    **Q.**   All right.  So I'm trying to understand, again, why we

6    have two reports on October 12th.

7    **A.**   That is the date that I finally signed off on the

8    reports.

9    **Q.**   So you did one report based on what literature?

10   **A.**   No.

11   **Q.**   One report based on labels?

12   **A.**   When I do the literature search, I look for the product

13   itself, and for the product associated with the possible

14   sponsor manufacturer who may have submitted a new drug

15   application.  When I had the label, I had, um, a whole list

16   of what sounded like German names that were associated with

17   it, not included with that search was the names based on the

18   invoice, that Quality Services Product.  So I conducted

19   additional searches to make sure Quality Services Product

20   didn't try to get the product approved and didn't try testing

21   the product in clinical studies.

22   **Q.**   From your searches and from what the Government provided

23   you, did you determine who the manufacturer was for

24   Neulastim, and feel free to check the label, if you have

25   them.

**A.**    And just to be clear, we are talking about Neulastim?

**Q.**    Correct.

**A.**    I had no labelling for Neulastim.  I only had the order form, and therefore, only the name Quality Service -- I'm sorry, Quality Specialty Products.

**Q.**    Who's the manufacturer for Neulasta?

**A.**    I do not have that name in my report.

**Q.**    Excuse me?

**A.**    I do not have that name in my report.

**Q.**    Who's the manufacturer for Eprex?

**A.**    I don't have any labelling for Eprex to tell you who the manufacturer was.

**Q.**    All right.  How about Procrit, the FDA-approved drug?

**A.**    And I did not list the manufacturer of Procrit in my report.  So I cannot tell you off the top of my head.

**Q.**    How about Ribomustin?

**A.**    Ribomustin is manufactured by Pharmachemi B.V. in the Netherlands, and it's manufactured for Cephalon Incorporated in Frazer, Pennsylvania.

**Q.**    So it's manufactured in the Netherlands for a Pennsylvania company?

**A.**    That is correct.

**Q.**    And that's Ribomustin?

**A.**    I'm sorry.  I'm sorry, Treanda.  That's from the Treanda label.

1   **Q.**   That's Treanda?

2   **A.**   Yes.  My mistake.  For Ribomustin, if it's on the label,

3   the print is too small for me to read it, but it does --

4   there is something that ends in a GmGH.

5   **Q.**   Gm --

6   **A.**   I can't make out the first letters.

7   **Q.**   GmGH, as in capital GMGH?

8   **A.**   Capital Gm, capital G capital H.

9   **Q.**   So you can't tell us where that's made, correct?

10  **A.**   Not with the font that's here in my report, no.

11  **Q.**   How about Zometa?

12  **A.**   However, I can -- well, I can tell you, because I did

13  record it, so Temmler Werke GmbH is the manufacturer.  The

14  Marketing Authorization Holder, M-A-H, which is basically a

15  sponsor for a product in the European Union, is Astellas

16  Pharma GmbH, and the distributor is Mundi Pharma GmbH.

17  **Q.**   And those are European companies?

18  **A.**   As far as I know, yes.

19  **Q.**   And Zometa, and to clarify which version -- let's do the

20  non-FDA Zometa.

21  **A.**   In the non-FDA Zometa there were a number of names

22  associated with the product, but a specific manufacturer

23  wasn't identified.  But we have Novartis Eurolari, it's

24  listed as coming from Istanbul, Turkey.  Novartis Pharma AG,

25  Novartis Pharma Switzerland and Novartis Pharma Stein AG in

1    Switzerland.

2    **Q.**   During your direct testimony you testified that it is --

3    first of all, a lot of FDA-approved drugs are made outside

4    the United States?

5    **A.**   I can't say a lot, but there are a fair number of drug

6    products that are approved that are made outside of the

7    United States.

8    **Q.**   And I believe you testified that it is possible that

9    a -- let's say a European manufacturer could manufacture the

10   same drug, let's say -- let's use MabThera as an example, the

11   same drug, and label it MabThera, and also label it Rituxan,

12   and Rituxan would be for the US market, and MabThera would be

13   for the European market, hypothetically that's possible,

14   correct?

15   **A.**   That they could -- yes.

16   **Q.**   They could be made in the same factory, the same way?

17   **A.**   That is possible.

18   **Q.**   Now, the FDA does not try to regulate how a doctor

19   conducts their practice, correct?

20   **A.**   That is correct.

21   **Q.**   And, in fact, you recognize that physicians have demands

22   on their time and their medical practice is increasingly

23   complex, and labels may be viewed as cumbersome to read or

24   interpret, and that physicians might not read labels,

25   correct?

1    **A.**    I stated that early last decade, yes.

2    **Q.**    I'm sorry, that's a yes, right?

3    **A.**    That's a yes.

4    **Q.**    So you recognize physicians may not even have the time

5    to read labels or they may find them cumbersome, right?

6    **A.**    Yes.

7    **Q.**    And it's a physician's job, as the best arbiters of

8    risk, to determine what's in the best interest of the

9    patient?

10    **A.**    That is correct.

11    **Q.**    And, in fact, there are times even when the FDA approves

12    a label, where a physician may use an FDA-approved drug in a

13    way that is not stated as acceptable on the label?

14    **A.**    What you are saying is essentially correct, yes.  That

15    is called off-label use.

16    **Q.**    In fact, a label cannot contain all of the possible uses

17    of a drug, correct?

18    **A.**    The label contains only the information to support the

19    safety and efficacy of the use of the product for its

20    approved indications.  All the information that a physician

21    should need to decide if a particular product is right for a

22    particular patient with a given condition is on the label

23    for -- if those are an approved indication.

24    **Q.**    But a physician is able to use the product other than

25    what's approved on the label?

1    **A.**    That's the practice of medicine and FDA would not

2    regulate that.

3    **Q.**    That's the practice of medicine?

4    **A.**    Correct.

5    **Q.**    Now, one of the things you talked about, about

6    labelling, is the "Rx only" symbol, correct?

7    **A.**    Yes.

8    **Q.**    Do you remember talking about that?

9    **A.**    Yes.

10   **Q.**    And you consider that trivial, don't you?

11   **A.**    I consider it one of the smaller points, but it's still

12   a point that's required for a product to not be misbranded.

13   **Q.**    Right, but I'm asking do you consider that trivial?

14   **A.**    I considered it one of smaller points, the least

15   important of all the points that are required for a product

16   to not be misbranded.

17   **Q.**    Do you remember testimony you gave under oath on

18   October 15, 2015?

19   **A.**    Vaguely, yes.

20   **Q.**    Page 777, line 10, "They range from something as trivial

21   as having the statement, 'Rx only' on the container of the

22   drug."  Do you remember saying that?

23   **A.**    That sounds familiar.

24   **Q.**    So you did call it "trivial," didn't you?

25   **A.**    I guess I did, yes.  If that's what it says.

Q.   And there are times when the FDA approves drugs for use

without doing the whole clinical study, whole shebang, isn't

there?

A.   I'm not sure what you're referring to.

Q.   How about generic drugs that are so similar that the FDA

has approved the generic without going through the same

process of the FDA approvals?

A.   For the approval of a generic product the sponsor of

that can rely on the agency's previous findings of safety and

efficacy for what we call the "innovator drug," the first

drug to come out, provided that they can demonstrate that

their product acts in a similar manner.  So usually there are

studies called pharmacokinetic studies that are required to

demonstrate that.

Q.   So if the product acts in a similar manner as the

original approved product, the FDA has approved it?

A.   It has to act more than a similar manner.

Q.   I'm using your words, doctor.

A.   Yeah.  Um, essentially, yes, is the bottom line.

        And while you're looking, I would like to qualify

that last answer, if I may.  For small molecule drugs they

need to show similarity in terms of absorption, that if I

take the pill of the innovator product at a certain point in

time, the levels of that medication in my blood would be the

same as if I take the generic product.  And then, if you have

1    similar levels of the drug, it's probably going to act the

2    same way.  It should have pretty much the same efficacy and

3    safety.

4            For biologic products coming up with a generic

5    equivalent has been a very difficult way forward.  We call

6    those products biosimilars, and they can be extraordinarily

7    different in terms of both the active ingredient, and the

8    impurities that are in the product.  And at this point in

9    time to have a biosimilar approved, the agency requires

10   clinical studies demonstrating that the biosimilar product is

11   at least as effective as the innovator product and no less

12   safe than the innovator product.  So it's a much more

13   complicated path forward.

14   **Q.**   Okay.  Now, MabThera and Rituxan are made by the same

15   manufacturer, correct?

16   **A.**   I'm not sure where you're getting that.

17   **Q.**   Do you recall your testimony on October 15, 2015, where

18   you were testifying under oath?

19   **A.**   Stating again?

20   **Q.**   Under oath you testified on a previous occasion,

21   October 15, 2015?

22   **A.**   Right.

23   **Q.**   Do you remember that?

24   **A.**   Yes.

25   **Q.**   Okay.

1          MR. TRAGOS:  May I approach the witness, your

2    Honor?

3          THE COURT:  Yes.

4    BY MR. TRAGOS:

5    Q.   Would it refresh your recollection to take a look at

6    that testimony about who manufactured MabThera and Rituxan?

7    A.   It may.  The question was, "MabThera and Rituxan are

8    both made by the same company, correct?"  And my answer was,

9    "I would have to look at the package again, but I --" and

10   then question, "Fair enough, fair enough."

11   Q.   "Fair enough, fair enough."  Okay.  Keep reading.

12   A.   "I'll put on the screen Government's Exhibit.  Do you

13   recognize that photograph, sir?  Yes, I do."

14   Q.   I'm sorry.  Just read that to refresh your recollection

15   and then I'll ask the question.

16   A.   I'm sorry.  (Witness peruses document.)  I did not state

17   that it was made by the same company.  I stated that it was

18   made by Roche.

19   Q.   Made by Roche?

20   A.   Roche.

21   Q.   And are you familiar with Roche?

22   A.   Somewhat.

23   Q.   Are they a drug company?

24   A.   They are.

25   Q.   Are they a drug company that manufactures FDA-approved

1    drugs?

2    **A.**    They do.

3    **Q.**    And are they a foreign company?

4    **A.**    They have offices abroad.  They are much like Novartis.

5    **Q.**    Excuse me?

6    **A.**    They are much like Novartis.

7    **Q.**    Well, they are all over the place?

8    **A.**    Yes.

9            MR. TRAGOS:  If I may have a moment, your Honor?

10           THE COURT:  All right.

11           MR. TRAGOS:  That's all the questions I have, your

12   Honor.

13           THE COURT:  Any redirect?

14           MR. SALTZMAN:  Yes, your Honor.  If we could please

15   switch over to the computer and publish Government's

16   Exhibit 60A.

17                    **REDIRECT EXAMINATION**

18   **BY MR. SALTZMAN:**

19   **Q.**    Do you recall questions about this chart during

20   cross-examination?

21   **A.**    Yes.

22   **Q.**    And you said the products on -- did you say that the

23   products on the right side purport to have the same active

24   ingredient for the FDA-approved drugs that are on the left

25   side?

1  **A.**    That's correct.

2  **Q.**    What did you mean when you used the word "purport?"

3  **A.**    I have no samples of the product.  I have no way of

4  testing it to see if it actually contains the ingredients or

5  not.

6  **Q.**    Do you know if the drugs that are listed underneath the

7  column of "not FDA-approved" are the same as the drugs listed

8  under "FDA-approved?"

9  **A.**    I'm not quite sure what you mean by "the same."

10 **Q.**    Well, do they have the same -- do you know if they have

11 the same active ingredients?

12 **A.**    Actually, I would have to say that none of the products

13 can be the same.  The FDA products have everything from the

14 studies and appropriate labelling to support their use for

15 their approved indications.  They have manufacturing

16 processes that have been evaluated by the Food and Drug

17 Administration so we know the quality and the purity of the

18 product.  They also have a pedigree.  They have a way of

19 being tracked from the time they are manufactured to the time

20 they are finally used, either in a physician's office or

21 pharmacy distributing it to a patient.  All of the products

22 listed as non-FDA-approved products lack that.  So I would

23 say they are not the same on that basis.

24 **Q.**    And has the FDA-approved any applications for the drugs

25 that are listed in the column on the right?

1    **A.**   At present time none of these products have an approved

2    application.   The only one that ever had an approved

3    application that I could find was Eprex, and that had a

4    biologics licensing application that had been revoked.

5    **Q.**   What does that mean about whether or not the drugs

6    listed in the right column are safe and effective for use?

7    **A.**   It means that the agency hadn't weighed in on it so we

8    don't know.   We can't state definitively.

9    **Q.**   If a recall was effected by the manufacturer of a drug

10   that's listed in the left column, the FDA-approved drug

11   column, but someone had received the drug listed on the right

12   column, is there any way to track that?

13           MR. TRAGOS:   Objection, relevance into this case.

14           THE COURT:   Overruled.

15           THE WITNESS:   No, there is not.   That gets back to

16   the pedigree of the product.

17   BY MR. SALTZMAN:

18   **Q.**   Can you explain why that couldn't be tracked in any way?

19   **A.**   In the US it's a closed system.   So one of the

20   requirements is that the drugs when they are manufactured we

21   keep -- the drug company keeps track of them and we have

22   access to that tracking.   So if there turns out to be a

23   problem, something is adulterated, something that was

24   supposed to be sterile isn't sterile and it gets out into the

25   marketplace, we have a way of going out, finding that drug

1    and recalling it all and being sure that we recalled it all.

2         Furthermore, we can also track to where it went to,

3    find out who may have been exposed to that patient whether it

4    was a pharmacy in a hospital, or physician's office or even a

5    CVS that was distributing it.  We can go that far to find out

6    who got the product from them, who may have been exposed.

7    Q.   If there's a drug that's listed in the right column that

8    was for a foreign market and there was a recall of that drug

9    in the foreign market, would the FDA or manufacturer be able

10   to effect that recall for that drug in the United States?

11        MR. TRAGOS:  Objection, relevance and speculation,

12   and beyond the scope.

13        THE COURT:  Overruled.

14        THE WITNESS:  There are two issues there.  One, FDA

15   would not know necessarily.  We might be aware that a product

16   in Europe had issues with it.  They would share that with us,

17   so that if any of our products are manufactured at the same

18   facility, we can be aware and go ahead and inspect.  But we

19   couldn't be concerned about recalling a product that was not

20   approved here because, to the best of our knowledge, it's not

21   here.  We would have no way of knowing that it got into the

22   country.

23   BY MR. SALTZMAN:

24   Q.   Do you recall the questions on cross-examination about

25   Novartis and related entities?

1    **A.**   Yes.

2    **Q.**   Are you familiar with the corporate structure of

3    Novartis and it's various affiliates in other countries?

4    **A.**   Minimally.

5    **Q.**   Are you familiar with all the affiliates and all the

6    different countries?

7    **A.**   No.

8    **Q.**   For the FDA-approved product Zometa that is listed in

9    the chart on the bottom row of Exhibit 60A, what company

10   submitted that product for seeking FDA approval?

11   **A.**   May I check my notes?

12   **Q.**   If it would refresh your memory.

13   **A.**   So the entity that holds the new-drug applications

14   Novartis Pharmaceuticals Corporation in East Hanover, New

15   Jersey.

16   **Q.**   If a company that had the name Novartis in it, but did

17   not -- was not the "pharmaceuticals corporation" at the end,

18   and was not within the United States, could that Novartis

19   product be distributed in the United States as an

20   FDA-approved drug?

21   **A.**   No, it couldn't, and if it were, it would be misbranded

22   because it has to have the manufacturer, distributor,

23   repackager and labeler associated with the approval.  Lacking

24   that, by using one of their alternative sites, it would be a

25   misbranded product.

1  **Q.**   Do you recall the questions that you were asked on

2  cross-examination about the studies of Zometa that you've

3  reviewed?

4  **A.**   Yes.

5  **Q.**   And the questions regarding the studies of Eprex in lieu

6  of Procrit?

7  **A.**   Yes.

8  **Q.**   And the studies that you reviewed of MabThera in lieu of

9  Rituxan?

10  **A.**   Yes.

11  **Q.**   And did you discuss with Defense counsel the names of

12  the studies that were conducted for -- that you reviewed when

13  you ran your searches, correct?

14  **A.**   More appropriate to say the citations that were

15  discovered in that search.  Not all of them referred to

16  studies.

17  **Q.**   And is it -- that is three of the drugs -- that is for

18  three of the five drugs that you looked at, that you found

19  studies?

20  **A.**   I would have to go and look at the other products, but I

21  believe I found some citations for all, but I can't -- I'd

22  have to look to verify.

23  **Q.**   Would it refresh your memory to look to see?

24  **A.**   Yes.

