UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA


– – –

HONORABLE JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE PRESIDING
– – –

UNITED STATES OF AMERICA,    )
                             )
          PLAINTIFF,         )
                             )
VS.                          ) NO. 8:15–cr–183–T–30AEP
                             )
D. ANDA NORBERGS,            )
                             )
          DEFENDANT.         )
_____)


**TRIAL – DAY 5**
**\*\*EXCERPT\*\***

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**NOVEMBER 14, 2016**
TAMPA, FLORIDA




MELISSA A. PIERSON, CA CSR 12499,
IL CSR 084.003138, RPR
FEDERAL OFFICIAL COURT REPORTER
801 N. FLORIDA AVENUE, 2ND FLOOR
TAMPA, FLORIDA 33602
PH:  (813)301-5336
USDCtranscripts@gmail.com

```
1    APPEARANCES OF COUNSEL:

2    ON BEHALF OF PLAINTIFF:
             A. LEE BENTLEY, III
3            UNITED STATES ATTORNEY
             BY:  MR. ADAM SALTZMAN, ESQ.
4            BY:  MR. JAY TREZEVANT, ESQ.
             ASSISTANT UNITED STATES ATTORNEYS
5            400 N. TAMPA STREET
             ST. 3200
6            TAMPA, FL 33602
             (813) 274-6000
7            ADAM.SALTZMAN@USDOJ.GOV
             JAY.TREZEVANT@USDOJ.GOV
8

9

10   ON BEHALF OF DEFENDANT:
             TRAGOS, SARTES & TRAGOS, PLLC
11           BY:  MR. GEORGE E. TRAGOS, ESQ.
             BY:  MR. PETER SARTES, ESQ.
12           601 CLEVELAND STREET
             ST. 800
13           CLEARWATER, FL 33755
             (727) 441-9030
14           george@greeklaw.com
             peter@greeklaw.com
15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

I-N-D-E-X

**WITNESS:**

Dawn McKenna

    Direct Examination by Mr. Saltzman:          4
    Cross-Examination by Mr. Tragos:            27

**E X H I B I T S**                          **ADM**

Government's Exhibit No. 201D1                     17

1          TAMPA, FLORIDA; NOVEMBER 14, 2016

2                        - - -

3          (COURT IN SESSION AT 1:305 P.M.)

4                      *   *   *   *

5     (Whereupon, witnesses Stephen Quindoza and

6     Valerie Jensen were reported, but not

7     asked to be transcribed.)

8               THE COURT:  Call your next witness, please.

9               MR. SALTZMAN:  The United States calls Dawn

10    McKenna.

11              MADAM CLERK:  Please raise your right hand.

12              THE WITNESS:  Yes, ma'am.

13              THE COURT:  Please state your name and spell your

14    first and last name for the record.

15              THE WITNESS:  Dawn McKenna, D-A-W-N, M-C-K-E-N-N-A.

16              MADAM CLERK:  Thank you.  You may have a seat in

17    the witness box.

18              THE COURT:  Proceed.

19              MR. SALTZMAN:  Thank you, your Honor.

20                      **DAWN MCKENNA**

21    Called as a witness herein, having been first duly sworn

22    was examined and testified as follows:

23                   **DIRECT EXAMINATION**

24    **BY MR. SALTZMAN:**

25    **Q.**   Good afternoon.

| | | |
|---|---|---|
| 1 | **A.** | Hello. |
| 2 | **Q.** | Where do you currently live? |
| 3 | **A.** | Clearwater. |
| 4 | **Q.** | How long have you lived in Clearwater, Florida? |
| 5 | **A.** | Seven years, maybe eight. |
| 6 | **Q.** | Do you mind just pulling that microphone a little closer |

7  to you.  And how long have you lived in Florida?

8  **A.**   Eight years.

9  **Q.**   And what is your, um, highest level of education?

10  **A.**   Completed high school, attending college now.

11  **Q.**   Excuse me?

12  **A.**   Completed --

13  **Q.**   I couldn't hear what you said?

14  **A.**   Completed high school, attending college now.

15  **Q.**   What do you do -- currently do for work?

16  **A.**   I work at a plant nursery.

17  **Q.**   What do you do for the plant nursery?

18  **A.**   Bookkeeping, invoicing, customer service.

19  **Q.**   And what are you in school for now?

20  **A.**   Going for my Associates Degree in Health Information

21  Management.

22           THE COURT:  Speak up, please, you have a soft

23  voice.

24           THE WITNESS:  Okay.

25           THE COURT:  Thank you.

1    BY MR. SALTZMAN:

2    **Q.**   Pull the microphone even closer.  That will make it

3    easier.  And before you worked at the plant nursery where did

4    you work?

5    **A.**   Medical Business Partners.