25  **Q.**   Specifically if I can ask you to look to see if you

1    found any studies for a drug by the name of Ribomustin as

2    opposed to Treanda, and for a drug named Neulastim as opposed

3    to Neulasta?

4    **A.**    The search for Neulastim, which also included a search

5    for Pegfilgrastim and Quality Specialty Products both

6    resulted in no citations.  And the other product, I'm sorry,

7    was Ribomustin?

8    **Q.**    Yes, sir.

9    **A.**    Ribomustin, in my memo marked, "in lieu of Treanda," I

10   searched Ribomustin and Bendamustine and Quality Specialty

11   Products and neither of those searches returned any

12   citations.

13   **Q.**    So in summary, is it fair to say that you found

14   studies for two of the drugs -- did not find studies for two

15   of the drugs, but did find studies for three of the drugs?

16   **A.**    Yes.

17   **Q.**    And for the studies that you did find, what about them

18   were insufficient for you to make a determination as to

19   whether the drugs were generally recognized as safe and

20   effective, generally speaking?

21   **A.**    There were a variety of issues.  Um, for a clinical

22   study to be adequate and well controlled, there are certain

23   things that need to be in place.  Most of them relate to

24   appropriate conduct of the study, appropriate design of the

25   study, having a comparative group like a placebo, sugar pill,

1    active comparative to the drug under investigation.  The

2    study has to be designed to evaluate one of the intended uses

3    of the product.  A lot of these studies referred to totally

4    unrelated uses.

5           To minimize biased generally we use what's called

6    "blinding" in the study.  The person getting the medication

7    is blinded.  They don't know if they are getting a placebo or

8    a real pill.  That's a single blind.  If the physician that's

9    giving the medication is also blinded, it's double blind, and

10   that prevents someone from just being a little bit biased

11   about the medication that's being given and the results that

12   are being retained.  A lot of these studies were what's

13   called "open label" where there was no blinding.  A lot of

14   the studies had no comparator whatsoever.  So there were a

15   variety of reasons that way.  Some of the studies didn't list

16   the product and the manufacturer, especially when I looked at

17   a generic name there was nothing there.

18          The search sometimes when I included "Quality

19   Specialty Products," if I forgot to put the quotations in any

20   citation that had specialty or products in it would come

21   back.  So I tried to restrict it in a way that would likely

22   provide any studies that would come back for the product at

23   hand.

24          One -- if I may, one last thing.  These -- for a

25   product to be generally recognized as safe and effective,

1    there are several steps.  One is, someone has to actually do

2    good clinical trials, adequate and well-controlled studies of

3    the product for the intended use.

4            Second, they need to publish those studies, and

5    they need to publish them in enough detail that experts in

6    that area can review them and make sure the studies were done

7    properly, and the studies were done at all.  A lot of time

8    there is fabricating data that's published.

9            Third, these experts need to get together and

10   decide, and in the FDA's opinion it needs to be unanimous,

11   that this product is safe and effective based on these

12   studies for these intended uses.

13           And then, lastly, the FDA weighs in on it, and this

14   was an issue that was a little bit eluded to before.  The FDA

15   does have databases of lots of studies that have been done

16   for various indications of products.  Some products were

17   never approved, or some products that were approved, but not

18   for all the indications the sponsor did research for.  A lot

19   of times those failed studies don't get published.  Companies

20   would rather -- publishers would rather put something in

21   their journal where it shows a great new drug that does work

22   on cancer as opposed to another product that didn't.  Those

23   failed studies are important.  A lot of times those aren't

24   available to experts that would be reviewing this.  So the

25   FDA also weighs in on the process.

1          But the first step is that the studies have to be

2     done and they have to be published and that's where I was

3     looking.  If there are no published adequate and

4     well-controlled studies of this particular product for these

5     particular uses, then there is no way the rest of the steps

6     can be taken for it to be generally recognized as safe and

7     effective.

8     **Q.**   For the analysis you did in this case, did you find any

9     studies that were adequate and well controlled for the drugs

10    at issue?

11    **A.**   No, I did not.  And in each of my memos I outlined

12    study-by-study what the shortcomings were.

13    **Q.**   Do you recall the questions regarding a statement you

14    wrote about, "Neulastim when used in lieu of Neulasta is not

15    safe except under the supervision of a practitioner licensed

16    by law to administer drugs?"

17    **A.**   Yes.

18    **Q.**   Why did you include that information in your report?

19    **A.**   Because when the product is used as a substitute for the

20    other product, it's being used for the same indications.

21    Those indications require medical expertise to diagnose the

22    patient and determine what the best treatment is.  They

23    require or -- may require clinical testing to confirm the

24    diagnosis or to make sure that the patient is suitable to

25    receive the treatment.

1           There are also toxicities associated with these

2     products.  Some of the toxicities are life threatening and

3     someone with medical expertise needs to be evaluating the

4     patient constantly to make sure they are not experiencing any

5     of those things, and the treatment either needs to stop or

6     they need to be treated for these severe adverse reaction.

7     **Q.**   And when you said, "It's not safe unless used under the

8     supervision of a practitioner," were you saying it actually

9     was --

10              MR. TRAGOS:  Objection, leading.

11              THE COURT:  Sustained.

12    BY MR. SALTZMAN:

13    **Q.**   When you said, "That it is not safe for use except under

14    the supervision of a licensed practitioner," what does that

15    mean about whether or not the drug is safe?

16    **A.**   It -- I guess the best way to phrase it is that the

17    safest way to use this product is under the supervision of

18    someone who has the training necessary to make the diagnosis,

19    determine the best treatment and to rescue the patient from

20    any adverse reactions that occur.

21    **Q.**   And in your analysis you said, "Neulastim, when used in

22    lieu of Neulasta is not safe unless under the supervision of

23    a licensed practitioner," is that accurate?

24              MR. TRAGOS:  Objection, asked and answered.

25              THE COURT:  Sustained.

1    BY MR. SALTZMAN:

2    **Q.**   Was that part of your -- coming to that conclusion, was

3    that part of your analysis to determine whether or not the

4    drug was a prescription drug?

5    **A.**   The safety of a -- no.  The safety of the -- the

6    risks --

7              MR. TRAGOS:  Objection to the answer.

8              THE COURT:  Overruled.  I think the question is too

9    vague.  Would you rephrase the question?

10             MR. SALTZMAN:  Sure.

11   BY MR. SALTZMAN:

12   **Q.**   Can you explain, when you did your analysis of the drugs

13   at issue in this case, that are listed in the right column,

14   did you first determine whether or not the drug was a drug --

15   the product was a drug?

16   **A.**   I did.

17   **Q.**   What was the next step after that?

18   **A.**   The next step was to determine whether it's a

19   prescription drug.

20   **Q.**   If a drug is a prescription drug, does that mean that it

21   is safe to use?

22   **A.**   No.  Depending how one looks at it, it could be less

23   safe to use, which is why it requires some type of expert to

24   be involved with its administration.

25   **Q.**   How would you know if a prescription drug is safe to

1    use?

2    **A.**    Clinical studies are the best way to determine that.

3    They are the ones that show when it's efficacious, what

4    indications, what doses, how much to give, how often to give,

5    and they also provide all of the risks that are associated

6    with the product so someone can actually monitor a patient

7    for those, or decide if this product does something like

8    cause heart damage.  You may not want to give it to a patient

9    that has heart problems.  So it allows appropriate selection

10   of the patient.  All of these clinical studies that are done

11   to support approval, all that information is incorporated

12   into the label.

13   **Q.**    And when you said that, "Neulastim, when used in lieu of

14   Neulasta, is not safe for use except under the supervision of

15   a practitioner licensed by law," does that mean that the --

16            MR. TRAGOS:  Objection, leading.

17            THE COURT:  Sustained.

18   BY MR. SALTZMAN:

19   **Q.**    Is Neulastim an approved prescription drug?

20   **A.**    No, it is not.

21   **Q.**    Do you recall the questions that you were asked about

22   the manufacturer of the drugs for MabThera and Rituxan?

23   **A.**    Yes.

24   **Q.**    And you were asked questions on cross-examination, I

25   believe, about the facilities that they were made in.  Do you

1    recall those questions?

2    **A.**    The one where my previous testimony was cited?

3    **Q.**    Today.

4    **A.**    Is that what you're talking about?

5    **Q.**    Do you recall testimony about that today?

6    **A.**    Yes.

7    **Q.**    And I believe -- did you testify that, "It's possible

8    that the drugs were made in the same factory?"

9            MR. TRAGOS:  Objection, repeating testimony.

10           THE COURT:  Sustained.  Leading.

11   BY MR. SALTZMAN:

12   **Q.**    If a drug is made in the -- if a drug that is named

13   Rituxan is made in the same factory as a drug with the name

14   MabThera, does that make the drugs the same?

15   **A.**    No, it does not.

16   **Q.**    Why not?

17   **A.**    As I eluded to before, there is no way of knowing A,

18   whether the manufacturing processes were the same; B, there

19   is no way of establishing a pedigree for the product so it

20   can be tracked.  There is no approved label for the product

21   with a different name.  I know nothing about specifications

22   for it, and just the fact that their labelling is different

23   also distinguishes them.

24           I -- I don't know if it would be helpful at all to

25   talk a little bit --

1      MR. TRAGOS:  Objection, your Honor, no pending

2 question.

3      THE COURT:  Overruled.

4      THE WITNESS:  -- the active-ingredient portion of

5 the drug that was discussed.  There's a lot more to the drug

6 than active ingredient, and especially for the biologics

7 process that makes the manufacturing of these biologics

8 processes, which in this case would include the Neulastim,

9 the Eprex and the MabThera.

10      And I don't know if it's helpful to discuss a

11 little bit about proteins and issues that are related to

12 them, or anything else, but I'm happy to do so to expand on

13 that.

14 BY MR. SALTZMAN:

15 **Q.**   Is it possible for, um -- do you remember talking about

16 biosimilar products?

17 **A.**   Yes.

18 **Q.**   Are biosimilar products biologics?

19 **A.**   Yes, they are.

20 **Q.**   Are biologics required to be stored cold?

21 **A.**   Many of them are.

22 **Q.**   And when you -- biosimilar products require a separate

23 approval process by the FDA, is that correct?

24 **A.**   They do.

25 **Q.**   Do you recall the specific, um -- during

1    cross-examination you were asked questions about "Rx only."

2    Do you recall the specific wording that you used when you

3    testified previously?

4    **A.**   For a product to not be -- for a product that does not

5    have adequate directions --

6             MR. TRAGOS:  Objection, your Honor, not responsive.

7             THE COURT:  Sustained.

8    BY MR. SALTZMAN:

9    **Q.**   Do you recall the exact wording that you used when you

10   testified previously regarding "Rx only?"  Do you recall the

11   wording that you said when you testified?

12   **A.**   Only that that specific term, the letters "Rx" and the

13   word "only" needed to be included on labelling for the

14   product.

15   **Q.**   And do you recall describing it in relation to other

16   aspects of the approval process?

17   **A.**   For such a product to be able to --

18            THE COURT:  He's not asking you to answer the

19   question as you want to answer it now.  He's asking if you

20   remember what exact words you used a year ago.

21            THE WITNESS:  I'm sorry.  No, I don't.

22   BY MR. SALTZMAN:

23   **Q.**   Would seeing the transcript help you refresh your memory

24   as to what you said?

25            MR. TRAGOS:  Objection, your Honor.  There isn't a

1    question.

2            THE COURT:  Overruled.

3            THE WITNESS:  Yes, it would.

4            MR. SALTZMAN:  Your Honor, may I approach?

5            THE COURT:  Yes.

6            MR. TRAGOS:  Can we have a page and line number,

7    your Honor?

8            MR. SALTZMAN:  Your Honor, page 77, line --- 77,

9    line 10.

10   BY MR. SALTZMAN:

11   **Q.**   Now, can you review the paragraph beginning at line 10

12   through line 15?

13   **A.**   (Witness peruses document.)  Yes.

14   **Q.**   When you said that "Rx only" -- when you said that

15   something could be as trivial as being a statement as "Rx

16   only," what did you mean by that in that context?

17   **A.**   Something simple.  I was talking about this in the

18   context of the steps a company needs to do to get a

19   product -- a prescription drug product approved so that it

20   can be exempted from the requirement that it has adequate

21   directions for use by a lay person.  There's a number of

22   steps the sponsor has to take, and you have to meet all of

23   those things to be exempted from the requirement.  Since a

24   prescription drug cannot have adequate directions for use by

25   a lay person, unless they take all of these steps, their

1    product is misbranded.  The simplest of the steps is to put

2    the term "Rx only" on the labelling for the product.

3           The other end of that, the most complicated part is

4    having labelling, which is based on adequate and

5    well-controlled clinical trials, animal data and chemistry

6    data that could be used to make a label approved by the FDA

7    or biologics application.

8    **Q.**   Why is it the simplest thing that can be done?

9    **A.**   Because it's just a matter of printing "Rx only" on

10   labels, and boxes and package inserts.

11   **Q.**   Do you recall on cross-examination being asked questions

12   about drugs being used for indications not on the labelling?

13   **A.**   Yes.

14   **Q.**   What is that referred to as?

15   **A.**   Off-label use.

16   **Q.**   Can you explain what that means?

17   **A.**   So the labelling reflects the best information that the

18   FDA has to guide medical people, doctors, nurses, pharmacists

19   on how to safely use the product.  It describes the patient

20   populations that you can use it in, the indications that you

21   can use it in, where there has been data that has been

22   submitted to show that the benefits of the product outweigh

23   the risk.  Use of the product for a different indication on a

24   different patient population, injecting the medicine in a

25   different manner, using doses that are not on the label,

1   those are all off-label uses.

2   **Q.**   Is -- when a drug is used "off-label," is the drug

3   itself approved by the FDA?

4   **A.**   It remains an approved product, yes.

5   **Q.**   Is the manufacturing of the drug, as part of the

6   approval of the drug, considered approved?

7   **A.**   The manufacturing, um, requirements are all part of the

8   approval.  That doesn't change.

9   **Q.**   Is the facility considered as part of the approval

10  process?

11  **A.**   Yes, it is.

12  **Q.**   Even for off-label uses of drugs, are there still

13  aspects of the product safety that are considered by the FDA?

14  **A.**   Can you rephrase that question, please?

15  **Q.**   Even for off-label uses of drugs, are there still

16  aspects of the product's safety that are assured because the

17  drug is FDA-approved?

18  **A.**   In one way, yes.  You're still administering the product

19  to a patient.  So a lot of adverse events that have been

20  associated with it may occur in the patient that's receiving

21  the product.  By using it off-label, you might be taking

22  greater risks from unknown adverse reactions that could occur

23  because it hadn't been studied.

24          There are rare occasions where the FDA is aware of

25  adverse reactions that can be life threatening for off-label

1 | use, and we actually go ahead and put that information into

2 | the label to discourage that kind of use.

3 |       THE COURT:  How much longer do you have on

4 | redirect?

5 |       MR. SALTZMAN:  Three questions, your Honor.

6 |       THE COURT:  One, is what?  We're counting.  One --

7 |       MR. SALTZMAN:  I should have said four then.

8 |       THE JURY:  (Jury laughing).

9 |       MR. SALTZMAN:  I have to be judicious.

10 | BY MR. SALTZMAN:

11 | **Q.**  If an FDA-approved drug is being used for off-label

12 | purposes and there's a recall of that drug by the

13 | manufacturer, can that drug be properly recalled?

14 | **A.**  Yes, the pedigree still exists.  We can still track it.

15 | **Q.**  Is the usage of an unapproved prescription drug from a

16 | foreign country akin to off-label usage?

17 | **A.**  No.  Off-label usage requires an FDA-approved label.

18 | Lacking an FDA-approved label, it's just usage of the

19 | product, the safety and efficacy of which is not known for

20 | any use in any patient population.

21 |       MR. SALTZMAN:  No further questions, your Honor.

22 |       THE COURT:  Great.

23 |       MR. SALTZMAN:  I'll save it.

24 |       THE COURT:  Thank you, sir.  You may step down.

25 | (Witness excused.)

1 (Witness Karen Rothschild was

2 reported but not asked to be transcribed.)

3          THE COURT:  Call your next witness, please.

4          MR. SALTZMAN:  Your Honor, the United States calls

5 Kelly Krouse.

6          MR. SALTZMAN:  Your Honor, may I approach to

7 retrieve some exhibits for this witness?

8          THE COURT:  Yes.

9          MADAM CLERK:  Good afternoon.  Please raise your

10 right hand.

11          THE WITNESS:  I do.

12          MADAM CLERK:  Please state your name and spell your

13 first and last name for the record.