6    **Q.**   And before that?

7    **A.**   East Lake Oncology.

8    **Q.**   Who hired you at East Lake Oncology?

9    **A.**   Dr. Norbergs.

10   **Q.**   Do you see Dr. Norbergs in the courtroom here today?

11   **A.**   Here in the black and red scarf.

12            MR. SALTZMAN:  Your Honor, if the record could

13   reflect that the witness has identified the Defendant?

14            THE COURT:  She may have identified Mr. Saltzman.

15   (Jury laughs.)  Let the record so reflect.

16   BY MR. SALTZMAN:

17   **Q.**   Can you please identify Dr. Norbergs clearly?

18   **A.**   Blond hair, black glasses, red and black scarf with a

19   black jacket.

20            MR. SALTZMAN:  May the record reflect the witness

21   has identified the Defendant?

22            THE COURT:  The record may so reflect.

23   BY MR. SALTZMAN:

24   **Q.**   What did you do at East Lake Oncology?

25   **A.**   Billing and coding at the office.

1   **Q.**   What does billing and coding mean?

2   **A.**   Taking the daily charges and putting alphanumeric codes

3   to what happened in the office so that they could be

4   submitted to the insurance companies for payment.

5   **Q.**   What do you mean by daily charges?

6   **A.**   Patients' visits.

7   **Q.**   Okay.

8   **A.**   A patient would come into the office, it would be done,

9   what was done, lab, administration, chemo, seeing

10   Dr. Norbergs, and the following day the flow sheet would come

11   to me and I would put the corresponding CPT or ICD-9 codes,

12   procedure codes and diagnosis codes on the visits.

13   **Q.**   And you said something about a flow sheet.  What is a

14   flow sheet?

15   **A.**   Depending on what was done there would be a chart sheet

16   or a chemotherapy flow sheet that would -- on that flow sheet

17   would say what happened that day, what the visit consisted

18   of.

19   **Q.**   And what type of information would that include?

20   **A.**   Whether the patient had lab work done, if they received

21   chemotherapy administration.  If it was just a doctor's

22   visit, normally there wouldn't be a flow sheet.

23   **Q.**   If you didn't have a flow sheet, how did you know what

24   to bill for, if at all?

25   **A.**   Then there was a charge ticket.

1  **Q.**    What is a charge ticket?

2  **A.**    A HCFA 1500.

3  **Q.**    Can you explain, just generally speaking, what a charge

4  ticket is and how you used it?

5  **A.**    Before we went to electronic medical records it was a

6  piece of paper that would follow the patient to the office

7  visit with Dr. Norbergs; and then, if lab work was done, it

8  would go there; if chemotherapy was done, it would go there.

9  It would be compiled at the end of the day and come to me the

10  next day for billing.

11  **Q.**    How did you learn how to do the billing work?

12  **A.**    Specifically chemotherapy billing?

13  **Q.**    Any type of billing.

14  **A.**    I went to school many years ago.

15  **Q.**    How long ago did you go to school?

16  **A.**    20 years ago.

17  **Q.**    And what type of schooling was it?

18  **A.**    It was, in general, um, Medical Academy Services, which

19  is -- was located in Albuquerque, New Mexico.  It was general

20  front-office billing, office managerial stuff and

21  on-the-job-training.

22  **Q.**    Did you do any billing work for Dr. Norbergs?

23  **A.**    I didn't hear the question.

24  **Q.**    Did you do any billing work before you worked for

25  Dr. Norbergs?

1    **A.**    A lot of it.

2    **Q.**    How long did you do that work for?

3    **A.**    15 years.

4    **Q.**    And approximately when did you start working for

5    Dr. Norbergs?

6    **A.**    In 2009.

7    **Q.**    And approximately when did you stop?

8    **A.**    2013.

9    **Q.**    Do you know when in 2013?

10    **A.**    I want to say April.

11    **Q.**    And whose decision was it for you to stop working?

12    **A.**    Whose decision?

13    **Q.**    Yes.  To stop working at Dr. Norbergs office.

14    **A.**    Mine.

15    **Q.**    And I'd like to talk about the billing work you did for

16    Dr. Norbergs.  What type of insurance did you bill to?

17    **A.**    Medicare, United Healthcare, Blue Cross/Blue Shield.

18    **Q.**    How would you describe United Healthcare, Blue