14          THE WITNESS:  Kelly Krouse, K-E-L-L-Y, K-R-O-U-S-E.

15          MADAM CLERK:  Thank you.  You may have a seat.

16          MR. SALTZMAN:  Your Honor, at this point, I would

17 like to move into evidence Government's Exhibits 21A through

18 H, which are business records that were noticed at Docket

19 Entry 47.

20          THE COURT:  They will be admitted.

21 (Government Exhibit Nos. 21A – 21H

22 admitted into evidence.)

23                              *

24                              *

25                              *

1                              **KELLY KROUSE**

2      Called as a witness herein, having been first duly sworn

3      was examined and testified as follows:

4                          **DIRECT EXAMINATION**

5      **BY MR. SALTZMAN:**

6      **Q.**   Ms. Krouse, how old are you?

7      **A.**   52.

8      **Q.**   Where did you grow up?

9      **A.**   Lincoln, Nebraska.

10     **Q.**   Would you mind just pulling that microphone closer to

11     you.  Where do you currently live?

12     **A.**   Arizona.

13     **Q.**   Before that where did you live?

14     **A.**   Colorado.

15     **Q.**   And before that where did you live?

16     **A.**   Florida.

17     **Q.**   I want to talk a little bit about your educational

18     background.  How far did you get in school?

19     **A.**   Um, I did -- I took a few classes at the University of

20     Nebraska and a few classes at Southeast Community College.

21     **Q.**   Did you complete college?

22     **A.**   No.

23     **Q.**   Did you complete high school?

24     **A.**   Yes.

25     **Q.**   And what type of work, just generally speaking, have you

1    done since you finished high school?

2    **A.**    Clerical, bartending.  I should say bartending first,

3    then clerical.

4    **Q.**    Can you --

5    **A.**    Clerical.

6    **Q.**    Did you mention bartending as well?

7    **A.**    Yeah, first.  Like, when I first got out of school.

8    **Q.**    And when did you move to -- when did you leave Florida?

9    **A.**    Um, October of 2014.

10   **Q.**    And when did you come to Florida?

11   **A.**    Um, November of '95.

12   **Q.**    And when you came to Florida, what type of work did you

13   do?

14   **A.**    Clerical.

15   **Q.**    In what industry?

16   **A.**    Um, I started off in, like, a realtor company, and then

17   I went to, um, a medical office.

18   **Q.**    Who was the doctor at that medical office?

19   **A.**    Dr. Norbergs.

20   **Q.**    When did you start working for Dr. Norbergs?

21   **A.**    October of 1996.

22   **Q.**    Do you see Dr. Norbergs in the courtroom here today?

23   **A.**    I do.

24   **Q.**    Can you please point her out and identify her by an

25   article of clothing she is wearing?

1  **A.**    Right here in the brown jacket.

2           MR. SALTZMAN:  Your Honor, if the record can

3  reflect the witness has identified the Defendant?

4           THE COURT:  Let the record so reflect.

5  BY MR. SALTZMAN:

6  **Q.**    How long did you work for Dr. Norbergs?

7  **A.**    18 years.

8  **Q.**    Was that 18 years straight or were there any breaks in

9  between?

10 **A.**    There was one break, um, around 2007.

11 **Q.**    For how long was that break?

12 **A.**    For three months.

13 **Q.**    Other than working for Dr. Norbergs, can you describe

14 the nature of your relationship?

15 **A.**    Um, she was my friend and I rented from her.  I'm sorry.

16 (Witness is crying.)  She was my friend, and I rented from

17 her for a couple months.

18 **Q.**    Were you friends with her the entire period of time you

19 worked for her?

20 **A.**    No.

21 **Q.**    When did you become friendly?

22 **A.**    Probably after seven, eight years of employment.

23 **Q.**    What do you mean you were friends?  Can you explain

24 that?

25 **A.**    Um, we talked about personal stuff, and towards the

1   last, um, few years we, you know, would go out to dinner with

2   our husbands, and shopping and hangout by the pool.

3   **Q.**   And when did you start renting from her?

4   **A.**   We sold our house in July of 2014, and we left in

5   October.  So it was the last couple months before we left

6   Florida.

7   **Q.**   What kind of a medical practice did Dr. Norbergs have

8   while you worked for her?

9   **A.**   Oncology/hematology.

10  **Q.**   What was the name of the medical practice when you

11  started working there?

12  **A.**   Bay Area Cancer Consultants.

13  **Q.**   Did it ever change names?

14  **A.**   Yes.

15  **Q.**   Approximately when did that happen?

16  **A.**   Around -- I can't recall for sure, um, but it went to

17  the Tampa Bay Area Cancer Consultants, and then after that it

18  was East Lake Oncology.

19  **Q.**   Just approximately, do you remember when it became East

20  Lake Oncology?

21  **A.**   I want to say 2008/2009.

22  **Q.**   Who was the owner of East Lake Oncology?

23  **A.**   Dr. Norbergs.

24  **Q.**   Over the course of time that you worked at East Lake

25  Oncology, can you explain your various positions and/or

1    responsibilities?

2    **A.**    Yeah, I started out as a medical receptionist, um, and

3    then, answering phones, doing front desk work, and then I

4    went to the administrative assistant and took on more

5    responsibilities as far as keeping track of her schedule, and

6    rearranging, and if I needed to, um, made copies, um,

7    basically more of the -- we did have an office manager, but I

8    did more of the clerical side of the management as

9    administrative assistant, and then, I became an office

10   manager, and I did anything from front desk, to maintenance,

11   the lab.  I just didn't do chemo.  I didn't give chemo.

12   **Q.**    What do you mean by maintenance?

13   **A.**    Building maintenance, office maintenance.

14   **Q.**    Like what?

15   **A.**    Sometimes painting the walls, changing light bulbs, um,

16   tried to fix the washer and dryer, air conditioning unit.

17   **Q.**    You were a Jack of all trades?

18   **A.**    By then I had been there long enough.

19   **Q.**    Did you order drugs as the office manager?

20   **A.**    Yes.

21   **Q.**    Before you officially became office manager, did you

22   function in that capacity in any way?

23   **A.**    Um, not necessarily.  Most of it would be, you know,

24   copying, or faxing the requests, not physically looking them

25   up or ordering them.  Yeah, mailing off checks, not writing

1   them.

2   **Q.**   When did you stop working for Dr. Norbergs?

3   **A.**   October of 2014.

4   **Q.**   Why did you stop working there?

5   **A.**   We pretty much had closed down the practice and my --

6   um, we pretty much had our apartment ready in Colorado, but

7   the business was pretty much shut down.

8   **Q.**   What do you do for work now?

9   **A.**   Um, I work for an OB/GYN as front desk.

10  **Q.**   Did you receive a subpoena requiring you to be here

11  today?

12  **A.**   Yes.

13  **Q.**   After you received that subpoena did you also receive a

14  letter from the US Attorney's Office, my office?

15  **A.**   Yes.

16  **Q.**   What is the nature of that letter, to your

17  understanding?

18  **A.**   Um, my status as a witness, any information directly or

19  indirectly derived, such information may be held against me.

20  **Q.**   May be held against you or may not be held against you?

21  **A.**   No.  May not be held against me.

22  **Q.**   Did you ask for that letter?

23  **A.**   No.

24  **Q.**   When you were involved in ordering the drugs at Dr.

25  Norbergs office, who paid for them?

**A.**   East Lake Oncology.

**Q.**   And were the orders placed in the name of East Lake Oncology or Dr. Norbergs?

**A.**   Both.

**Q.**   Were you involved in identifying where to buy drugs from?

**A.**   Yes.

**Q.**   Did you go to a pharmacy, like, a CVS?

**A.**   No.

**Q.**   Where did you identify to buy drugs from?

**A.**   Drug distributors that we had set up accounts for.

**Q.**   Did you ever go to a physical store to buy drugs?

**A.**   Once, twice.

**Q.**   And why was that?

**A.**   The wholesale distributors were out of vitamin B12, and that was where we could get it was at Target.

**Q.**   When you order drugs from the wholesale distributors, how did you actually place an order?

**A.**   Online and by fax.

**Q.**   And for what -- what were those drugs that you ordered designed to treat?

**A.**   Cancer and blood disorders.

**Q.**   Approximately how many different wholesalers or distributors did you order from?

**A.**   About seven.

1    **Q.**   How is a distributor chosen to buy the drugs?

2    **A.**   Mostly on prices so --

3    **Q.**   What about prices drove a decision on a particular

4    order?

5    **A.**   You would have out the seven wholesale distributors, and

6    you would look at the prices of each drug, and would you

7    order it by the cost of which one was most reasonable.

8    **Q.**   By "most reasonable," what do you mean?

9    **A.**   Inexpensive, less expensive, less expensive.

10   **Q.**   And whose decision was it to buy drugs at the least

11   expensive price?

12   **A.**   Dr. Norbergs.

13   **Q.**   How did you determine who sold a particular drug at the

14   least expensive price?

15   **A.**   I'm sorry, one more time?

16   **Q.**   How did you determine who sold a particular drug at the

17   least expensive price?

18   **A.**   By looking, um, up each particular drug, either online

19   or we had, um, vexed pages that had prices on it, so you just

20   went through to see which one had the least expensive and

21   that's who you would get it --

22   **Q.**   Was that a responsibility you had as the office manager?

23   **A.**   Yes.

24   **Q.**   And who instructed you to do that?

25   **A.**   Dr. Norbergs.

1  **Q.**   Who made the final decision about where to buy drugs

2  from?

3  **A.**   Dr. Norbergs.

4  **Q.**   For decisions that were not related to ordering drugs

5  who had the final decision at East Lake Oncology on

6  administrative aspects of the office?

7  **A.**   Dr. Norbergs.

8  **Q.**   And what other areas would Dr. Norbergs have that kind

9  of decision-making authority?

10  **A.**   Um, pretty much everything that went on in our office.

11  **Q.**   And if you found a drug and got it at a cheaper price,

12  and therefore, saved East Lake Oncology money, did you

13  receive any payment as part of that savings?

14  **A.**   No.

15  **Q.**   Did you receive any bonus based on that?

16  **A.**   No.

17  **Q.**   Did you receive any commission?

18  **A.**   No.

19  **Q.**   Who determined your salary?

20  **A.**   Dr. Norbergs.

21  **Q.**   And to your knowledge was your salary based on how well

22  you did at buying drugs at the cheapest cost?

23  **A.**   No.

24  **Q.**   Who would use the credit card in the office for East

25  Lake Oncology to pay for bills?

1    **A.**    Um, Dr. Norbergs, but I had the credit card to, um, put

2    on the, um, the fax cover or fax sheet for, um, a drug

3    company.

4    **Q.**    And for a drug company, what do you mean by that?

5    **A.**    Some of them, some of the drugs we had to pay for that

6    day, and some of them we were on a payment plan.  So for the

7    ones that we had to pay that day, um, we would sometimes pay

8    them by credit card.

9    **Q.**    When the time came to pay the credit card bill or other

10    bills and a check was required, who could do that?

11    **A.**    Dr. Norbergs.

12    **Q.**    Could you pay for anything by check?

13    **A.**    No.

14    **Q.**    Do you know if anyone else in the office had

15    authorization to write checks on behalf of East Lake

16    Oncology?

17    **A.**    No.

18    **Q.**    Whose decision was it that only Dr. Norbergs could write

19    checks?

20    **A.**    Dr. Norbergs.

21    **Q.**    And do you know why?

22    **A.**    Um, it was her decision based on a bad experience that

23    we had previous -- in previous years with another office

24    manager.

25    **Q.**    What was that bad experience?

**A.**   Um, she wrote the checks -- the office manager wrote the

checks basically for herself instead of the company and stole

money.

**Q.**   Do you know approximately how much money?

**A.**   Um, I'm thinking it was two million.

**Q.**   And what happened to the office manager?

**A.**   One more time?

**Q.**   What happened to the office manager?

**A.**   She's in prison.

**Q.**   Going back to the drugs, after drugs were purchased from

distributors, were the drugs administered to patients?

**A.**   Yes.

**Q.**   Were drugs typically ordered with a particular patient

in mind?

**A.**   Yes.

**Q.**   Were they purchased for any other purpose other than to

give to patients?

**A.**   No.

**Q.**   Did patients pay Dr. Norbergs' medical practice for the

drugs themselves?

**A.**   Say that one more time?

**Q.**   For the drugs that were administered to patients, did

patients pay for those drugs?

**A.**   No.

**Q.**   Who paid for them?

1    **A.**    Their insurance.

2    **Q.**    Does that include Medicare?

3    **A.**    Yes.

4    **Q.**    And if Medicare didn't cover the entire portion or --

5    the entire cost of the drug, who had to pay for the rest?

6    **A.**    Um, either the secondary or patients, if it was their

7    responsibility.

8    **Q.**    I'd like to talk about Quality Specialty Products.  Are

9    you familiar with that entity?

10   **A.**    With what?

11   **Q.**    Quality Specialty Products or QSP?

12   **A.**    Yes, yes.

13   **Q.**    Did you hear about them when you worked at East Lake

14   Oncology?

15   **A.**    Yes.

16   **Q.**    How did you hear about Quality Specialty Products?

17   **A.**    Fax.  Fax price sheet.

18   **Q.**    And who receives the faxes at East Lake Oncology?

19   **A.**    Um, there were -- pretty much anybody in the office

20   could get them.  Um, a lot of times, um, they would set it on

21   my desk and I would give it to Dr. Norbergs or they would

22   just put it in Dr. Norbergs office.

23          MR. SALTZMAN:  Your Honor, permission to approach?

24          THE COURT:  You may.

25                                    *

1    BY MR. SALTZMAN:

2    **Q.**   I've just handed you what's been marked for

3    identification as Government's Exhibit 6, 11, 13A, 14B, 15A

4    through C, and 105B.  If you could take a look at those and

5    let us know if you have seen those documents before today.

6    **A.**   Yes, I've seen them.

7    **Q.**   How do you know that you've seen these particular

8    documents?

9    **A.**   Um, I've initialed the, um, exhibit tag and the day.

10   **Q.**   Were these documents from East Lake Oncology's office?

11   **A.**   Yes.

12   **Q.**   Are some of the documents in the exhibits from QSP?

13   **A.**   Yes.

14   **Q.**   Are some of the documents in these exhibits from other

15   distributors?

16   **A.**   Um, yes.

17   **Q.**   Did you rely on these documents in your work at East

18   Lake Oncology?

19   **A.**   Yes.

20   **Q.**   Was it a regular practice to put materials together like

21   this at East Lake Oncology?

22   **A.**   Yes.

23   **Q.**   Was it a regular practice to keep these documents?

24   **A.**   Yes.

25   **Q.**   And was it a normal part of the business to keep records

1    like this?

2    **A.**    Yes.

3            MR. SALTZMAN:  Your Honor, may I publish exhibits

4    in evidence?

5            THE COURT:  Are they already in evidence?

6            MR. SALTZMAN:  Yes, sir.

7            THE COURT:  And yes, if they are already in

8    evidence, of course, you don't have to go through laying a

9    foundation for getting them into evidence.

10           MR. SALTZMAN:  I understand, your Honor.

11   BY MR. SALTZMAN:

12   **Q.**    I just published Exhibit 6A.  In the upper left-hand

13   corner, what does that exhibit show or -- what does it say?

14   **A.**    QSP, Quality Specialty Products.

15   **Q.**    And I just displayed Exhibit 6B.  Is that the same

16   folder that we're looking at as Exhibit 6A?

17   **A.**    Yes, the inside.

18   **Q.**    And whose handwriting is on this document?

19           MR. TRAGOS:  Objection, your Honor.  Could we

20   specify which handwriting, which document?  It's multiple

21   documents.

22           THE COURT:  Well, the witness can certainly say

23   that.

24   BY MR. SALTZMAN:

25   **Q.**    Looking at the -- looking at Exhibit 6B, whose

1   handwriting, and if there is more than one, please tell us,

2   is on this document?

3   **A.**   Upper left-hand corner is Dr. Norbergs.  Lower left-hand

4   corner is mine, and the big one on the right side is mine.

5   **Q.**   So let's start by looking at the big one on the right

6   side.  On the top, what is involved -- what is that that's on

7   the top of that document?

8   **A.**   A nursing company marketing sticky tab that they gave

9   out.

10  **Q.**   Does that involve anything to do with handwritten notes

11  that's on the document?

12  **A.**   No.

13  **Q.**   And whose handwritten notes are on this document in

14  particular?

15  **A.**   Mine.

16  **Q.**   And what does the first entry on that document say?

17  **A.**   "Where are drugs shipped from?"

18  **Q.**   And what is that question relating to?

19  **A.**   Where do -- where do the drugs come from, like, from

20  our -- where is the distributor.

21  **Q.**   Does this relate to Quality Specialty Products?

22  **A.**   Yes.

23          MR. TRAGOS:  Objection, leading.

24          THE COURT:  Overruled.

25                              *

1   BY MR. SALTZMAN:

2   **Q.**   Why did you write that down?