19    Cross/Blue Shield?  What type of insurance companies are

20    those?

21    **A.**    Third-party payers.

22    **Q.**    And do you know what secondary supplemental insurance

23    is?

24    **A.**    Yes, sir.

25    **Q.**    And what is that?

1   **A.**    Secondary or supplemental would cover the 20 percent

2   that Medicare would not cover.

3   **Q.**    When working for Dr. Norbergs did you bill to those

4   policies?

5   **A.**    Absolutely.

6   **Q.**    When you submitted claims to Medicare, when you worked

7   at East Lake Oncology, who were you submitting those claims

8   on behalf of?

9   **A.**    East Lake Oncology.

10  **Q.**    And who's the owner of East Lake Oncology or -- who was

11  the owner?

12  **A.**    Dr. Norbergs.

13  **Q.**    And did, to your knowledge, other doctors work at East

14  Lake Oncology?

15  **A.**    Yes.

16  **Q.**    And when you submitted claims for those other doctors'

17  services or anything else, were you submitting those claims

18  for that doctor or for East Lake Oncology?

19  **A.**    East Lake Oncology.

20  **Q.**    And what does that mean?

21  **A.**    Explain your question.

22  **Q.**    What does that mean if you're submitting a claim on

23  behalf of East Lake Oncology based on another doctor's

24  services.

25  **A.**    They are being submitted under the tax ID of the company

1    or the corporation.

2    **Q.**   And what type of services did you bill for at East Lake

3    Oncology?

4    **A.**   The visits, the office visits, any lab work that would

5    be done, any administration of chemotherapy.

6    **Q.**   And when you worked for Dr. Norbergs, did anyone else,

7    other than you, do billing?

8    **A.**   Lisa was there with me for a while.  She did some

9    training with me, and Ashley as well.

10   **Q.**   And when was it that someone, other than you, would do

11   the billing at East Lake Oncology?

12   **A.**   If I wasn't there, and if I got behind.

13   **Q.**   And, um, you mentioned chemotherapy.  How did you

14   receive the information about what chemotherapy to submit

15   claims for?

16   **A.**   That came on the flow sheets.

17   **Q.**   Any other drugs that you received, how did you get that

18   information?

19   **A.**   That came on the flow sheets.

20           MR. TRAGOS:  I'm sorry, I can't hear, your Honor.

21           THE COURT:  Repeat your answer, please.

22           THE WITNESS:  It came on the flow sheets.

23   BY MR. SALTZMAN:

24   **Q.**   And how would you actually submit the billing?  What was

25   the means by which you submitted claims to Medicare or other

1    insurance companies?

2    **A.**    Toward the end it was from eClinicalWorks and using a

3    clearinghouse emdeon.  EClinicalWorks was the electronic

4    medical record.

5    **Q.**    As part of your job at East Lake Oncology, did you ever

6    order any drugs that were given to patients?

7    **A.**    No.

8    **Q.**    Did you ever see invoices that came from drugs that were

9    ordered?

10   **A.**    Occasionally, if I was hunting for something.

11   **Q.**    If we could publish Exhibit 31A.  Is this one of the --

12   is this a type of invoice that you saw when looking at

13   invoices?

14   **A.**    I don't recognize that invoice at all.

15   **Q.**    Could we publish 35A.  Does this look familiar?

16   **A.**    I've seen one like that.

17   **Q.**    Why is it that you would look at an invoice such as this

18   one?

19   **A.**    There was a time when I had to start putting NDC codes,

20   National Drug -- I don't know what the "C" stands for -- but

21   claims started acquiring NDC codes for any drug that was

22   administered to be put on the claim and I needed to find out

23   what those were.

24   **Q.**    If we could zoom in on the center section, and if you

25   can tell me if you see any NDC codes?

1  **A.**   In the fourth from the right you see NDC number, and

2  then those ten digits -- 11 digits.

3  **Q.**   And that is the NDC code?

4  **A.**   That's an NDC code.

5  **Q.**   If we can publish Exhibit 101A, and we go to page 2, I

6  believe, and if we can zoom in on the center section.

7  Actually, let me back up.  If we can zoom out.  Do you recall

8  seeing any invoices like this?