3   **A.**   These were questions I was asked to inquire about.

4   **Q.**   And what is the answer that you received to that

5   question?

6   **A.**   "Directly to US."

7   **Q.**   Did you relay that information to Dr. Norbergs?

8   **A.**   Yes.

9           MR. TRAGOS:  Date, time and place.

10          THE COURT:  Establish date, time and place.

11  BY MR. SALTZMAN:

12  **Q.**   Do you know when these notes were written,

13  approximately?

14  **A.**   Um, around 2010/'11.

15  **Q.**   Let me show you another document.  I just published

16  Exhibit 6F.  Do you know what this document is?

17  **A.**   Um, yes.  This was an application for a business account

18  for QSP.

19  **Q.**   Is that the distributor you were talking about in the

20  other document?

21  **A.**   Yes.

22  **Q.**   And who filled out this application?

23  **A.**   Myself.

24  **Q.**   Is that your handwriting in the document?

25  **A.**   In that -- yes, the upper part.  So --

1  **Q.**   Whose signature is in the bottom of the document?

2  **A.**   Dr. Norbergs.

3  **Q.**   What's the date of that document?

4  **A.**   May 15, 2009.

5  **Q.**   Going back to 6B, approximately when was this note

6  written?

7  **A.**   Um, approximately around May of 2009.

8  **Q.**   And where did you write this document?

9  **A.**   Um --

10  **Q.**   Where were you when you handwrote this note?

11  **A.**   At Dr. Norbergs office.

12  **Q.**   And where were you when you relayed this information

13  that's in this note to Dr. Norbergs?

14  **A.**   In her office.

15  **Q.**   The other entries on this document, are these other

16  questions?

17  **A.**   Yes.

18  **Q.**   Who posed these questions?

19  **A.**   Dr. Norbergs.

20  **Q.**   And did she provide those questions to you?

21  **A.**   Yes.

22  **Q.**   What were you supposed to do with those questions?

23  **A.**   Um, call this distributor and ask them these questions

24  and give the answers to her.

25  **Q.**   What does the second question ask?

1   **A.**   "What guarantee do we have drugs going through Customs."

2   **Q.**   And what is written below that?

3   **A.**   "No problem, shipped through parcel to parcel."

4   **Q.**   And did you write both the questions and the answers?

5   **A.**   Yes.

6   **Q.**   And did you share that information with Dr. Norbergs?

7   **A.**   Yes.

8   **Q.**   And what does the third entry say?

9   **A.**   "On order form:  Spot for patient's name, is this

10  required?  Only for Canada products.  No patients for

11  Gemzar/Kytril."

12  **Q.**   Did you relay that information back to Dr. Norbergs?

13  **A.**   Yes.

14  **Q.**   Did Dr. Norbergs, on occasion, ask you questions to then

15  ask others?

16  **A.**   Yes.

17  **Q.**   Are some of those others distributors of drugs?

18  **A.**   Yes.

19  **Q.**   How did you keep track of those questions when they came

20  in?

21  **A.**   Usually by stickies or paper of some sort.

22  **Q.**   And was it part of your practice to keep those sticky

23  notes?

24  **A.**   Yes.

25  **Q.**   Why did you keep them?

1  **A.**   In case I was asked again, or did I ever ask, or it came

2  up again.

3  **Q.**   Was that a situation that occurred on occasion that you

4  were asked for follow-up on issues that had been visited once

5  before?

6  **A.**   Yes.

7  **Q.**   When you asked questions to QSP, did you only ask the

8  questions that Dr. Norbergs provided to you?

9  **A.**   Yes.

10 **Q.**   Did you report back everything you learned from QSP to

11 Dr. Norbergs?

12 **A.**   Yes.

13 **Q.**   Did you ask any of your own questions of QSP?

14 **A.**   No.

15 **Q.**   Why not?

16 **A.**   I didn't really have any.  I didn't have any questions.

17 Um, I was basically calling them for Dr. Norbergs.

18 **Q.**   When you initially set up the relationship with QSP,

19 from what country were the drugs being shipped?

20         MR. TRAGOS:  Objection, foundation.

21         THE COURT:  Sustained.

22 BY MR. SALTZMAN:

23 **Q.**   When you initially set up the relationship with QSP, did

24 Dr. Norbergs ask you where the drugs were being shipped from?

25 **A.**   Yes.

1    **Q.**    Did you find that information out?

2    **A.**    Yes.

3    **Q.**    And where were they being shipped from?

4              MR. TRAGOS:  Objection, hearsay.

5              THE COURT:  Overruled.  You can rephrase.  Ask her

6    what she told Dr. Norbergs.

7    BY MR. SALTZMAN:

8    **Q.**    What did you tell Dr. Norbergs about where the drugs

9    were being shipped from?

10   **A.**    Um, on the third question down is from Canada -- I got

11   my answer from Canada.

12   **Q.**    Did Dr. Norbergs ask you about whether the packaging for

13   the drugs that came from QSP were in English?

14             MR. TRAGOS:  Objection, leading.

15             THE COURT:  Sustained.

16   BY MR. SALTZMAN:

17   **Q.**    I just zoomed in on the top Post-it Note.  Is that your

18   handwriting?

19   **A.**    Um, only in the left bottom corner.

20   **Q.**    On the top of it, is that your handwriting?

21   **A.**    No.

22   **Q.**    Whose handwriting is that?

23   **A.**    Dr. Norbergs.

24   **Q.**    How are you familiar with Dr. Norbergs handwriting?

25   **A.**    Um, because I worked with her for so long.

**Q.**   And how often did you see her writing things down?

**A.**   All day long, every day.

**Q.**   Over the course of the 17 years?

**A.**   Yes.

**Q.**   And did you watch her write things down?

**A.**   Yes.

**Q.**   With your own eyes.  Did Dr. Norbergs provide you with this handwritten note?

**A.**   Yes.

**Q.**   How do you know that?

**A.**   Because I wrote on it.

**Q.**   What is -- when she provided you with this note, did she say anything?

        MR. TRAGOS:  Date, time and place.

BY MR. SALTZMAN:

**Q.**   The Post-it notes that are on the screen in this document, are they all from approximately the same time period?

**A.**   Yes.

**Q.**   Are they all notes that were written in East Lake Oncology's office?

**A.**   Yes.

**Q.**   And did Dr. Norbergs say anything to you when she handed you this note?

**A.**   I couldn't -- I can't recall.

1  **Q.**   When you got the note, did you do anything with it?

2  **A.**   Yes.

3  **Q.**   What did you do?

4  **A.**   I, um, called in regards to if they had those two in

5  stock and cost.

6  **Q.**   And when you say, "If they had those in stock," who's

7  the "they?"

8  **A.**   QSP.

9  **Q.**   And what do the handwritten notes that you put on there

10  signify?

11  **A.**   40 milligrams left, $36; and then, 20, $17.

12  **Q.**   I displayed Exhibit 11F on the left and 6B on the right.

13  What is Exhibit 11F?

14  **A.**   A drug order form for QSP.

15  **Q.**   How does that drug order form relate to Exhibit 6B?

16  **A.**   The drugs are the same on the sticky note as the order

17  form.

18  **Q.**   Who prepared -- who -- what distributor is the order

19  form related to?

20  **A.**   I'm sorry?

21  **Q.**   What distributor is the order form in Exhibit 11F

22  related to?

23  **A.**   QSP.

24  **Q.**   And what is written in the -- in the location where it

25  says "medications?"

1  **A.**   Gemzar 1 gram, Eloxatine 100 milligrams.

2  **Q.**   Did you fill that form out after Dr. Norbergs gave you

3  the Post-it Note that's shown in Exhibit 6B?

4  **A.**   I don't know.  I do not.

5  **Q.**   Do those refer to the same --

6  **A.**   Yes.

7  **Q.**   -- two drugs?  And what is the date that's on the bottom

8  of the document?

9  **A.**   5-19, 2009.

10 **Q.**   Where it says "doctor's signature," is that Dr. Norbergs

11 signature?

12 **A.**   Yes.

13 **Q.**   And who put the credit card number that's above that?

14 **A.**   Dr. Norbergs.

15 **Q.**   I've published Government's Exhibit 6H.  What company

16 does that relate to?

17 **A.**   QSP.

18 **Q.**   Is there a date at the top of the document?

19 **A.**   5-15 of 2009.

20 **Q.**   Was this document received at East Lake Oncology?

21 **A.**   Yes.

22 **Q.**   Was this document provided to Dr. Norbergs?

23 **A.**   Yes.

24 **Q.**   How do you know that?

25 **A.**   Because she got everything that came off of the fax in

1   regards to the drug company.

2   **Q.**   Can you read what the first sentence says?

3   **A.**   "Quality Specialty Products is a Canadian company that

4   has been supplying companies and individual clients through

5   its group of companies with medications for five years."

6   **Q.**   Can you read the next sentence that is in that

7   paragraph?

8   **A.**   "Quality Specialty Products sells Health Canada-approved

9   medications through its Canadian facilities and makes

10  available European Union products through its related

11  facility in the United Kingdom."

12  **Q.**   Do you know what Health Canada is?

13  **A.**   Canadian Health --

14  **Q.**   Other than --

15  **A.**   No.

16  **Q.**   The words on the screen, do you know what that is?  And

17  can you read the next two sentences.

18  **A.**   "All European products is EMEA registered indicating

19  that the product is produced in a single manufacturing

20  location in Europe.  The EMEA is the regulatory body which

21  grants Europe-wide license.  The language on the outer and

22  inner package depends on the designation of the product and

23  are indicated by the country specific code within a blue

24  triangle, if applicable for product.  English language

25  inserts are available upon request."

1  Q.   Do you know what the EMEA is, other than what it says in

2  this document?

3  A.   (Indicating no.)

4  Q.   Can you -- you have to say the answer out loud, I'm

5  sorry.

6  A.   Oh, no, I do not.

7  Q.   I've zoomed in on the second paragraph of the document.

8  Can you read the last sentence of the document?

9  A.   "You will be made aware of the delays that this may

10  cause, but typically amounts to a week or two.  Once

11  inventory is shipped, delivery will take a maximum of five

12  days to arrive from our UK office, and approximately 5 to

13  10 days from our Canadian office."

14  Q.   In 2009, was that accurate in terms of how long drugs

15  took to be delivered to East Lake Oncology when drugs were

16  ordered from QSP?

17  A.   I'm sorry, say the beginning.

18  Q.   In May of 2009, approximately that time frame, is that

19  statement accurate as to how long drugs took to be delivered

20  to East Lake Oncology from QSP?

21  A.   Yes.

22  Q.   Did that change ever?

23  A.   Yes.

24  Q.   How so?

25  A.   Um, they started overnighting a lot of the drugs.

1    Q.    After Dr. Norbergs saw this document, did --

2          MR. TRAGOS:  Objection, your Honor, about any

3    testimony that, "she saw it."

4          THE COURT:  He hadn't finished his question, I

5    don't think.

6    BY MR. SALTZMAN:

7    Q.    Did Dr. Norbergs see this document?

8    A.    Yes.

9          THE COURT:  I didn't hear that.

10         MR. SALTZMAN:  Did Dr. Norbergs see the document.

11         MR. TRAGOS:  Foundation, and date, time and place.

12         THE COURT:  Overruled.

13   BY MR. SALTZMAN:

14   Q.    Did Dr. Norbergs see the document?

15   A.    Yes.

16   Q.    Did she see the document on approximately the date

17   that's listed on there of May 15, 2009?

18   A.    Yes.

19   Q.    Did she tell you whether or not she wanted to order from

20   QSP after seeing it?

21   A.    No discussion.

22   Q.    Did you order from QSP after that?

23   A.    Yes.

24   Q.    Did she tell you to stop ordering from QSP after seeing

25   the document?

1   **A.**   No.

2   **Q.**   Did she ever say that she did not want to buy drugs from

3   a foreign company?

4   **A.**   No.

5   **Q.**   Did she ask you, um, if the drugs that QSP sold were

6   FDA-approved?

7   **A.**   No.

8   **Q.**   I've published Government's Exhibit 11E.  I'm not sure

9   you can see that, but at the top of the document, I've zoomed

10  in, can you see the date on there?

11  **A.**   Yes.

12  **Q.**   What does it say?

13  **A.**   May 14, 2009.

14  **Q.**   I zoomed in on a Post-it Note -- I should ask, is that a

15  Post-it Note?

16  **A.**   Yes.

17  **Q.**   Is that the same pad we looked at before with "involve

18  it" at the top?

19  **A.**   Yes.

20  **Q.**   Was this Post-it Note in or around that same time?

21  **A.**   Yes.

22  **Q.**   And who wrote the Post-it Note?

23  **A.**   Myself.

24  **Q.**   And what distributor was this Post-it Note related to?

25  **A.**   QSP.

1   **Q.**   And why did you write this Post-it Note?

2   **A.**   Um --

3   **Q.**   Let me ask you what it says, first.

4   **A.**   I spoke with Peter at QSP.

5           MR. TRAGOS:  Objection, hearsay.

6           THE COURT:  Repeat the question, what does the note

7   say?

8           MR. SALTZMAN:  Yes, sir.

9           THE COURT:  This is her handwriting, right?

10           MR. SALTZMAN:  This is Ms. Krouse's handwriting.

11           THE COURT:  Overruled.

12           THE WITNESS:  "Spoke with Peter at QSP, no

13   Canada/USP company."

14   BY MR. SALTZMAN:

15   **Q.**   What does it say after that?

16   **A.**   "Drugs are shipped directly to us five days,

17   approximately, UK, 5 to 10 days, approximately, Canada.

18   Shipped parcel to parcel, no custom issues.  Patient's name

19   not required on Gemzar and Kytril."

20   **Q.**   Did you show this note to Dr. Norbergs on approximately

21   the date that's on the document that we just looked at?

22   **A.**   Yes.

23   **Q.**   Do you know what "parcel to parcel" means?

24   **A.**   No.

25   **Q.**   Do you know what "no Customs issues" means?

1    **A.**   No.

2    **Q.**   Why did you write this note?

3           MR. TRAGOS:  Objection, relevance.

4           THE COURT:  Overruled.

5           THE WITNESS:  It's clearer than the first one that

6    I wrote a sticky note on the inside of the folder and wrote

7    this particular fax sheet.

8    BY MR. SALTZMAN:

9    **Q.**   I'm sorry, I'm not understanding.  Why did you write it

10    then?

11    **A.**   Because I actually spoke to someone, spoke to Peter.  I

12    wrote it clearer with -- the information was the same as the

13    Post-it Note on the inside of the folder.

14    **Q.**   Did Dr. Norbergs ask you to find out if QSP was a

15    licensed wholesaler in the state of Florida?

16    **A.**   No.

17    **Q.**   Did she ever ask you how a company such as McKesson

18    would get their drugs through Customs?

19    **A.**   No.

20    **Q.**   How about Curescript?

21    **A.**   No.

22    **Q.**   Oncology Supply?

23    **A.**   No.

24    **Q.**   How about Metro?

25    **A.**   No.

1    **Q.**   And Cardinal?

2    **A.**   No.

3    **Q.**   Do you know why not?

4    **A.**   No.

5    **Q.**   Do you know where those companies, that I just

6    mentioned, are located?

7    **A.**   In the US.

8    **Q.**   I've published on the screen Exhibit 11B.  What is that

9    showing?

10   **A.**   (QSP) Quality Specialty Products folder.

11   **Q.**   And looking at page 2, what is the title of the

12   document?

13   **A.**   Commercial invoice.

14   **Q.**   It will be easier to read there.  Can you tell us what

15   the date of document is?

16   **A.**   May 21, 2009.

17   **Q.**   Is that the office address for East Lake Oncology on the

18   left side?

19   **A.**   Yes.

20   **Q.**   And what is the -- written in the item description below

21   that?

22   **A.**   Gift.

23   **Q.**   And what is the country of origin written?

24   **A.**   United Kingdom.

25   **Q.**   And what is the currency?

1    **A.**    GP -- GBP.

2    **Q.**    Do you know what this commercial invoice related to?

3    **A.**    A drug order.

4    **Q.**    And do you know why the item description is listed as

5    "gift" then?

6            MR. TRAGOS:  Objection, hearsay, foundation.

7            THE COURT:  Sustained.

8    BY MR. SALTZMAN:

9    **Q.**    Was this document seen by Dr. Norbergs around May 21st,

10   of 2009?

11           MR. TRAGOS:  Objection, foundation.

12           THE COURT:  Overruled.

13           THE WITNESS:  Yes.

14   BY MR. SALTZMAN:

15   **Q.**    Are you aware of QSP ever --

16           THE COURT:  Now ask her how she knows that.

17           MR. SALTZMAN:  Excuse me, sir?

18           THE COURT:  Now ask her how she knows that.

19   BY MR. SALTZMAN:

20   **Q.**    How do you know that Dr. Norbergs saw this around

21   May 21, 2009?

22   **A.**    Because when we got the invoice, the order form, the

23   invoice, the packing slip was all stapled together and given

24   to her.