9  **A.**   No.

10  **Q.**   And if you could zoom in on the center section.  If you

11  can just tell me if you see any NDC codes?

12  **A.**   I do not.

13  **Q.**   If we could publish Government Exhibit 201D, and if we

14  can zoom in at the top.  Do you know who created this

15  document?

16  **A.**   I did.

17  **Q.**   Can you tell us what this document is?

18  **A.**   The chemo -- most of -- the most used chemotherapy drugs

19  we had in there, and you can see the -- written in on the

20  side, like, the Abraxane is -- that number is the NDC code,

21  and --

22  **Q.**   You said that you referred to "we."  "These are the most

23  common, I think, chemotherapy drugs 'we' use."  Who did you

24  mean by "we?"

25  **A.**   I'm sorry, the office.

1   **Q.**   That is East Lake Oncology?

2   **A.**   It is.

3   **Q.**   And whose handwriting is on that document?

4   **A.**   That's my handwriting.

5   **Q.**   And if you could just explain to us, looking at the

6   first entry on the upper left, what that indicates?

7   **A.**   The J code is the 9264.  The Abraxane at 1 milligram.

8   The written numbers next to that is the NDC code, and I

9   believe the amount was how much reimbursement it was for the

10  drug.

11  **Q.**   Is J9264 the code for Abraxane?

12  **A.**   The J code, yes, sir.

13  **Q.**   Did you ever come across names of drugs on flow sheets

14  that you did not recognize?

15  **A.**   Occasionally.

16  **Q.**   What did you do if that happened?

17  **A.**   I would go to the nurses and say, "What is this drug."

18  **Q.**   What is shown on this document that are next to the

19  J codes that you talked about?  Are these the active

20  ingredients for the drugs or a trade name?

21          MR. TRAGOS:  Objection, foundation.

22          THE COURT:  Lay a foundation.

23  BY MR. SALTZMAN:

24  **Q.**   Do you know what the difference is between an active

25  ingredient and a tradename?

1    **A.**   No, sir.

2    **Q.**   How did you use this sheet of paper in your job?

3    **A.**   It was -- I put it together -- like I said, the most

4    commonly used drugs it was easier to look at that than to

5    look through the HCPCS book for drug codes that I did not

6    know.

7    **Q.**   And if we could go to the next page.  What is the

8    difference between the last page and this page?

9    **A.**   One is chemotherapy drugs, the others are not.

10   **Q.**   And why was the document organized in this fashion?

11   **A.**   Other than just being organized, there really wasn't any

12   reason.

13   **Q.**   I put on the -- up at the bench, I believe, Government

14   Exhibit 201D1.  Do you see that?

15   **A.**   Yes.

16   **Q.**   Have you seen that document before today?

17   **A.**   I have.

18   **Q.**   How do you recognize that as a document you have seen

19   before today?

20   **A.**   My initials are on it.

21   **Q.**   Can you explain what the relationship is between

22   Exhibit 201D1 and Exhibit 201D that is shown on the screen

23   right now?

24   **A.**   201D1 -- between 201D1 and what's on the screen?  Is

25   that your question?

1    **Q.**    Yes.  Bear in mind we're looking at page 2 of

2    Exhibit 201D right now.

3    **A.**    This one is highlighted, that one is not.

4    **Q.**    Who put the highlighting on Exhibit 201D1?

5    **A.**    I did.

6    **Q.**    And who asked you to do that?

7    **A.**    I want to say Detective Larson, I believe.

8    **Q.**    When you put the highlighting on there, what did that

9    indicate that you put the highlighting on there?

10   **A.**    That I recognized the drug.

11   **Q.**    What does that mean about the code that's next to the

12   drug?

13   **A.**    The J code?

14   **Q.**    Yes, ma'am.

15   **A.**    That's how the drug would be billed to the insurance

16   companies.

17   **Q.**    And is -- other than the highlighting that you just

18   described is 201D1 a true and accurate copy of Exhibit 201D?

19   **A.**    Yes.

20            MR. SALTZMAN:  At this point, the Government moves

21   for the admission of Exhibit 201D1.

22            MR. TRAGOS:  No objection.

23            THE COURT:  Is 201D1 in?

24            MR. SALTZMAN:  201D is in evidence.

25            MR. TRAGOS:  201D and D1 are the same except for