25   **Q.**    To your knowledge, did Quality Specialty Products send

1   gifts to Dr. Norbergs?

2           MR. TRAGOS:  Objection, hearsay.

3           THE COURT:  Well, we don't know if it's hearsay or

4   not, and do we know if we have an answer, and if we have an

5   answer, find out how she knows it.  Don't tell us what

6   anybody said, just answer the question yes or no.

7           THE WITNESS:  No.

8   BY MR. SALTZMAN:

9   **Q.**   And how do you know that?  Well, what did Quality

10  Specialty Products send to Dr. Norbergs?

11  **A.**   Drugs.

12  **Q.**   Did you ever discuss commercial invoices or customs

13  documents, including a declaration of a gift with

14  Dr. Norbergs?

15  **A.**   No, I just had given that as one of the answers.

16          MR. TRAGOS:  Objection, asked and answered.

17          THE COURT:  Overruled.

18  BY MR. SALTZMAN:

19  **Q.**   Did you ever discuss with Dr. Norbergs that Quality

20  Specialty Products would declare on shipments items being

21  shipped as a gift?

22  **A.**   Yes.

23          MR. TRAGOS:  Objection, hearsay and foundation.

24          THE COURT:  I think he asked her about what she may

25  have told Dr. Norbergs.  How is that hearsay?

1          MR. TRAGOS:  Because he said, "had the Quality,"

2     referring to Quality Specialty Products.

3          THE COURT:  Ask her if she told Dr. Norbergs that,

4     right?  Overruled.

5          MR. TRAGOS:  Okay.

6     BY MR. SALTZMAN:

7     Q.   What, if anything, did Dr. Norbergs say to you about

8     Quality Specialty Products sending gifts to East Lake

9     Oncology?

10          MR. TRAGOS:  Objection, leading.

11          THE COURT:  Overruled.

12     BY MR. SALTZMAN:

13     Q.   What, if anything, did Dr. Norbergs say to you about

14     Quality Specialty Products and gifts to East Lake Oncology?

15     A.   That's how they got through Customs.

16          MR. TRAGOS:  Date, time and place.

17          THE COURT:  All right.  Have her establish date,

18     time and place.  I think she already has.  The date's on the

19     document.

20     BY MR. SALTZMAN:

21     Q.   Approximately when did that conversation happen?

22     A.   May 9, 2009.

23          MR. SALTZMAN:  Your Honor, could I have a moment?

24                                    *

25     BY MR. SALTZMAN:

1   **Q.**   I'm sorry.  When you said that's how they got through

2   Customs, what's the "they" that you are referring to?

3   **A.**   Can you repeat that?

4   **Q.**   You said that's how "they got through Customs."  Are you

5   talking about something getting through Customs?  What is it

6   that you are talking about?

7   **A.**   The drugs.

8        MR. TRAGOS:  Objection.  She is interpreting now --

9   what Dr. Norbergs said or meant.

10       THE COURT:  Overruled.

11  BY MR. SALTZMAN:

12  **Q.**   What was the answer, ma'am?

13  **A.**   Um --

14  **Q.**   When you said, "that's how they got through Customs?"

15  **A.**   The drugs.

16  **Q.**   Thank you.  Let's publish Government's Exhibit 6D.  What

17  is the date that's on the upper right-hand corner of the

18  document?

19  **A.**   May 14, 2009.

20  **Q.**   Was this document shown to Dr. Norbergs?

21  **A.**   Yes.

22  **Q.**   How do you know that?

23  **A.**   Because she got all these -- all the drug information

24  documents.

25  **Q.**   And what is -- what's depicted below the date?

1    **A.**    A flag.

2    **Q.**    Do you know for what country that flag is?

3    **A.**    Canada.

4    **Q.**    And the address that's below the flag, what country does

5    that address relate to?

6    **A.**    Homewood -- Canada.

7    **Q.**    Who's this letter addressed to?

8    **A.**    Dr. Norbergs.

9    **Q.**    And what does the -- what does it say right below, "Dear

10   Dr. Norbergs?"

11   **A.**    "I have enclosed our latest price sheet."

12   **Q.**    And looking at the bottom of the document, what does

13   that say?

14   **A.**    "To opt out from future faxes, go to

15   www.removemynumber.com, enter pin number 15330, or call

16   877-286-5812."

17   **Q.**    Okay.  We could end there.  Was the information that

18   came in from -- for the first time to East Lake Oncology

19   about Quality Specialty Products, did that come in through a

20   fax?

21   **A.**    Yes.

22   **Q.**    And was this the initial information that was received

23   at East Lake Oncology, if you know?

24   **A.**    I don't recall.

25   **Q.**    Is May 14, 2009, around when the information was first

1    received?

2    **A.**    Yes.

3    **Q.**    Looking at Government Exhibit 6G, what is shown on the

4    left side of this?

5    **A.**    Drug names, milligrams.

6    **Q.**    What is the title of the document?

7    **A.**    QSP.

8            THE COURT:  Let me stop you.  Mr. Saltzman, do you

9    know how to remove the red dots from the screen?

10           MR. TREZEVANT:  Ms. Wetherald can take care of

11   that, your Honor.

12           THE COURT:  Go ahead, Ariana.

13   BY MR. SALTZMAN:

14   **Q.**    What does it say to the right of QSP?

15   **A.**    Price list.

16   **Q.**    Is this a price list of drugs for QSP?

17   **A.**    Yes.

18   **Q.**    And what date is associated with it?

19   **A.**    June 15, 2009.

20   **Q.**    Did East Lake Oncology receive price lists from QSP?

21   **A.**    Yes.

22   **Q.**    Were those price lists seen by Dr. Norbergs?

23   **A.**    Yes.

24   **Q.**    And how do you know that?

25   **A.**    Because, um, I gave her all of these.  All the price

1    lists would go to her.

2    **Q.**   And what is the top entry in the chart?

3    **A.**   "Zometa, 4 milligrams/5 milliliters UK, $600."

4    **Q.**   What's the difference between the first entry and the

5    second entry?

6    **A.**   One is from UK, one is from Canada and the price is

7    different.

8    **Q.**   Do you know why Canada is a different price than the UK?

9    **A.**   No, I do not.

10   **Q.**   And what is shown on the right side of this document?

11   **A.**   Um, "quantity price total."

12   **Q.**   What is this used for?

13   **A.**   Order form.

14   **Q.**   And now I'm publishing Government's Exhibit 11G.  If you

15   look at the date, is this a different price list than we just

16   looked at?

17   **A.**   Yes.

18   **Q.**   And what's the date on this document?

19   **A.**   June 30, 2009.

20   **Q.**   And what is shown on the right side of the document?

21   **A.**   Um, "order form," and we had ordered Zometa.

22   **Q.**   And who filled that out?

23   **A.**   Myself.

24   **Q.**   And I just zoomed in on the bottom right section.  Who

25   filled out this part of the form?

1    **A.**    Myself.

2    **Q.**    And what were you including in this section, just

3    generally speaking?

4    **A.**    Um, by using the Visa it was three percent added, which

5    made it $127.80 in addition to the total.

6    **Q.**    And did you fill out the doctor's name that's listed in

7    here?

8    **A.**    Yes.

9    **Q.**    Did you fill out the credit card that's on the bottom?

10   **A.**    Yes.

11   **Q.**    I'm publishing Government Exhibit 11D.  What's the date

12   of this document?

13   **A.**    5-15-2009.

14   **Q.**    And what information -- you just described the

15   information that's in this document?

16   **A.**    QSP price list.

17   **Q.**    Was this document provided to Dr. Norbergs around

18   May 15, 2009?

19   **A.**    Yes.

20   **Q.**    And how do you know that?

21   **A.**    Because I would give it to her.

22   **Q.**    I will display Government Exhibit 11H side-by-side with

23   Government Exhibit 11F, and in Exhibit 11H, I'm zooming in on

24   the top of the document.  Can you tell me the amount that's

25   listed in this particular document?

1    **A.**    $1,991.

2    **Q.**    And does that match the amount that's in Government

3    Exhibit 11F?

4    **A.**    Yes.

5    **Q.**    And looking at the credit card numbers on this document,

6    focused on the last four digits, do those -- are those digits

7    the same?

8    **A.**    No.

9    **Q.**    And what does it say -- what is handwritten above the

10   digits on the Document 11F in blue pen?

11   **A.**    Um, "May 22nd, didn't work."

12   **Q.**    And what does that mean?  What is that relating to?

13   **A.**    That means that credit card did not go through.

14   **Q.**    And what was --

15   **A.**    To pay for -- to make that payment.

16   **Q.**    And what was the payment for?

17   **A.**    Drugs.

18   **Q.**    And in Exhibit 11H, I just zoomed in on some handwritten

19   notes.  Who wrote that?

20   **A.**    I did.

21   **Q.**    And what does it say?

22   **A.**    "Per Karen with Sun Trust, Visa charges a three percent

23   charge because it is going across two countries, which three

24   percent times $1,991 equals 59.73, which total would be

25   $2,050.73."

1   **Q.**   What does the three percent charge refer to?

2   **A.**   The Visa charge.

3   **Q.**   And why was there a three percent charge for this Visa

4   transaction?

5   **A.**   Because it was, um -- it had to go through two different

6   countries to make the payment.

7   **Q.**   Was this document seen by Dr. Norbergs?

8   **A.**   Yes.

9   **Q.**   And how do you know that?

10  **A.**   Um, because I had to give it to her because of Karen at

11  Sun Trust had -- it was her bank that told me about the three

12  percent charge.  So it was a question, um, I had to give

13  Dr. Norbergs.

14  **Q.**   Was that a -- Dr. Norbergs ask you about that

15  transaction?

16  **A.**   Yes.

17  **Q.**   I just published Government's Exhibit 12A, going to page

18  2.  What is the title of that document?

19  **A.**   Um, QSP credit account application.

20  **Q.**   And who filled this document out?

21  **A.**   Dr. Norbergs, most of it.

22  **Q.**   Under "banking information," whose handwriting is that?

23  **A.**   Dr. Norbergs.

24  **Q.**   In the top with the clinic -- the name of the clinic,

25  the physician and the rest of the information, who wrote

1    that?

2    **A.**    Dr. Norbergs.

3    **Q.**    And whose signature is that?

4    **A.**    Dr. Norbergs.

5    **Q.**    And what is a credit account application with QSP for?

6    **A.**    Um, that we can, um, pay -- don't have to pay the day of

7    ordering, that gives us time to pay it.

8    **Q.**    And had you been ordering from QSP between May of 2009,

9    and March of 2011, when this form was signed?

10   **A.**    Yes.

11   **Q.**    And was the monthly ordering in the approximate range

12   that's listed on that document?

13   **A.**    Yes.

14   **Q.**    I've just published Government Exhibit 13A.  Is there a

15   date on the top of that document?

16   **A.**    March 15th, of 2011.

17   **Q.**    And can you see, without it being zoomed in, whose

18   handwriting is on the document?

19   **A.**    Mine.

20   **Q.**    Does it include anyone else's handwriting?  I'll zoom in

21   a little bit.

22   **A.**    It doesn't look like it.

23   **Q.**    Do you see any handwriting on there that is yours?

24   **A.**    The "W" on the top right.

25   **Q.**    That's your handwriting?

1   **A.**   No, that was not mine.

2   **Q.**   Whose handwriting is that?

3   **A.**   That was Dr. Norbergs.

4   **Q.**   And did Dr. Norbergs see this document?

5   **A.**   Yes.

6   **Q.**   And how do you know that?

7   **A.**   Because she wrote the "W"  on the upper right-hand.

8   **Q.**   Approximately when was that handwritten on there?

9   **A.**   Um, cross -- approximately March 15, 2011.

10   **Q.**   And how would you describe what this document is?

11   **A.**   It's a price list from QSP.

12   **Q.**   Towards the bottom of this list here, do you see

13   Ribomustin/Treanda?

14   **A.**   Yes.

15   **Q.**   Does that refer to one drug or two drugs, if you know?

16   **A.**   One.

17   **Q.**   And what drug is it?

18   **A.**   Treanda.

19   **Q.**   And are there other drugs listed on this document?

20   **A.**   Yes.

21   **Q.**   And what did the "W" mean that was handwritten by

22   Dr. Norbergs?

23   **A.**   "Warm."  That they didn't have to be a cold shipment.

24   **Q.**   And for this section over here with the title of

25   "monoclonal antibodies" what's handwritten next to that?

**A.**   "Cold."

**Q.**   And who wrote that?

**A.**   Me.

**Q.**   And what does "cold" mean?

**A.**   Meaning that it would have to come in cold packaging.

**Q.**   And do you see at the bottom a product listed as
"MabThera/Rituxan?"

**A.**   Yes.

**Q.**   Can you read the last sentence that I am pointing at
with the arrow there?

**A.**   "QSP supplies genuine oncology medicines manufactured
and sold in Europe and Canada."

**Q.**   Did it -- have you ever reviewed this document before
today?

**A.**   Yes.

**Q.**   Does it say anywhere in the document that QSP sells
genuine oncology medicines manufactured and sold in the
United States?

**A.**   Does it say -- I'm sorry, one more time.

**Q.**   When you reviewed this document before today, does it
say anywhere in there that QSP supplies genuine oncology
medicines manufactured and sold in the United States?

**A.**   No.

THE COURT:  When you reach a convenient stopping
place, we'll take a break.

1  BY MR. SALTZMAN:

2  **Q.**   Did East Lake Oncology have any offices in Europe and

3  Canada?

4  **A.**   No.

5  **Q.**   Can you explain how if QSP supplies medicines sold in

6  Europe and Canada, East Lake Oncology bought these drugs?

7  **A.**   No.

8           MR. SALTZMAN:  Your Honor, we can take a break now.

9           THE COURT:  We'll take a 15-minute break.

10          CSO OFFICER:  All rise.

11          (Afternoon recess taken at 3:02 p.m.)

12          (Court back in session at 3:15 p.m.)

13          THE COURT:  How are we doing time wise?

14          MR. SALTZMAN:  She is certainly going to go through

15  the end of the day and into tomorrow.

16          THE COURT:  How are you doing time wise?

17          MR. SALTZMAN:  I don't think we've fallen far

18  behind, if at all.  I think we're still on track for

19  Wednesday of next week.

20          MR. TREZEVANT:  We're trying for Tuesday, though,

21  Judge, but it looks like Wednesday.

22          THE COURT:  It sounds like we will be working

23  tomorrow afternoon.

24          MR. TREZEVANT:  Unfortunately.

25          MR. TRAGOS:  Do you know what time tomorrow

1    afternoon?

2          THE COURT:  Well, my -- the luncheon is at 12:00.

3    I probably will miss the luncheon, but probably will work

4    until 12:30, and then my panel discussion is from 1:30 to

5    2:30.  So I probably can't get back here until 2:45, and

6    we'll probably work from 2:45 to 4:45.  Bring in the jury.

7    What did you decide to do about the note from the juror.

8          MR. TRAGOS:  We're going to see about -- that's

9    them.

10          MR. SALTZMAN:  Your Honor, we are going -- I don't

11    know.  Are you talking about the note from the Jury.

12          THE COURT:  From the Juror, yes.

13          MR. SALTZMAN:  The note for the Jury, I don't know

14    which documents they are referring to so --

15          THE COURT:  I think they are referring to those

16    first Post-it Notes on the inside front of the file.

17          MR. SALTZMAN:  I'll ask about those.

18          MR. TRAGOS:  Also, your Honor, the Government did

19    point out that they did provide that receipt.  We may not

20    worry about it.  They are going to ask some questions during

21    the conversation with this witness, and that may take care of

22    it.

23          THE COURT:  For the record, we'll make the note

24    from the Juror about the different colored writing as Court's

25    Exhibit 3.

1    (Court's Exhibit No. 3

2    admitted into evidence.)

3              CSO OFFICER:  All rise.

4              (Jury enters courtroom at 3:21 p.m.)

5              THE COURT:  You may proceed.

6              MR. SALTZMAN:  Thank you, your Honor.

7    BY MR. SALTZMAN:

8    **Q.**   I've put back up on the screen Government's Exhibit 6B.

9    Are there two different colored pens in this exhibit?

10   **A.**   Yes.

11   **Q.**   Whose handwriting is in this?

12   **A.**   Mine.

13   **Q.**   Did you write both of these?  Why did you write in two

14   different colored pens?

15   **A.**   Just, I like using my colored pen.  Just as this is the

16   question and this is the answer.  No particular reason.  The

17   blue is the question, the purple was the answer, and it was

18   just me wanting to use colored pens.  No other reason.