```
 1   the highlights?

 2               MR. SALTZMAN:  Yes, sir.

 3               MR. TRAGOS:  We object as to reference.

 4               THE COURT:  Overruled.

 5               MR. SALTZMAN:  If we could publish 201D1.  Your

 6   Honor, if could I approach to get the exhibit?

 7               THE COURT:  All right.

 8   (Government's Exhibit No. 201D1

 9   admitted into evidence.)

10   BY MR. SALTZMAN:

11   Q.   Is this the exhibit you just described?

12   A.   Yes.

13   Q.   And the yellow highlighting that you just described?

14   A.   Yes.

15   Q.   And if we could just look at, um, in the right column

16   I'm just going to point to J9310.  Do you see that?

17   A.   Yes.

18   Q.   Do you know if J9310 is the code for Rituxan?

19   A.   It was then.

20   Q.   And do you know if J9310 is also the code for MabThera?

21   A.   For what?

22   Q.   MabThera.

23   A.   I don't know that drug.

24   Q.   And a few lines down do you see J9033, pointing to it

25   right now with my pen?
```

**A.**   Yes.

**Q.**   And do you know if J9033 is the code for Treanda?

**A.**   Yes.

**Q.**   And do you know if J9033 is also the code for Ribomustin?

**A.**   I don't know that drug.

**Q.**   And going to the next page of the document, on the left side.  Do you see where I'm pointing to J2505?

**A.**   Yes.

**Q.**   Is that the code for Neulasta?

**A.**   Yes.

**Q.**   Is that also the code for Neulastim?

**A.**   I've heard of that, but I don't know.

**Q.**   And on the right side do you see where it says J0885?

**A.**   Yes.

**Q.**   Is that the code for Procrit?

**A.**   Yes.

**Q.**   Is that also the code for Eprex?

**A.**   I do not know that drug.

**Q.**   We haven't talked about all the codes here, but are the other codes that are highlighted accurate with the codes matching up with the drug?

**A.**   Yes.

MR. SALTZMAN:  If we could switch back to the computer and publish Government Exhibit 13F, and I believe a

1   copy is also up on the table.  If you can take a look at 13F,

2   as in Frank.

3   BY MR. SALTZMAN:

4   **Q.**   Have you seen this document before?

5   **A.**   Yes.

6   **Q.**   Excuse me?

7   **A.**   Yes.

8   **Q.**   And how do you know that?

9   **A.**   My initials are on it.

10  **Q.**   And what drug does this document relate to?

11  **A.**   Oxyplatin and Eloxatine.

12  **Q.**   On the left side do you see a reference to an HCPCS

13  code?

14  **A.**   Yes.

15  **Q.**   What is the reference on the other side?

16  **A.**   J9263.

17  **Q.**   Is that the code for that drug?

18  **A.**   Yes.

19  **Q.**   And if we can publish Exhibit 13H?  Zoom in at the top.

20  What drug does this relate to?

21  **A.**   Boniva.

22  **Q.**   Do you see HCPCS code J1740?

23  **A.**   I do.

24  **Q.**   Is that the code for that drug?

25          MR. TRAGOS:  Objection, predicate, your Honor,

1  foundation.

2  BY MR. SALTZMAN:

3  **Q.**   Do you know if that's the code for that drug?

4  **A.**   Sitting here right now, no.  But a J code is a code for

5  a drug.

6  **Q.**   Before today did you review this document Government

7  Exhibit 13H?

8  **A.**   Yes.

9  **Q.**   Did you confirm before today if this code matches this

10 drug?

11 **A.**   Yes.

12 **Q.**   And is that the right code for that drug?

13 **A.**   That is.

14 **Q.**   I would like to talk about the payment responsibility of

15 patients at East Lake Oncology, for a moment.  What, if any,

16 payment responsibilities did patients have when a drug was

17 administered at East Lake Oncology?

18 **A.**   It would depend on if the patient had insurance, and we

19 submitted the claim to the insurance or if the patient was

20 "cash pay."

21 **Q.**   So let's talk about Medicare.  What was the

22 responsibility if they had Medicare?

23 **A.**   We would submit the claim to Medicare, Medicare would

24 then either submit to their secondary, if they had one.  If

25 they didn't, then the patient's responsibility was their

1    20 percent co-insurance.

2    **Q.**    And if there was a responsibility for a patient, who

3    collected those payments?

4    **A.**    I would say -- we would send the statements out to --

5    either Ashley or myself would send statements out to the

6    patients.

7    **Q.**    And then, who would receive those payments, if at all?

8    **A.**    Ashley and/or I.

9    **Q.**    If a patient did not make a payment after a statement

10   comes out, what would East Lake Oncology do?

11   **A.**    They would --

12           MR. TRAGOS:  Objection, your Honor.  Sidebar.

13           THE COURT:  Approach the bench.

14           (Sidebar conference held.)

15           MR. TRAGOS:  Your Honor, we object based on 403 and

16   relevance.  What they are going to try to do is characterize

17   her as some kind of predatory collector.  That these people

18   are dying of cancer, they can't pay their bill, she goes out

19   and tries to collect that money from them.  It has nothing to

20   do with any of the charges, but is basically a character

21   assassination without any relevance or connection to any of

22   the charges.  So they are going into collection efforts now

23   on patients, and they have provided us with some documents

24   and that's where I think they are going.

25           THE COURT:  Response.