19   **Q.**   Publish Government's Exhibit 11E, which we also already

20   looked at with two different colors of handwriting.

21   **A.**   Yes.

22   **Q.**   Whose handwriting is this?

23   **A.**   Mine.

24   **Q.**   Why did you use different colored pens?

25   **A.**   Basically the same thing.  That I spoke to Peter, and

1    then what I spoke to him about was in the purple.

2    **Q.**   And putting up on the screen Government Exhibit 13A,

3    which we already discussed, are there multiple colors of pen

4    in this document?

5    **A.**   Yes.

6    **Q.**   And whose handwriting is in this document?

7    **A.**   All mine, except for the "W."

8    **Q.**   Who wrote the "W?"

9    **A.**   Dr. Norbergs.

10   **Q.**   Why are there different colored pen markings on this

11   document?

12   **A.**   No particular reason, just so that it would stand out,

13   like, the two prices was -- the prices had changed, than what

14   was on the fax.

15   **Q.**   I'm going to publish Government Exhibit 4A.  Are you

16   familiar with this document?

17   **A.**   Yes.

18   **Q.**   And zooming in at the top, who's this letter from?

19   **A.**   Department of Health and Human Services, FDA.

20   **Q.**   Who is it addressed to?

21   **A.**   Dr. Norbergs.

22   **Q.**   Is this the correct address for Dr. Norbergs?

23   **A.**   Yes.

24   **Q.**   Who received this letter when it came to East Lake

25   Oncology?

1    **A.**    The office, then myself, then --

2    **Q.**    Do you recall if you signed for this document when it

3    arrived?

4    **A.**    I do not recall.

5    **Q.**    Do you recall when it arrived at the East Lake Oncology

6    office?

7    **A.**    Around approximately April 5, 2012.

8    **Q.**    Do you recall how many days after?

9    **A.**    I wouldn't say that many.  I can't recall a date, but

10   approximately around that date.

11   **Q.**    And did you see it when it arrived?

12   **A.**    Yes.

13   **Q.**    And after it came in, what did you do with it after you

14   saw it?

15   **A.**    I gave it to -- put it on Dr. Norbergs' desk.

16   **Q.**    Did you ever get it back?

17   **A.**    Yes.

18   **Q.**    And approximately when do you think you provided it to

19   Dr. Norbergs?

20   **A.**    Around that April 5th, of 2012.

21   **Q.**    Can you read the first sentence that's there?

22   **A.**    "FDA requests that you cease using and retain and secure

23   all remaining products purchased from Richard Pharma, Richard

24   Services Warwick, Healthcare Solutions, BDMI or any other

25   foreign or unlicensed US sources until further notice."

**Q.**   After this letter came in, did Dr. Norbergs ask you to secure all remaining products purchased from any foreign supplier?

**A.**   No.

**Q.**   Going to the next page, and zooming in on the sentence that begins, "January 13, 2012," do you see if there's a footnote demarcation there?

**A.**   Yes.

**Q.**   And can you just read the sentence up until that footnote?

**A.**   This notice includes information on how to identify whether your distributor or the product you received is legitimate.

**Q.**   Is that the footnote that's referenced in that document?

**A.**   Yes.

**Q.**   Did you ever go to this website?

**A.**   No.

**Q.**   Do you know if Dr. Norbergs ever went to that website?

**A.**   I do not know.

**Q.**   Did Dr. Norbergs tell you to stop ordering from foreign sources after you received this letter?

**A.**   No.

**Q.**   Did Dr. Norbergs ask you to look anything -- look into anything that was discussed in this letter?

**A.**   No.

1   **Q.**   And did Dr. Norbergs ask you to do anything in response

2   to the letter?

3   **A.**   No.

4            MR. SALTZMAN:  Your Honor, may we approach at

5   sidebar?

6            THE COURT:  All right.

7            (Sidebar conference held.)

8            MR. SALTZMAN:  Your Honor, the last witness, who

9   does know about the tracking information regarding that

10  letter, I've not finished my questions with Kelly Krouse on

11  that letter, and I wanted to check if Mr. Tragos was

12  comfortable on the answers on that topic because she has a

13  flight to catch.

14           MR. TRAGOS:  No, but if you are willing to

15  stipulate that is the receipt from this letter.

16           MR. SALTZMAN:  That's fine.

17           MR. TREZEVANT:  There is no reason to doubt it.

18           MR. TRAGOS:  I just -- why don't we put it in as an

19  exhibit and that's all we need.

20           THE COURT:  All right.

21           MR. SALTZMAN:  We'll have to do it tomorrow.

22           MR. TREZEVANT:  We have three copies in the

23  courtroom.

24           MR. TRAGOS:  Of the receipt?  Oh, good.  Okay.

25           (Back before the Jury.)

1        MR. SALTZMAN:  Your Honor, permission to approach?

2        THE COURT:  All right.

3   BY MR. SALTZMAN:

4   **Q.**   I've handed you what's been marked as Government's

5   Exhibit 7.  Do you recognize this document?

6   **A.**   Yes.

7   **Q.**   And what is it?

8   **A.**   A newspaper article.

9   **Q.**   And when is it dated from?

10  **A.**   February 16th, of 2012.

11  **Q.**   And when did you first see this document?

12  **A.**   Um, it was in -- around February 16th, of 2012.

13  **Q.**   And did you ever show that -- or what -- did you ever

14  show that document to Dr. Norbergs?

15  **A.**   Yes.

16  **Q.**   And what is it -- just in a very general sense, what is

17  that document?

18  **A.**   Saying that, um, Avastin drug is counterfeit.

19       MR. SALTZMAN:  Your Honor, we move to admit

20  Government's Exhibit 7 under 9026.

21       MR. TRAGOS:  Objection, hearsay and relevance.

22       THE COURT:  Overruled.

23  BY MR. SALTZMAN:

24  **Q.**   Is this the document you were just talking about?

25  **A.**   Hmm-hmm.

1    **Q.**   What publication is this document from?

2    **A.**   Um --

3    **Q.**   If you look at the screen in the upper left-hand corner,

4    can you tell what publication?

5    **A.**   Yeah, the Tampa Bay Times.

6    **Q.**   And on the right side of the document do you see a

7    headline starting with, "Drug Maker Warns of Counterfeit

8    Avastin?"

9    **A.**   Yes.

10   **Q.**   Is that the article you were referring to?

11   **A.**   Yes.

12   **Q.**   And going to page 2 of the document, is this the same

13   article on page 2?

14   **A.**   Yes.

15   **Q.**   Is that just a bigger version of it?

16   **A.**   Yes.

17   **Q.**   Can you read what's on the screen?

18   **A.**   "The FDA and Roche are trying to track down the vials of

19   the fake cancer drug in the US, Associated Press, Washington.

20   The maker of the widely prescribed cancer drug Avastin is

21   warning doctors and patients about counterfeit vials of the

22   product that have been distributed in the United States.

23         Roche Genentech Unit said Tuesday that the fake

24   products do not contain the key ingredients in Avastin, which

25   is used to treat cancer of the colon, lung, kidney and brain.

1    The drug is a huge money maker for Roche, generating about

2    6 million a year."

3    **Q.**   I've now zoomed in on the bottom two paragraphs.  Can

4    you please read those.

5    **A.**   "In a related action, the FDA said late Tuesday it has

6    contacted 19 medical practices that may have purchased

7    unapproved drugs, including counterfeit Avastin, from a

8    company called Quality Specialty Products.  The foreign

9    supply company may also do business as Montana Healthcare

10   Solutions, the agency said.

11        FDA has requested that the medical practices stop

12   using any remaining products from these suppliers, the FDA

13   said in a statement.  Genentech said the suppliers listed by

14   the FDA are not authorized to distribute Avastin."

15   **Q.**   Can you explain the circumstances in which you remember

16   Dr. Norbergs seeing this article?

17   **A.**   Um, yeah.  I had laid it on her desk and she handed it

18   back and said, um, "That's okay.  We don't use Avastin."

19   **Q.**   And where it says, at the end, "FDA has requested

20   medical practices stop using any remaining products from

21   these suppliers," did Dr. Norbergs also say we should stop

22   using any remaining products from QSP, Quality Specialty

23   Products?

24   **A.**   No.

25   **Q.**   Did you tell her that East Lake Oncology should stop

1    using any remaining products from Quality Specialty Products?

2    **A.**   No, I did not.

3    **Q.**   And why not?

4    **A.**   It wasn't my place to say.

5    **Q.**   Why not?

6    **A.**   Um, she made the decisions of what we did at East Lake

7    Oncology.

8    **Q.**   I've published Government Exhibit 6C.  Have you seen

9    this document before?

10   **A.**   Yes.

11   **Q.**   And what does the top of the document say?

12   **A.**   "Fake Avastin spurs docs to scour drug supply,

13   healthcancer@msnbc.com."

14   **Q.**   The handwritten note that's there, whose handwriting is

15   that?

16   **A.**   Mine.

17   **Q.**   What does that say?

18   **A.**   QSP.

19   **Q.**   Why did you write that?

20   **A.**   Because down in the article where I drew lines

21   underneath, it says, "Called Quality Specialty Products."

22   **Q.**   Is that your notation as well?

23   **A.**   Yes.

24   **Q.**   And what is underneath the headline here, can you read

25   the date that's on the screen?

1   **A.**   I'm not sure what that first word on the top is.

2   **Q.**   Okay.

3   **A.**   It says, "Updated 2-15 of 2012."

4   **Q.**   And at the bottom of the document, do you see a date

5   listed there?

6   **A.**   Yes.

7   **Q.**   What does that date indicate?

8   **A.**   March 21, 2012, when it would have been printed.

9   **Q.**   Do you know if Dr. Norbergs saw this document?

10  **A.**   Yes.

11  **Q.**   And how do you know that?

12  **A.**   Because it would have been put on her desk.

13          THE COURT:  I couldn't hear that.

14          THE WITNESS:  It would have been put on her desk.

15  BY MR. SALTZMAN:

16  **Q.**   And what happened -- well, who put it on her desk?

17  **A.**   I did.

18  **Q.**   And what happened after you put it on her desk?

19  **A.**   Um, I recall her laying it back down on my desk and I

20  just filed it.

21  **Q.**   Why did you file it?

22  **A.**   Because it said "QSP."  I just filed it in the QSP

23  folder.

24  **Q.**   Can you read those first two paragraphs, please?

25  **A.**   "New York, AUS distributor of phoney vials of the widely

1    used cancer drug Avastin arouse suspicion at doctors' offices

2    as early as July well before health regulators issued their

3    own warning and sparked new alarms over the counterfeit

4    medicines.

5              The US Food and Drug Administration said this week

6    it notified 19 oncology practices, those practices that had

7    purchased drugs from a supplier not approved by the agency,

8    including a counterfeit version of Roche Holding AG's

9    Avastin, that did not contain the multibillion dollar drug's

10   active ingredients."  I don't even -- can I spell it?

11   **Q.**    Take your best shot?

12   **A.**    B-E-V-A-C-I-Z-U-M-A-H (misspelled by witness).

13   **Q.**    I think that's spelled B-E-V-A-C-I-Z-U-M-A-B.  Can you

14   read through the end of everything that's on the screen?

15   **A.**    "FDA and Roche Generate Genentech Division said on

16   Wednesday they were still investigating how widely the fake

17   medicine was distributed.  They do not know how many patients

18   might have been affected or if anyone was harmed.  Connie

19   Jung of the FDA office security said it was possible more

20   practices could be involved.  Clinics need to know who they

21   are buying their medicines from.  They need to make sure they

22   are buying them from legitimate sources, licensed sources in

23   the United States, she said.  The FDA said the drugs came

24   from an overseas supplier called Quality Specialty Products,

25   which does business in the United States with a distributor

1    identified as Montana Health Solutions."

2    **Q.**    Did East Lake Oncology ever order Avastin from Quality

3    Supply Products?

4    **A.**    No.

5    **Q.**    Did East Lake Oncology order products from other

6    specialty products?

7    **A.**    Yes.

8    **Q.**    The 19 oncology practices that are referenced on the top

9    here, was East Lake Oncology one of those practices?

10   **A.**    I do not recall.

11   **Q.**    After Dr. Norbergs saw that article, did she tell you

12   that we need to cease business with overseas suppliers?

13   **A.**    No.

14   **Q.**    After you saw this article, did you tell her that you

15   should cease business with overseas suppliers?

16   **A.**    No.

17   **Q.**    Why not?

18   **A.**    I don't -- I didn't have any say to do that.

19   **Q.**    Can you read these two paragraphs?

20   **A.**    "An official from one California oncology practice told

21   Reuters it stopped buying drugs from Montana Health in July

22   when it noticed the products were missing a national health

23   code necessary for billing and reimbursement.

24          When we called Montana Health to ask for their

25   national health code they gave me the runaround.  At the --

1    at that point, we ceased all business, said the source who

2    asked not to be named because they did not have permission to

3    speak to the media."

4    **Q.**   And after Dr. Norbergs saw this article, did she say,

5    "We should cease all business with foreign suppliers?"

6    **A.**   No.

7    **Q.**   If you could read that heading in the first paragraph,

8    please?

9    **A.**   "UK discovery."

10   **Q.**   And the first paragraph?

11   **A.**   "Jung said the FDA encountered a wide variety of fake

12   drugs from conventional pills to injectable medicines that

13   need to be administrated by a doctor.  The trend is fueled,

14   in part, by the high cost of certain medicines pressuring

15   patients and doctors to seek cheaper alternatives."

16   **Q.**   Did Dr. Norbergs ask you to seek cheaper alternatives

17   for drugs?

18   **A.**   No.

19   **Q.**   Did Dr. Norbergs ask you to buy the cheapest drugs you

20   could buy?

21   **A.**   Yes.

22   **Q.**   Is that why you looked into buying drugs for East Lake

23   Oncology from QSP?

24              MR. TRAGOS:  Objection, leading.

25              THE COURT:  Sustained.  Asked and answered.

BY MR. SALTZMAN:

**Q.**   Can you read the next paragraph?

**A.**   "The FDA said it first found out about the bogus Avastin in late December after the UK Medicine and Healthcare Products Regulator Agency alerted US officials and Roche about the problem.  Roche confirmed, via testing earlier this week, that the Avastin was fake, the FDA said."

**Q.**   Once again, East Lake Oncology never bought Avastin, is that correct?

**A.**   Right.

**Q.**   Can you read the first paragraph right there?

**A.**   "The bogus Avastin distributed in the United States had several differences in its package and label that should make it easy to spot.  For example, the counterfeit says, Roche, on the packaging, and writing on the boxes is in French rather than English.  Roche distributes Avastin outside the United States, but all legitimate Avastin meet -- met -- meant for US patients, say Genentech."

**Q.**   At some point did you stop ordering, on behalf of East Lake Oncology, drugs from Quality Specialty Products?

**A.**   Yes.

**Q.**   And why did you stop ordering from them?

**A.**   Um, because we had a raid.

**Q.**   If you recall, when did you stop ordering from Quality Specialty Products?

**A.**    I can't quite recall the date.

**Q.**    Do you recall if it was around the time of this article,

if you remember?

**A.**    I don't.

**Q.**    Whose decision was it to stop ordering from Quality

Specialty Products?

**A.**    Dr. Norbergs.

**Q.**    Between these two articles can you just explain the

chronology of when these two articles were seen by

Dr. Norbergs, and I've displayed, for the record, on the left

side Exhibit 6C and on the right side Exhibit 7?

**A.**    Within the proximity of the dates that are on the

article, within February and March of 2012.

**Q.**    Can you explain why you showed both of these to

Dr. Norbergs?

**A.**    Well, I remember the one on February 16th being an

actual newspaper article and put it on there because of the

counterfeit drug.  Because it said, "Drugmaker warns of

counterfeit and the fake Avastin."  So I had given her both,

even though we did not order Avastin.

**Q.**    I've published side-by-side Government Exhibits 4A and

5.  Do you recall Exhibit 5?

**A.**    Yes.

**Q.**    What does the top of Exhibit 5 say?

**A.**    "Media inquiry into letter Dr. Norbergs received from

1   FDA April 5th."

2   **Q.**   And what -- can you describe this type of document in

3   Exhibit 5?

4   **A.**   Um, an email.

5   **Q.**   And who's it from?

6   **A.**   Sarah Karlin.

7   **Q.**   Do you know who that is?

8   **A.**   It was a -- just a reporter.  I don't know.

9   **Q.**   What is the date of the email?

10  **A.**   April 18, 2012.

11  **Q.**   And who's it sent to?

12  **A.**   Elopa@msn.com.

13  **Q.**   Who used that email address?

14  **A.**   The whole office, but mostly myself and Dr. Norbergs.

15  **Q.**   Do you recall who received this email first?

16  **A.**   Myself.