```
 1              MR. SALTZMAN:  Your Honor, we are not going to
 2    elicit testimony to make it appear that she is a predatory
 3    collector.  There are situations, only handfuls, which I
 4    think testimony will bear out, there were only a handful in
 5    situations where patients were sent to the collections.
 6              Additionally, the mail fraud charge, one (sic) of
 7    the victims are patients, and so, in this particular
 8    situation we're going to be showing documents to show that
 9    patients paid money based on the false representations that
10    the drugs they were getting were FDA-approved.  So it goes
11    directly to the evidence and the charges in this case, and
12    it's not being submitted for any other purpose.
13              MR. TRAGOS:  I understand patients paid money, but
14    they are going into collection efforts, and that's what -- my
15    concern is, for instance, they are going to show that some
16    lady didn't pay her bill, and now my client tried to collect
17    the money from that lady, and it doesn't go to anything that
18    has anything to do with the case, and the charges, and just
19    -- again, they are just trying to show that the probative
20    value, definitely not only does not outweigh the prejudice
21    showing my client collects money.
22              THE COURT:  Your last question was, "if Medicare
23    didn't cover the entire bill, what would you do?"  Wasn't
24    that the question.
25              MR. TRAGOS:  No, it was the next question.
```

1          MR. SALTZMAN:  If the patient continued not to pay,

2    what would you do.

3          THE COURT:  So the answer would be, we would seek

4    payment from the patient or from supplemental insurance.

5          MR. TRAGOS:  Which I don't have any problem with

6    that answer.

7          THE COURT:  And you can just leave it at that.

8          (Back before the Jury.)

9    BY MR. SALTZMAN:

10   **Q.**   I think the pending question was if a patient did not

11   pay their bill, what did East Lake Oncology do?

12   **A.**   Send another statement.

13   **Q.**   What, if anything, did East Lake Oncology do if they did

14   not pay after that?

15         MR. TRAGOS:  Objection.

16         THE COURT:  Overruled.

17         THE WITNESS:  It would depend on how long the

18   amount -- the amount of the patient's responsibility, and how

19   long it was out there.  If it was on the AR, the aging

20   report, as we were working them, I would ask Dr. Norbergs if

21   the patient should be sent to collections.

22   BY MR. SALTZMAN:

23   **Q.**   And do you recall a patient by the name of --

24         MR. TRAGOS:  Objection, your Honor, sidebar.

25         THE COURT:  Overruled.

1          MR. TRAGOS:  I object to the question.

2          THE COURT:  Overruled.

3    BY MR. SALTZMAN:

4    **Q.**   Do you recall a patient by the name of Crystal King?

5    **A.**   Yes.

6    **Q.**   If we could publish Government Exhibit 332I.  If we can

7    zoom in.

8          MR. TRAGOS:  Your Honor, we object based on 403 and

9    relevance with this particular document.

10         THE COURT:  It's already in evidence.

11         MR. TRAGOS:  We did object, your Honor.  We would

12   like to renew our objection because we did not stipulate to

13   this document.  We preserved our objections on this document.

14         THE COURT:  All right.  Approach the bench and

15   bring your copy of the document.

16         (Sidebar conference held.)

17         THE COURT:  What is it you are going to ask her

18   about.

19         MR. SALTZMAN:  Your Honor, if I can get my outline?

20         THE COURT:  All right.

21         MR. SALTZMAN:  Your Honor, in this document we are

22   showing that Ms. McKenna, who's the witness right now, who's

23   going to be testifying to the notes that were taken in here

24   and what this document shows is that this patient had been

25   seeing Dr. Norbergs, this is Crystal King, she had Medicare,

1   and she had a responsible portion of the 20 percent

2   co-insurance, and this shows the efforts that were made to

3   collect on this.  This document -- there were other

4   documents, which based on the Court's ruling, I'm not