17  **Q.**   How do you know that?

18  **A.**   I was the one that checked it most of the time.  I just

19  remember seeing it about a reporter.

20  **Q.**   And can you read that paragraph that's below there?

21  **A.**   "I'm reporting for the Drug Industry Daily at FDA News.

22  I'm working on a story today regarding the letters, a number

23  of you as physicians, including Dr. Norbergs, has received

24  from the agency because their medical practice purchased

25  multiple medications from a foreign distributor, which sold

1    products that were not FDA-approved.  I was curious how

2    Dr. Norbergs has responded to the letter from the agency?

3    Has purchasing decisions been changed?  Has the practice

4    stopped using supplies purchased from Richards Pharma?"

5    **Q.**   After that email came in, what did you do with it?

6    **A.**   I put it on Dr. Norbergs desk.

7    **Q.**   And whose handwriting is on that document?

8    **A.**   Mine.

9    **Q.**   Can you explain what happened after you put the email on

10   Dr. Norbergs desk?

11   **A.**   Um, I don't think she saw it right away, and I had wrote

12   originally, "if you want to," and, um, I was in her office

13   and, um, asked her about it.  She handed it back to me and

14   she said, "just reply, 'unable to comment.'"

15   **Q.**   What did you do mean by, "if you want to?"

16   **A.**   If she wanted to respond to the email.

17   **Q.**   And what did you do with that piece of paper after you

18   wrote that note on there?

19   **A.**   Um, I think I just put it in the file.

20   **Q.**   Why did you put it in the file?

21   **A.**   In case there was anything more that came up from this

22   gal, from Sarah.

23   **Q.**   Did Sarah ever reach out again?

24   **A.**   No.

25   **Q.**   After a few months, if she didn't reach out, why did you

1  keep it?

2  **A.**  I have a tendency not to throw anything away.

3  **Q.**  Did anyone in the State of Florida ever come to East

4  Lake Oncology after this letter was received from any -- did

5  any official from the State of Florida, Department of Health

6  or other agency ever visit East Lake Oncology after the

7  letter had -- Exhibit 4A was received?

8  **A.**  I think it was after.

9  **Q.**  So is the answer yes?

10  **A.**  Yes.

11  **Q.**  Okay.  And you think it was after the letter was

12  received?

13  **A.**  Yes.

14  **Q.**  Do you recall approximately how long after?

15  **A.**  Probably, I want -- would say about a month maybe.

16  **Q.**  Did you -- did they ask to see anything?

17       MR. TRAGOS:  Objection, hearsay.

18       THE COURT:  Sustained.

19  BY MR. SALTZMAN:

20  **Q.**  Did you show them anything?

21       MR. TRAGOS:  Objection, that's still hearsay.

22       THE COURT:  Overruled.

23       THE WITNESS:  Yes.

24  BY MR. SALTZMAN:

25  **Q.**  What did you show them?

**A.**   Um, the -- our drug books.  Our drug distributor books

that -- where we kept the packets, um, order

form/invoice/packing slip stapled together, and then we filed

it by date.  They asked to see those books.

**Q.**   And did they ask to see them for any particular

suppliers.

        MR. TRAGOS:  Objection, hearsay.

        THE COURT:  Sustained.

BY MR. SALTZMAN:

**Q.**   Did you provide them those books for any particular

suppliers?

**A.**   Yes.

**Q.**   Which suppliers did you provide the books for?

**A.**   Cardinal, Curescript, Oncology Supply, McKesson and

Metro.

**Q.**   Did you show them any other distributors' books?

**A.**   Yes.

**Q.**   And why?

**A.**   Um, because they asked me.

        MR. TRAGOS:  Objection, hearsay.

        THE COURT:  He didn't ask you what they said.  The

question was, did you show them other books and why did you

do that?

        THE WITNESS:  Yes, and they asked me for any

additional books that we had.

1          THE COURT:  Overruled.

2    BY MR. SALTZMAN:

3    **Q.**   And did you provide them with those books?

4    **A.**   Yes.

5    **Q.**   After this happened did you tell Dr. Norbergs about what

6    happened?

7    **A.**   Yes.

8    **Q.**   What did Dr. Norbergs say?

9    **A.**   "Oh, sweetie, you didn't have to give them those books."

10   **Q.**   What was her demeanor when she said that?

11   **A.**   Um, sad.

12   **Q.**   I'm sorry, what did you say?

13   **A.**   Sad.  Like -- disappointed.  Not angry.  So I would use

14   sad, disappointed.

15   **Q.**   I published Government Exhibit 12B.  Do you recognize

16   the handwriting on the left side of the document?

17   **A.**   Yes.

18   **Q.**   Whose handwriting is that?

19   **A.**   Mine.

20   **Q.**   Did you create this document?

21   **A.**   Yes.

22   **Q.**   In the upper right what does that say?

23   **A.**   "My cheat sheet."

24   **Q.**   What does that mean?

25   **A.**   That I -- this is something that I just used to, um --

1   when I ordered to give me generic and brand names, and then I

2   had all my account numbers, and who my contact persons were.

3   **Q.**   How many different entries are there on the right column

4   of the document?

5   **A.**   Five.

6   **Q.**   And in what -- how would you describe those?  What is

7   listed there?

8   **A.**   Um, domestic distributors.

9   **Q.**   Domestic distributors of what?

10  **A.**   Drug distributors.

11  **Q.**   Why is Quality Specialty Products not on this list?

12  **A.**   They were a different section.  They didn't really have

13  an account number.  It's me.  I'm touching it.  I'm so sorry

14  (witness touching screen).

15  **Q.**   And what is shown on the screen now?

16  **A.**   "Rituxan equals MabThera."

17  **Q.**   Why did you write "Rituxan equals MabThera" on your

18  cheat sheet?

19  **A.**   Because I had thought that MabThera was the generic name

20  for Rituxan.

21  **Q.**   Had you -- did you learn the information that's shown on

22  the screen?

23  **A.**   Um --

24        MR. TRAGOS:  Which information are we talking

25  about, your Honor?

1      THE COURT:  I presume the information in her last

2  answer.

3      THE WITNESS:  Chemo nurses and Dr. Norbergs.

4      MR. TRAGOS:  Date, time and place of that

5  conversation, your Honor.

6      THE COURT:  Give the date, time and place.

7  BY MR. SALTZMAN:

8  **Q.**   Do you recall approximately when that conversation

9  happened?

10 **A.**   I know at the office, but, um, I had been putting

11 together some sort of list since I started ordering in

12 2011/2010.

13 **Q.**   We looked at what was displayed then.  Does this show

14 MabThera/Rituxan in the same table?

15 **A.**   Yes.

16 **Q.**   I should ask, the highlighting that's on this document,

17 who put that there?

18 **A.**   Me.

19 **Q.**   And when did you put it there, approximately?

20 **A.**   When I received this fax March 15th, of 2011.

21 **Q.**   On the right side where it says, "Biologic response

22 modifiers," whose handwriting is beside that?

23 **A.**   Mine.

24 **Q.**   And see the last column where it says, "Neulastim --

25 Neulasta/Neulastim?"

**A.**   Yes.

**Q.**   Does that refer to one drug or two drugs, to your

knowledge?

**A.**   One drug.

**Q.**   How about where it says, "Procrit/Eprex?"

**A.**   One drug.

**Q.**   Does that refer to one drug or two drugs?

**A.**   One drug.

**Q.**   Publishing Exhibit 13C.  What is the title on the

document?

**A.**   "Progress Note."

**Q.**   Does this document show progress notes?

**A.**   No.

**Q.**   What is this document?

**A.**   Um, a drug cheat sheet.

**Q.**   What do you mean by a drug cheat sheet?

**A.**   Um, it's got, like, the J code, milligrams -- I'm sorry.

The name of the drug, the price for the different suppliers,

the different distributors.

**Q.**   Are the different distributors listed on the top of the

document?

**A.**   Yes.

**Q.**   Which distributors are listed here?

**A.**   QSP, Global/Oberlin, McKesson, Metro.

**Q.**   Do you see towards the bottom a reference towards

```
1    Rituxan?

2    A.    Uh-huh.

3    Q.    Is that yes?

4    A.    Yes.

5    Q.    And whose handwriting is that in?

6    A.    Dr. Norbergs, except for the 2057, that's my

7    handwriting.

8    Q.    Is the handwriting in the left column all Dr. Norbergs

9    or some yours?

10   A.    From what I see here it's all her's.

11   Q.    And the writing at the top of the document, whose

12   handwriting is that in?

13   A.    Her's.

14   Q.    The handwriting that's to the bottom of the header and

15   to the right of the left column, whose handwriting is that

16   in?

17   A.    Dr. Norbergs.

18   Q.    Is there any handwriting on here that's yours?

19   A.    That $2,375 next to the "Rituxan 500."

20   Q.    And how would you describe what this -- the purpose of

21   this document is?

22   A.    Um, it's -- it would be for prices -- price comparison.

23   So it's got the information of the J code, the drug, and then

24   what each company's price is.

25   Q.    How did QSP prices generally compare to other
```

1    distributors prices?

2    **A.**    Quite a bit cheaper.

3    **Q.**    Quite a bit cheaper than who?

4    **A.**    Than the, um -- the other, um, distributors, McKesson,

5    Metro, Cardinal.

6    **Q.**    How would you describe the three distributors that you

7    just listed?

8    **A.**    The US, the United States distributors?

9    **Q.**    Was QSP always cheaper than the US distributors?

10   **A.**    Pretty much.

11   **Q.**    If -- did you only order from QSP?

12   **A.**    No.

13   **Q.**    If QSP is cheaper than the US distributors, why would

14   you order from other distributors?

15   **A.**    Um, QSP didn't have everything, all the drugs.  They had

16   just the certain ones, and occasionally the other -- the US

17   distributors would actually be at close-to cost or -- but

18   they would be quicker shipping or something like that that we

19   would order from that -- the US companies.

20   **Q.**    Who was responsible for gathering pricing information?

21   **A.**    Dr. Norbergs was at first and then she gave me the

22   responsibility.

23   **Q.**    When you say she was responsible at first, can you give

24   us a general time period for that?

25   **A.**    Um, like 2008 to 2011.

1    **Q.**    And what changed in 2011?

2    **A.**    Um, she gave me the responsibility.

3    **Q.**    Why did she give you the responsibility?

4    **A.**    Because she just didn't have time to do the price

5    shopping.

6    **Q.**    How did you know how to do the price shopping then?

7    **A.**    Um, she showed me how -- how to look for, um, the

8    milligrams, in what doses that was prescribed to the patient.

9    She showed me how to figure out -- how much milligrams I

10   needed.  A lot of times I would go back to the chemo nurses

11   and ask them just how many milligrams do I need, and then she

12   showed me how to go through on each company and look for that

13   milligram of what I needed and to look at the price.

14   **Q.**    Were the milligrams for US distributors for drugs the

15   same unit of milligrams for foreign distributors?

16   **A.**    Sometimes.

17   **Q.**    Were they sometimes not the same?

18   **A.**    Right.  Correct.

19   **Q.**    How did you know, if you were asked to order a drug,

20   what to order then?

21   **A.**    Um, that was where if you needed 600 milligrams of

22   something, and it only sold in 500 and 100, then I knew I

23   needed to get one of each vial.

24          Um, McKesson was a good example.  It would say 10

25   milliliters/ -- ten milligrams/ten milliliters and you take

1   ten times ten is 100.  So I would order one of those.

2   **Q.**   If there are different -- do you know in the drugs from

3   foreign distributors as compared to drugs from US

4   distributors if they were in different units, did you know if

5   they were the same potency?

6   **A.**   No.  Could you rephrase that?

7   **Q.**   Do you know what I mean by potency of a drug?

8   **A.**   Um, same milligrams, or the same strength?  No, I do

9   not.

10  **Q.**   Did Dr. Norbergs teach you about potency of drugs?

11  **A.**   No.

12  **Q.**   Was that something that -- did you ever ask her about

13  how drugs have different potencies?

14  **A.**   No.

15  **Q.**   Publishing Exhibit 14B, looking at the top of this, who

16  is this from?

17  **A.**   Rituxan.

18  **Q.**   Who typed that?

19  **A.**   Myself.

20  **Q.**   Did you type in the information that's on the top?

21  **A.**   On the very top the word "Rituxan."

22  **Q.**   And whose handwriting is on that?

23  **A.**   Mine.

24  **Q.**   And was this document shown to Dr. Norbergs?

25  **A.**   Yes.

1    **Q.**    And how do you know that?

2    **A.**    Because this was when I was, um, first learning how to

3    order, McKesson had this already on their computer and I

4    copy/paste, so I would know how much the price was, and then

5    I used -- down the page --

6    **Q.**    Well, before we go down the page, do you see on the left

7    side where it says, um, "HCPC code."  Do you know what that

8    is?

9    **A.**    Yes.  The billing code, PC code.

10   **Q.**    Along the top, "six percent for billing code," do you

11   know what that means?

12   **A.**    That's what you would get reimbursed for Medicare.

13   **Q.**    And you mentioned the bottom of the document.  What does

14   the bottom, not reading it all, can you describe what

15   information is in the bottom of the document?

16   **A.**    Yes.  So I've got the other distributors, and for the

17   same milligrams I would copy off their website and their

18   price.  So I did it for Curescript, Oncology Supply and

19   McKesson.

20   **Q.**    So are those -- knowledge?

21   **A.**    Yes.

22   **Q.**    What did you write or what is on here?

23   **A.**    This is what -- this I typed, um, that Metro and

24   Cardinal didn't have any in stock and that QSP was -- for the

25   same milligrams it came in the two-pack and it was $950.  So

1    I just divided it by two.

2    **Q.**   And what does that mean that the difference of pricing

3    is between it coming from QSP versus other suppliers?

4    **A.**   That it was quite a bit less.

5    **Q.**   Did you show this document to Dr. Norbergs?

6    **A.**   Yes.

7    **Q.**   And approximately when do you think that happened?

8    **A.**   Um, when I first started ordering.  So approximately

9    2011 sometime.

10   **Q.**   And did you order this product from QSP around that

11   time?

12   **A.**   More than likely.

13   **Q.**   I displayed on the left the page we were just looking

14   at, on the right Exhibit 13A.  Is this the same pricing shown

15   for QSP for Rituxan on the left as it is on the right?

16   **A.**   Yes.

17   **Q.**   What is -- why -- does it also say "MabThera" on the

18   right document in that same cell?

19   **A.**   Because --

20   **Q.**   In Exhibit 13A does it also say.  "MabThera," in the

21   right -- in that cell?

22   **A.**   Yes.

23   **Q.**   When you got pricing information from domestic

24   distributors, did it include MabThera in there?

25   **A.**   No.

1   **Q.**   When this drug was purchased at a lower price, did you

2   receive any of the money that was saved as a result?

3   **A.**   No.

4   **Q.**   Who received the money or -- who saved the money, if

5   this drug was bought at a cheaper price?

6   **A.**   East Lake Oncology.

7   **Q.**   And who owns East Lake Oncology?

8   **A.**   Dr. Norbergs.

9   **Q.**   And can you describe what ASP plus six percent is?

10  **A.**   Um, I don't remember what the letters stand for, but

11  basically it's Medicare.

12          MR. TRAGOS:  Objection, speculation.

13          THE COURT:  Sustained at this point.

14  BY MR. SALTZMAN:

15  **Q.**   Did you say Oncology buys drugs from QSP and then

16  administer them to patients?

17  **A.**   Yes.

18          MR. TRAGOS:  Objection, foundation.

19          THE COURT:  Overruled.

20  BY MR. SALTZMAN:

21  **Q.**   Did East Lake Oncology -- did you ever do billing for

22  East Lake Oncology to Medicare?

23  **A.**   Yes.

24  **Q.**   Did East Lake Oncology seek reimbursement for the

25  administration of the drugs from Medicare?

1  **A.**   Yes.

2  **Q.**   Did East Lake Oncology seek payment from patients based

3  on the administration of drugs?

4  **A.**   Yes.

5  **Q.**   And did East Lake Oncology seek reimbursement from other

6  insurance companies for the administration of drugs?

7  **A.**   Yes.

8  **Q.**   And did that depend on the distributor that a drug was

9  bought from?

10  **A.**   No.

11  **Q.**   If -- and who instructed you to seek reimbursement for

12  certain drugs?

13          MR. TRAGOS:  Objection, vague, "certain drugs."

14          THE COURT:  Sustained on foundation, unless I

15  missed it.  I don't think that she said she did the billing

16  to Medicare.

17          MR. SALTZMAN:  Can I have a moment, your Honor?

18  BY MR. SALTZMAN:

19  **Q.**   Did you ever submit claims to Medicare for East Lake

20  Oncology?

21  **A.**   Yes.

22  **Q.**   Did you elect to do that or were you instructed to do

23  it?