5   planning on showing, but this document shows the efforts that

6   were made to collect on it.  Other documents show she was

7   sent to collections.  Given the Court's ruling I won't go

8   into that.  But this is important to show the efforts that

9   she was making to buy drugs at cheaper prices, submit claims

10  for reimbursement.  At this point, when she got the

11  80 percent payment, she already made money on the drug, and

12  it shows the point of this document is to show it didn't

13  matter.  She then continued to seek additional money from

14  this patient for a drug that she gave to them that was not

15  FDA-approved.

16          THE COURT:  You already got in evidence when it

17  didn't cover the full amount they would seek further

18  collection efforts.

19          MR. SALTZMAN:  That's true.

20          THE COURT:  So this is cumulative.

21          MR. SALTZMAN:  If I could have a moment, your

22  Honor.

23          THE COURT:  Yes.

24          MR. SALTZMAN:  I mean -- I thought I said this

25  already.  Mr. Trezevant says maybe I should elaborate that

1   the 20 percent -- this is the 20 percent that --

2           THE COURT:  That Medicare did not cover.

3           MR. SALTZMAN:  -- that Medicare did not cover, and

4   that she is going after that portion that is above and beyond

5   what Medicare has paid, and above and beyond what she should

6   be paid based on the 20 percent of the other -- 20 percent of

7   the other costs.

8           THE COURT:  What do you mean, "20 percent of the

9   other costs?"

10          MR. TREZEVANT:  The lower costs.

11          MR. SALTZMAN:  Right.  She's been reimbursed

12  80 percent.  That 80 percent that she was -- 80 percent that

13  was reimbursed already cleared the cost of what she made in

14  this drug.  What we believe the MabThera and Rituxan -- at

15  this point, we are wanting to get additional documents in

16  evidence showing that cash was actually collected from this

17  patient in efforts to get any additional money that they

18  could from patients for the administration of this unapproved

19  drug.

20          THE COURT:  Objection is sustained.

21          (Back before the Jury.)

22          MR. TRAGOS:  Your Honor, so the record is clear --

23          THE COURT:  The objection is sustained on 403(b).

24          MR. TRAGOS:  And similar, these came in evidence,

25  the Court has to strike them.

 1          THE COURT:  You have to make whatever objections

 2    you think are appropriate.

 3    BY MR. SALTZMAN:

 4    **Q.**    Is the electronic submission of a claim, is that the

 5    same or different than the type of information included on a

 6    form 1500?

 7    **A.**    It's the same information.

 8          MR. SALTZMAN:  No further questions, your Honor.

 9          THE COURT:  Cross.

10                    **CROSS-EXAMINATION**

11    **BY MR. TRAGOS:**

12    **Q.**    Ma'am, MabThera, Ribomustin, Neulasta, Eprex, you had

13    never heard of those drugs, is that correct?

14    **A.**    I do not know those drugs, no, sir.

15          MR. TRAGOS:  That's all the questions I have.

16          THE COURT:  Any redirect?

17          MR. SALTZMAN:  No, your Honor.

18          THE COURT:  Thank you.  You may step down.

19    (Witness excused.)

20

21

22

23

24

25

1                        CERTIFICATE OF REPORTER

2

3     COUNTY OF HILLSBOROUGH      )

4                                 )  SS.

5     STATE OF FLORIDA            )

6

7     I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER, REGISTERED

8     PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

9     COURT FOR THE MIDDLE DISTRICT OF FLORIDA, DO HEREBY CERTIFY

10    THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS

11    AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME

12    WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF

13    COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT

14    THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC

15    NOTES.

16

17

18    DATE: 3/22/2016

19

20    S:/MELISSA A. PIERSON

21    MELISSA A. PIERSON, CA/CSR 12499

22    IL/CSR 084.003138, RPR

23    FEDERAL OFFICIAL COURT REPORTER

24

25