24  **A.**   Instructed.

25  **Q.**   Who provided you with those instructions?

**A.**   Dr. Norbergs -- Dr. Norbergs.

**Q.**   Did you ever talk to Dr. Norbergs or did Dr. Norbergs

ever say anything to you about the rates that Medicare

reimbursed them?

         MR. TRAGOS:  Leading, and date, time and place.

         THE COURT:  Well, answer the question first.  If

the answer's no, we don't need a date, and time and place.

BY MR. SALTZMAN:

**Q.**   Did you ever talk to Dr. Norbergs or -- did Dr. Norbergs

ever talk to you, I should say, about the rates that Medicare

reimbursed them?

**A.**   Yes.

**Q.**   Approximately when was that conversation?

**A.**   It would have been in the beginning of the year of -- it

was when Medicare rates changed on payment of the

reimbursement amount.  I want to say 2011, '10 or '11.

**Q.**   And where did this conversation happen?

**A.**   At the office.

**Q.**   And what did she say?

**A.**   That the -- something like, "The Medicare rates are

killing us.  The Medicare reimbursements are killing us."

**Q.**   How did Medicare reimbursement rates compare to the cost

of the drugs from distributors that were located in the

United States?

**A.**   It was a small amount.

1  **Q.**   How did the Medicare reimbursement rates compare to the

2  cost of the drugs that were being purchased from QSP?

3  **A.**   It was larger.

4  **Q.**   How did it compare to other foreign distributors?   How

5  did the Medicare reimbursement rates compare to the other

6  distributors like Cancer Drugs Online?

7  **A.**   It was larger.

8  **Q.**   And when you said the Medicare rates were a small amount

9  as compared to domestics distributors, can you quantify that?

10  **A.**   Um, like, a couple $100 as opposed to four and $500.

11  **Q.**   When say as opposed to four or $500, who are you

12  referring to in that context?

13  **A.**   QSP.

14  **Q.**   An was that money that was made for the medical

15  practice?

16  **A.**   Say that again.

17  **Q.**   The money that was made, if the drug costs were less

18  than the reimbursement rates, was that money that was made

19  for the medical practice?

20  **A.**   Yes.

21  **Q.**   Did other doctors work at East Lake Oncology other than

22  Dr. Norbergs?

23  **A.**   Yes.

24  **Q.**   Around 2011 and 2012, what doctor was working there?

25  **A.**   Dr. Raj.

1    **Q.**   How was Dr. Raj paid?

2    **A.**   Um, I -- through -- through East Lake Oncology.

3    **Q.**   Was Dr. Raj a co-owner of the practice with

4    Dr. Norbergs?

5    **A.**   No.

6    **Q.**   How would you describe her relationship with East Lake

7    Oncology?

8    **A.**   She was an employee of East Lake Oncology.

9    **Q.**   And for the administration of drugs to patients, did

10   Dr. Raj make any money if East Lake Oncology made money?

11            MR. TRAGOS:  Foundation.

12            THE COURT:  Lay a foundation.

13   BY MR. SALTZMAN:

14   **Q.**   Did Dr. Raj prescribe drugs to administer to patients?

15   **A.**   Yes.

16   **Q.**   Did Dr. Raj -- was Dr. Raj involved in the ordering

17   process of drugs?

18   **A.**   No.

19   **Q.**   When the drugs were administered to patients based on

20   Dr. Raj's instructions, were those drugs administered to

21   patients?

22   **A.**   Yes.

23   **Q.**   Were claims then submitted to Medicare and health

24   insurance companies?

25   **A.**   Yes.

1    **Q.**   When reimbursement was paid for the administration of

2    the drugs, where did the payment go?

3    **A.**   To East Lake Oncology.

4    **Q.**   Did Dr. Raj then get any of the money from those

5    payments?

6               MR. TRAGOS:  Foundation.

7               THE COURT:  Sustained.

8    BY MR. SALTZMAN:

9    **Q.**   Are you familiar with the -- who gets paid from Medicare

10   when East Lake Oncology gets reimbursed for Medicare?

11   **A.**   Can you say that again.

12              THE COURT:  She's already answered that.  Does she

13   know how Dr. Raj gets paid and how does she know?

14   BY MR. SALTZMAN:

15   **Q.**   Do you know how Dr. Raj gets paid?

16   **A.**   From East Lake Oncology.

17              THE COURT:  That's a yes or no, do you know.

18              THE WITNESS:  Yes.

19              THE COURT:  How do you know?  You're the one that

20   wrote the checks.  You know what account it came out of.  How

21   do you know?

22              THE WITNESS:  Um, I guess conversations with

23   Dr. Norbergs that she is an employee, like the rest of us

24   were.  I would give her her check.

25   BY MR. SALTZMAN:

1    **Q.**   You gave Dr. Raj her check?

2    **A.**   In an envelope.

3    **Q.**   How often -- did you see the check?

4    **A.**   No.

5    **Q.**   How often did you give her the check?

6    **A.**   She -- once a month.

7    **Q.**   Do you know if the -- if that number fluctuated each

8    month?

9              MR. TRAGOS:  Objection, your Honor.  I believe she

10   answered.  She doesn't know how much the check was and she

11   hadn't seen it.

12             THE WITNESS:  No.

13             THE COURT:  Sustained.  How much longer do you have

14   on direct?

15             MR. SALTZMAN:  Quite a bit, your Honor.

16             THE COURT:  Start asking them and move along,

17   please.

18   BY MR. SALTZMAN:

19   **Q.**   Exhibit -- I displayed 13B on the left and Exhibit 13D

20   on the right.  Can you explain which drugs these two exhibits

21   relate to?

22   **A.**   Um, Avastin and Rituxan.

23   **Q.**   And can you explain -- just describe generally what

24   these two documents are.

25   **A.**   Um, price comparison.

1    **Q.**   For the exhibit document -- Exhibit 13D, is there a

2    reference to QSP at the bottom?

3    **A.**   Yes.

4    **Q.**   And what drug does that refer to?

5    **A.**   Avastin.

6    **Q.**   Did East Lake Oncology ever buy Avastin from QSP?

7    **A.**   No.

8    **Q.**   Was this document at Exhibit 13D ever shown to

9    Dr. Norbergs?

10   **A.**   Yes.

11   **Q.**   And how do you know that?

12   **A.**   Because this was part of my learning to order the drugs.

13   So --

14            MR. TRAGOS:  Objection, date, time and place.

15            THE COURT:  Overruled.

16            MR. SALTZMAN:  I'm sorry, was that overruled?

17            THE COURT:  That was overruled.

18   BY MR. SALTZMAN:

19   **Q.**   Approximately when was it?

20            THE COURT:  Well, it was before she took over

21   ordering the drugs.  She already told us that was in 2010 or

22   2011.  So it had to be sometime before then.  That is good

23   enough.

24            MR. SALTZMAN:  Thank you, your Honor.

25            THE COURT:  Next question.

BY MR. SALTZMAN:

**Q.**   I displayed Exhibit 13E on the right.  Is that related to another drug?

**A.**   Yes.

**Q.**   And what drug was that?

**A.**   Neupogen.

**Q.**   And does that include price comparisons for Neupogen from different distributors?

**A.**   Yes.

**Q.**   Is QSP listed as one of the distributors on that document?

**A.**   Yes.

**Q.**   Was this also part of your learning how to buy drugs from distributors?

**A.**   Yes.

**Q.**   How would you describe QSP pricing as compared to the other distributors?

**A.**   A lot less.

**Q.**   I displayed on the right 13F.  That is another example, "price comparisons," during your learning process?

**A.**   Yes.

**Q.**   On page 2 of the document does it list a number of distributors there?

**A.**   Yes.

**Q.**   Does it include domestic distributors?

1    **A.**    Yes.

2    **Q.**    Does it include QSP?

3    **A.**    Yes.

4    **Q.**    And how would you describe the pricing for this drug

5    with -- between the domestic distributors and QSP?

6    **A.**    A lot less.

7    **Q.**    Um, displayed is Government Exhibit 14A.  What does it

8    say at the top of the document?

9    **A.**    Quantum Solutions, SRL.

10   **Q.**    And what is the date?

11   **A.**    February --

12   **Q.**    Shown on the document where I just displayed it.

13   **A.**    October 26, 2011.

14   **Q.**    And who was it sent to?

15   **A.**    Myself and Dr. Norbergs.

16   **Q.**    And who was it sent from?

17   **A.**    Harp@quantumsolutionssrl.

18   **Q.**    Without telling us if you said anything or what was

19   said, did you ever speak to Harp@quantumsolutionssrl?

20   **A.**    Yes.

21   **Q.**    Was it a man or woman?

22   **A.**    Man.

23   **Q.**    Did this person have an accent?

24   **A.**    Yes.

25   **Q.**    How would you describe that accent?

**A.**    Um --

MR. TRAGOS:  Objection, hearsay.

THE COURT:  How would you describe that accent, objection, hearsay?

MR. TRAGOS:  And foundation.

THE COURT:  Overruled.

BY MR. SALTZMAN:

**Q.**    How would you describe the accent for the person that you spoke to named Harp?

**A.**    Um, I would say French.

**Q.**    Going to page 2 of the document -- wait, there is no page 2.

MR. TRAGOS:  We don't have a page 2.

MR. SALTZMAN:  There isn't.

BY MR. SALTZMAN:

**Q.**    Displaying Government Exhibit 14B, and zooming in at the top, can you describe what this document is?

**A.**    This is a price sheet from Quality Solutions.

**Q.**    What is written below Quantum Solutions, SRL?

**A.**    Cancer Drugs Online.

**Q.**    What's the relationship to this?

**A.**    Um, that it's the same company.

**Q.**    And the handwriting to the right on that document, whose handwriting is that?

**A.**    Dr. Norbergs.

1   **Q.**   And what does it say?

2   **A.**   "QSP" and underneath that was 785.

3   **Q.**   Is this a --

4   **A.**   Price from QSP.

5   **Q.**   Towards the bottom do you see where it says, "Zometa?"

6   **A.**   Yes.

7   **Q.**   What's the price that's listed from Cancer Drugs Online?

8   **A.**   $369.

9   **Q.**   And what's written on the right side?

10  **A.**   $500 for QSP.

11  **Q.**   Displaying on the right side of that same document, and

12  on the left side Government's Exhibit 13A, and showing you in

13  the upper right-hand corner, do you see, "Zometa?"

14  **A.**   Yes.

15  **Q.**   And which distributor is this document related to?

16  **A.**   QSP.

17  **Q.**   Is that the same pricing that's in Government

18  Exhibit 14A for QSP/Zometa?

19  **A.**   Yes.

20  **Q.**   Did you ever receive the exhibit -- the document in

21  Exhibit 14B?

22  **A.**   One more time.

23  **Q.**   The document that's at Exhibit 14B, did you ever receive

24  that exhibit?

25  **A.**   Yes.

1    **Q.**   Who did you receive it from?

2    **A.**   Harp.

3    **Q.**   Whose handwriting is on that document?

4    **A.**   Dr. Norbergs.

5    **Q.**   Are you saying you received the document from

6    Dr. Norbergs?

7    **A.**   Um, yes.  I think we went through this one together.

8    **Q.**   Which was part of your learning process?

9    **A.**   Yes.

10   **Q.**   Exhibit 14C, what's shown on the first page here?

11   **A.**   Um, "Wants to get a better price on these drugs."

12   **Q.**   Who wrote that?

13   **A.**   Me.

14   **Q.**   Why did you write that?

15   **A.**   I -- it must be a note that I was needing to ask

16   somebody if I could get a better price on a drug.  I don't

17   know right now who it went to.

18   **Q.**   Let me go to page 2.  What is this document?

19   **A.**   Cancer Drugs Online.

20   **Q.**   Do you see a reference to Zometa in there?

21   **A.**   Uh-huh -- yes.

22   **Q.**   Is there an "X" on that?

23   **A.**   Yes.

24   **Q.**   Do you know who wrote that?

25   **A.**   I'm thinking I did, the "X."

1   Q.   And how would you describe what's in the bottom section?

2   A.   Um, account setup form that I filled out.

3   Q.   Had you learned how to order drugs at this point?  Did

4   you fill the document out?

5   A.   Yes, for the most part, I would say.

6   Q.   What's shown in Exhibit 14D?

7   A.   A folder for drug companies.

8   Q.   And what is shown -- is this the inside flap of that

9   same document on page 2?

10  A.   Yes.

11  Q.   Can you read the handwritten note in red on the right?

12  A.   "Kelly, need to go back to Metro for Procrit, resign --

13  oh, resign forms --"  Okay.  "Kelly, need to go back to, um,

14  Metro for Procrit.  Resign forms.  Curescript is on

15  backorder."

16  Q.   And whose handwriting is that?

17  A.   Dr. Norbergs.

18  Q.   And did she provide you that Post-it Note?

19  A.   Yes.

20  Q.   Is there a date of 3-31-11 there?

21  A.   Yes.

22  Q.   Was that approximately when she provided you that note?

23  A.   Yes.

24  Q.   Was this describing a change in a -- which distributor

25  to order from for this particular product?

**A.**   Yes.

**Q.**   Whose decision was it to order a drug from Metro as opposed to Curescript?

**A.**   Dr. Norbergs.

**Q.**   Did Dr. Norbergs make the decisions in the office about which distributors to buy from?

**A.**   Yes.

**Q.**   After a relationship with a distributor was set up, did you have to run all purchasing -- after you learned how to order drugs, did you have -- learn how to run all purchasing orders by Dr. Norbergs?

**A.**   No.

**Q.**   Did you have instructions, though, on what -- how to order?

**A.**   Yes.

**Q.**   And how -- what were those instructions?

**A.**   Usually --

          MR. TRAGOS:  Objection, date, time and place.

BY MR. SALTZMAN:

**Q.**   Approximately when did you finish your learning, after being taught by Dr. Norbergs how to order drugs?

**A.**   2011.

**Q.**   When in 2011?

**A.**   Um, probably, I would say, the beginning, I would, like, say maybe January/February.

1    **Q.**    And what were her instructions at that point?

2    **A.**    That, um, I am looking for, um, the least expensive, and

3    then I also had to pay attention to how it gets shipped, from

4    when we need it, and, um, shipping costs, um, there were

5    several different variables on that.  So shipping costs, how

6    soon we could get it, what kind of, you know, arrangements

7    have we set up for the account, whether we pay for it in one

8    month, three months or by credit card.

9    **Q.**    And how often were drugs ordered?

10   **A.**    Um, usually it started out kind of once a week and then

11   we went to twice a week, and --

12   **Q.**    Why were drugs ordered at that interval?

13   **A.**    So we did not keep -- for one, that we could get the

14   shipping costs covered, like, if you ordered a certain

15   amount, they would give you free shipping.  So we had enough

16   days in there, and then we didn't want to keep any inventory

17   on the shelf.

18   **Q.**    How long were drugs kept in inventory in the office?

19   **A.**    Less than a week.

20   **Q.**    Were there any exceptions to that?

21   **A.**    Yes.

22   **Q.**    What were the exceptions?

23   **A.**    Procrit and Neupogen came in ten packs.  So that

24   sometimes we would order and -- because people came in and

25   got their lab tests done and some need shots, some don't.

1    So --

2    **Q.**    And for those drugs how long do they stay in the office?

3    **A.**    Approximately 1-to-2 weeks.

4    **Q.**    And for drugs that required to be refrigerated, was that

5    a shorter period of time?

6    **A.**    It still, no longer than a week.  It would be within a

7    few days.

8         THE COURT:  When you reach a convenient stopping

9    place, we'll break for the day.

10        MR. SALTZMAN:  This is a perfect spot, your Honor.

11        THE COURT:  We'll be in recess until 8:45 tomorrow

12   morning.

13        CSO OFFICER:  All rise.

14        (Jury exits courtroom at 4:38 p.m.)

15        THE COURT:  How far behind are we?

16        MR. SALTZMAN:  Your Honor, we are still on the same

17   pace to be done.  We'll try Tuesday, but by Wednesday.

18        THE COURT:  See you tomorrow morning.

19        MR. SALTZMAN:  Thank you, your Honor.

20        (Court adjourned at 4:40 p.m.)

21

22

23

24

25

CERTIFICATE OF REPORTER


COUNTY OF HILLSBOROUGH     )

                          )  SS.

STATE OF FLORIDA          )


I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER, REGISTERED

PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

COURT FOR THE MIDDLE DISTRICT OF FLORIDA, DO HEREBY CERTIFY

THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS

AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME

WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF

COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT

THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC

NOTES.



DATE:  3/22/2017


S:/MELISSA A. PIERSON

MELISSA A. PIERSON, CA/CSR 12499

IL/CSR 084.003138, RPR

FEDERAL OFFICIAL COURT REPORTER